Page 1

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                    EL PASO DIVISION

**Exhibit FF**

4   - - - - - - - - - - - - - - - - - - - - - - - - - -

5   Joseph Carrillo,        Case No. 3:21-cv-00026-FM

6            Plaintiff,

7        v.

8   Union Pacific Railroad Company,

9            Defendant.

10  - - - - - - - - - - - - - - - - - - - - - - - - - -

11               REMOTE DEPOSITION OF

12               DR. JOHN CHARBONNEAU

13

14

15  DATE:    November 18, 2021

16  TIME:    1:01 p.m. CST

17  PLACE:   Veritext Virtual Videoconference

18

19

20

21

22

23

24  REPORTED BY:  Jayne M. Seward, RPR

25  Job No:  4889286

Page 2

1      * * APPEARANCES * *

2

3

4 On Behalf of the Plaintiff:  (via videoconference):

5      James H. Kaster, Esquire

6      Nichols Kaster, PLLP

7      4700 IDS Center

8      80 South Eighth Street

9      Minneapolis, Minnesota 55402

10      (612) 256-3200

11      kaster@nka.com

12

13 On Behalf of the Defendant:  (via videoconference):

14      Robert L. Ortbals, Esquire

15      Constangy, Brooks, Smith & Prophete, LLP

16      680 Craig Road

17      Suite 400

18      St. Louis, Missouri 63141

19      (314) 338-3740

20      rortbals@constangy.com

21

22

23

24

25

Page 3

1            I N D E X

2

3 WITNESS:  DR. JOHN CHARBONNEAU

4

5 EXAMINATION:

6 By Mr. Kaster:  4 - 46

7

8 EXHIBITS MARKED:

9 EXHIBIT 53:  Email chain, top Gengler to

10      FWESTERN@UP.com, 2-2-18....................31

11      UPCARRILLO2039 - 2040 - CONFIDENTIAL

12 EXHIBIT 54:  Holland to Frankel letter,

13      1-10-18...................................48

14      UPCARRILLO000411 - 414 - CONFIDENTIAL

15

16

17

18

19

20

21

22 REPORTER'S NOTE:  All quotations from exhibits are

23 reflected in the manner in which they were read into

24 the record and do not necessarily indicate an exact

25 quote from the document.

Page 4

1            P R O C E E D I N G S

2            DR. JOHN CHARBONNEAU,

3 duly sworn, was examined and testified as follows:

4            EXAMINATION

5 BY MR. KASTER:

6      Q.   Dr. Charbonneau, I know you've been

7 deposed previously.  I'm familiar with your

8 depositions in other cases that you have appeared on

9 behalf of Union Pacific, so I won't spend too much

10 time with the ritual.

11            I'll just tell you that if you don't

12 understand my question, please ask me to repeat it.

13 I'm happy to clarify.

14      A.   I'll do that.

15      Q.   If you need a break at any point -- I

16 don't anticipate this being a long deposition.  I

17 assume it will take an hour to an hour and a half,

18 but if you need a break during that time, just let

19 me know.

20      A.   I will do that.

21      Q.   You've been placed under oath here today.

22 What does that mean to you?

23      A.   As the oath says, I'm sworn to tell the

24 truth and answer your questions truthfully and

25 completely.

Page 5

1      Q.   Do you still have a relationship with

2 Union Pacific Railroad?

3      A.   I do.

4      Q.   And what is your relationship?

5      A.   I am the associate medical director in

6 Health and Medical Services.

7      Q.   And how long have you worked in that

8 capacity?

9      A.   Well, I've been doing work for Union

10 Pacific for 32 years.  I actually started in

11 November of 1989.  I -- along the way there have

12 been multiple titles, but, for all intents and

13 purposes, it's always been to make fitness-for-duty

14 determinations.

15      Q.   And your educational background?

16      A.   Undergraduate a double major in biology

17 and chemistry.  I have a medical degree from Indiana

18 University.  Internship in general surgery at the

19 University of Colorado Health Sciences Center and an

20 occupational medicine residency at the University of

21 Utah.

22      Q.   And so for the past 30 or more years

23 you've been doing fitness-for-duty determinations

24 for Union Pacific?

25      A.   Yes, that's been part of my work.

2 (Pages 2 - 5)

Page 6

1    Q.  So explain that answer, please.
2    A.  I've also been a practicing occupational
3  medicine physician throughout essentially all of
4  that time.  So until the last three years my work
5  for Union Pacific Railroad was only part-time, and I
6  was a practicing clinician and a consultant
7  occupational medicine physician.  I really have done
8  that work since 1978.  But even while I've done some
9  work for Union Pacific, I have had other jobs or
10  positions or other work to do along the way.
11    Q.  So it sounds like three years ago you
12  started as a full-time associate medical director,
13  correct?
14    A.  Yes.  What happened on August 30th of 2018
15  I stopped seeing patients, and so the only work that
16  I'm doing now is when I work for Union Pacific
17  Railroad.
18    Q.  What caused that event to occur from Union
19  Pacific's side?  Do you know?
20    A.  I'm sorry.  I don't understand that
21  question.
22    Q.  Okay.  Let me put it in plain English.
23  Why did they hire you as a full-time associate
24  medical director?  Do you know?
25    A.  Well, first of all, I'm still a

Page 7

1  consultant.  And, number two, nothing really changed
2  much at Union Pacific Railroad's end.  I just
3  stopped seeing patients at 41 years of doing it.
4        And so since I stopped seeing patients,
5  I've been doing a little bit more work.  I'm the
6  only associate medical director now, so my work has
7  kind of expanded to fill my available time.  And so
8  the change -- it wasn't so much on UP's end as on my
9  end.
10    Q.  How are you paid?
11    A.  I have a contract with Union Pacific
12  Railroad.  There is a retainer for up to 100 hours
13  per month.  And if I go over that, I just bill them
14  on an hourly basis.  It's -- it's still the same
15  basic hourly rate but it just --
16    Q.  Which is what?
17    A.  $180 per hour.  And, Mr. Kaster, just --
18  just to make sure that I've clarified, the retainer
19  is $18,000 per month because it's for 100 hours per
20  month.  But if I go over that, particularly now
21  since we don't have any other associate medical
22  directors, I just bill them for the additional hours
23  at the same rate, $180 per hour.
24    Q.  Do you get paid a particular number of
25  hours for a particular rate for reviewing a

Page 8

1  particular employee's fitness-for-duty
2  determination?  In other words, is it by the head?
3    A.  No.  It's by the time spent.
4    Q.  So it doesn't matter how many or how
5  few people you review; it's the amount of time
6  spent?
7    A.  Yes, that's fairly said.  Again,
8  there's a 100-hour minimum per month, and I can't
9  remember the last time it was under 100 hours worth
10  of work in a month.  And if I go over 100 hours, I
11  bill them by the hour for time spent.
12    Q.  Do you have a target amount of time that
13  you are dedicating to a given person's case?
14    A.  No.  Just as long as I -- whatever time it
15  takes me to do the cases that I need to do on any
16  given day, that's what I've spent.
17    Q.  Is there a typical amount of time spent on
18  a given case?
19    A.  No.  It really depends on the nature of
20  the medical conditions involved, the complexity of
21  the case, things like that.  And volume of records.
22  In this day and age, with electronic medical
23  records, we get huge volumes of records sometimes.
24    Q.  Are you a neurologist?
25    A.  No.

Page 9

1    Q.  Have you ever proclaimed that you are an
2  expert in neurology?
3    A.  No.
4    Q.  You've not held yourself up as an expert
5  in neurology?
6    A.  No.
7    Q.  Do you remember Joseph Carrillo's case?
8    A.  I do now because I've been preparing for
9  this deposition.  When I was notified that I had to
10  do a deposition, I didn't remember the case.
11    Q.  What do you remember now that your
12  recollection is refreshed?
13    A.  Well, I've been through all the records
14  start to finish and all the entries in eHealthSafe
15  and things like that.  So I understand what the
16  questions were at the beginning, the processes we
17  went through and the decisions that were made.
18    Q.  Did you receive any kind of incentive
19  compensation from Union Pacific Railroad for
20  anything?
21    A.  Anything to do with this case do you mean
22  or what?
23    Q.  In particular certainly, but do you
24  receive any kind of incentive compensation from
25  Union Pacific?

3 (Pages 6 - 9)

Page 10

1    A.   No.  Again, we talked before about the
2  basic financial agreement.  And when I do legal
3  work, that's billed outside of those hours in the
4  retainer that we talked about.
5    Q.   So legal work being like this deposition
6  today?
7    A.   Depositions and trial testimony, yes, sir.
8    Q.   And what is that rate?
9    A.   It is variable.  There's -- there's a rate
10  for travel, and that is, I think, $150 per hour.
11  There is a rate for review of medical documents in
12  preparation, and that's $300 per hour.  Depositions
13  are done at $500 per hour.  And if I go to trial, I
14  think -- I'd have to look at the contract.  It's
15  either 700 or $750 per hour.
16    Q.   On how many occasions have you been to
17  trial defending Union Pacific related to a
18  fitness-for-duty evaluation?  Do you know?
19    A.   Well, when I'm involved it's almost always
20  for fitness-for-duty evaluations, so there are kind
21  of two basic categories.  One would be on-duty
22  injuries or alleged on-duty injuries, and the other
23  would be off-duty medical conditions such as
24  Mr. Carrillo's case.
25    Q.   So how many times?

Page 11

1    A.   I'm often asked that.  I'm going to tell
2  you about 50, I think, over the 32 years.  Early on
3  it was mostly on-duty injury cases, and the last two
4  or three years more off-duty medical conditions.
5    Q.   More disqualification based on
6  restrictions you mean?
7    MR. ORTBALS:  Objection to the form of the
8  question.  It's argumentative.  You can answer.
9    THE WITNESS:  Okay.  It is the -- my
10  involvement has been to explain the decision making
11  that we've made in a case.  I mean, obviously we
12  wouldn't be doing a deposition if there weren't
13  litigation involved.  So it's -- it has to do with
14  decisions, fitness-for-duty decisions that we have
15  made along the way.
16  BY MR. KASTER:
17    Q.   Which resulted in people losing their
18  jobs?
19    MR. ORTBALS:  Objection, form.  You can
20  answer.
21    THE WITNESS:  Okay.  I don't know if
22  they -- if they've lost their jobs.  I'm not
23  involved with things after the fitness-for-duty
24  determination is made.  I don't always know what the
25  outcome of the case is.  Such as in Mr. Carrillo's

Page 12

1  case, I didn't know what happened after the
2  fitness-for-duty determination had been made.  So
3  I'm -- I don't know always what the final outcome is
4  about a combination of the restrictions or final
5  placement and things like that.
6  BY MR. KASTER:
7    Q.   Has there been any change in the rules or
8  procedures regarding fitness-for-duty evaluations
9  since Dr. John Holland has departed?
10    A.   I would tell you that basically the way we
11  do our job on a day-to-day basis has not changed.
12    One step that has changed is, when we make
13  a final fitness-for-duty determination and someone
14  notifies the employee, either I or our new chief
15  medical officer, Dr. Laura Gillis, is on the call,
16  and we kind of do the explaining of the
17  fitness-for-duty process and the decision to the
18  employee.
19    So the doctors making the decisions now
20  participate in the calls notifying the employee.
21  Beyond that, it's pretty much the same process.
22    Q.   Is that a communication that can result in
23  a change of mind?
24    A.   We explain the process -- excuse me.  I'll
25  tell you how I do the calls.  I explain the

Page 13

1  fitness-for-duty process undertaken.  I tell them
2  what the decision has been.  If it ends in
3  restrictions, I explain what the restrictions are,
4  and I always, as part of those calls, ask the
5  employee if there is anything they want to say or if
6  they have any questions for me.
7    We -- it can end in a give-and-take
8  discussion whereby we agree to go back and get more
9  information, if needed.  That -- I will tell you
10  that doesn't happen very often because we spend a
11  lot of time getting the medical records that we need
12  to make the decision in the first place.
13    So I won't -- I won't say that very many
14  have been changed or we've gone through another
15  iteration of looking at information, at least not
16  with that initial call to explain the
17  fitness-for-duty determination.  So it can, but
18  honestly it doesn't happen very often just because
19  of the diligence we do before we make the decision.
20    Q.   How many times has it happened?
21    A.   As I've said, there's the first iteration
22  is what I'm involved in.  There have been
23  reconsideration cases that go to the chief medical
24  officer.  So I don't know how often something like
25  that leads to a different decision or amending the

4 (Pages 10 - 13)

Page 14

1  decision.  I'm just not involved in that.
2      I was involved in a case recently where
3  we're trying to determine whether a guy had a TIA or
4  he had symptoms related to a migraine.  So when I
5  called to tell him about the decision, we agreed to
6  get further clarification from his neurologist, and
7  that process is ongoing right now.
8      Q.  How many times have you changed your mind?
9      A.  Well, I -- it's not a matter of changing
10 the mind.  It's being open to submission of
11 additional information and changing the decision if
12 it's warranted.  I will -- and, as I said earlier,
13 that doesn't happen very often because of the
14 diligence we try to do before we make the initial
15 decision.
16     As far as how often the chief medical
17 officer might change the decision later based on new
18 information or input from an outside expert, I can't
19 tell you how often that happens.  I'm not aware of
20 that.
21     Q.  You still don't do a physical exam of that
22 patient or employee, right?
23     A.  Do I do a hands-on physical examination?
24     Q.  Does anyone in the fitness-for-duty
25 department do a hands-on physical evaluation as a

Page 15

1  part of the fitness-for-duty process?
2      A.  No.  We rely on medical records submitted
3  by the employee.
4      Q.  Were you the decision maker in
5  Mr. Carrillo's case?
6      A.  I was involved in the case up to the time
7  we requested an outside opinion from Dr. Frankel,
8  and after that I don't believe that I was involved
9  in the case.  So I did not make the final decision
10 in his case.
11     Q.  Who did?
12     A.  Dr. Holland.
13     Q.  Well, Dr. Holland made the decision in
14 June of 2018.  Are you aware of that?
15     A.  Based on what I reviewed, that's when he
16 wrote up his memo, that's correct.
17     Q.  Do you know when Dr. Frankel submitted his
18 outside opinion?
19     A.  Dr. Holland put in his memo that he had
20 talked with Dr. Frankel and based his final decision
21 on the medical information to that point, plus his
22 conversation with Dr. Frankel.  I believe
23 Dr. Frankel's report came in later than that, a
24 month or two later.
25     Q.  August of 2018, right?

Page 16

1      A.  I don't remember the date.  That's about a
2  month or two later than June, so, yes.
3      Q.  Okay.  Did you ever look at drafts of his
4  report?
5      A.  Of whose report?
6      Q.  Dr. Frankel's report.
7      A.  No.  I don't think I was involved in the
8  case after we sent the case to Dr. Frankel for his
9  review.
10     Q.  It looks to me, from records, that
11 Dr. Frankel was reviewing quite a few reports on a
12 monthly basis.
13     Do you recall that?
14     A.  No.  In fact, I didn't have much
15 interaction with Dr. Frankel in my cases to -- to
16 the best of my recollection.  The way it was
17 ultimately set up is that it could have gone to a
18 number of neurologists in the department at the
19 University of Nebraska Medical Center.
20     Q.  As a regular ordinary course of business,
21 did the fitness-for-duty evaluators from Union
22 Pacific, such as yourself, see drafts of reports
23 from the so-called independent expert?
24     MR. ORTBALS:  Objection to form.  It's
25 argumentative.  You can answer.

Page 17

1      THE WITNESS:  I don't believe that I saw
2  drafts of any such reports.  I suppose it's possible
3  that I could have seen kind of their first
4  submission and later they were asked to look at
5  additional information, but I can't even remember
6  one of those cases off the top of my head, and so I
7  did not routinely look at drafts from the outside
8  experts.
9  BY MR. KASTER:
10     Q.  My question is different than that.  You
11 said:  I cannot remember "routinely" looking at
12 drafts.
13     Did you ever look at a draft from an
14 independent expert?  Yes or no?
15     A.  I don't believe so, no.
16     Q.  Okay.  I'm going to share a document on
17 the screen that is the Medical Comments History for
18 Mr. Carrillo.  I'm sure that you probably reviewed
19 this in preparation for your deposition here today.
20     Is that right?
21     A.  I reviewed the Medical Comments History
22 from the case.  I'm presuming the one I read is
23 Bates labeled so I'm presuming it's the same one
24 that you're going to put up.
25     Q.  Let me share my screen here.

5 (Pages 14 - 17)

Page 18

1      THE REPORTER:  I believe this was marked
2  yesterday, Jim?
3      MR. KASTER:  Yes.
4      THE REPORTER:  As Exhibit 51?
5      MR. KASTER:  51.  That sounds right,
6  Jayne.  Thank you.
7  BY MR. KASTER:
8      Q.  Do you see the Medical Comments History,
9  Doctor?
10     A.  Yes, I do.
11     Q.  So I've highlighted a particular entry
12  here.  It's Bates 89.  This is the entry for
13  December 8 of 2017.
14         Did you write this entry?
15     A.  Are you talking about the one that starts
16  with the word "Bridgette"?
17     Q.  Yes.
18     A.  Yes, I did author this.
19     Q.  It says "The employee has provided
20  records from two providers in his neurologist's
21  office, Dr. Aguilar and his nurse practitioner.  All
22  of those notes are meticulously documented.  The
23  notes demonstrate that since the LOC event" --
24  that's the loss-of-consciousness event -- "in late
25  June of 2017, the employee has had; 1, headaches, 2;

Page 19

1  memory problems, 3; light sensitivity, 4; weight
2  loss, 5; fatigue/weakness, amongst other symptoms.
3  The employee's brain MRI and EEG are reported as
4  normal.  We still do not have the ETT report."
5         What's an ETT report?
6      A.  Exercise Tolerance Test.
7      Q.  "The neurologist is considering several
8  diagnoses which include; Episode of
9  unresponsiveness; Single unprovoked seizure; single
10  provoked seizure."
11        Then you say "He is still on activity
12  restrictions for driving/safety sensitive
13  activities.  He has been referred to the Mayo Clinic
14  for additional evaluation.  He will be seen in
15  follow up by his neurologist in January, 2018."
16        Then you say "The employee remains not fit
17  for duty.  2, the available documentation points to
18  a seizure."
19        What pointed to a seizure?
20     A.  Just, first, as a point of clarification,
21  this was written on December 8th of 2017, as you
22  correctly said.  By this time we had been working on
23  this case for several months, and so this is the
24  most recent information and I'm summarizing this new
25  submission of information.  This builds upon all of

Page 20

1  the other information that we had and reviewed to
2  that point.  So, again, the note speaks for itself;
3  it's taken right from Dr. Aguilar's note.
4         So the process of him getting up, taking a
5  shower, probably brushing his teeth, and then
6  heading back to the bedroom when he had this
7  precipitous loss-of-consciousness event, part of
8  which was witnessed by his wife, referred to as
9  girlfriend in one or two records I believe, with him
10  being unconscious, some jerking motions, and a
11  period of loss of consciousness and a period of
12  confusion afterwards.
13        So it was this, and the other information,
14  the absence of an obvious cardiology problem, and
15  then this new information on the neurologic front.
16        So, again, we try -- you've seen my notes.
17  They're fairly thorough when I write them and we --
18  each new submission of information builds upon the
19  foundation of the other information that we have.
20        So at this point I thought this was a
21  seizure, and we were doing the diligence trying to
22  twice check our work by having an outside doctor
23  take a look at it, and this was standard for me
24  to -- to request authorization for an outside
25  neurology review.

Page 21

1      Q.  All right.  Well, you understand that a
2  treating neurologist rendered a differential
3  diagnosis.
4         You understand that, right?
5      A.  Yes.
6      Q.  The treating neurologist who had examined
7  Mr. Carrillo had been unable to reach a definitive
8  diagnosis.
9         You're aware of that?
10     A.  Yes.  And what he did -- again --
11     Q.  I didn't ask you what he did.  I said -- I
12  asked you a simple question.  Now, this can be a
13  short deposition or a very long one depending on if
14  you want to answer my questions.
15        So the treating neurologist was unable to
16  render a definitive diagnosis.
17        Is that true?
18     A.  That's true.  He didn't come down to a
19  final one-item diagnosis.
20     Q.  Did you?
21     A.  I came -- again, putting things in
22  context, he comes up with an MDM, Medical Decision
23  Making, or a differential diagnosis, another term
24  essentially for the same thing, and he embarked upon
25  a medical evaluation that -- that kind of eliminated

6 (Pages 18 - 21)

1 some of those options.
2       And so it appeared to me that the totality
3 of the information available pointed to a seizure.
4 I recognized the possibility that it would be a
5 single episode was a possibility, and I asked for
6 the neurology evaluation to help us sort out the
7 probabilities, if you would.
8    Q.   So you asked for a further neurology
9 review?
10   A.   Yes, that's what the last line in this
11 note says.  I was asking for authorization for a
12 neurology file review.
13   Q.   So did you render a definitive diagnosis?
14   A.   I, like Dr. Aguilar, narrowed down the
15 possibilities, and in an effort to make the best
16 decision we could make on the available information,
17 we asked for a neurology file review.  As I said
18 earlier, I wasn't part of the final decision making,
19 and Dr. Holland made the final decision.
20   Q.   Did you render a definitive diagnosis?
21   A.   Again, I think that I narrowed down the
22 possibilities to syncope versus an unprovoked
23 seizure, and that's what we asked Dr. Frankel to
24 help us sort out.
25   Q.   Well, syncope is simply the loss of

1 consciousness precipitated by something going on
2 with your heart, right?
3    A.   There -- there can be multiple causes for
4 syncope.  Most episodes of syncope are
5 cardiovascular in nature.
6    Q.   So were you able to say one way or the
7 other it's a seizure or it's syncope?
8    A.   As I said, I got to a point where I
9 thought it was one of two diagnoses.  More likely
10 seizure.  Then I asked for the neurology file
11 review.  And, again, a couple times already I've
12 said that I was kind of out of it after that, out of
13 the case after that.
14   Q.   This entry right below here on
15 December 8th of 2017, Bridgette Ziemer says -- now,
16 this is actually -- so we're putting this in the
17 order of time, this is the entry before the entry we
18 were just looking at, right?
19   A.   Yes.
20   Q.   This is 8:15.  Your entry is 8:37 a.m.,
21 right?
22   A.   That's right.
23   Q.   Okay.  "Dr. Charbonneau, this employee
24 submitted all the medical records you requested and
25 responded regarding Gabapentin.  See his email

1 response below.  Please review and advise."
2       Then it says "I have been taking
3 Gabapentin for over two years since my first elbow
4 surgery.  Dr. Llewelyn Williams prescribed it
5 because I had a little numbness after my first
6 surgery on my right elbow.  I have been taking it
7 since then."
8    Q.   So he's taking it for pain, right?
9    A.   Pain and what we call paresthesia.  He had
10 two procedures on his elbow.  He had some residual
11 pain, and he also had some tingling in his hand as a
12 result of an ulnar nerve problem in his elbow.
13      So it's hard to tell from the records
14 exactly why he was taking it.  My sense was that he
15 was taking it for both problems.
16   Q.   For pain and what else?
17   A.   Tingling from his ulnar -- as a residual
18 from his ulnar nerve problem.
19   Q.   All right.  So let's go back in time.
20 We'll go to another record, December 1st of 2017.
21 And this is on Bates page number 90 -- 91.  It looks
22 like it's on 91.
23   A.   Mr. Kaster?
24   Q.   Yeah.
25   A.   May I please stop you for one minute.  I

1 want to change the layout on my computer here.  I
2 have the pictures of you and Mr. Ortbals on the
3 right-hand column.  So I'm not seeing the right-hand
4 margin, and I want to see if I can get those.
5    Q.   Why don't I try this.  Can you read it?
6    A.   It needs to be a little bigger.
7    Q.   Let me try that.
8       MR. ORTBALS:  So, Doctor, if you go up to
9 view options at the top of the screen --
10      THE WITNESS:  Yes.
11      MR. ORTBALS:  -- and click side-by-side
12 mode.
13      THE WITNESS:  Side-by-side speaker or
14 side-by-side gallery?
15      MR. ORTBALS:  You can do either depending
16 on whether you want to see just the speaker or all
17 of us.  Gallery would show you all of us.  Speaker,
18 I think, would just show the speaker.
19      THE WITNESS:  Yeah, that's where I was.
20 Let me see something here.  No, I can't make that
21 any bigger.  What I was trying to do is get you
22 folks across the top and then I could see what
23 Mr. Kaster puts up.
24      MR. KASTER:  Well, I can make this a
25 little bigger if you can't read it right now.  Now

Page 26

1  can you see everyone and read the document?
2       THE WITNESS: That's getting better. If
3  you could make it just a little bigger, I think it
4  will be adequate.
5       MR. KASTER: Fine. How's that?
6       THE WITNESS: Better.
7       MR. KASTER: Would you like it bigger?
8       THE WITNESS: One more, yes.
9       MR. KASTER: Okay. Does that work?
10      THE WITNESS: I think I can live with
11  that, yes.
12      MR. KASTER: Okay. I wasn't asking you
13  whether you could live or not live with that, but
14  I'm trying to make it convenient for you. So just
15  let me know if you want me to make it a little
16  bigger and I can try.
17      THE WITNESS: As long as we're going to
18  do, like, a paragraph like this, if you could please
19  make it bigger.
20      MR. KASTER: Okay. Because that's what
21  I'm going to do; we're going to focus on this
22  paragraph. How's that?
23      THE WITNESS: Much better.
24  BY MR. KASTER:
25      Q.  So I think this is the first time you

Page 27

1  touched this case, right?
2       A.  Oh, no. I think I was involved before. I
3  think I was involved before this.
4       Q.  Okay. All right. It says -- you talk
5  about: "I did not find the date of the event in
6  these records."
7       Actually, just for the record, there is an
8  entry on July 14th of 2017, which reads as follows:
9  "The employee had a precipitous loss of
10  consciousness and was found on the floor by his
11  wife. (There is no indication of the length of the
12  LOC period) and had bitten his tongue. He must be
13  evaluated for LOC and have seizure ruled out.
14  Action: Not fit for duty. He needs both neurology
15  and cardiovascular evaluations for LOC/seizure.
16  Thanks, Dr. Charbonneau."
17      So there is a prior entry. Do you have
18  those records in front of you? Would you like to go
19  to that record first?
20      A.  Well, if you're going to ask me questions
21  about it, then I think we should go to that entry,
22  yes.
23      Q.  I'm not going to ask any more questions
24  about it. It's just the foundation for your review
25  of this matter, Mr. Carrillo's case.

Page 28

1       A.  Okay. Then we can go forward with this
2  one if you want.
3       Q.  Then you have a description in the first
4  couple sentences, and then you say "All of this
5  sounds like a seizure. He is reported to have no
6  medical conditions, but he takes Gabapentin
7  600 milligrams twice per day. This is a seizure
8  medication."
9       Let me ask you a question. Would it make
10  a difference if this was a provoked seizure, as
11  opposed to an unprovoked seizure?
12      A.  Would it make a difference how so? Do you
13  mean at the final determination?
14      Q.  Yes.
15      A.  Yeah, it would make a big difference.
16      Q.  Because?
17      A.  Because if there is a documentable or
18  credible reason for attributing the seizure to a
19  medical event, let's say, then if you can control
20  the underlying medical event and get it to a point
21  where it's not likely to occur again, then the
22  duration of the medical restrictions is
23  substantially reduced.
24      Q.  Gabapentin is an antiseizure medication,
25  right?

Page 29

1       A.  I believe that that's why it was
2  originally developed, yes. It has other uses, but,
3  yes.
4       Q.  And at the time he wasn't taking the
5  Gabapentin, right?
6       A.  At what time?
7       Q.  At the time of the loss of consciousness
8  event.
9       A.  His report, I believe, was that he had not
10  taken it for four or five days.
11      Q.  Now, you go on to describe the records
12  that you have seen here, and you end with: "I think
13  we will need a neurology file review on this case
14  once we have all of the listed information."
15      Why did you think that you needed a
16  neurology file review?
17      A.  Well, again, it was -- as I said earlier,
18  it's an attempt to be comprehensive in our review,
19  to get as much detailed information as we can, and
20  then to make the appropriate decision in the case.
21      So there's information, cardiovascular
22  information that did not add up to an obvious reason
23  for a syncopal episode. There was information in
24  the -- I'll call it neurologic realm, but it came
25  from multiple providers, that made it sound like a

8 (Pages 26 - 29)

1 seizure.

2      And in the interest of being comprehensive
3 and fair and coming to the right decision, I wanted
4 to have this looked at by an outside neurology
5 expert.

6    Q.   So it was important to have an outside
7 neurology review to be as clear and certain as you
8 could be, right?

9    A.   We wanted to make the best possible
10 decision that we could make given the limitations of
11 our information set, yes.

12    Q.   So that would be important in that
13 circumstance to have an independent neurology
14 review, right?

15    A.   I mean, that's the idea.  We had experts
16 from the University of Nebraska Medical Center who
17 were willing to review the cases, and that's --
18 that's what we did.  That was the -- those were the
19 physicians, the outside physician group that we
20 used.

21    Q.   And you wouldn't want to put your thumb on
22 the scale, right?

23    A.   I didn't put my thumb on the scale, sir.

24    Q.   That wasn't my question.

25      My question is:  In this circumstance,

1 when you're seeking an outside independent review to
2 make certain what the proper and best decision is,
3 would it be important not to put your thumb on the
4 scale?

5    A.   I think that's -- that's routine.  I think
6 it is important not to put the -- our thumb on the
7 scale.

8    Q.   Right.  I'm going to move to a different
9 document here.

10      Do you see this email of February 2nd of
11 2018?

12    A.   I do.

13      THE REPORTER:  Is this a new exhibit,
14 Mr. Kaster?

15      MR. KASTER:  This is a new exhibit.
16 Thank you, Jayne.  And let's be clear about what the
17 Bates numbers are.  I'll get the Bates numbers here
18 so we're clear.  It's 2039 and 2040.  And the number
19 is?

20      THE REPORTER:  The number is 53.

21      MR. KASTER:  Thank you.

22      (Exhibit 53 marked.)

23 BY MR. KASTER:

24    Q.   Dr. Charbonneau, do you recognize
25 Exhibit 53?

1    A.   I do.

2    Q.   You're copied on an email sending the file
3 review materials to Dr. Frankel, the outside
4 neurologist, right?

5    A.   Well, the email at the top is from Deb
6 Gengler, G-E-N-G-L-E-R, the director of Medical
7 Services, to Bridgette Ziemer, and I am copied on
8 that email.  That's right.

9      And basically what it's saying is that
10 prepare the file review to go to Dr. Frankel, and
11 she asked me to write the referral letter.  By this
12 time I had already done it.

13    Q.   And it describes the electrician from
14 El Paso, Texas is currently on medical leave of
15 absence for syncope and collapse, right?

16    A.   SI, I think, stands for sudden
17 incapacitation.  Currently on medical leave of
18 absence for syncope and collapse.

19    Q.   Did you render an opinion that
20 Mr. Carrillo had a greater than 1 percent risk of
21 sudden incapacitation based upon your consideration
22 of his medical records?

23    A.   No.  As I've said a couple times now, I
24 was involved in the case up to the point of crafting
25 the letter to Dr. Frankel, and then I'm not sure

1 that I touched the case after the case went to
2 Dr. Frankel for review.

3    Q.   So did you ever render the opinion at any
4 time that Mr. Carrillo had a greater than 1 percent
5 risk of sudden incapacitation based on his
6 loss-of-consciousness event?

7    A.   No.  As I said, that final decision about
8 what was the most likely diagnosis was made after I
9 was no longer involved in the case to the best of my
10 recollection.

11      MR. KASTER:  All right.  I'll mark a
12 separate document here, so this will be 54.

13      (Exhibit 54 marked.)

14 BY MR. KASTER:

15    Q.   Do you see a letter dated January 10th
16 of 2018?

17    A.   Yes.

18      THE REPORTER:  Are there Bates numbers,
19 Mr. Kaster?

20      MR. KASTER:  Yeah, there are, Jayne.  This
21 was previously marked as a part of a different, a
22 longer exhibit.  It's Bates Nos. 411 through 414.

23      THE REPORTER:  Thank you.

24 BY MR. KASTER:

25    Q.   So a couple of questions about this

Page 34

1 letter. It's signed by Dr. Holland.
2      You see that, right?
3   A.  Yes.
4   Q.  Did you write the letter?
5   A.  I authored the first draft of it, yes.
6   Q.  What happened to the first draft?  Do you
7 know?
8   A.  I sent it about the time -- or actually on
9 or about January 10th I sent it to Health and
10 Medical Services.  I sent it to Bridgette Ziemer,
11 Theresa Rodino and to Deb Gengler, and I asked them
12 to review and edit it for accuracy.
13      This is the corrected one because I had
14 spelled "January" wrong in mine.  I put an M in the
15 middle of "January" rather than an N.  So this is
16 the one that they edited and corrected that mistake
17 on my part.
18   Q.  How do you know you put an M in "January"?
19   A.  It was in the document that I sent to the
20 three people that I just named.
21   Q.  So did you review that in advance of your
22 deposition, the document that you sent?
23   A.  Yes.  I'm pretty sure I did, yes.
24   Q.  So you reviewed that yesterday?
25   A.  I don't remember when I reviewed it most

Page 35

1 recently, but I'm almost certain that I saw it
2 during my preparation for this deposition.
3   Q.  So there's a draft of this letter that you
4 actually created?
5   A.  That's correct.
6      MR. KASTER:  Bob, do you know if that
7 draft has been produced?
8      MR. ORTBALS:  Yeah, Jim, it was part of
9 the ESI production.
10      THE REPORTER:  I'm sorry.  Part of the?
11      MR. ORTBALS:  ESI production.
12      THE REPORTER:  Thank you.
13      MR. KASTER:  Thank you.
14      MR. ORTBALS:  Absolutely.
15 BY MR. KASTER:
16   Q.  Other than the letter or the word
17 "January" being misspelled, do you recall any other
18 changes?
19   A.  There was an email I think from Theresa
20 Rodino that said that she fixed that spelling of
21 "January" and added the address information, I
22 assume, for Dr. Frankel.  I'm not aware of any other
23 changes that were made.
24   Q.  So this language here in the letter on the
25 first page:  "The episode sounded like a seizure and

Page 36

1 Mr. Carrillo had subsequently undergone a detailed
2 medical evaluation."
3      So you wrote that, "sounded like a
4 seizure"?
5   A.  Yes.
6   Q.  And have you told us everything that you
7 remember that made it, in your view, sound like a
8 seizure?
9   A.  I mean, I'd have to go through the
10 information that came in along the way.  There were
11 several sources of information.  There were
12 Mr. Carrillo's statements directly to Theresa
13 Rodino.  There was the medical records from his
14 primary care provider whom he saw two days after the
15 episode.  There is what is documented in the
16 cardiology notes, what is documented in the
17 neurology notes, and then what is documented on the
18 intake information when he had his EEG.
19      So, I mean, those are five different
20 provider documents, if you will, that included
21 information almost certainly provided by
22 Mr. Castillo (sic) with some input from his wife.
23   Q.  I'm going to ask you about this next
24 sentence:  "He is reported to have no medical
25 conditions, but he was apparently taking

Page 37

1 Gabapentin 600 milligrams twice per day.  There was
2 no clear explanation of why he takes this
3 medication."
4      Do you see that?
5   A.  Yes.
6   Q.  You write this letter on January 10th
7 of 2018.  Was that a true statement on January 10th
8 of 2018?
9   A.  In retrospect, as I've looked at this and
10 prepared for it, there was a reference in the
11 cardiology note, I believe, that said he was taking
12 it for his elbow and elbow-related conditions.
13      And I think some of the documents mention
14 that he had no chronic active problems other than
15 that elbow problem.  And, again, perhaps in context,
16 if -- they were talking about major medical
17 conditions, but by this point I should have known
18 why he was taking that medicine, and so this was a
19 mistake that I made in writing up this report.
20      Now, it is possible for -- particularly
21 with Gabapentin to take it -- be taking it two years
22 ago for one condition and now taking it for
23 something else.  That's a possibility.
24      I'm not giving you that as an excuse.  It
25 is just a reason that we try to get detailed medical

10 (Pages 34 - 37)

1 information so we have an explanation. But by this
2 point I probably should have said he's taking
3 Gabapentin for residuals from an old elbow problem.
4     Q.   Because Gabapentin is a well-recognized
5 antiseizure medication, right?
6     A.   As I said before, it is -- I believe it
7 was developed as an antiseizure medication. It is
8 used widely for chronic pain conditions as well.
9     Q.   And if we look back at the Medical
10 Comments History, I'm going to read to you this
11 sentence from December 8, 2017, where the employee
12 answered the question of why he was taking the
13 Gabapentin.
14         And he says that "I have been taking
15 Gabapentin for over two years since my first elbow
16 surgery. Dr. Llewelyn Williams prescribed it
17 because I had a little numbness after my first
18 surgery on my right elbow."
19         So it was clear for a month or more that
20 he was taking it for pain in his elbow, right?
21     A.   Yes. I'm not 100 percent sure of the date
22 of the document that I could have learned that from.
23 I've already said it was in the first cardiology
24 record. This was an oversight on my part, and --
25 and I should have stated it more clearly what that

1 was for.
2     Q.   So the information provided to Dr. Frankel
3 about the medications that Mr. Carrillo was on and
4 why he was taking the medications that you submitted
5 in your letter to Dr. Frankel included a mistake?
6     A.   This last sentence: "There was no clear
7 explanation of why he takes this medication," that
8 is factually incorrect.
9     Q.   Do you think it's important that the
10 information that you provide to an outside evaluator
11 who is doing the evaluation based solely on your
12 communication and medical records, do you think it's
13 important that that be accurate?
14     A.   Yes, I think that it is important. That's
15 why we give them all the medical records so they can
16 make their own decision, and in his final report he
17 actually addressed why Mr. Carrillo was taking the
18 medication.
19         So, again, I've said mea culpa three
20 times. And I should have said that differently. I
21 should have put more accurate information in there,
22 but he caught it and made his decision knowing that
23 the Gabapentin was taken for a chronic condition.
24     Q.   Did Dr. Frankel have the Medical Comments
25 History available to him?

1     A.   I don't know. I don't think so, but I
2 don't honestly know if he received that at any other
3 time.
4     Q.   Certainly if he had been taking Gabapentin
5 for antiseizure medication and then stopped, that
6 could be a provoked seizure, right?
7         MR. ORTBALS: Objection to the form, calls
8 for speculation. You can answer.
9         THE WITNESS: Dr. Frankel addressed that
10 in his report. He said that since the dosage was
11 low and in the absence of other withdrawal symptoms,
12 he did not think that that explained the cause for
13 the seizure.
14 BY MR. KASTER:
15     Q.   It's possible that if you're taking
16 antiseizure medication and you stop, that you could
17 have a provoked seizure, right?
18         MR. ORTBALS: Objection to form.
19         THE WITNESS: It is possible that if
20 you're taking antiseizure medication and stop it,
21 you can have a seizure. Again, Dr. Frankel
22 addressed that in his report in this case, specific
23 to this case.
24 BY MR. KASTER:
25     Q.   I'm going to ask you this: Now, I've

1 looked at these reports of Dr. Aguilar's, and I
2 don't think we need to go through them line by
3 line, but I saw one single reference to memory
4 problems, for memory issues following the
5 loss-of-consciousness event.
6         You point those out specifically on page 2
7 of 4 of your letter. Do you see what I have up
8 here?
9     A.   Are you talking about the sentence that
10 starts with "Mr. Carrillo has reported"?
11     Q.   Correct.
12     A.   Those are taken from Dr. Aguilar's notes.
13     Q.   "Headaches," the headaches had actually
14 resolved by the time Dr. Aguilar saw Mr. Carrillo
15 the second time, right?
16     A.   I --
17         MR. ORTBALS: Objection.
18         THE WITNESS: I'm sorry. Go ahead.
19         MR. ORTBALS: You can go ahead and answer,
20 Doctor.
21         THE WITNESS: Okay. I don't think they
22 were resolved by the second one. They were resolved
23 by the last time Dr. Aguilar saw him. I mean, it
24 took several months.
25 BY MR. KASTER:

11 (Pages 38 - 41)

Page 42

1    Q.  There's one -- I saw one reference in the
2  reports of Dr. Aguilar to memory problems or issues.
3        Do you have any more specifics about that?
4    A.  The things that I wrote here are, as I
5  mentioned, taken from Dr. Aguilar's notes.  Right
6  now, off the top of my head, I can't remember if
7  that was mentioned in any other provider's notes or
8  not.
9    Q.  I mean, there's short-term memory,
10  long-term memory, there's "I can't remember where my
11  car was parked."
12        There's all kinds of memory issues, right?
13    A.  Well, it's true.  I mean, we're talking
14  about cognitive function here, and there can be
15  different aspects of that, different types,
16  different severities and things like that.
17        So, I mean, this -- Dr. Aguilar, as I've
18  already said, wrote very detailed notes, and I think
19  he was just trying to be inclusive of the -- my term
20  now -- the riddle he was trying to solve here of
21  coming up with what had happened to Mr. Carrillo.
22    Q.  Do you have any more specifics on the
23  so-called "memory problems" of Mr. Carrillo?
24    A.  I don't have them memorized, no.  Well,
25  excuse me.  He talked about, I think, remembering

Page 43

1  passwords for accounts or computers or something
2  like that.  It is spelled out somewhere in just,
3  like, one sentence about the types of memory
4  problems that he reported that day.
5    Q.  Do you have problems remembering your
6  passwords for different computer programs and
7  entries into your bank account or your credit card
8  or things like that?  Does that come up from time to
9  time?
10        MR. ORTBALS:  Objection to form.  You can
11  answer.
12        THE WITNESS:  It's a longer answer than
13  you want here.  My wife does all our banking and
14  paying our credit cards and things like that.  I
15  don't even have accounts that -- for electronic
16  paying and things like that.  She manages our
17  household well.  Have I lost the passwords?  Sure,
18  and that's just because I'm not very good with
19  computers at all.
20  BY MR. KASTER:
21    Q.  I mean, I have problems remembering my
22  password for this account or that account.  In fact,
23  we have a repository for passwords just so you can
24  get your passwords for different things because you
25  have one for Apple, you have one for this, you have

Page 44

1  one for that.
2        You've had problems remembering your
3  passwords from time to time, right?
4        MR. ORTBALS:  Objection to form.
5        THE WITNESS:  Of the -- of the passwords I
6  need to function on a day-to-day basis, I remember
7  them.  When I haven't used my Yahoo account for a
8  year, I might not get it right.  And you know what,
9  when I do that, I go to my wife and ask her "What's
10  my Yahoo account password?"
11  BY MR. KASTER:
12    Q.  And she remembers?
13    A.  She remembers because she's very
14  responsible, and she has it on her cell phone and
15  I'm sure some other place.
16    Q.  Was this letter that you wrote the last
17  time you touched this case?
18    A.  Well, actually not, because we looked at
19  an email later, I think it was from early February,
20  where Deb Gengler told me, "Well, go ahead and write
21  the letter," and I said "Well, I've written it
22  already, and it's" -- you know, "it's pretty much
23  ready to go."  We looked at the email just a few
24  minutes ago.  So I did touch the case afterwards in
25  that sense.  I think -- I think that was the last

Page 45

1  time I was involved in the case.
2    Q.  There was some reference to Mr. Carrillo
3  going to Mayo Clinic.  Were you waiting on that
4  evaluation to make a final determination?
5    A.  Well, actually, if you look at the
6  notes, I wrote this letter -- excuse me.  I
7  authored this letter on January 10th, and he saw
8  Dr. Carrillo (sic) I believe on January 25th, and --
9  I think that's the date.  I'm not 100 percent sure.
10  And that's when he said he was going to the Mayo
11  Clinic.
12        So at that point that kind of put this
13  process of the independent neurology review on hold
14  because it would give him time to go to the Mayo
15  Clinic and submit the records.
16        And then he told, I believe it was
17  Bridgette Ziemer, that he wasn't going to go.
18  It was too far away and too expensive.  And so
19  that's when we went forward with the independent
20  file review.
21    Q.  And Mr. Carrillo was no longer covered
22  under his employer's insurance, right?
23    A.  I don't know about his insurance benefits.
24  We do a fair amount of information in -- or work in
25  Health and Medical Services to try to help them

12 (Pages 42 - 45)

Page 46

1 maintain their medical leave of absence so that they
2 stay employed. And, secondly, to help them with
3 submission of medical documentation to keep their
4 insurance current.
5      My understanding was he would have still
6 had insurance by this time, but, again, that's not
7 my end of things.
8   Q. Did you see in the Medical Comments
9 History that Mr. Carrillo did not, in fact, have
10 insurance and was having trouble having his family
11 seen by --
12   A. I --
13   Q. -- service providers? Did you notice
14 that?
15      MR. ORTBALS: Objection to form, but you
16 can answer.
17      THE WITNESS: Sorry. I didn't mean to
18 speak over you, Mr. Kaster.
19      I saw a note that he was concerned
20 about making sure his insurance was in place.
21 One of his children had a medical problem or
22 something like that. So he had reached out to
23 Bridgette to make sure that the insurance forms
24 were completed. That's probably as much as I know
25 about that.

Page 47

1      MR. KASTER: All right. Thank you. I
2 don't have any further questions for you, Doctor.
3      THE WITNESS: Okay.
4      MR. ORTBALS: No questions. Thank you.
5      (WHEREUPON, the deposition of DR. JOHN
6 CHARBONNEAU was concluded at 2:04 p.m.)
7           ***
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 48

1           REPORTER'S CERTIFICATE
2
3
    STATE OF MINNESOTA    )
4                         )SS.
    COUNTY OF HENNEPIN    )
5
6
        I hereby certify that I reported the remote
7   deposition of DR. JOHN CHARBONNEAU on November 18,
    2021, via Veritext Virtual Videoconference, and that
8   the witness was by me first duly sworn to tell the
    whole truth;
9
        That the testimony was transcribed by me and is
10  a true record of the testimony of the witness;
11      That the cost of the original has been charged
    to the party who noticed the deposition, and that
12  all parties who ordered copies have been charged at
    the same rate for such copies;
13
        That I am not a relative or employee or
14  attorney or counsel of any of the parties, or a
    relative or employee of such attorney or counsel;
15
        That I am not financially interested in the
16  action and have no contract with the parties,
    attorneys, or persons with an interest in the action
17  that affects or has a substantial tendency to affect
    my impartiality;
18
        That the right to read and sign the deposition
19  by the witness was not waived.
20
        WITNESS MY HAND AND SEAL this 24th day of
21  November, 2021.
22
23
24
        Jayne M. Seward
    Notary Public, Hennepin County, Minnesota
25  My commission expires January 31, 2025

Page 49

1           Veritext Legal Solutions
            1100 Superior Ave
2               Suite 1820
            Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
5   November 29, 2021
6   To: Mr. Ortbals
    Case Name: Carrillo, Joseph v. Union Pacific Railroad Company
7
    Veritext Reference Number: 4889286
8
    Witness: Dr. John Charbonneau      Deposition Date: 11/18/2021
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript. Please have the witness
12  review the transcript and note any changes or corrections on the
13  included errata sheet, indicating the page, line number, change, and
14  the reason for the change. Have the witness' signature notarized and
15  forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19  this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

13 (Pages 46 - 49)

Page 50

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS

2

     ASSIGNMENT REFERENCE NO: 4889286
3   CASE NAME: Carrillo, Joseph v. Union Pacific Railroad Company
     DATE OF DEPOSITION: 11/18/2021
4   WITNESS' NAME: Dr. John Charbonneau
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9  Date       Dr. John Charbonneau
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
    I have affixed my name and official seal
16
  this _____ day of_____, 20____.
17
18     _____
     Notary Public
19     _____
     Commission Expiration Date
20
21
22
23
24
25

Page 51

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS

2

     ASSIGNMENT REFERENCE NO: 4889286
3   CASE NAME: Carrillo, Joseph v. Union Pacific Railroad Company
     DATE OF DEPOSITION: 11/18/2021
4   WITNESS' NAME: Dr. John Charbonneau
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
   Date      Dr. John Charbonneau
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
     They have listed all of their corrections
18      in the appended Errata Sheet;
     They signed the foregoing Sworn
19      Statement; and
     Their execution of this Statement is of
20      their free act and deed.
21   I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23    _____
     Notary Public
24
     _____
25     Commission Expiration Date

Page 52

1      ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 4889286
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
   _____  _____
20  Date       Dr. John Charbonneau
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23     _____
     Notary Public
24
     _____
25     Commission Expiration Date

14 (Pages 50 - 52)

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

**Exhibit GG**

December 01, 2017

Joseph A. Carrillo
3013 Zacatecas Ct
Las Cruces, NM 88012

**Employee ID: 00457172**
**Employee Position: Electrician**

Dear **Joseph A. Carrillo**:

Union Pacific Health & Medical Services (HMS) has been notified of your request for time off due to a medical reason. Based on the information reviewed:

**[x ]** A Medical Leave of Absence is recommended for the following dates:
**July 01, 2017 - January 31, 2018**

In accordance with Union Pacific Railroad Medical Rules, you will require a Fitness-For-Duty (FFD) review **prior** to your return to work. This involves a review by Health & Medical Services of medical information **related to your absence**. Please provide the following information at least ten (10) business days prior to your anticipated return to work date **OR** to extend your Medical Leave of Absence which expires on the above noted date.

**[x ]** Copy of the ETT (exercise treadmill test? full  report.

**[x ]** Copy of **Neurologist's clinic  notes** (also known as office notes or progress notes) from the office visits. *The full Neurology evaluation.*

**[x ]** Please have your provider who prescribed the Gabapentin to document why you are now taking Gabapentin. Including the medical diagnosis, dosage, and efficacy.

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically

Page 1 of 2



UPCARRILLO000379

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

Bridgette Ziemer
Fitness For Duty Nurse
Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: 877-275-8747
Fax: 402-501-0067
Email: BZIEMER@UP.COM

CC:

*The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.*

www.up.com

BUILDING AMERICA®

APP0413

UPCARRILLO000380

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

January 17, 2018



Joseph A. Carrillo
3013 Zacatecas Ct
Las Cruces, NM 88012

**Employee ID: 00457172**
**Employee Position: Electrician**

Dear **Joseph A. Carrillo**:

Union Pacific Health & Medical Services (HMS) has been notified of your request for time off due to a medical reason. Based on the information reviewed:

**[x ]** A Medical Leave of Absence is recommended for the following dates:
**July 01, 2017 - March 01, 2018**

Please submit the following medical documents:

**[x ]** Copy of Follow Up Neurology visit and the Mayo Clinic evaluation reports when they become available

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

www.up.com

UNION PACIFIC **BUILDING AMERICA**

UPCARRILLO000569

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

Bridgette Ziemer
Fitness For Duty Nurse
Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: 877-275-8747
Fax: 402-501-0067
Email: BZIEMER@UP.COM

CC:

*The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.*

www.up.com

 **BUILDING AMERICA**®

UPCARRILLO000570

CONFIDENTIAL

Diplomate American Board of Neurology

## Mario R. Aguilar M.D., P.C.

1240 S. Telshor Blvd, Suite C. Las Cruces, NM 88011-4731
Phone # (575) 522-1212 / Fax # (575) 522-2898

Exhibit II

### NEUROLOGY FOLLOW-UP

PATIENT:  **Joseph Carrillo**
GENDER:  **Male**
DOB:
AGE:  **31y**

PRIMARY CARE PROVIDER:  **Saenz, Mia NP**

DATE OF VISIT: **01/25/2018**

### CHIEF COMPLAINT
Episode of unresponsiveness.
Paresthesia in the right arm, torso and right leg.
Headache.

### SUBJECTIVE
I reviewed the symptoms outlined on his 08/07/2017 visit.

Patient provided the history:

Episode of unresponsiveness.

Patient stated having experienced an episode of unresponsiveness at the end of June 2017.
He denied previous episodes of unresponsiveness or recurrences.

Description:  See H&P.

Headaches.
Headaches have resolved for the most part.

Hypersensitivity:

It has been resolving.  The only area, which has been affected is in the back of his thigh.

He denied new neurologic symptoms.

### HISTORY OF PRESENT ILLNESS
DATE OF INITIAL CONSULTATION: 08/07/2017

Patient provided the history:

Onset
Patient stated having experienced an episode of unresponsiveness at the end of June 2017.
He denied previous episodes of unresponsiveness or recurrences.

UPCARRILLO000571

CONFIDENTIAL

Joseph Carrillo                                    01/25/2018
Page 2

Description
He woke up at 4:45 am and was getting ready to go to work when he experienced the episode of
unresponsiveness.  There was no warning.
He recalled brushing his teeth next he is in the bathroom on the floor being helped by his girlfriend.

He reported being told the his breathing was slow and was snoring.
His arms were initially shaking.
His body became limp afterwards.
There was no bowel or bladder incontinence.
There was tongue biting across his tongue worse in the right side.

The duration of the episode is unknown.  His girlfriend heard him snoring and went to check on him.

He woke up not knowing what had happened.

He recalled experiencing skin hypersensitivity to light touch in the right side of the body and numbness in the
back of his right thigh.

He had a headache when he woke up.

He felt nauseated but he did not vomit.

He went to see Dr. Saenz that day and underwent blood tests.

There was no specific treatment.

Currently.
Headaches.  He never had similar headaches.  The headaches have been constant since the episode of
unresponsiveness. The headaches have been located in the frontal region, left temple and eyes.  He described
the pain as throbbing and at times severe.  He has taken ibuprofen, which does not help.

Hypersensitivity:  Patient has been experiencing discomfort (hypersensitivity of skin to light touch) in the
right arm, right abdomen, chest and leg (right side).

Tiredness.  He feels tired in the mornings.

He has had lower back pain: The pain has recurred at times.  The pain has been localized to the lower back.
It does not radiate to the legs.

He also described morning stiffness.

He reported having had difficulty recalling phone numbers and passwords.

He reported anxiety episodes since the episode.

He had anxiety before.

UPCARRILLO000572

CONFIDENTIAL

**Joseph Carrillo**          01/25/2018
**Page 3**

He did not know if he injured his head at the time of unresponsiveness. There were no head lumps or lacerations.

He reported being a diesel electrician and works on locomotives.
He is not working at this time.

He denied double vision, blindness, speech or swallowing problems.
He denied focal weakness. He denied sphincteric dysfunction.

He has taken Gabapentin for years for paresthesias (numbness and tingling) in his right fingers.

## MEDICAL / SURGICAL & HOSPITALIZATION HISTORY
Patient denies any new medical problems from previous visit.   Patient denies any new surgeries from previous visit. Patient denies any hospitalizations since previous visit.

## REVIEW OF SYSTEMS

**Cardiovascular System Reviewed**
Patient denies Chest Pain. Patient denies Palpitations. Patient denies Dyspnea on Exertion.

**Constitutional System Reviewed**
Patient denies Weight loss. Patient denies Fever. Patient denies Chills.

## PAST MEDICAL HISTORY
He has had right elbow surgery twice. He reported having had a fatty liver.

## PAST SURGICAL HISTORY
He has had right elbow surgery twice.

## MEDICATIONS
No changes
Active Medications
• gabapentin 600 mg tablet. Take 2 tablets by mouth at bedtime QHS. Do not substitute.

## ALLERGIES
No changes
• No Known Allergies (Mild): Recorded on 08/07/2017. Reactions: None noted.

## OBJECTIVE

**Vital Signs**
Added vitals entry: Measurement date: 2018-01-25 08:41  Weight: 167.0 lbs  Height: 5 ft 6.0 in  BMI: 27.0
Heart rate: 60 bpm  Blood pressure: 120 / 70 mmHg  Respiration Rate: 20 breaths per minute

**General**
The patient is well developed. The patient is well nourished. The patient is in no acute distress. The patient's head shows no recent trauma. There is no proptosis in the right eye. There is no proptosis in the left eye.

UPCARRILLO000573

CONFIDENTIAL

Joseph Carrillo                          01/25/2018
Page 4

The patient's neck is supple without any adenopathies or bruits. The patient's lungs are clear. The patient's heart is regular.

## Mental Status
Patient is awake. Patient is alert. Patient is cooperative. Patient is attentive. Patient is appropriate. The patient's speech is unremarkable.

## Cranial Nerves
### Cranial Nerve II - Optic
The patient's right fields are full. The patient's left fields are full.

### Cranial Nerve III - Oculomotor
The patient's right pupil is 2 mm in size. The patient's left pupil is 2 mm in size. The patient's right pupil is reactive to light. The patient's left pupil is reactive to light. There is no ptosis in the right eye. There is no ptosis in the left eye. The patient's right eye shows normal adduction. The patient's left eye shows normal adduction. The patient's right eye shows normal upward movement. The patient's left eye shows normal upward movement. The patient's right eye shows normal downward movement. The patient's left eye shows normal downward movement.

### Cranial Nerve IV - Trochlear
The patient's right eye shows normal intorsion. The patient's left eye shows normal intorsion.

### Cranial Nerve VI - Abducens
The patient's right eye shows normal abduction. The patient's left eye shows normal abduction.

### Cranial Nerve VII - Facial
There is no weakness of the right frontalis. There is no weakness of the left frontalis. There is no weakness of the right orbicularis oculi. There is no weakness of the left orbicularis oculi. There is no weakness of the right orbicularis oris. There is no weakness of the left orbicularis oris.

### Cranial Nerve IX - Glossopharyngeal
The patient's palatal motion is normal.

### Cranial Nerve XII - Hypoglossal
The patient's tongue movements are normal. The patient's tongue shows no atrophy. The patient's tongue shows no fasciculations.

## Motor
There is no Weakness in the Right and Left Thumb, Index Finger, Middle Finger, Ring Finger, or Little Finger. There is no Hand Grip Weakness. There is no Wrist Weakness. There is no Elbow Weakness. There is no Shoulder Weakness. There is no weakness in the Right or Left Toe. There is no weakness in the Right or Left Foot. There is no weakness in the Right or Left Knee. There is no weakness in the Right or Left Hip. There is no cogwheeling rigidity in the patient's Wrists, Arms, or Legs. There is no resting tremor in the patient's Lips or Hands. There is No Postural Tremor in the patient's Hands. There is no Bradykinesia. There are no Dyskinesias of the Head, Arms, Hands, or Legs.

## Cerebellar

UPCARRILLO000574

CONFIDENTIAL

Joseph Carrillo                                         01/25/2018
Page 5

The patient's right finger-to-nose test is normal. The patient's left finger-to-nose test is normal. The patient's right rapid alternating movements of fingers are normal. The patient's left rapid alternating movements of fingers are normal.

**Station & Gait**
The patient gets out of a chair and onto the examination table well. The patient is able to perform Romberg's maneuver well.

## STUDIES

**Blood Tests**
07.01.2017-8:18A at Fletcher Flora Lab:
CMP:  Glucose 116 H (65-100).
ALT:  138 H (10-40). AST 78 H (9-44).
CBC and TSH:  Unremarkable.
Lipid panel:  cholesterol 223 H (20-200), triglycerides 208 H (0-150), HDL 33 L (40-60).  Ma.

10.24.2017-1231 at MMC:
B12, RPR, ANA, IFE, Anti-Hu antibodies and ESR were unremarkable. Ma.

**Neuro Imaging**
PATIENT: Joseph Carrillo
DOB: 5/23/1986
MRN: 100000552974
PHYSICIAN: Mario Aguilar, MD
EXAM DATE: 8/16/2017
MRI, Brain c/s Contrast Brain :
HISTORY: Headaches. Weakness. Memory loss.
REFERENCE : None available in PACS.
TECHNIQUE: Multi-planar and multi-sequential MR images of the brain were performed. Without and with IV contrast, Magnevist contrast 15 cc. No contrast reaction reported.
FINDINGS:
BRAIN:
Cerebrum: No intracranial hemorrhage, cerebral edema, diffusion restriction, or mass lesion.
Basal Ganglia: Normal caudate nuclei and lentiform nuclei.
Thalami: Normal.
Cerebellum: No abnormality.
Brain stem: No suspicious lesion.
Ventricles and CSF spaces:
Cortical sulci and basilar cisterns are unremarkable.
Ventricles are normal in size.
Expected flow-voids are patent.
Sella and Pituitary gland: Normal.
Orbits: Normal.
CALVARIUM:
No significant extracranial soft tissue swelling.
SINUSES and MASTOID AIR CELLS and etc.:

UPCARRILLO000575

CONFIDENTIAL

Joseph Carrillo                                        01/25/2018
Page 6

Visualized paranasal sinuses are clear.
Mastoid air cells are clear.
Post enhancement:
Images obtained after the contrast injection show no enhancing abnormalities.
IMPRESSION:
1. Normal MRI examination of the brain.
2. No abnormal enhancement.
----------------------------------------------------------------------
Dictation site: SVIPAC-TCSV102R
----------------------------------------------------------------------
This document has been reviewed and Signed by: Benjamin Wang on 8/16/2017 11:59 AM

10.13.2017  MRI cervical spine without contrast at TIC showed:
IMPRESSION:
No demyelinating lesions or myelomalacia.  Mild disc bulge at C5-6 with no canal stenosis, cord compression
or nerve root impingement.  Ma.

10.13.2017  MRI thoracic spine without contrast at TIC showed:
IMPRESSION:
Unremarkable non-contrast enhanced MRI of the thoracic spine.  Ma.

**Electrophysiological Studies**
08.22.2017 at MMC:
EEG:  Normal awake EEG as per Dr. Aguilar. Ma.

## CLINICAL IMPRESSION
In essence, this is a 31-year-old male with an episode of unresponsiveness in the latter part of June 2017.

He denied recurrences:
MRI brain and EEG were unremarkable.

Headaches:
Resolved.

Hypersensitivity of the skin in right arm, chest, abdomen and leg, etc.  The cause is undetermined.  He has
been doing well.  He sees Dr. Williams regarding this issue.

I previously discussed work-up and significance.  I discussed the results of his cervical and thoracic spine
MRIs and blood tests.  I discussed ongoing symptomatic treatment, other options, referral to university center,
etc.

He apparently has been diagnosed with fatty liver in the past.

## DIFFERENTIAL DIAGNOSIS
Episode of unresponsiveness:
Single unprovoked seizure.
Single provoked seizure.

UPCARRILLO000576

CONFIDENTIAL

**Joseph Carrillo**
Page 7

01/25/2018

Syncope.
Stroke was not demonstrated.
CNS infection.
Metabolic encephalopathy.
Others.

Headaches:
Intracranial mass lesion was not demonstrated.

Hypersensitivity of the skin in right arm, chest, abdomen and leg, etc.
Intracranial pathology such as stroke or multiple sclerosis lesion were not demonstrated.
Myelopathy, radiculopathy, polyneuropathy, etc.

## RECOMMENDATIONS

1.     Patient will continue care with Ms. Saenz and Dr. Williams.

2.     Please refer Mr. Carrillo back here if needed.

The patient and/or all parties present voiced understanding and agreement.

Thank you very much for allowing me to participate in this patient's care.

Sincerely yours,

Mario R. Aguilar M.D., P.C.

*Electronically Signed on 01/26/2018 10:20:10.
*Electronically Faxed to M. Saenz 647-1565 on 01/26/2018 at 10:24 am*

UPCARRILLO000577

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 WESTERN DISTRICT OF TEXAS
 3                     EL PASO DIVISION
 4    Joseph Carrillo,            )
                                  )
 5                   Plaintiff,   )
                                  )
 6    v.                          )Case No. 3:21-cv-00026-FM
                                  )
 7    Union Pacific Railroad Co., )
                                  )
 8                   Defendant.   )
 9
      _____
10
                DEPOSITION OF DR. MARIO R. AGUILAR
11    _____
12
                      February  11, 2022
13                       9:00 a.m.
14      Taken via Zoom Videoconference originating at:
15            The Offices of Dr. Mario Aguilar
              1240 South Telshor Boulevard
16            Las Cruces, New Mexico  88011
17
18
19
20
21
22
23
24
25    Reported by:  Sandra M. Mierop, FAPR, CRR, CCP, CBC
```

**Exhibit JJ**

                                                    Page 1

| | |
|---|---|
| 1      APPEARANCES | 1      PROCEEDINGS |

**Page 2**

```
 1             APPEARANCES
 2  For the Plaintiff:
 3     NICHOLS KASTER, PLLP
          4700 IDS Center
 4        80 South 8th Street
          Minneapolis, Minnesota  55402
 5
       By: Lucas J. Kaster
 6        kaster@nka.com
 7  For the Defendant:
 8     CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
          8911 North Capital of Texas Highway
 9        Building 3, Suite 3350
          Austin, Texas 78759
10
       By: Lara C. de Leon
11        ldeleon@constangy.com
12  For Dr. Mario R. Aguilar:
13     ATWOOD, MALONE, TURNER & SABINE, P.A.
          400 North Pennsylvania Avenue, Suite 1100
14        Roswell, New Mexico 88201
15     By:  Lee Rogers
             lrogers@atwoodmalone.com
16
17  Also Present:
18     Steve Cummings, Videographer
       Sherick Francois, Legal Assistant
19     Grant Franks, Concierge
20
21
22
23
24
25
```

Page 2

**Page 4**

```
 1             PROCEEDINGS
 2        THE VIDEOGRAPHER:  We are now on the
 3  record, today is February the 11th, 2022.  The time
 4  is 9:12 a.m.
 5        This is the recorded deposition
 6  of Dr. Mario Aguilar being taken remotely using
 7  the video conference platform Zoom.
 8        Today's deposition is in regard
 9  to the matter of case No. 3:21-cv-00026-FM
10  captioned Joseph Carrillo versus Union Pacific
11  Railroad Company filed in the United States
12  District Court, Western District of Texas,
13  El Paso Division.
14        Counsel, will you please identify
15  yourselves for the record?
16        MS. de LEON:  This is Lara de Leon.  I'm
17  here on behalf of Defendant Union Pacific Railroad.
18        MR. KASTER:  And Jim Kaster here on behalf
19  of the Plaintiff.
20        MR. ROGERS:  Lee Rogers, I'm personal
21  counsel for Dr. Aguilar.
22        THE VIDEOGRAPHER:  At this time, the
23  doctor may be sworn in by the court reporter.
24        DR. MARIO R. AGUILAR,
25     being duly sworn, testified as follows:
```

Page 4

**Page 3**

```
 1              INDEX
 2  DR. MARIO R. AGUILAR          FEBRUARY 11, 2022
 3
    EXAMINATION                        PAGE
 4
    By Ms. de Leon                   5
 5  By Mr. Kaster                   50
 6
 7              EXHIBITS
 8  NUMBER         DESCRIPTION        FIRST REFERENCE
 9  Exhibit 13    Neurology Consultation    Pg 13, Ln 13
10  Exhibit 72    UPCARRILLO2596            Pg 31, Ln 14
11  Exhibit 14    Neurology Follow-up 9/7/17  Pg 36, Ln 25
12  Exhibit 15    EPCARRILLO 395-402        Pg 42, Ln 5
13  Exhibit 21    Neurology Follow-up 1/25/18  Pg 46, Ln 1
14  Exhibit 8     Mia Saenz Records         Pg 52, Ln 12
15  Exhibit 11    UPCARRILLO0000329         Pg 55, Ln 20
16  Exhibit 17    Email from M. Carrillo    Pg 68, Ln 22
17
18
19
20
21
22
23
24
25
```

Page 3

**Page 5**

```
 1             EXAMINATION
 2     Q.  (BY MS. de LEON) Good morning,
 3  Dr. Aguilar.
 4     A.  Good morning.
 5     Q.  I introduced myself briefly on the
 6  record, but my name is Lara de Leon.  I am here
 7  as an attorney for Union Pacific Railroad, and
 8  we are here today to take your deposition in --
 9  in connection with the lawsuit filed by
10  Mr. Joseph Carrillo.
11        Have you ever had your deposition
12  taken before?
13     A.  No.
14     Q.  All right.  Probably a little bit
15  daunting.  So, I'd like to just go through a
16  couple of ground rules that will hopefully make
17  our time together go a little more smoothly.
18  First off, do you understand, sir, that you've
19  been placed under oath, which means that the
20  testimony you give today is being given under
21  penalty of perjury?
22     A.  Yes.
23     Q.  Is there any reason today why you
24  think you could not give complete and truthful
25  testimony?
```

Page 5

2 (Pages 2 - 5)

1    A.   No.
2    Q.   And even though we're on Zoom, which
3  is a little bit informal, do you understand,
4  sir, that your testimony today will have the
5  same force and effect as if it were given in
6  front of a judge or a jury?
7    A.   Yes.
8    Q.   Now, we have a court reporter here
9  today who's going to be taking down what I say,
10  what you say, and what the other attorneys
11  present are going to say.  And it's really
12  important for her and for us in this case that
13  we try to take turns responding.  And by that I
14  mean, if you could please just wait for me to
15  ask -- ask my question before you give me your
16  answer.
17       Does that make sense?
18    A.   Yes.
19    Q.   Okay.  And, at the same time, if I
20  could ask you to please remember to respond
21  verbally to a question of mine with a yes or a
22  no, or the substance of the question.  The
23  court reporter can't get down head shakes or
24  head nods or uh-huhs or things of that nature.
25  All right?

Page 6

1    A.   Yes.
2    Q.   Okay.  And if you don't understand a
3  question that I'm asking you, will you please
4  ask me to rephrase it?
5    A.   Yes.
6    Q.   Okay.  I promise you my feelings won't
7  get hurt.  It happens almost every time.  But
8  it's real important for us to be able to be
9  certain that you understood all my questions
10  today.  All right?
11    A.   Yes.
12    Q.   All right.  Now, sir, do you have
13  anything in front of you in terms of documents
14  that you plan on relying on for your deposition
15  today?
16    A.   Yes.
17    Q.   Okay.  And what is it that you have
18  with you?
19    A.   I have Mr. Joseph Carrillo's records
20  in front of me.
21    Q.   Okay.  And -- and do you know if your
22  office produced those records to -- to my law
23  firm in connection with this lawsuit?
24    A.   Yes.
25    Q.   Okay.  And is that about 64 pages of

Page 7

1  records?
2    A.   I don't know the number of pages.
3  Just the records were sent to the attorneys.
4    Q.   Okay.  All right.  Well, what I'm
5  going to ask you to do, and we can coordinate
6  this through your counsel if we need to, just
7  to make sure that we have everything is perhaps
8  after the deposition have you send us a copy of
9  what you have in front of you.
10       But I'm also going to ask you,
11  sir, don't -- if you -- don't look at the
12  records until I know you're looking at the
13  records.  I'm actually going to show you
14  exhibits today, and I'd like you to focus on
15  the exhibits that I'm showing to you on the
16  computer.  And if there's something else that
17  you need to look at, I'm just going to ask you
18  to please let me know ahead of time so the
19  record can reflect what it is you're looking
20  at.
21       Does that make sense?
22    A.   So, you're asking me not to look at my
23  records at this point.  You want me to look at
24  the demonstration on the screen?
25    Q.   Yes, yes.

Page 8

1    A.   The document on the screen?
2    Q.   Yes.  Yes.  And if you need to look at
3  something else, let me know so we can make sure
4  we all are aware of what it is you're looking
5  at to refresh your memory.  Okay?
6    A.   Yes.
7    Q.   Okay.  Thank you.
8       All right.  So, Dr. Aguilar, I
9  just want to go through some background
10  medica- -- information first.
11       You are -- you have a -- a
12  medical degree, correct?  An M.D.?
13    A.   Yes.
14    Q.   And where did you get your M.D. from?
15    A.   Mexico City.
16    Q.   Do you know the name of the university
17  where you obtained your medical degree?
18    A.   Universidad Nacional Autonoma de
19  Mexico.
20    Q.   What year did you obtain your M.D.?
21    A.   I went from '68 to '71 to the
22  university.  Then you're required to do an
23  internship, one year.  And then social service,
24  one year.  And then you become an M.D. in
25  Mexico.

Page 9

3 (Pages 6 - 9)

1    Q.   So, by my math, then, you would have
2  attained your M.D. in 1973; is that correct?
3    A.   So, '68 to '71, '71 to '72, '72-'73.
4  That's when I finished.  Yes.
5    Q.   Thank you.  Did you do any residencies
6  after you attained your M.D.?
7    A.   After that I moved to the States and
8  did internal medicine for three years.  After
9  that, I did neurology for three years.  And
10  since then, I -- I've been practicing here in
11  Las Cruces.
12    Q.   All right.  And did you do your
13  residency in internal medicine at St. Luke's
14  Hospital?
15    A.   Yes.
16    Q.   Where is St. Luke's Hospital located?
17    A.   Pennsylvania.  Bethlehem,
18  Pennsylvania.
19    Q.   Am I correct, sir, that you did your
20  residency in neurology at the University of
21  Arizona?
22    A.   Yes.
23    Q.   Where -- which location?
24    A.   Tucson, Arizona.
25    Q.   And you indicated after you finished

Page 10

1    A.   I'm Board-certified in neurology.
2    Q.   Is that by the American Board of
3  Psychiatry and Neurology?
4    A.   Yes.
5    Q.   And you have medical licenses still in
6  Pennsylvania, Arizona and New Mexico; is that
7  right?
8    A.   At this point, just in New Mexico.
9    Q.   And you're current on all of your
10  continuing legal -- I'm sorry, continuing
11  medical education?
12    A.   Yes.
13    Q.   Okay.  All right.  So, let's talk
14  about Mr. Castillo just a little bit.  Now, you
15  first treated Mr. Castillo in around June of
16  2016; is that correct?
17    A.   Without looking at the records, it
18  sounds like that's correct.
19    Q.   Okay.  Well, let me just go --
20        THE REPORTER:  Excuse me.  Ms. de Leon, is
21  it Castillo or Carrillo?
22        MS. de LEON:  I'm so sorry.  It's
23  Carrillo -- Carrillo.  I'm so sorry.  That's my
24  mental lapse.  Mr. Carrillo.
25    Q.   (BY MS. de LEON) So let me ask that

Page 12

1  your residency in neurology, you began your
2  current practice in Las Cruces, New Mexico?
3    A.   Yes.
4    Q.   Is -- have you done any other -- have
5  you associated with any other medical practices
6  other than your current medical practice since
7  you began?
8    A.   No.
9    Q.   Do you have any affiliations with any
10  hospitals or medical centers?
11    A.   There are two hospitals here in
12  Las Cruces.  I'm courtesy staff at this point.
13    Q.   And what hospitals are those?
14    A.   Memorial Medical Center, Mountain View
15  Regional Medical Center.
16    Q.   Now, as a neurologist, am I correct
17  that you are a specialist who treats diseases
18  or conditions of the brain and nervous system?
19    A.   Yes.
20    Q.   And do some of these neurological
21  conditions that you diagnose and treat include
22  epilepsy and seizures and strokes?
23    A.   Yes.
24    Q.   And do you have any Board
25  certifications?

Page 11

1  question again.  Dr. Aguilar, did you first
2  treat a Mr. Carrillo in around June of 2016?
3    A.   Yes.
4    Q.   And was that in connection with some
5  elbow pain he was experiencing?
6    A.   Yes.
7    Q.   And then it looks like after that
8  incident you saw him again in August of 2017?
9    A.   It sounds like that's the correct
10  date.
11    Q.   All right.  Sure.  Let me go ahead and
12  show you what has previously been marked as
13  Exhibit No. 13 in this lawsuit.  So just give
14  me one moment.  The first one is always a
15  little tricky.  All right.  You should have
16  Exhibit No. 13 available for you to look at
17  right now.
18        THE CONCIERGE:  Mr. Aguilar, do you see
19  the folder marked Exhibits?
20        THE WITNESS:  It says folder's empty.
21        THE CONCIERGE:  Double click on that -- on
22  the folder itself for me.
23        THE WITNESS:  It doesn't open.
24        THE CONCIERGE:  Excuse me.  So on the left
25  side of your screen where it says marked exhibits,

Page 13

4 (Pages 10 - 13)

1  could you double-click on that folder?
2      THE WITNESS:  Folder -- I see Exhibit
3  0001.
4      THE CONCIERGE:  Perfect.
5  A.  This is a neurology consultation.
6  Q.  (BY MS. de LEON) Yes, good.  So you're
7  able to see it now?
8  A.  Yes.
9      MS. de LEON:  All right.  And I'll just
10  state for purposes of our record, it might show as
11  1 -- Exhibit 1 in connection with your deposition,
12  but it -- it's previously been marked as Exhibit
13  No.13 in connection with this lawsuit, so that's what
14  we're referring to, and it's Bates EPCARRILLO381 to
15  387.
16  Q.  (BY MS. de LEON) All right.  Now,
17  Dr. Aguilar, this document, is this a -- a type
18  of document that you usually create following
19  an appointment or a consult you have with a
20  patient?
21  A.  Yes.
22  Q.  Okay.  And this document reflects a
23  neurology consultation that you had with Joseph
24  Carrillo on August 7th, 2017; is that correct?
25  A.  Yes.

Page 14

1  Q.  Okay.  Now, is this the first visit
2  that you had with Mr. Carrillo regarding an
3  episode where he lost consciousness?
4  A.  Yes.
5  Q.  Okay.  Now, do you -- do you fill out
6  or do you complete this consultation record
7  yourself?
8  A.  I create this form, and then it's
9  edited by my secretary.
10  Q.  All right.  So, according to this
11  form, Mr. Carrillo presented with a complaint
12  of having an episode of unresponsiveness and
13  headaches and paresthesia in the right arm,
14  torso and right leg; is that right?
15  A.  Yes.
16  Q.  Okay.  Now, there's a history of
17  present illness.  Did you obtain that directly
18  from Mr. Carrillo?
19  A.  Yes.
20  Q.  Do you know if he -- or do you recall
21  if anyone else was with him during this visit
22  with you?
23  A.  I don't recall, but I usually write if
24  there's somebody else with a patient.  In this
25  case, it says patient provided the history.

Page 15

1  Q.  Thank you.  Did you ever feel that you
2  had any trouble communicating with
3  Mr. Carrillo?
4  A.  No.
5  Q.  Did you believe that he was able to
6  understand you well during your visits?
7  A.  Yes.
8  Q.  Did he ever indicate to you that he
9  did not understand what you were telling him?
10  A.  Not that I recall.
11  Q.  And Mr. Carrillo speaks English; is
12  that correct?
13  A.  Yes.
14  Q.  Thank you.  All right.  So, from the
15  history of present illness, it appears that
16  Mr. Carrillo said that he had an episode of
17  unresponsiveness at the end of June of 2000 --
18  2017; is that right?
19  A.  Yes.
20  Q.  Okay.  And you obtained details from
21  him regarding what he recalled from that
22  episode; is that right?
23  A.  Yes.
24  Q.  Did you review any other medical
25  records or documentation relating to this

Page 16

1  incident?
2  A.  No.  Other than, usually, there is a
3  referral from the primary doctor, other than
4  that, no.
5  Q.  And in the referral, does it provide
6  any background or context for the referral?
7  A.  No.  It's a very brief referral.  One
8  may say headache.  One may say episode of
9  unresponsiveness.  It's a brief --
10  Q.  All right.
11  A.  -- correction.
12  Q.  All right.  He was referred by, it
13  looks like, Mia Saenz, who is a nurse
14  practitioner; is that correct?
15  A.  Yes.
16  Q.  Okay.  All right.  So, I would like to
17  just ask you -- we're not going to go through
18  every element of the details you provided, but
19  let me ask you this:  When you complete this
20  consultation form, do you write down everything
21  that the patient has told you?
22  A.  The history of present illness, that's
23  where you ask the patient different multiple
24  questions.  That's where the patient described
25  a history.  So, that's the history of present

Page 17

5 (Pages 14 - 17)

1   illness.  And after that, you review systems,
2   different systems.  You review past medical
3   history, past surgical history, social history,
4   medications, allergies, family history, and
5   then you examine the patient.
6       Q.   Thank you.  And it appears that
7   Mr. Carrillo had reported that he takes
8   Gabapentin due to the paresthesias on his right
9   fingers; is that correct?
10      A.   Medication's Gabapentin, 600, two
11  tablets at night.
12      Q.   And what is Gabapentin typically used
13  for?
14      A.   It's an antiepileptic drug.  It also
15  is used for pain of any type, including
16  headaches or nerve pain.
17      Q.   Does it cause drowsiness?
18      A.   Yes, it can cause drowsiness.
19      Q.   Now, if you look on Page 3 of your
20  report, about half way in the middle, you
21  reference "psychiatric system review."
22          Do you see that?
23      A.   Yes.
24      Q.   And the note here states:  Patient
25  reports depression, patient denies suicidal

Page 18

1       A.   Yes.  I try to finish my form either
2   at the end of the visit or at the end of the
3   day.
4       Q.   Right.  So, going to your clinical
5   impression here, you note, in essence, this is
6   a 31-year-old male with an episode of
7   unresponsiveness in the latter part of June,
8   2017.  He has been experiencing headaches,
9   forgetfulness, tiredness, hypersensitivity of
10  the skin and right arm, chest, abdomen and leg,
11  et cetera.  The cause for his multiple symptoms
12  at this time is undetermined; is that correct?
13      A.   Yes.
14      Q.   Okay.  And how is it that you had --
15  came up with the impression that the cause was
16  undetermined?
17      A.   At that point, I have my history of
18  present illness, and I review systems and the
19  examination.  At that time, I don't know the
20  cause for the multiple symptoms based on that
21  history and examination.
22      Q.   Did you have an impression about what
23  Mr. Carrillo actually suffered?  You know, it
24  says here "episode of unresponsiveness," but
25  what does that mean?

Page 20

1   thoughts, patient reports anxiety; is that
2   correct?
3       A.   Yes.
4       Q.   Why are there braces around patient
5   reports depression and patient reports anxiety?
6       A.   To make it easy to read for -- for me
7   and -- and the referring physician when we send
8   the letter.
9       Q.   Okay.  All right.  No other reason --
10  it doesn't mean -- it doesn't refer to how that
11  was reported to you or anything like that?
12      A.   No.
13      Q.   Okay.  All right.  If we go down then,
14  to the -- Page 6, you note your clinical
15  impressions; is that right?
16      A.   Clinical impression, yes.
17      Q.   Yes.  Okay.  Let me ask you this:
18  About how long was this initial consultation,
19  if you recall?
20      A.   I usually take an hour to complete and
21  then probably 10-15 minutes to edit my form.
22  So, more than an hour.
23      Q.   Do you keep your -- record your notes
24  shortly after you've had the consult with the
25  patient?

Page 19

1       A.   It means you lose consciousness as
2   opposed to being awake.  Sometimes if you lose
3   consciousness and you're standing, you fall.
4       Q.   All right.  So, it was a loss of
5   consciousness.  Does that mean that he had a
6   seizure?
7       A.   They're different terms that you can
8   use.  When somebody complains of an episode of
9   passing out, we can call it "a spell."  We can
10  call it "a seizure."  We can call it "syncope."
11  Just a term to communicate that the patient
12  lost consciousness.
13      Q.   All right.  So, is there a difference
14  between the term "spell," "seizure" or
15  "syncope"?
16      A.   So those terms only means that you
17  pass out.
18      Q.   Okay.  They don't have any other
19  medical significance?  You know, why would you
20  use one term over another?
21      A.   Sometimes if you feel that the episode
22  is clear-cut -- an epileptic seizure, then you
23  would call it an epileptic seizure.
24          Sometimes, if you feel that the
25  patient had a stroke, you would call it a

Page 21

6 (Pages 18 - 21)

1    stroke.  And it still is a clinical impression.
2        Q.   All right.  And so -- thank you for
3    that.
4            Now, with a differential
5    diagnosis section, what does that section
6    address?
7        A.   So, these are possibility --
8    diagnostic possibilities that go through your
9    mind trying to figure out what was the cause
10   for the events or his symptoms.  So, you
11   mention different diagnostic possibilities,
12   single unprovoked seizure, syncope, TIA or a
13   stroke, CNS infection, metabolic
14   encephalopathy, others.
15       Q.   And -- and those are the diagnoses
16   that you provided on this particular consult,
17   correct?
18       A.   That -- that's the differential
19   diagnosis.  Things you keep in your mind that
20   potentially would have caused the symptoms that
21   he was complaining of.
22       Q.   Did you have any doubt that
23   Mr. Carrillo actually did have a seizure or
24   lose consciousness in June of 2017?
25           MR. KASTER:  I object to the question as
Page 22

1    patient had a stroke, then you would say these
2    symptoms the patient is describing are related
3    to the stroke.
4        Q.   All right.  So, what does "unprovoked"
5    mean, when we're looking at single unprovoked
6    seizure?
7        A.   Unprovoke, it means we don't find a
8    cause for the event, versus provoked or
9    symptomatic spell or seizure.  In that
10   situation, when we do that workup, you find
11   that the patient had a stroke, you find that
12   the patient glucose was low, the sodium was
13   low.  So, there's something that explains the
14   episode that would -- that would be provoked.
15   Something caused the event that we can say,
16   yes, we have this test telling us that's the
17   cause.
18       Q.   So, if I understand that, then, a
19   single unprovoked seizure would be a seizure
20   where we can't identify a cause for it?  Is
21   that correct?
22       A.   Yes.
23       Q.   Okay.  And then the next option or
24   possibility under differential diagnosis is
25   syncope.  How is that different, if at all,
Page 24

1    vague and confusing, and multiple.
2        Q.   (BY MS. de LEON) Dr. Aguilar, did you
3    understand that question or would you like me
4    to rephrase it?
5        A.   Can you repeat it?
6        Q.   Sure.  Did you have any reason to
7    question Mr. Carrillo's report that he lost
8    consciousness in June of 2017?
9        A.   From the encounter that I had with
10   him, I didn't have any questions, the validity
11   of his complaints.
12       Q.   And then the differential diagnosis
13   section just refers to, if I'm correct, the
14   possible causes of that particular episode,
15   correct?
16       A.   Yes.
17       Q.   What is a single unprovoked seizure?
18       A.   Typically, after you do a workup, for
19   instance, you do MRI brain, you don't see a
20   stroke, you don't see a tumor.  You do ET, you
21   do blood work, and you don't find the cause.
22   And you say, this patient had an episode of
23   unresponsiveness probably related to one
24   episode or unprovoked seizure.
25           If you find on the MRI that the
Page 23

1    from a single, unprovoked seizure?
2        A.   A seizure is related to hyperactivity
3    of neuronal networks in the cerebral cortex.
4    At root, at rock onset and that leads to
5    unresponsiveness.
6            Syncope, it means that there was
7    a lack of blood flow to the brain, and that
8    caused the episode of passing out.
9        Q.   All right.  So, like a different
10   cause, if you will, for the incident of losing
11   consciousness?
12       A.   Yes.
13       Q.   Okay.  Are they different -- is there
14   any difference in severity between an
15   unprovoked seizure and a syncope?
16       A.   A syncope is usually brief, lasts less
17   than a minute or a minute -- minute and a half.
18   Patient usually has symptoms before passing
19   out.  They may feel light-headed, and maybe
20   sweaty.  They may have feeling cold or hot and
21   they have blurred vision, and then they become
22   unresponsive.  When they wake up, they usually
23   are able to tell you that they were
24   experiencing symptoms before passing out, so
25   they're aware of what happened, most of the
Page 25

7 (Pages 22 - 25)

1  time.
2         Versus a seizure, there is no
3  warning, most of the time the patient becomes
4  unresponsive.  The seizure lasts two, three
5  minutes, and then there's a period where
6  they're confused, they're -- they don't know
7  what happened.  They're very sore and have
8  headaches after the episode.  It lasts for
9  hours.
10        So, based on that history, you
11  try to decide what would be the most likely
12  explanation.
13    Q.   Thank you for that.
14        Is there any difference in the
15  seriousness of the event between a seizure and
16  a syncope?
17    A.   The majority of the seizures or a
18  large percent of patient with seizures, when
19  you do that workup, you're not going to find
20  the cause.
21        Now, if you find the cause for
22  the seizure, you might be able to tell what's
23  going to happen to these patients.
24        In cases of syncope, the most
25  common cause at this age is related to -- it's

Page 26

1    A.   In that category, you have conditions
2  like low glucose causing unresponsiveness, low
3  sodium or high sodium causing unresponsiveness,
4  liver disease, kidney disease, medications,
5  drugs, intoxicational withdrawal.  So, those
6  would be the causes -- some of the causes of
7  metabolic encephalopathy.
8    Q.   Thank you.  And then on your
9  recommendations, back here, your first one
10  indicates you told Mr. Carrillo not to drive
11  and avoid any other activities in which he
12  could sustain any injuries or could cause
13  injuries to others if a seizure were to
14  reoccur; is that right?
15    A.   Yes.
16    Q.   And you also recommended he's to avoid
17  swimming, taking baths, climbing ladders,
18  open-flame exposure, et cetera, correct?
19    A.   Yes.
20    Q.   Why is it you made that
21  recommendation?
22    A.   You're concerned about recurrences.
23  You're concerned if theres a recurrence.  You
24  worry about injuries to the patient, he or
25  himself, or others.

Page 28

1  like fainting.  So it's less significant as far
2  as the outcome.
3    Q.   Okay.  What is -- going back to your
4  differential diagnosis -- diagnosis what is
5  "TIA?"
6    A.   That's transient ischemic attack.
7    Q.   Is that a synonym for stroke?
8    A.   TIA means the patient has neurological
9  symptom, such as, an episode of difficulties
10  with speech, one side of the body being
11  paralyzed that lasts less than 24 hours.
12        A stroke, clinically, the
13  deficit -- neurological deficit lasts more than
14  24 hours.  When you do MRI brain, you are not
15  going are to see a TIA, you're going to see a
16  stroke.  TIA doesn't have any markers on MRI or
17  any test we do.
18    Q.   What is CNS infection?
19    A.   That's related to meningitis,
20  encephalitis.  An infection in the brain
21  itself, that's encephalitis.  Meningitis,
22  that's in the covering of the meninges, the
23  brain.  So those are infectious processes.
24    Q.   And what is metabolic enceph- --
25  encephalopathy?

Page 27

1    Q.   And what did you base that
2  recommendation on?
3    A.   If the patient has an episode of
4  unresponsiveness, and you do -- you're doing
5  the workup, this would be a precaution.  You
6  advise the patient to avoid activities where if
7  he were to have recurrence of the episode, he
8  or she can injure he or himself.
9    Q.   What -- the second recommendations
10  were to -- sounds like they were to run some
11  lab work on him?  A blood test; is that right?
12    A.   Yes.
13    Q.   Okay.  And then you also recommended
14  that he have an MRI with the brain -- of the
15  brain, correct?
16    A.   Yes.
17    Q.   Okay.  And that was to identify if
18  there were any -- if he had a stroke; is that
19  right?
20    A.   You're looking for a cause for the
21  spell, including strokes, tumors, et cetera.
22    Q.   And then you recommended an E -- an
23  EEG, correct?
24    A.   Yes.
25    Q.   Okay.  And what does an EEG do?

Page 29

8 (Pages 26 - 29)

1    A.   The EEG is a test to see -- study
2  brain wave activity.  So you put electrodes in
3  the skull and record brain-wave activity.
4         In patients that have had
5  seizures, between seizures, you may see
6  abnormalities we call "epileptiform
7  discharges."
8         So you have brain wave activity
9  at a certain frequency, and all of a sudden you
10 see a sharp wave that keeps recurring.  So,
11 when you do the EEG in somebody that has -- has
12 had an episode of unresponsiveness, you're
13 trying to see if they're epileptiform
14 discharges.  When you see epileptiform
15 discharges, and you feel that the risk for
16 seizures -- recurrence of seizures increases.
17    Q.   Thank you.  And it looks like you also
18 recommended that he have a referral to
19 occupational medicine regarding work
20 restrictions, short-term disability, correct?
21    A.   Yes.
22    Q.   Do you know if he did that?
23    A.   I don't know.
24    Q.   Okay.  Now, you -- you also had
25 Mr. Carrillo sign a safety guidelines for

Page 30

1  seizure patients; is that correct?
2    A.   Is that on the exhibit?  I don't see
3  it.
4    Q.   No it's not.  Let me go ahead and show
5  you what I'm marking as Exhibit 71.
6    A.   So I can close this one?
7    Q.   You can close that one.
8         THE CONCIERGE:  And, Dr. Aguilar, you
9  do --
10        THE WITNESS:  Yes.
11        THE CONCIERGE:  -- that just by clicking
12 the small arrow in the top left corner.
13        MR. KASTER:  I -- I think it should
14 actually be Exhibit 72.
15        MS. de LEON:  Oh, okay.  Thank you.
16        MR. KASTER:  Yeah, you're welcome.
17        THE WITNESS:  Where is the small arrow you
18 said?
19        THE CONCIERGE:  Are you still in the
20 exhibit?
21        THE WITNESS:  Yes.
22        THE CONCIERGE:  So up in the top -- top
23 left corner.
24        THE WITNESS:  Top left --
25    Q.   (BY MS. de LEON) All right.  Now --

Page 31

1        THE CONCIERGE:  It should be just right
2  next to the name Exhibit 0001.
3        THE WITNESS:  Okay, okay.  I'm back to the
4  exhibits now.
5        MS. de LEON:  Yeah, for some reason, it
6  wouldn't let me change the stamp.  So perhaps we can
7  address that afterwards.
8        THE CONCIERGE:  Certainly.
9        MS. de LEON:  It -- it -- the stamp says
10 71, but it should be 72.
11        THE CONCIERGE:  And I can change the
12 last -- the name on it right now, if you'd like.
13        MS. de LEON:  That would be fantastic.
14 Thank you.
15        And for the record, this is
16 Bates-stamped EPCARRILLO2596.
17    Q.   (BY MS. de LEON) Do you have the
18 document in front of you, Dr. Aguilar?
19    A.   Exhibit --
20        THE CONCIERGE:  Dr. Aguilar, just check
21 double click on that marked exhibits, again, like you
22 did last time.
23        THE WITNESS:  Okay.
24        THE CONCIERGE:  It should pop up.
25        THE WITNESS:  So it would be the second?

Page 32

1        THE CONCIERGE:  Yes, sir.
2        THE WITNESS:  Okay.  Yes, I find it.
3    A.   Yes, I have the exhibit.
4    Q.   (BY MS. de LEON)  Is this a document
5  that you have your patients sign when they have
6  had a seizure?
7    A.   I do that for patients with episodes
8  of unresponsiveness, including seizures.
9    Q.   Okay.  And so why do you give this
10 document to patients who have had seizures?
11    A.   I ask them to read the document, go
12 over the document.  It talks about precautions,
13 primarily.  My concern is about precautions.
14        MR. KASTER:  Yeah, I (inaudible).  The
15 question is misleading.
16    Q.   (BY MS. de LEON) Were you finished
17 with your answer, Dr. Aguilar?
18    A.   Yes.
19    Q.   Okay.  So, you mentioned you've given
20 this to patients who have had episodes of
21 unresponsiveness, including seizures.  What's
22 the difference between the two?
23    A.   You're talking about patients that
24 have syncope, patients that have seizures.  If
25 there is a risk for the patient or others, I

Page 33

9 (Pages 30 - 33)

1   use this form.
2       Q.   With Mr. Carrillo, did you believe
3   that he had a seizure?
4       A.   At the end of that visit, I wasn't
5   sure the cause for the episode of
6   unresponsiveness.  So, I label him as having
7   episode of unresponsiveness and multiple other
8   symptoms.  So, I'm going to do workup to try to
9   define the definite diagnosis.
10      Q.   Did you ever come up with a definite
11  diagnosis for Mr. Carrillo?
12      A.   On my initial visit or in the
13  subsequent visits?
14      Q.   Well, let's go in this first visit?
15      A.   As far as the initial visit, I don't
16  have a definite diagnosis.
17      Q.   Okay.  Did you think it was probable
18  that he had had a seizure?
19      A.   Possible seizure.
20      Q.   Okay.  Now, you could go back to
21  Exhibit 13 for a moment.  On Page 2 of that
22  exhibit, in the patient history, the document
23  notes, look near the bottom, that he reported
24  being a diesel electrician and works on
25  locomotives.

Page 34

1   troubleshooting both high and low voltage
2   equipment?
3       A.   No.
4       Q.   All right.  And you didn't know that
5   his job involved physical activities, such as,
6   maintaining balance on locomotive steps and
7   ladders?
8            MR. KASTER:  I object to Counsel
9   testifying.
10      Q.   (BY MS. de LEON) You can go ahead and
11  answer.
12      A.   No.
13      Q.   All right.  So, then, the restrictions
14  and recommendations that you made were just
15  routine precautions that you put in place
16  following a seizure episode; is that correct?
17           MR. KASTER:  Object to that as a
18  misleading question.
19      A.   If a patient has had an episode of
20  unresponsiveness, yes, I give this form to
21  protect the patient and others from injuries,
22  yes.
23      Q.   (BY MS. de LEON) All right.  Let's go
24  and -- I'm going to show you what has
25  previously been marked as Exhibit No. 14.

Page 36

1            Do you see that?
2       A.   Yes.
3       Q.   All right.  Now were -- at the time
4   that you had him sign that -- well, let me ask
5   you this:  Were you familiar at all with any of
6   the details of his job as a diesel electrician
7   working with locomotives?
8       A.   No.
9       Q.   Okay.  Now, when you put in place the
10  recommendations, you know, regarding him
11  limiting his conduct and had him sign the
12  seizure guidelines, did you take into account
13  any aspect of his job?
14      A.   I don't understand your question.
15      Q.   Okay.  So, did -- did you ask
16  Mr. Carrillo any questions about what his job
17  entailed?
18      A.   No.
19      Q.   Okay.  Or did you have any knowledge
20  independent of that about what a diesel
21  electrician working on locomotives is
22  responsible for?
23      A.   No.
24      Q.   Okay.  So, you didn't know whether or
25  not that -- his job involved him

Page 35

1            And just give me one moment.
2            You should be able to view it.
3            THE REPORTER:  Excuse me.  This is the
4   court reporter.  I'm just confirming that all the
5   objections have been Mr. Kaster so far, correct?
6            MR. KASTER:  I think that's right.
7            THE REPORTER:  Okay.  Thank you.
8            MS. de LEON:  And, Mr. Kaster, your
9   objection should be limited to form.  But you've been
10  okay so far.
11           MR. KASTER:  Thank you.
12      Q.   (BY MS. de LEON) All right.
13  Dr. Aguilar, do you have this exhibit in front
14  of you, Exhibit 14?
15      A.   Exhibit 14.
16           Okay.  Hold on a second.
17           This neurology consult?
18      Q.   It should say neurology follow-up --
19      A.   Okay.
20      Q.   -- dated September 7th, 2017?
21      A.   Yes.
22      Q.   Okay.  And so this is a record of your
23  second visit with Mr. Carrillo; is that
24  correct?
25      A.   Yes.

Page 37

10 (Pages 34 - 37)

1    Q.   All right.  And by the time of this
2    visit, he had had an MRI; is that right?
3          And it might help sir, if you
4    look at Page 5 of this exhibit, which is
5    EPCARRILLO392 --
6    A.   8/16 --
7    Q.   -- under studies.
8    A.   8/16/2017 MRI brain with and without
9    contrast.
10   Q.   Correct.  All right.  And it was
11   normal; is that right?
12   A.   Impression normal MRI examination of
13   the brain.  No abnormal enhancement.
14   Q.   All right.  And he had also had an EEG
15   study; is that right?
16   A.   Yes.
17   Q.   And that was unremarkable; is that
18   correct?
19   A.   Yes.
20   Q.   Okay.  Now, did you have any -- did
21   you perform any examine of Mr. Carrillo at this
22   time?
23   A.   Yes.
24   Q.   And what did that exam entail?
25   A.   You want me to read the vital signs,

Page 38

1    initial visit, is it?
2    A.   It's -- it's basically the same as the
3    other --
4    Q.   Okay.
5    A.   -- but, yes, I didn't have it on the
6    initial differential diagnosis.
7    Q.   All right.  And you also seemed to
8    have included as a differential diagnosis,
9    single provoked seizure; is that right?
10   A.   There was single unprovoked seizure.
11   Single provoked seizure.  It's more complete
12   list of the differential diagnosis.
13   Q.   All right.  And then on the next page
14   you address your recommendations again, and you
15   have the same recommendation regarding No. 1,
16   which is for unresponsiveness, correct?
17   A.   Yes.
18   Q.   Right.  Where you told him to avoid
19   driving or any other activities where he could
20   injure himself or cause injuries to others if a
21   seizure were to occur; is that right?
22   A.   Here I'm stating:  Previously patient
23   was told.  So -- so to me here it says, I'm not
24   changing anything.  That something was
25   discussed previously on the initial visit.

Page 40

1    general exam, mental exam, what do you want me
2    to read?
3    Q.   I just want to ask you generally
4    what -- what do you do during a follow-up visit
5    that might be different from an initial visit?
6    A.   There are some areas that you don't
7    exam.  As far as, for instance, the cranial
8    nerves, you don't examine all of them.  So it's
9    a briefer examination as compared to the
10   initial one.
11         But, yes, the examination was
12   done.
13   Q.   All right.  And if you look at Page 6
14   of this document, you have a differential
15   diagnosis listed out again; is that right?
16   A.   Yes.
17   Q.   All right.  And I want to ask you
18   about some additional diagnoses that you added
19   here.
20         On this form, on this date, you
21   added as a potential cause an episode of
22   unresponsiveness; is that right?
23   A.   Yes.  Episode of unresponsiveness.
24   Q.   All right.  And that is something that
25   you did not have on the first -- on your

Page 39

1    Q.   All right.  And under head -- under
2    headaches, you just discussed that you agreed
3    to increase his Gabapentin to include a half
4    tablet in the morning and noon, and then the
5    two at night; is that correct?
6    A.   Yes.
7    Q.   And then for the paresthes- --
8    paresthesias -- hopefully, I've said that
9    correctly -- what is No. 4, B12, ESR, ANA, RFR,
10   IFE, and anti-aging antibodies.  Is -- is that
11   some type of blood work?
12   A.   In -- at this point, I was trying to
13   find the cause for the paresthesias.  I'm doing
14   blood work, and I'm doing MRIs, recommending.
15   Q.   Okay.  And then you suggest or you
16   schedule a follow-up for October 25th, 2017; is
17   that correct?
18   A.   Yes.
19   Q.   All right.  So, why don't we go ahead,
20   you know, and you can close this exhibit.
21         How -- how are we doing?  Do we
22   need a break?  I think it's been about an
23   hour -- I'm not a 100 percent sure on that.  We
24   keep going?
25   A.   It's fine with me.

Page 41

11 (Pages 38 - 41)

1    Q.   All right.
2         MR. KASTER:  Me, too.
3    Q.   (BY MS. de LEON) All right.  I'm going
4    to show you what has previously been marked as
5    Exhibit No. 15.  Just give me one moment and
6    you can pull that up.
7         All right.  Please let me know
8    when you have that up.
9    A.   Which one?
10   Q.   It's Exhibit No. 15.  It's stamped
11   EPCARRILLO395 to 402.
12        THE CONCIERGE:  Mr. Aguilar, you may need
13   to refresh again.
14        THE WITNESS:  Okay.
15        THE CONCIERGE:  Double click in that
16   folder.
17   A.   This follow-up, 10/25, follow-up?
18   Q.   (BY MS. de LEON) Per -- yes, you've got
19   it.  It's entitled:  Neurology follow-up, date
20   of visit, 10/25/2017; is that right?
21   A.   Yes.
22   Q.   Okay.  And these are the notes that
23   you made following your visit with Mr. Carrillo
24   on October 25th, 2000 -- 2017; is that right?
25   A.   Yes.
                                        Page 42

1    Q.   Now, under the subjective part, you
2    indicate you reviewed the symptoms outlined on
3    his August 7th, 2017 visit, right?
4    A.   Yes.
5    Q.   And then you say:  Patient provided
6    the history.  Now, the -- the notes that
7    follow, are they based on new conversations
8    that you had with Mr. Carrillo at that time?
9    A.   So, this is a follow-up, so it's about
10   30 minutes of duration where you get the
11   history that's subjective to see if something
12   else is new, and then you examine the patient.
13   Q.   All right.  And there -- Mr. Carrillo
14   hadn't reported anything new at this visit, had
15   he?
16   A.   As far as episodes of
17   unresponsiveness, there were no recurrences.
18   Headaches have been improving from being daily,
19   they were occurring every few days, so there
20   were some improvements as far as symptoms.
21   Q.   And if you could scroll down to Page 7
22   for me, sir.  I want to look at the
23   differential diagnosis section again.
24   A.   Okay.  So you want me to review
25   differential diagnosis?
                                        Page 43

1         Yes.
2    Q.   There you still have listed episode of
3    unresponsiveness; single unprovoked seizure;
4    single provoked seizure; syncope; you've ruled
5    out stroke, or at least indicated stroke was
6    not demonstrated; CNS infection; and metabolic
7    encephaloathy and others, correct?
8    A.   Yes.
9    Q.   Okay.  So, at this time, did you
10   believe you had honed in on what the potential
11   cause of this loss of conscious episode was?
12   A.   No.  There is no definite cause for
13   the patient's symptoms.
14   Q.   And under recommendations, you, again,
15   note that previously you had informed him not
16   to drive and to avoid other activities that
17   would result in harm to himself and others,
18   correct?
19   A.   Yes.
20   Q.   Okay.  Now, under paresthesias, Item
21   5, you've referred him to the Mayo Clinic; is
22   that right?
23   A.   Yes.
24   Q.   Okay.  And so why did you refer him to
25   the Mayo Clinic?
                                        Page 44

1    A.   The way I practice, if I don't reach
2    definite diagnosis after doing my evaluation, I
3    offer patients a referral to centers of
4    excellence, and that would be Mayo Clinic.  So
5    you're hoping that you would gain a better view
6    and to see if they can come up with a
7    diagnosis.
8    Q.   Was this referral solely in relation
9    to the paresthesias, or was it in relation to
10   the headaches and unresponsiveness, as well?
11   A.   This suggestion was in reference to
12   his multiple symptoms.  And that would be the
13   episode of unresponsiveness, the paresthesias,
14   headaches.
15   Q.   Okay.  Do you know if Mr. Carrillo
16   ever went to the Mayo Clinic?
17   A.   No.
18   Q.   Okay.  And then you also recommend a
19   follow-up visit with him on January 25th, 2018;
20   is that correct?
21   A.   Yes.
22   Q.   All right.  So, let's go ahead and
23   look at your follow-up notes from that visit.
24        You can put this exhibit aside.
25        I'm going to show you what has
                                        Page 45

1 previously been marked as Exhibit No. 21.
2   A.   Yes, I have visit 1/28/2018.
3   Q.   Is it 1/25/2018?
4   A.   Yes.
5   Q.   Okay.  All right.  So, these are the
6 notes from your neurology follow-up on January
7 25th, 2018, correct?
8   A.   Yes.
9   Q.   Okay.  And is this your last visit
10 with Mr. Carrillo?
11   A.   Yes.
12   Q.   Okay.  And he indicated at this visit
13 that his headaches had been resolved; is that
14 correct?  That's on the first page.
15   A.   Yes.
16   Q.   You can turn to Page 6 for me, please.
17   A.   Yes.
18   Q.   All right.  Under the clinical
19 impression.
20   A.   Yes.
21   Q.   All right.  You indicate at the end
22 that you've discussed ongoing symptomatic
23 treatment, other options, referral to
24 university center, et cetera.
25       What -- what do you mean by that?

Page 46

1   A.   Ongoing treatment is what he's been
2 getting.  That would be the Gabapentin.  Other
3 options, paresthesias can be treated with
4 Gabapentin.  There are other medications that
5 can be used.  And then referral to university
6 center.  That -- that's the same as going to
7 the Mayo Clinic.
8   Q.   So, just a referral to another
9 potential center of excellence to help identify
10 what the cause of his symptoms were?
11   A.   Yes.
12   Q.   Okay.  Under differential diagnosis,
13 we have a list of episode of unresponsiveness;
14 single unprovoked seizure; single provoked
15 seizure; syncope; stroke was not demonstrated;
16 CNS infection; metabolic encephalopathy; and
17 others.  Is that correct?
18   A.   Yes.
19   Q.   Okay.  So, am I correct, then, that
20 you did not have a definitive cause for his
21 period of -- or when he lost consciousness?
22   A.   I had not reached a definite diagnosis
23 for his multiple symptoms.
24   Q.   Now, did you -- on the
25 recommendations, you indicate that he'll

Page 47

1 continue his care with Ms. Saenz and
2 Dr. Williams; is that correct?
3   A.   Yes.
4   Q.   Why -- why didn't you repeat the
5 recommendation referencing your previous
6 guidance to him to avoid driving or engaging in
7 other conduct that would injure himself or
8 others?
9   A.   I -- I don't understand, where is it?
10   Q.   Sure.  And I'm sorry about that.
11       On the previous visits, under
12 recommendation, you had noted under
13 unresponsiveness that previously he was told
14 not to drive and avoid other activities that
15 could cause injuries to himself and others; is
16 that correct?
17   A.   Yes.
18   Q.   Okay.  And why is it that you did not
19 restate that guidance under these
20 recommendations on the January 25th note?
21   A.   I don't know.
22   Q.   Did you make any recommendations to
23 Mr. Carrillo as far as him being able to return
24 to work?
25   A.   No.

Page 48

1   Q.   Okay.  And did you at any point make
2 any assessment of Mr. Carrillo with respect to
3 any risk for future seizures?
4   A.   Typically, when you review records or
5 review symptoms, you don't have a diagnosis in
6 this case.  So, yes, there is always a risk for
7 spells.  We don't know that percentage of the
8 risk, because there is no definite diagnosis.
9   Q.   All right.  And you used the term
10 "spells" there, and just want to make sure that
11 we are clear that when you use spells -- terms
12 of a risk for spells, is that different, in
13 your mind -- is there a difference -- sorry,
14 strike that.
15       Is there a difference, in your
16 mind, between a risk for spells and a risk for
17 seizures?
18   A.   Spells, I'm using the term for
19 seizures, episodes of unresponsiveness,
20 syncope, all of those would be included.
21   Q.   Am I correct, Dr. Aguilar, that this
22 January 25th was the last time that you saw
23 Mr. Carrillo?
24   A.   Yes.
25   Q.   All right.  Well, thank you, sir.  I

Page 49

13 (Pages 46 - 49)

1   have no further questions at this time.
2          THE WITNESS:  Thank you.
3          MR. KASTER:  And I'm going to have some
4   questions for you, Doctor.  But why don't we take a
5   few-minute break so we can -- before we proceed,
6   because I'll probably be less than an hour, but we've
7   been going for an hour and 20 minutes or so.  So
8   let's take a few minutes and we'll come back.  Let's
9   say five.
10         THE VIDEOGRAPHER:  All right.  This ends
11  Media No. 1.  Going off the record at 10:21 a.m. and
12  one second while I stop the recording.
13         We're off.
14         (Break.)
15         THE VIDEOGRAPHER:  This begins Media
16  No. 2.  Going back on the record at 10:31 a.m.
17         EXAMINATION
18   Q.  (BY MR. KASTER)  Dr. Aguilar, same
19  instructions for you that Counsel reviewed at
20  the beginning.  In particular, I would say that
21  if any of my questions are unclear, ask me to
22  repeat and clarify.  I'm happy to try to ask
23  you simple, direct questions.  And if I fail to
24  do that, just let me know.
25         Okay, is that --

Page 50

1   A.  Yes.
2   Q.  -- good?
3   A.  Yes.
4   Q.  Okay.  We're going to cover some of
5   the same exhibits that you just went through.
6   At least, we'll talk about a few things that
7   are on those exhibits which reference the
8   various meetings and conferences --
9   consultations that you had with Mr. Carrillo.
10         But, let me just back up a little
11  bit.  It sounds to me like from looking at the
12  documents, that you saw Mr. Carrillo four -- on
13  four separate occasions; is that correct?
14   A.  Yes.
15   Q.  And you mentioned the first occasion
16  was a visit that lasted about an hour or so.
17         Do you recall that?
18   A.  Yes.
19   Q.  This lawsuit is about Union Pacific
20  taking the position that Mr. Carrillo cannot --
21  could not safely perform his job as a diesel
22  electrician, so he lost his job with them for a
23  period of years as a result of -- of them
24  reviewing records.
25         After visiting with Mr. Carrillo

Page 51

1   for four -- on four separate occasions, you
2   were unable to come up with a definitive
3   diagnosis, correct?
4   A.  Yes.
5   Q.  Did anyone talk to you from Union
6   Pacific before Mr. Carrillo lost his position
7   with Union Pacific?
8          MS. de LEON:  Objection, form.
9   A.  No.
10   Q.  (BY MR. KASTER)  I'm going to cover a
11  couple of other exhibits that I am not sure if
12  you've seen.  But, let's go to Exhibit 8.
13         MR. FRANCOIS:  Just bear with me, I'm
14  getting it pulled up here.
15         MR. KASTER:  Okay.  No problem.
16         MR. FRANCOIS:  That's not the right one.
17  Oops, sorry about that.  I think I introduced the
18  wrong one here.  My apologies.
19         So one second.
20         You can take that one there.
21   Q.  (BY MR. KASTER)  Okay.  I'm going to
22  pull up --
23         MR. KASTER:  Or are you pulling it up?
24         MR. FRANCOIS:  Yeah, I am, Jim.  It's just
25  giving me a little bit of a hard time.

Page 52

1          MR. KASTER:  Okay.  No problem.  No
2   problem.
3          MR. FRANCOIS:  Just bear with me one
4   second.
5          MR. KASTER:  Okay.
6          MR. FRANCOIS:  All right.  We should be
7   good now.
8          MR. KASTER:  Okay.
9          THE CONCIERGE:  Yes, it is.  It should be
10  in there, Counsel.
11   Q.  (BY MR. KASTER)  Okay.  Pulling up
12  Exhibit 8.  These are records from Mia Saenz --
13   A.  I don't find that exhibit.
14   Q.  You don't find it?
15         MR. FRANCOIS:  So -- so, Mr. Aguilar,
16  you're going to need to double click on the marked
17  exhibits folder to make that refresh.
18         THE WITNESS:  Okay.  Yes.  No. 8?
19         MR. KASTER:  Correct.
20   A.  Okay.  Yes, I have No. 8.
21   Q.  (BY MR. KASTER)  Okay.  One of the
22  things about -- so, these are records from a
23  care provider, Mia Saenz.  Did you see these
24  records for Mr. Carrillo?
25   A.  I see it, yes.  I had never seen it.

Page 53

14 (Pages 50 - 53)

| | |
|---|---|
| 1      Q.   Let me rephrase the question. | 1          MR. FRANCOIS:  You said Exhibit 11, |
| 2          Did you see them at the time of | 2  correct, Jim? |
| 3  your visits with Mr. Carrillo? | 3          MR. KASTER:  I did say that. |
| 4      A.   No. | 4          Thank you. |
| 5      Q.   All right.  It says here chief | 5          MR. FRANCOIS:  We're good now. |
| 6  comp- -- the chief complaint is:  Patient is | 6      Q.  (BY MR. KASTER)  Okay.  I'm pulling up |
| 7  here for physical exam and states last Tuesday | 7  Exhibit 11. |
| 8  he fainted. | 8          Do you see that, Doctor? |
| 9          Is that the same thing -- is that | 9          Can you click on that? |
| 10  a synonym for syncope? | 10      A.   Yes. |
| 11          MS. de LEON:  Objection, form. | 11      Q.   Mr. Carrillo was simultaneously with |
| 12      A.   Fainting is used for syncope. | 12  your visiting with him as a neurologist, |
| 13      Q.  (BY MR. KASTER)  And one of the things | 13  Mr. Carrillo was also getting a cardiology |
| 14  you talked about with syncope, was that in- -- | 14  workup; is that correct? |
| 15  with syncope a lot of times you might be | 15      A.   This is a note from a cardiologist, is |
| 16  light-headed prior to the event, right? | 16  that what you're saying? |
| 17      A.   Yes. | 17      Q.   This is the reason for an appointment |
| 18      Q.   Mr. Carrillo was actually sleeping | 18  is -- it appears that this relates to an EKG? |
| 19  prior to the event, right? | 19          MS. de LEON:  Objection, form. |
| 20          MS. de LEON:  Objection, form. | 20      Q.   (BY MR. KASTER) If you look at the |
| 21      A.   Do -- do you want me to go to initial | 21  reason for the appointment. |
| 22  sheet that I received -- that I obtained? | 22          Do you see that on the first |
| 23  Because this is a records from somebody else. | 23  page, syncope and collapse, PCP, Mia Saenz, EKG |
| 24      Q.  (BY MR. KASTER)  No, I understand.  I | 24  done today? |
| 25  understand. | 25      A.   Okay.  Yes. |
| Page 54 | Page 56 |

| | |
|---|---|
| 1          Well, let's defer on that | 1      Q.   Did you see this record prior to |
| 2  question.  We can come back to it. | 2  today? |
| 3          One of the things that this | 3      A.   No. |
| 4  record talks about, if we go to -- if you go to | 4      Q.   And, again, and with the history of |
| 5  page -- what is Bates-stamped Page 329, in the | 5  the present illness, it says 31-year-old male |
| 6  bottom right-hand corner, there's Bates-stamped | 6  with no significant PMH.  Do you know what that |
| 7  pages on the document. | 7  stands for, "PMH?" |
| 8          Do you see that, Doctor? | 8          MS. de LEON:  Objection, form. |
| 9      A.   329? | 9      A.   PMH? |
| 10      Q.   Yes, that would be CARRILLO -- | 10      Q.   (BY MR. KASTER)  Would that be a prior |
| 11  UPCARRILLO0000329.  It's actually -- | 11  medical history? |
| 12      A.   Yes. | 12          MS. de LEON:  Objection, form. |
| 13      Q.   -- Page 5.  It says, in the discussion | 13      A.   Where is that, Page 1? |
| 14  of the patient, it says, educated on adequate | 14      Q.   That would be on Page 1 of the |
| 15  sleep, hydration and healthy diet. | 15  document, Page 1 of 3 under general. |
| 16          Can dehydration cause -- cause an | 16      A.   Okay.  And the question is what?  I'm |
| 17  event of syncope? | 17  sorry. |
| 18      A.   Yes. | 18      Q.   We were referring to an acronym, PMH, |
| 19      Q.   If we go back to -- let -- let's go to | 19  and I was wondering if you know -- if you know |
| 20  Exhibit 11. | 20  if that refers to prior medical history? |
| 21          MR. FRANCOIS:  Hold on one second. | 21      A.   Past medical history, no medical |
| 22          MR. KASTER:  Sure. | 22  history.  Maybe I'm not reading what you're -- |
| 23          MR. FRANCOIS:  Give me a second here.  My | 23  want me to read. |
| 24  computer is just moving a little slower than normal. | 24      Q.   No, that's -- that's fine.  But it -- |
| 25          MR. KASTER:  It's all right. | 25  and then it goes on to talk about, he's here |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

Page 58

1  for an evaluation of syncope.
2       Do you see that?
3    A.  Yes.
4    Q.  And then if we go to your first visit
5  with Mr. Carrillo, that is represented by
6  Exhibit 13, the 8/7 visit, correct?
7       So, if you go to that Exhibit 13
8  and go to the first page?
9    A.  Neurology consultation?
10   Q.  Right.  And that's -- the date of that
11  visit is 8/7 of 2017, correct?
12   A.  Okay.  Yes.
13   Q.  And you've talked here about an
14  episode of unresponsiveness in terms of onset,
15  correct?
16   A.  Episode of unresponsiveness, yes.
17   Q.  Now, throughout this time, I think you
18  say that you were unable to determine the
19  length of time of the unresponsiveness; that
20  the duration was unknown.
21       Do you see that?  It's probably
22  ten lines down under history of present
23  illness?
24   A.  Yes.
25   Q.  Would it be fair to say that when you

Page 59

1  are unconscious or when you lose consciousness,
2  that you yourself might not be able to
3  determine or know what that duration is?
4    A.  Yes.
5    Q.  Did you ever speak to his significant
6  other, his girlfriend?
7    A.  No.
8    Q.  You review a number of (indiscernible)
9  systems, and I just want to ask you, at the
10  bottom of Bates-Page 382, which is Page 2 of
11  your visit, at the bottom of that page, I'm a
12  little confused by this.  It says,
13  "constitutional system review."  Do you see
14  that line?
15   A.  Yes.
16   Q.  It says, "Patient denies weight loss.
17  Denies fever, denies chills."  But then it
18  says, "He lost about 20 pounds after the
19  episode of unresponsiveness."
20   A.  Yes.
21   Q.  That would be a significant weight
22  loss, right?
23   A.  Yes.
24   Q.  You review a number of systems, his
25  cardiovascular system, his endocrine system,

Page 60

1  gastrointestinal, musculoskeletal, respiratory,
2  all of the systems that you reviewed were
3  normal, right?
4    A.  He was told that he probably had
5  prediabetes in the most recent lab test.
6    Q.  Okay.  So he had to -- he had to lose
7  some weight, right?
8    A.  Yeah.  And he had diarrhea and
9  nausea --
10   Q.  Uh-huh.
11   A.  -- after the episode of
12  unresponsiveness.
13   Q.  Uh-huh.  Okay.
14   A.  And then he had had muscle pain,
15  flu-like symptoms.
16       He had a cough.  He reported
17  itching.  He reported anxiety, depression.
18   Q.  You mentioned the anxiety earlier that
19  he had reported.  He actually told you he had
20  anxiety before this event, right?
21   A.  In the review of systems, he reported
22  anxiety.
23   Q.  Sure.  But going back to that record,
24  the reference to anxiety, it says -- and I'm
25  looking at Page 2 of the document.  It says:

Page 61

1  He reported I -- anxiety episodes since the
2  episode.  I assume that's the episode of
3  unresponsiveness, right?
4       Are you with me, Doctor?
5    A.  He reported anxiety episodes since the
6  episode.
7    Q.  Right.
8    A.  Since the episode of unresponsiveness,
9  yes.
10   Q.  Okay.  But, right there in the next
11  line it says, he had anxiety before, right?
12   A.  Yeah, he had anxiety before.
13   Q.  Okay.  And then if we go down to
14  the -- what is Page 385 -- or Page 5 of 6, you
15  review his motor functions?
16   A.  Yes.
17   Q.  And that's summarized there.
18       No weakness in the right or left
19  thumb, fingers, middle finger; no hand-grip
20  weakness; no wrist weakness; no elbow weakness,
21  right?
22   A.  Yes.
23   Q.  Did I understand you to say earlier
24  that typically that it's oftentimes true that
25  with respect to a seizure, that you will be

16 (Pages 58 - 61)

1  able to find the cause?
2        MS. de LEON:  Objection, form.
3     A.  With respect to the seizures, the
4  cause a lot of times is not (no audio).
5     Q.  (BY MR. KASTER)  I'm sorry, I didn't
6  hear -- I -- I'm not sure that we heard that
7  answer.  The cause is not what, I'm sorry?
8     A.  Determined, a known cause for a
9  seizure.
10     Q.  Well, one of the reasons why you do an
11  MRI, for example, is to find out if a person
12  has a lesion in the brain, right?
13     A.  Yes.
14     Q.  And one of the reasons why you perform
15  the other tests, the EEG, is to find out if
16  there was seizure activity?
17     A.  Yes.
18     Q.  So, is it time -- is it oftentimes
19  true that with respect to a seizure, you can
20  find a physical cause or physical evidence?
21        MS. de LEON:  Objection, form.
22     A.  It's not uncommon not to find a cause
23  for a seizure.
24     Q.  (BY MR. KASTER)  Okay.  Not really my
25  question.  My question is:  Is it oftentimes

Page 62

1     A.  Yes.
2     Q.  Let's go to Exhibit 14.
3     A.  Yes.
4     Q.  We start out in Exhibit 14, again,
5  talk about an episode of unresponsiveness,
6  right?  If you look under subjective?
7     A.  Yes.
8     Q.  You still at this point don't know how
9  long the episode lasted, right?
10     A.  So, it would be like a -- see history
11  and physical description.  So, yes, the
12  duration and all of that is unknown.
13     Q.  Yeah, if we look at Page 2 of this
14  document, it says the duration of the episode
15  is unknown, right?
16     A.  Yes.
17     Q.  Does that matter, by the way?
18        MS. de LEON:  Objection, form.
19     A.  Regarding what?
20     Q.  (BY MR. KASTER)  In terms of dec- --
21  deciding if it was a fainting episode or a
22  seizure episode, does it matter how long it
23  lasted?
24     A.  It would help with the history.
25     Q.  Would it be more likely to be an event

Page 64

1  true that you can find a cause for a seizure?
2     A.  Can you repeat the question?
3     Q.  Sure.  Is it oftentimes true that you
4  can find a cause for a seizure, a physical
5  cause?
6        MS. de LEON:  Objection, form.
7     A.  Sometimes you find a cause for the
8  seizures, yes.
9     Q.  (BY MR. KASTER)  We've gone through the
10  recommendations that you had for Mr. Carrillo
11  to avoid driving and other things.  That's a
12  part of your last section of Exhibit 13, your
13  first visit with Mr. Carrillo, right?
14     A.  Yes.
15     Q.  At the bottom of that section of your
16  record, you reference a long explanation
17  regarding the above.  And you say, I also
18  explained that despite multiple tests, a
19  definite diagnosis might not be reached.
20        This is on Page 7 of your
21  document.  Do you see where I'm looking?
22     A.  Yes.
23     Q.  So, you had a long conversation with
24  Mr. Carrillo about how you may not find or be
25  able to reach a definite diagnosis?

Page 63

1  of syncope or fainting if the episode wasn't of
2  short duration?
3        MS. de LEON:  Objection, form.
4     A.  So, the -- the duration of seizures is
5  shorter than seizures.  Syncope lasts less --
6  let's say, a minute, minute and a half.
7  Seizures may last two, three minutes.
8     Q.  (BY MR. KASTER)  So, the duration might
9  be important?
10     A.  It's one of the characteristics that
11  help to reach a diagnosis.
12     Q.  If we go to Page 6 of this document, I
13  think you talked about that before.  If we go
14  to Page 6, of the document.
15     A.  Yes.
16     Q.  We see under, clinical impression, he
17  denied reoccurrences.  MRI brain and EEG were
18  unremarkable.
19     A.  Yes.
20     Q.  Unremarkable simply means that they
21  were normal, right?
22     A.  Normal examination.
23     Q.  One of the -- one of the words that
24  was used earlier was "paresthesias."  What is
25  paresthesias?

Page 65

17 (Pages 62 - 65)

| | |
|---|---|
| 1    A.   It's an abnormal sensation.  It can be<br>2   used for numbness.<br>3    Q.   Uh-huh.<br>4    A.   Tingling.  Burning.<br>5    Q.   I'm sorry.  I didn't mean to cut you<br>6   off?<br>7    A.   Bur-- -- burning, pain, burning.<br>8    Q.   Mr. Carrillo was taking Gabapentin for<br>9   a condition like that prior to this episode,<br>10   right?<br>11    A.   Yes.<br>12    Q.   And still at the end of the second<br>13   visit, you have a differential diagnosis,<br>14   right?<br>15    A.   What was the question, sir?<br>16    Q.   At the end of the second visit, you<br>17   still have a differential diagnosis?<br>18    A.   Yes.<br>19    Q.   So, you can't -- and were unable to<br>20   identify which of these conditions Mr. Carrillo<br>21   had experienced, correct?<br>22    A.   Yes.<br>23    Q.   You're pretty sure it's -- wasn't a<br>24   stroke?  He doesn't have any physical symptoms<br>25   of a stroke, right?<br><div align="right">Page 66</div> | 1    Q.   -- 2, middle of the page?<br>2    A.   Yes.<br>3    Q.   And you've referenced the fact that<br>4   his girlfriend was there with him because she<br>5   heard him snoring, right?<br>6    A.   Are you going back to the initial<br>7   history?<br>8    Q.   Right.<br>9    A.   Yes.<br>10    Q.   And if we go to the end of this<br>11   document, under clinical impressions, Page 6,<br>12   and I think you referenced this earlier.  His<br>13   headaches were improving, right?<br>14    A.   Improving, headaches improving.<br>15    Q.   This is under clinical impression?<br>16    A.   Yes.<br>17    Q.   And then if we go to Page 7 you had,<br>18   again, the differential diagnosis, right?<br>19    A.   Yes.<br>20    Q.   And, again, you referred to in the<br>21   recommendation, a reference to driving or other<br>22   activities -- to avoid those activities, right?<br>23    A.   Yes.<br>24    Q.   I'm going to take you to Exhibit 17,<br>25   which I'm not sure if you've seen it before<br><div align="right">Page 68</div> |
| 1    A.   Stroke was not demonstrated on MRI<br>2   brain.<br>3    Q.   So, if we go to Exhibit 15 -- and by<br>4   the way, you still have this recommendation in<br>5   here, you referred to the recommendation that<br>6   was made earlier about driving, right?<br>7    A.   Episode of unresponsiveness,<br>8   previously patient was told.  Is that what<br>9   you're talking about?<br>10    Q.   Yeah.  Right.  You're repeating what<br>11   the recommendation was from your earlier visit<br>12   a month earlier about driving, right?<br>13    A.   Yes.<br>14    Q.   All right.  Let's go to Exhibit 15.<br>15    A.   Yes.<br>16    Q.   This is your visit a little bit more<br>17   than a month later where you go through the<br>18   background and history with the patient.  The<br>19   history of the present illness is at the bottom<br>20   of Page 1 of the document, right?<br>21    A.   Yes.<br>22    Q.   And you talk about his symptoms and,<br>23   again, the duration of the episode is unknown,<br>24   right?  That's referred to on Page --<br>25    A.   Yes.<br><div align="right">Page 67</div> | 1   or not.<br>2        MR. FRANCOIS:  Working on it, Jim.  Give<br>3   me a sec.<br>4        MR. KASTER:  Yeah, thank you.<br>5        MR. FRANCOIS:  Sure.<br>6        Should be good.<br>7        MR. KASTER:  Not seeing it yet -- let me<br>8   refresh here.  Oh, there it is.  I got it.<br>9        Thank you.<br>10    A.   Yes.<br>11    Q.   (BY MR. KASTER)  This is an e-mail from<br>12   Mr. Carrillo to finish for duty people at Union<br>13   Pacific.  It references a recommendation from<br>14   his family doctor.  And the papers that he<br>15   received, I -- I believe, from you, being<br>16   forwarded to them.<br>17        Did you ever speak to Doc- --<br>18   Mr. Carrillo's family doctor?<br>19    A.   No.<br>20    Q.   Did you ever make any kind of a<br>21   recommendation about whether and when he could<br>22   return to work?<br>23    A.   No.<br>24    Q.   No one from Union Pacific asked you<br>25   about whether and when Mr. Carrillo could<br><div align="right">Page 69</div> |

<div align="right">18 (Pages 66 - 69)</div>

| | |
|---|---|
| 1   return to work? | 1   question. Let's start over. |

1  return to work?
2      MS. de LEON: Objection, form.
3    A.  No.
4    Q.  (BY MR. KASTER) And let's go to
5  Exhibit 21, which I believe is your last visit
6  with Mr. Carrillo.
7    A.  Yes.
8    Q.  And this was in January of 2018,
9  correct?
10    A.  Hold on a second. I have that one --
11  exhibit -- what's the number, you said.
12    Q.  This would be Exhibit 21.
13    A.  21? Yes.
14      1/25/2018.
15    Q.  And I think you indicate that at this
16  point in time Mr. Carrillo's headaches had
17  resolved, right?
18    A.  Yes.
19    Q.  And you do -- you referenced the tests
20  that had been done, the EEG and MRI, right?
21    A.  Yes.
22    Q.  And there's no abnormality?
23    A.  MRI brain?
24    Q.  Normal MRI examination of --
25    A.  Yes.

Page 70

1  question. Let's start over.
2      Is it possible that there is no
3  recommendation regarding driving and that that
4  lack of a recommendation was intentional?
5      MS. de LEON: Objection, form.
6    A.  I don't know.
7      MR. KASTER: That's all the questions I
8  have for you, Doctor. Thank you.
9      THE WITNESS: Thank you.
10      MS. de LEON: Thank you, Doctor. I have
11  no questions -- no further questions.
12      THE VIDEOGRAPHER: All right. This
13  concludes today's deposition. Going off the record
14  at 11:07 a.m. and one second while I stop the
15  recording.
16      THE REPORTER: This is the reporter.
17  Mr. Kaster, do you want a copy of this deposition?
18      MR. KASTER: Oh, sure. We have a --
19  Sherick will give you the standard order --
20      THE REPORTER: Okay.
21      MR. KASTER: -- we have.
22      THE REPORTER: All right.
23    (Deposition adjourned at 11:07 a.m.)
24
25

Page 72

1    Q.  -- of the brain. No abnormal
2  enhancement. This is on Page 6.
3    A.  Yes.
4    Q.  And the EEG was also unremarkable,
5  right?
6    A.  Yes.
7    Q.  You still have the differential
8  diagnosis of the listed possibilities, right?
9    A.  Yes.
10    Q.  So, after the four visits with
11  Mr. Carrillo, you were unable to reach a
12  definite diagnosis, correct?
13    A.  Yes.
14    Q.  In terms of the recommendation, you
15  were asked earlier why the recommendation
16  regarding driving or not driving does not
17  appear here. And I think you said, I don't
18  know.
19      Do you recall saying that?
20    A.  Yes.
21    Q.  Is it possible that you don't know
22  because you don't remember?
23    A.  I don't know.
24    Q.  Is it possible that the reference to a
25  lack of recommendation -- I'm -- that's a bad

Page 71

CERTIFICATE

1
2    I, SANDRA M. MIEROP, Certified Shorthand
3  Reporter in and for the State of Texas, hereby certify
4  that the foregoing proceedings were taken before me at
5  the time and place herein set forth; that the witness
6  was sworn to tell the truth; that the proceedings were
7  reported stenographically by me and later transcribed
8  by computer transcription; that the witness requested
9  signature; that the foregoing is a true record of the
10  proceedings taken at that time; and that I am not a
11  party to, nor do I have any interest in, the outcome of
12  the action herein contained.
13    IN WITNESS WHEREOF, I have hereunto set
14  my hand and affixed my seal this 1st day of March,
15  2022.
16
17
18
      SANDRA M. MIEROP
19    Certified Shorthand Reporter No. 2185
    State of Texas
20
21
22
23
24
25

Page 73

19 (Pages 70 - 73)

1   Mr. Lucas J. Kaster, Esq.

2   kaster@nka.com

3                        March 1, 2022

4   RE:  Carrillo, Joseph v. Union Pacific Railroad Company

5    2/11/2022, Dr. Mario R. Aguilar (#5047629)

6      The above-referenced transcript is available for

7   review.

8      Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  errata-tx@veritext.com.

16

17    Return completed errata within 30 days from

18  receipt of testimony.

19    If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22            Yours,

23            Veritext Legal Solutions

24

25

                                              Page 74

---

1   Carrillo, Joseph v. Union Pacific Railroad Company

2   Dr. Mario R. Aguilar (#5047629)

3          ACKNOWLEDGEMENT OF DEPONENT

4      I, Dr. Mario R. Aguilar, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____   _____

12  Dr. Mario R. Aguilar              Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20___.

16

17

18  _____

19  NOTARY PUBLIC

20

21

22

23

24

25

                                              Page 76

---

1   Carrillo, Joseph v. Union Pacific Railroad Company

2   Dr. Mario R. Aguilar (#5047629)

3        E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____   _____

24  Dr. Mario R. Aguilar           Date

25

                                              Page 75

20 (Pages 74 - 76)

CONFIDENTIAL

Exhibit KK

**Union Pacific Railroad**
Health and Medical Services

## HEALTH & MEDICAL SERVICES STATUS UPDATE

March 05, 2018

**To:** Andreas Mader (00421353), Anthony Holman (00021633), Brett Thomason (00438092), Daniel Glenn (00231018), Heather Aguilera (00415677)

**From:** Bridgette Ziemer/ OCC Health Nurse

       **On behalf of Union Pacific Chief Medical Officer**


**Subject:**   **Fitness for Duty Determination**

**Regarding:**   Joseph A. Carrillo

**Employee ID #:** 00457172

**Job Title:**   Electrician

**Regarding Health & Medical Service:** HEALTH CONDITION - REPOR   ☑ Off Duty   ☐ On Duty/Occupational

**Based on medical information available to Health & Medical Services at this time, the employee is:**

Not Medically Cleared - Temporary effective   March 05, 2018

☑ MLOA recommended effective   July 01, 2017   through April 01, 2018

Comment:

In accordance with Union Pacific Railroad Medical Rules, this employee will require a Fitness-For-Duty review **_prior_** to his/her return to work. Please ensure that your employee contacts the FFD nurse upon their request to return to work.

For questions, please contact, Bridgette Ziemer at 877-275-8747.

CC:

**Business References:** BU006_BU Template Letter – MLOA Approved Off Duty
                             BU007_BU Template Letter – MLOA Approved On Duty
                             FL001_ FMLA Notice Of Eligibility and Rights & Responsibilities

UPCARRILLO000593

CONFIDENTIAL

**Exhibit LL**

Re: Disability Letter

We are in receipt of information from your employer indicating that you stopped working because you are disabled. In order for your health coverage to continue, we must have the proof of your disability statement below completed by your attending physician.

The completed form should be mailed or faxed to Railroad Enrollment Services. The mailing address and fax number are:

Railroad Enrollment Services
PO Box 30775
Salt Lake City, UT 84130-0775
Fax #: (248) 733-6080

**IF THIS PROOF OF DISABILITY IS NOT RECEIVED, YOUR COVERAGE WILL BE TERMINATED.**

If you have questions, please call Railroad Enrollment Services at (800) 753-2692.

**TO BE COMPLETED BY ATTENDING PHYSICIAN:**

Please put Union Pacific employee id here: 0457172

I certify that JOSEPH Carrillo has been disabled from performing his/her regular occupation from 7·1·2017 (Date) to 4·1·2018 (Date) due to the following condition(s):

RHC → Neurology

Is the employee permanently disabled from his/her regular occupation? YES **NO** (Please circle one.)

If no, please give us an estimated return to work date 4·1·2018, or the date of his/her next appointment with you N/A.

John P Holland MS MPH    3·5·2018

Physician's Signature                              Date

UNION PACIFIC RAILROAD
HEALTH & MEDICAL SERVICES
1400 DOUGLAS STREET #0350
OMAHA, NE 68179-0350
MDOS96

I AM NOT THE TREATING PHYSICIAN. THIS FORM COMPLETED IN MY CAPACITY AS MEDICAL DIRECTOR FOR THE UNION PACIFIC RAILROAD.

UPCARRILLO000586

CONFIDENTIAL

United States of America
Railroad Retirement Board

Form Approved
OMB No. 3220-0039

**SUPPLEMENTAL DOCTOR'S STATEMENT**

EID: 0457172

Social Security Number

Patient's Name

JOSEPH CARRILLO

INSTRUCTIONS TO DOCTOR: *Please complete all items and return this form* in the enclosed envelope to the Railroad Retirement Board (RRB) *immediately*. No additional sickness benefits can be paid to this patient until this supplemental medical form is completed and returned. This information is to be supplied without expense to the RRB. Also read the "Important Notice" on the previous page of this form.

1. Have you examined or treated the patient for illness or injury? ☐ Yes ☒ No
   If "Yes," give the date you last examined or treated the patient:
   LAST PHCP EVAL - JANUARY 2018       MEDICAL FILE REVIEW ONLY

2. Please give:
   A. Diagnosis: Loss of Consciousness
   B. Current objective finding:
   C. Complications (show any factors retarding recovery):
   D. Current response to treatment:

3. Did the patient require surgery? ☐ Yes ☒ No — Go to Item 4
   If "Yes" - A. Indicate the type of surgery:
   B. Date of most recent surgery:

4. If maternity, give estimated or actual date of delivery: ∅

5. Do you believe the patient is now able to work without restriction in his/her last occupation?
   A. ☐ Yes -- Give the date the patient became able to work:
   B. ☒ No -- Give an estimated return-to-work date and explain how the medical evidence shows the patient is still disabled.   ARTW DATE IS   4.1.2018
   Estimated return-to-work date (*if indefinite, give estimated date*):
   Explanation: PER UPRR HMS GUIDELINES - NOT FFD
   REVIEW IN PROGRESS

6. Has the patient reached maximum medical recovery? ☐ Yes ☐ No — Go to Item 7
   If "Yes" - A. Give the date the patient reached maximum recovery:
   B. Is the patient able to do some kind of work? ☐ Yes ☒ No

7. I certify that the information I am giving is true, complete, and correct. I understand that criminal and civil penalties may be imposed on me for false or fraudulent statements or for withholding information to cause or prevent payment of benefits by the RRB.

   Signature of Doctor: John Holland MD MPH       Degree/Title: CMO

   Name of Doctor (Print or Type): John Holland       Date: 3.5.2018

   Address (Print or Type): 1400 Douglas       Office Telephone Number (Include area code): (817) 275 8747

   City, State, ZIP Code: Omaha Ne 68179       National Provider Identifier:

I AM NOT THE TREATING PHYSICIAN. THIS FORM COMPLETED IN MY CAPACITY AS MEDICAL DIRECTOR FOR THE UNION PACIFIC RAILROAD.

SI-7 (06-09)

UPCARRILLO000587



PO Box 14560
Lexington
KY
40512-4560

Attn: SYLVIA BRANCH

Ph: 1-800-205-7651

Fax: 18666671987

**ATTENDING PROVIDER STATEMENT (APS)**

Please furnish this information about your patient's current absence. The patient's receipt of Disability Benefits depends upon the immediate return of this form.

Patient:

EID# 0457172

SS#

Claim #: 15984536

Date of Birth:

Job Title/Function: ELECTRICIAN

Provider Name

(Please Print): JOHN P. HOLLAND

Specialty: CMO UPRR

Provider Title

(MD, PhD, etc)

**UNION PACIFIC RAILROAD
HEALTH & MEDICAL SERVICES
1400 DOUGLAS STREET #0350
OMAHA, NE 68179-0350**

Provider Phone: (

Provider Fax: (

Provider Address:

DO NOT THE TREATING PHYSICIAN. THIS FORM COMPLETED IN MY CAPACITY AS MEDICAL DIRECTOR FOR THE UNION PACIFIC RAILROAD

Diagnosis: Syncope , RBBB, Sinus BradyCARDIA

ICD-9

Is Diagnosis work related?      o Yes      ☒ No

Surgery / CPT=

Date:  /  /

Hospitalized?    o Yes   ☑ No

Ad:  /  /   D/  /  /

Signs / Symptoms preventing patient from performing job

PER UPRR HMS Guidelines EE NOT yet

cleared FIT FOR DUTY.

Significant diagnostic exams /

Review remains IN Progress AS OF 1.18-2018

Current Treatment:

WITH PTCP

Medication(s) & dosages:

First Treatment Date: 07 /03 /2017      Most Recent Appt: JANUARY, 2018

UPCARRILLO

Next Appt:     /   /

EDC
(pregnancy only):     /   /

Specialist Referral: CARDIOLOGY  &  Neurology          Specialty:

Name

Phone:  (        )                                           Date of referral:     /   /

Could patient work with restrictions?     o Yes   X No

If                                    If

YES                                  NO

please describe restrictions:        dates requesting

                                     Total Disability:

                                     Start Date: 7/1 2017  Through Date: 4.1.2018

                                     Is Patient

                                     PERMANENTLY                    o Yes  X No

                                     disabled?

If Reduced working hours and/or Restrictions are requested,   Date Patient may Return to Work
indicate:

Start Date:    /   /    Through Date:    /   /          Full time / Full duty:    /   /

                                     # Hour / day:          # Days /week:

John P Holland MD MPH           __3-5-2018

Attending Provider's Signature                   Date

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

<div style="border:1px solid #000; display:inline-block; padding:4px;">**Exhibit NN**</div>

April 05, 2018

Joseph A. Carrillo
3013 Zacatecas Ct
Las Cruces, NM 88012

**Employee ID: 00457172**
**Employee Position: Electrician**

Dear **Joseph A. Carrillo:**

Union Pacific Health & Medical Services (HMS) has been notified of your request for time off due to a medical reason. Based on the information reviewed:

**[x ]** A Medical Leave of Absence is recommended for the following dates:
**July 01, 2017 - July 01, 2018**

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

Bridgette Ziemer
Fitness For Duty Nurse
Health & Medical Services

Page 1 of 2

www.up.com

**BUILDING AMERICA®**

APP0448

UPCARRILLO000603

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: 877-275-8747
Fax: 402-501-0067


CC:


The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

www.up.com

BUILDING AMERICA®

APP0449

UPCARRILLO000604

CONFIDENTIAL



**Union Pacific Railroad**
Health and Medical Services

## HEALTH & MEDICAL SERVICES STATUS UPDATE

April 05, 2018

**To:** Andreas Mader (00421353), Anthony Holman (00021633), Brett Thomason (00438092), Daniel Glenn (00231018), Heather Aguilera (00415677)

**From:** Bridgette Ziemer/ OCC Health Nurse

**On behalf of Union Pacific Chief Medical Officer**

**Subject:** **Fitness for Duty Determination**

**Regarding:** Joseph A. Carrillo

**Employee ID #:** 00457172

**Job Title:** Electrician

**Regarding Health & Medical Service:** HEALTH CONDITION - REPOR    ☑ Off Duty    ☐ On Duty/Occupational

**Based on medical information available to Health & Medical Services at this time, the employee is:**

Not Medically Cleared - Temporary effective   April 05, 2018

☑ MLOA recommended effective   July 01, 2017        through July 01, 2018

Comment:

In accordance with Union Pacific Railroad Medical Rules, this employee will require a Fitness-For-Duty review **_prior_** to his/her return to work. Please ensure that your employee contacts the FFD nurse upon their request to return to work.

For questions, please contact, Bridgette Ziemer at 877-275-8747.

CC:

**Business References:** BU006_BU Template Letter – MLOA Approved Off Duty
BU007_BU Template Letter – MLOA Approved On Duty
FL001_ FMLA Notice Of Eligibility and Rights & Responsibilities

UPCARRILLO000601

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

**Exhibit PP**

3                    EL PASO DIVISION

4   - - - - - - - - - - - - - - - - - - - - - - - - - -

5   Joseph Carrillo,         Case No. 3:21-cv-00026-FM

6          Plaintiff,

7       v.

8   Union Pacific Railroad Company,

9          Defendant.

10  - - - - - - - - - - - - - - - - - - - - - - - - - -

11                  REMOTE DEPOSITION OF

12                  DR. HARRIS A. FRANKEL

13

14

15  DATE:   December 17, 2021

16  TIME:   8:57 a.m. CST

17  PLACE:  Veritext Virtual Videoconference

18

19

20

21

22

23

24  REPORTED BY:  Jayne M. Seward, RPR

25  Job No:  4971966

* * APPEARANCES * *

On Behalf of the Plaintiff: (via videoconference):
Lucas J. Kaster, Esquire
Nichols Kaster, PLLP
4700 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 256-3200
lkaster@nka.com

On Behalf of the Defendant: (via videoconference):
Robert L. Ortbals, Esquire
Constangy, Brooks, Smith & Prophete, LLP
680 Craig Road
Suite 400
St. Louis, Missouri 63141
(314) 338-3740
rortbals@constangy.com

I N D E X

WITNESS: DR. HARRIS A. FRANKEL

EXAMINATION:
By Mr. Kaster: 4 - 56

EXHIBITS MARKED:
EXHIBIT 68: Holland to Frankel letter, 1/10/18 re Request for medical file review for Joseph Carrillo - Carrillo Medical File................................26
UPCARRILLO1719 - 1789 - CONFIDENTIAL
EXHIBIT 69: Frankel to Holland letter, 5-19-18 re medical file review re Joseph Carrillo....36
UPCARRILLO2517 - 2520 - CONFIDENTIAL

REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

P R O C E E D I N G S
DR. HARRIS A. FRANKEL,
duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. KASTER:
Q. Good morning, Doctor. Could you just say and spell your name for the record?
A. Yes. Harris Alan Frankel; H-A-R-R-I-S, A-L-A-N, F-R-A-N-K-E-L.
Q. Thank you, Doctor. And we met briefly off the record. My name is Lucas Kaster. I am one of the attorneys who's representing Mr. Carrillo in his case against Union Pacific.
Have you ever been deposed before?
A. I have.
Q. How many times?
A. Oh, I -- it would be difficult to estimate. I would say 25 perhaps.
Q. How many of those depositions had to do with cases involving Union Pacific?
A. None.
Q. And so I'm assuming those depositions had to do with your job with Nebraska Medicine?
A. No. Actually the lion's share of those occurred while I was in private practice, and

largely in my role as a treating physician typically in workers' comp or personal injury cases.
Q. Since you've been through this before, I won't run through all of the rules, but this may be your first time doing a virtual deposition where we're all in separate locations.
So just a reminder to try to wait until I'm done asking the question before you start to answer. I'll try to do the same for you. Just so Jayne can take down everything that we're saying.
If at any point you need a break, just let me know. I usually take breaks about every hour or so. The only thing I'd ask is that if I've asked a question, that you answer that question before we take a break.
All right?
A. Okay.
Q. You were placed under oath a minute ago.
What does that mean to you?
A. To tell the truth, the whole truth and nothing but the truth.
Q. Is there any reason you cannot do that today? Meaning are you under the influence of any drugs or alcohol that would impair your ability to understand questions and answer truthfully?

Page 6

1    A.   No.
2    Q.   What did you do to prepare for your
3  deposition today?
4    A.   I reviewed my report, and I was also
5  provided the cover letter that was provided to me by
6  Dr. Holland regarding this case and was also
7  provided a few email correspondences that I
8  reviewed.
9    Q.   Did you speak to anybody?
10    A.   I did not, other than Bob.
11    Q.   And we'll take a look at some of those
12  records at some point during the deposition today,
13  and you can just tell me at that point if those are
14  the records you reviewed.  Okay?
15    A.   That would be fine.
16    Q.   If you could, just run me through your
17  occupational kind of history.
18    A.   So I'm a neurologist.  I was in private
19  practice, general neurology, from August 1 of 1990
20  until April 1st of 2011.  I was in a -- part of a
21  group of multiple neurologists.
22        I left my practice after having been
23  recruited by the then CEO of UNMC Physicians and
24  took over the directorship of the Neurosciences
25  clinic, which was then operated by the faculty

Page 7

1  practice group, the UNMC Physicians.  That started
2  April of 2011.  I stayed in that role as medical
3  director really through June of 2014, as I was
4  tapped to step into the chief medical officer role
5  for the health system on January 1 of 2014, which is
6  my full-time occupation currently.
7        That being said, I still see patients
8  one day a week and have done so since stepping in
9  the role of chief medical officer at Nebraska
10  Medicine.
11    Q.   Remind me of the date that you stepped
12  into the chief medical officer role.
13    A.   January 1st, 2014.
14    Q.   And you were saying that you were a
15  medical director.  You were saying UMC or UNC?
16    A.   Well, it's U-N, so University of Nebraska
17  Medical Center Physicians, so UNMCP.  At the time
18  the faculty practice group operated the ambulatory
19  clinics.
20    Q.   And, Doctor, I'll just give you a little
21  warning -- well, not really a warning, but try to
22  just slow down a little bit for Jayne just when
23  you're speaking so she can make sure she's getting
24  down what you're saying.
25        Okay.  When you were in private practice,

Page 8

1  you said that you were a neurologist, right?
2    A.   Yes.
3    Q.   And when you were working with patients,
4  did you see them in person?
5    A.   I did.
6    Q.   Okay.  And why did you do that?
7    A.   Well, I was asked to perform consultations
8  on patients, and the routine would be to see the
9  patient, take a history and examine the patient, and
10  then formulate an opinion and potential care plan
11  for that patient.
12    Q.   Did you feel that it was important to see
13  the person or talk to the person face to face?
14    A.   I did.
15    Q.   Why is that?
16    A.   To get the history from the patient and/or
17  if they had somebody who could corroborate the
18  history with them, that was important.
19    Q.   And why would it be important to have
20  somebody who was with them also provide some history
21  about the person's condition?
22    A.   Well, if it's -- are you asking me about
23  this case specifically or just in general?
24    Q.   Just in general.
25    A.   Yeah.  Well, in general, if a patient is

Page 9

1  being seen perhaps for an issue for which they may
2  not have had full recollection or there may have
3  been some reason where they're not able to provide a
4  cogent history, perhaps somebody who's got cognitive
5  impairment for whatever reason, having that third
6  party present who can corroborate the history and
7  potentially provide details that the patient may not
8  be able to helps in formulating an opinion about the
9  case.
10    Q.   And did you say when you were the medical
11  director at UNMCP -- I think you said between April
12  of 2011 and January of 2014, right?
13    A.   Through June of 2014.
14    Q.   -- did you see patients still during that
15  period of time?
16    A.   I did.
17    Q.   Okay.  And did you take the same approach
18  in terms of seeing patients that you took when you
19  were in private practice?
20    A.   I did.
21    Q.   And you said that you still see patients
22  now as the chief medical officer; is that right?
23    A.   I do.  Well, I see patients as a faculty
24  physician who's a neurologist.  Not in my role as
25  chief medical officer.

3 (Pages 6 - 9)

1    Q.   And so are you seeing them with neurology
2  students?
3    A.   Occasionally I have students rotate with
4  me.
5    Q.   And do you take the same approach in terms
6  of seeing patients in person?
7    A.   I do.
8    Q.   And what courses do you teach?
9    A.   I don't teach any didactic course
10  currently.
11    Q.   And so explain to me what your involvement
12  is with medical students.
13    A.   If a medical student happens to be
14  rotating through my clinic on the day in which I'm
15  in clinic, obviously their role is largely
16  observational.  They -- they watch me take a history
17  from a patient.  They watch me examine a patient.
18  We discuss the exam.
19        My role is largely teaching them the
20  neurologic exam.  We talk about the case.  We talk
21  about differential diagnosis.  So basically it's a
22  general neurological education appropriate to a
23  medical student's level of learning.
24    Q.   And I previously spoke with a Dr. Diesing.
25  Is he within your department?

1    A.   He is.
2    Q.   And Dr. Diesing had explained to me, and
3  I'm not going to remember this off the top of my
4  head very well, but that there's different
5  organizations or branches of the medical center:
6  There's an educational part and then the actual
7  medical part.
8        Can you explain that to me?
9    A.   So Nebraska Medicine is an integrated
10  system.  We are the clinical partner to the
11  University of Nebraska Medical Center, which is
12  composed of six different colleges and three
13  different institutes.
14        And so faculty physicians are -- have a
15  dual appointment where I would say that -- that
16  they're dually employed.  One is there through their
17  academic department in the College of Medicine.  The
18  other is through Nebraska Medicine, which the
19  employment relationship with Nebraska Medicine is
20  for the clinical work they do in our clinics.
21        Does that make sense?
22    Q.   Sure.  So there's the educational arm and
23  then the clinical arm?
24    A.   Right.
25    Q.   And are most of the physicians employed by

1  both arms?
2    A.   Yes.
3    Q.   And, as chief medical officer, I'm
4  assuming you have roles in both of those arms?
5    A.   Actually I -- my role, as chief medical
6  officer, is for the health system.  So Nebraska
7  Medicine is my primary employer, and my
8  administrative activities and accountabilities are
9  largely for Nebraska Medicine, the health system.
10        I do serve on some committees that are
11  based out of the College of Medicine and/or UNMC,
12  but my role is primarily for the health system.
13  Now, that being said, I work collaboratively with
14  the medical center.
15    Q.   And you said that there was six schools
16  within that College of Medicine kind of arm.  What
17  are the six schools?
18    A.   College of Medicine, College of Nursing,
19  College of Pharmacy, College of Public Health,
20  College of Allied Health and -- what am I missing?
21  Did I say College of Dentistry?
22    Q.   You did not.  I think that --
23    A.   Okay.
24    Q.   -- that's the last one.
25    A.   Okay.  I think that's the last one, yeah.

1    Q.   And are those all located in Omaha?
2    A.   The College of Dentistry is primarily
3  located in Lincoln.  All the other colleges are
4  located on the campus here.
5    Q.   If you could, just briefly run through
6  your educational background.
7    A.   Would you like me to start with my
8  undergraduate education?
9    Q.   Sure.
10    A.   So I attended the University of
11  California, San Diego, from 1978 to 1982.  I
12  received a BA in animal physiology with a
13  concentration in neurophysiology.
14        I then attended, from 1982 to 1986, the
15  University of Nebraska College of Medicine.
16  Following my completion of medical school, I did a
17  one-year internship in internal medicine at
18  Creighton University Medical Center in Omaha.
19        And following that I then did a three-year
20  neurology residency at the University of Texas
21  Southwestern Medical Center in Dallas, and that was
22  completed in June of 1990.
23        And then following that I moved back to
24  Omaha and entered private practice.
25    Q.   During your career, have you held any

4 (Pages 10 - 13)

Page 14

1 positions in occupational health?
2    A.  I'm sorry.  Could you ask that again?
3    Q.  Sure.  Have you held any positions related
4 to occupational health specifically?
5    A.  I have not.
6    Q.  Do you have any training in occupational
7 health?
8    A.  I do not.
9    Q.  Have you conducted any occupational health
10 exams in your experience?
11    A.  Could you define an occupational health
12 exam for me?
13    Q.  Sure.  An exam that's specifically
14 tailored to determining whether an employee is able
15 to perform a specific job.
16    A.  I have been asked that question.  Was it
17 specifically under the premise of an occupational
18 health exam, I'm not sure that I -- that I would
19 answer one way or the other.  I have been asked to
20 see people; can they do something based upon a
21 neurologic assessment.
22    Q.  Have you been asked to do that by
23 organizations other than Union Pacific?
24    A.  I have not previously done work
25 specifically for any other organization.

Page 15

1    Q.  Have you ever been retained as an expert
2 in occupational health in a legal case?
3    A.  I have not.
4    Q.  Authored any articles or participated in
5 any presentations on occupational health?
6    A.  I have not.
7    Q.  Have you ever worked in the railroad
8 industry?
9    A.  I have not.
10    Q.  Have you ever been out in the field
11 observing railroad workers?
12    A.  I have not.
13    Q.  Do you belong to any occupational health
14 professional organizations?
15    A.  I do not.
16       Can I go back and add one thing for the
17 record?  I made the comment about not having done
18 any other work for any other organization.  I would
19 qualify that I, in the past, have been an examiner
20 for the NFL concussion program.
21    Q.  Apparent sad news in that respect
22 recently.
23    A.  It is.  It is disturbing to say the least.
24    Q.  Explain to me your history or experience
25 with the FMCSA medical guidelines.

Page 16

1    A.  My history with them is that I was
2 informed those are the guidelines used and that I
3 would use when evaluating patients and whose file I
4 was asked to review by Dr. Holland on behalf of the
5 Union Pacific Railroad.
6       And other than that, I had -- other than
7 that, I wasn't familiar with the guidelines prior to
8 any of that work, nor have had ever any input into
9 those guidelines, served on any of the committees
10 that advise, et cetera.
11    Q.  Okay.  Did you review all of the
12 background medical information regarding the FMCSA
13 guidelines?
14    A.  In reference to?
15    Q.  At any point, during your providing these
16 reviews for Union Pacific, did you go back and read
17 the entirety of the medical background for the FMCSA
18 guidelines?
19    A.  I did not.
20    Q.  Outside of doing these reviews for Union
21 Pacific, have you ever done any examinations under
22 the FMCSA medical guidelines?
23    A.  I have not.
24    Q.  I'm assuming then you're not a certified
25 FMCSA medical examiner?

Page 17

1    A.  I am not.
2    Q.  Have you used the FMCSA medical guidelines
3 to provide an opinion about whether an individual is
4 able to perform a job in any other context, other
5 than these reviews for Union Pacific?
6    A.  I have not.  Or I hadn't, I should say.
7    Q.  You said that you were informed that these
8 were the guidelines to be used.
9       Was that by Dr. Holland?
10    A.  Yes.
11    Q.  And what did Dr. Holland tell you?
12    A.  Just that.  When I first -- my
13 recollection, when I first talked with Dr. Holland
14 about doing these reviews, I was informed that the
15 guidelines is what the Union Pacific Railroad used.
16 And so I sought the guidelines out, and, as in this
17 case, developed an opinion about the case and
18 applied the guidelines accordingly.
19    Q.  Did you research as to whether or not
20 there were other guidelines that might be more
21 appropriate?
22    A.  I did not.
23    Q.  Did you ask Dr. Holland at all as to why
24 the FMCSA guidelines applied?
25    A.  Not to my recollection.

5 (Pages 14 - 17)

1    Q.   Do you understand that the FMCSA
2 guidelines were developed for the trucking industry?
3    A.   I'm aware that the FMCSA is the oversight
4 body that advises on safety for motor vehicle
5 carriers, commercial motor vehicle carriers.  That
6 was my understanding.
7    Q.   Are you aware of there being an indication
8 in any of the FMCSA medical guidelines that it's
9 appropriate to apply these guidelines to the
10 railroad industry?
11    A.   No.  I only did what I was asked to do.
12    Q.   Are you aware of any other railroad in the
13 United States applying the FMCSA guidelines to their
14 employees?
15    A.   I don't have any knowledge about the
16 processes or methodology of any other railroad.
17    Q.   And have you done any other medical
18 reviews for any other railroad?
19    A.   I have not.
20    Q.   You referenced this conversation with
21 Dr. Holland about doing these reviews.  Are you the
22 person that Dr. Holland initially reached out to?
23    A.   Well, I was initially reached out to by a
24 physician colleague who, for lack of a better term,
25 owned the contract between Union Pacific Railroad

1 and the College of Medicine.
2    Q.   And who was that?
3    A.   Dr. Rod Markin, M-A-R-K-I-N.
4    Q.   And do you recall approximately when that
5 occurred?
6    A.   I don't honestly remember exactly when it
7 occurred.  I think the first evaluation I may have
8 done was in 2018, so I suspect sometime before that.
9 Perhaps in 2017 at some time.  I don't have -- I
10 don't have exact recollection of when he reached
11 out.
12    Q.   And what was that discussion between
13 Dr. Markin and yourself around the Union Pacific
14 reviews?
15    A.   He explained that there was a contract
16 between Union Pacific and the College of Medicine
17 faculty to on occasion do these reviews for the
18 Union Pacific.  And he reached out to me and said
19 that Dr. Holland had reached out to him that there
20 was a backlog of cases requiring neurological
21 review, and Dr. Markin asked me if I would be
22 willing to help.
23    Q.   What was your response?
24    A.   I explained at that time to Dr. Markin I
25 would need to know how many of these cases.  That I

1 have a full-time job as a chief medical officer, and
2 also had a practice that I was still attending to
3 one day a week.  And that if it wasn't onerous and
4 the volume of files to be reviewed was not
5 overwhelming, that I -- that I could potentially
6 help.
7    Q.   And were you helping in the context of
8 doing reviews or were you coordinating all of the
9 reviews amongst the staff?
10    A.   The context of doing the reviews.
11    Q.   Do you know how many neurologists or
12 physicians were involved in doing these medical
13 reviews for Union Pacific?
14    A.   I don't.
15    Q.   Is Dr. Markin still at Nebraska Medicine?
16    A.   He is.
17    Q.   And is he still the point for the contract
18 between Union Pacific and Nebraska Medicine?
19    A.   I honestly do not know that.
20    Q.   Do you know if the contract is still in
21 existence?
22    A.   I believe it is.
23    Q.   And what are the terms of the contract to
24 the extent that you know?
25    A.   I don't know the details of the

1 contract or recall the details of the contract.  I
2 know that it stipulated a rate of compensation to
3 the reviewers, but in terms of the rest of the
4 details of the contract or the dates on which the
5 contract was signed, I don't recall those details.
6    Q.   And when you say "rate of compensation,"
7 are the doctors or neurologists who are doing the
8 review -- are they paid directly?
9    A.   They are not to my knowledge, and
10 certainly I was not.
11    Q.   Okay.  And how is the payment exchanged?
12    A.   There's -- well, I'll speak for myself.  I
13 can't speak for anybody else.  So there was a
14 development account that was established within UNMC
15 in which the funds were deposited subsequent to file
16 reviews, and those funds are -- can be used for
17 things like CME, attending meetings, et cetera.
18    Q.   Is CME Continuing Medical Education?
19    A.   Yes.
20    Q.   And what's the stipulated rate?
21    A.   I believe the rate -- the rate, when I was
22 doing these, I believe was $250 an hour.
23    Q.   Are you still doing these reviews,
24 Dr. Frankel?
25    A.   I'm not.

6 (Pages 18 - 21)

Page 22

1    Q.   And why not?
2    A.   Priorities elsewhere that required too
3  much time didn't allow me to do them.
4    Q.   Fair enough.
5        Were there any other benefits that you
6  received as part of doing these medical reviews for
7  Union Pacific?
8    A.   No.
9    Q.   So, if I understand your testimony
10  correctly, you have this initial conversation with
11  Dr. Markin about the contract, and then it sounds as
12  if you have a follow-up conversation with
13  Dr. Holland?
14    A.   Correct.  He had Dr. Holland reach out to
15  me.
16    Q.   Okay.  And how long was this conversation
17  with Dr. Holland?
18    A.   Oh, I don't recall.
19    Q.   Leading up to your first medical review,
20  did you only have that one conversation with
21  Dr. Holland?
22    A.   Correct.
23    Q.   And it's during that phone call that he
24  explained to you that they applied the FMCSA
25  guidelines?

Page 23

1    A.   That, and it was also conveyed in a cover
2  letter -- cover letters that would accompany the
3  files.
4    Q.   How many medical reviews for Union Pacific
5  do you think that you have done since that time?
6    A.   Not a lot.  I would say less than 20 and
7  maybe, I don't know, closer to 15 or so, but not a
8  lot.
9    Q.   Out of those reviews that you have done,
10  have you ever disagreed with Union Pacific's
11  position?
12    A.   Well, I don't know that I've ever been
13  presented anything that stipulated a position on
14  behalf of Union Pacific.  I have provided my
15  opinions and stood by those consistently.
16    Q.   Have you ever provided the opinion that
17  the FMCSA guidelines are not properly applied to
18  railroad employees?
19    A.   I have not.
20    Q.   Have you ever -- in those 15 or so cases
21  that you reviewed, did you ever provide the opinion
22  that work restrictions were not necessary for an
23  employee?
24    A.   I don't recall the details of every case
25  that I reviewed.  I may have.  I just don't recall.

Page 24

1    Q.   Explain your process when you're doing one
2  of these medical reviews for Union Pacific.
3    A.   So could I ask for a little bit more
4  clarity on what you're asking?
5    Q.   Sure.  How does the medical review come to
6  you?
7    A.   A file or files were sent to my --
8  delivered to my administrative assistant.  Those
9  files were then delivered to me.  And when I could
10  find time to review those files, which a single file
11  may be reviewed over a period of time dependent upon
12  my availability to do those file reviews, and the
13  duration of which would be dependent upon the
14  numbers of records.
15        I would -- I would review the records,
16  take some notes in my head, and oftentimes I would
17  begin typing the report as I'm reviewing just to
18  document the piece of information that I felt would
19  be germane in the report, and then finalize the
20  report.  That would be my process for reviewing the
21  files and the reports thereof.
22    Q.   So you would review the medical record
23  that was provided to you by Union Pacific?
24    A.   Correct.
25    Q.   Did you ever speak to any of the

Page 25

1  individuals who you were doing -- who were the
2  patient in the medical documentation?
3    A.   I never spoke to the patient.  There was
4  never, ever a physician-patient relationship
5  developed as part of the review of these records.
6    Q.   And I'm assuming then you never spoke to
7  any of the family members or close, you know,
8  individuals to those patients?
9    A.   I did not.
10    Q.   Have you ever been hired as an expert in a
11  legal proceeding?
12    A.   I have not.
13    Q.   In your report in this case there's a list
14  of five or six questions that you were asked to
15  answer.
16        Do you recall that?
17    A.   I do.
18    Q.   Were those kind of standard questions that
19  Union Pacific provided to you to answer?
20    A.   They were.
21    Q.   And in this case I believe you were
22  provided a job description for Mr. Carrillo.
23        Do you recall that?
24    A.   I do not recall that.  I believe his
25  job was -- his job title was listed.  I don't recall

Page 26

1  a job description.
2      Q.  Dr. Frankel, do you have Exhibit Share up?
3      A.  Well, I don't.  You know, I logged into
4  something, and I thought that that's what that was
5  but I don't know.
6          MR. KASTER:  Okay.  Why don't we go off
7  the record for a second.
8          (Discussion off the record.)
9          MR. KASTER:  We can go back on the record,
10  Jayne.
11          (Exhibit 68 marked.)
12  BY MR. KASTER:
13      Q.  Dr. Frankel, I'm showing you what's been
14  marked as Exhibit 68, and just let me know if you
15  need me to blow something up.  I'm not asking you
16  about a specific section of it right now, but I'm
17  going to scroll through this.
18          So this front page appears to be a letter
19  to you from January 10th of 2018.
20          Do you see that?
21      A.  I do.
22      Q.  And it appears to be a request for a
23  medical file review for Mr. Carrillo?
24      A.  Correct.
25      Q.  And then his job title is electrician,

Page 27

1  correct?
2      A.  Correct.
3      Q.  And is this the type of cover letter that
4  you were referring to that you would receive as part
5  of these medical reviews?
6      A.  Yes.
7      Q.  And then at the bottom of this letter it's
8  from Dr. Holland.
9          Do you see that?
10      A.  I do.
11      Q.  And Dr. Holland has provided kind of a
12  brief summary of Mr. Carrillo's medical condition;
13  is that fair?
14      A.  That's fair.
15      Q.  And then Mr. -- or Dr. Holland provides
16  some considerations in assessing medical safety
17  risks.
18          Do you see that?
19      A.  I do.
20      Q.  And addressing "for employees in Safety
21  Sensitive jobs," right?
22      A.  Correct.
23      Q.  Do you have any knowledge as to whether
24  Mr. Carrillo's job was considered safety sensitive?
25      A.  Well, the implication was he's in a safety

Page 28

1  sensitive job.
2      Q.  Do you have any understanding of what the
3  bases for that determination is?
4      A.  As to whether there's potential for sudden
5  incapacitation, whether it be on a -- related to
6  awareness, consciousness or physical incapacitation,
7  and the potential thereof to affect himself, others
8  in the workplace, et cetera.
9      Q.  Do you have any understanding as to how
10  often Mr. Carrillo was working around moving trains?
11      A.  I don't.
12      Q.  Have you ever been to the location where
13  Mr. Carrillo worked?
14      A.  I have not.
15      Q.  Have you ever observed electricians' work
16  environment on the railroad?
17      A.  I have not.
18      Q.  Do you have any understanding of the risks
19  for Mr. Carrillo's position should he have an
20  incident of sudden incapacitation?
21      A.  I don't know all the details, the specific
22  details of his job, so I would say, no, I don't.
23      Q.  And then here is a list of questions on
24  this cover letter from Dr. Holland, right?
25      A.  Yes.

Page 29

1      Q.  And these are the list of sort of standard
2  questions that Dr. Holland would send to you?
3      A.  Correct.
4      Q.  And there appears to be some attachments
5  of medical records, a job description and a DVD of
6  selected diagnostic studies.
7          Do you see that?
8      A.  I do.
9      Q.  Do you have any recollection of what these
10  diagnostic studies were?
11      A.  I don't -- I don't recall with certainty.
12      Q.  Did you do any of your own independent
13  research into diagnostic studies regarding
14  Mr. Carrillo's condition?
15      A.  I reviewed what was provided me with the
16  file.
17      Q.  And then we see -- I'm going to look at --
18  so there's this Bates number on the bottom which is
19  a unique number for each page.
20          Do you see this 1723, Dr. Frankel?
21      A.  I do.
22      Q.  Okay.  And I'll reference that page number
23  so the record's clear because there's not separate
24  page numbers on each of the documents.
25          And it appears, though, in this document

8 (Pages 26 - 29)

1 that there's a job description for a locomotive
2 electrician or maintenance technician.
3     Do you see that?
4     A.  I do.
5     Q.  And I'm going to just kind of scroll
6 through this, and my question is:  Does this appear
7 to be the file that you received from Dr. Holland
8 for Mr. Carrillo?
9     So I'll scroll through this now, and you
10 tell me whether you think that this is the file.
11    A.  Okay.  (Examining document.)
12    Q.  So, Doctor, this is a 71-page file.  Does
13 that appear to be the file you received from
14 Dr. Holland for Mr. Carrillo?
15    A.  I would say that I was able to catch
16 Mr. Carrillo's name on several of the records and
17 other records looked familiar and consistent with
18 those that I reference in my report, so I would say,
19 yes.
20    I will say that, in all honesty, I don't
21 have a recollection of the job description.
22    Q.  Outside of that potential job description,
23 did you have any knowledge or understanding of
24 Mr. Carrillo's job responsibilities?
25    A.  I did not.

1     Q.  In this discussion with Dr. Holland that
2 we were talking about earlier, did Dr. Holland point
3 to -- you to any section of the FMCSA guidelines in
4 particular?
5     A.  No, not that I recall.
6     Q.  Have you ever reviewed the entirety of the
7 FMCSA medical guidelines?
8     A.  I've only reviewed those parts applicable
9 to files I was reviewing.
10    Q.  Do you recall what parts of the FMCSA
11 medical guidelines you reviewed as part of
12 Mr. Carrillo's medical review?
13    A.  I do.
14    Q.  What did you review?
15    A.  I reviewed the section on an unprovoked
16 seizure.
17    Q.  Any others?
18    A.  Not to my recollection.
19    Q.  And why did you decide to review that
20 section?
21    A.  Because that was my opinion relative to
22 the condition of concern.
23    Q.  And what did you base that opinion on?
24    A.  My review of the historical information in
25 the records.

1     Q.  From a factual perspective, what do you
2 recall led you to believe it was an unprovoked
3 seizure?
4     A.  So when you say "factual," I'm assuming
5 you mean what in the records led me to that opinion?
6     Q.  Correct.
7     A.  So there was -- there was history recorded
8 by several individuals.  The most noteworthy of
9 which I believe was from the cardiologist he saw,
10 and then subsequently Dr. Aguilar, the neurologist,
11 of an unprovoked episode of loss of consciousness
12 that was associated with clonic movements of his
13 upper extremities, on being unresponsive at least
14 one -- one mentioned, but perhaps upwards of
15 five minutes.
16    The observation of those clonic movements,
17 the observation of shallow respiration and snoring,
18 the observation of tongue-biting and the observation
19 of confusion afterwards.
20    Q.  Anything else?
21    A.  No.
22    Q.  Do you recall that Mr. Carrillo's
23 neurologist, Dr. Aguilar, did not make a conclusive
24 diagnosis of an unprovoked seizure?
25    A.  I do.

1     Q.  Do you believe Dr. Aguilar has a closer
2 understanding of Mr. Carrillo's medical condition
3 than you do?
4     A.  I would not opine on what Dr. Aguilar's
5 understanding of Mr. Carrillo's medical condition
6 was.
7     Q.  Do you agree with me that Dr. Aguilar at
8 least saw Mr. Carrillo in person on multiple
9 occasions?
10    A.  I would agree.
11    Q.  And that was something you had not done,
12 right?
13    A.  That's correct.
14    Q.  Explain your rationale for why you did not
15 conclude that syncope was a possible diagnosis for
16 Mr. Carrillo.
17    A.  In my opinion, the totality of and the
18 circumstances related to the episode of loss of
19 consciousness, inclusive of those things I
20 highlighted previously, I'll repeat them:  The
21 precipitous loss of consciousness, the clonic
22 movements of the arms that were reported, the
23 alleged duration he was out, the confusion
24 afterwards, the tongue biting.
25    Those events all taken in aggregate led me

9 (Pages 30 - 33)

Page 34

1 to believe that the most likely cause of the event
2 was an unprovoked seizure.
3     Q.   Is Gabapentin an anti-convulsant drug?
4     A.   It is.
5     Q.   Can stopping an anti-convulsant drug
6 provoke a seizure?
7     A.   It can.
8     Q.   Did you understand from the records that
9 Mr. Carrillo had stopped taking Gabapentin for a few
10 days before this incident?
11     A.   I did, and it was my understanding it
12 was -- it was perhaps five days ahead of this, if I
13 remember correctly.
14     Q.   And so did the fact that Mr. Carrillo had
15 stopped taking Gabapentin affect your opinion at
16 all?
17     A.   It did not.
18     Q.   Why not?
19     A.   First and foremost, withdrawal seizures
20 from Gabapentin is uncommon.  And if withdrawal
21 seizures related to Gabapentin occur, there are
22 typically other withdrawal symptoms, and oftentimes
23 it may occur in the context of other substances like
24 alcohol.
25         And in this case there was no mention

Page 35

1 anywhere in any of the reported history that there
2 was reference to any of these other symptoms such as
3 agitation, confusion, tremulousness or anything like
4 that that would be otherwise consistent with a drug
5 withdrawal state.
6         And, furthermore, the half-life of
7 Gabapentin being what it is, you would expect, if
8 somebody were to have withdrawal seizures, it would
9 typically occur within the first couple of days
10 most likely.  Not that it couldn't occur a few days
11 later, but I think that's highly unlikely.  And
12 absent any other withdrawal symptoms, I think it's
13 highly unlikely that that's what occurred.
14     Q.   In your experience as a neurologist, when
15 somebody wakes up suddenly from sleep and stands up
16 quickly, does that pose a risk of syncope or
17 fainting?
18     A.   I suppose it could.
19     Q.   Why?
20     A.   There may be other underlying medical
21 conditions.
22     Q.   Why would it pose that risk?
23     A.   Well, if somebody has -- let's say
24 somebody were to stand up for -- quickly for any
25 reason, if they're dehydrated, if they're anemic, if

Page 36

1 they have a cardiac output issue, and, you know,
2 standing up quickly when you -- the rate of rise
3 exceeds the rate of blood getting to the brain, it
4 could predispose somebody to passing out.
5     Q.   Do you recall from the records that
6 Mr. Carrillo had been sick for a few days leading up
7 to this incident?
8     A.   I don't recall that.
9     Q.   Would that impact your diagnosis at all?
10     A.   It might have, but I don't recall that
11 being an issue.
12     Q.   If Mr. Carrillo had been ill and
13 experiencing diarrhea and vomiting, would that
14 impact your opinion?
15     A.   Well, that information was not in the
16 records that I reviewed.  So if you're asking me to
17 hypothesize here could that, it's possible.
18     Q.   Why?
19     A.   Well, I think I referenced that
20 dehydration could predispose somebody to a syncopal
21 event, fainting.  And if somebody is ill with
22 vomiting and diarrhea, that can predispose them to
23 dehydration.
24     Q.   Dr. Frankel, I am showing you what has
25 been marked as Exhibit 69.

Page 37

1         (Exhibit 69 marked.)
2 BY MR. KASTER:
3     Q.   Do you see that on your screen?
4     A.   I do.
5     Q.   This appears to be a letter to Dr. Holland
6 on May 19th, 2018.  And on the bottom, or last page,
7 page 4 of 4, is that your signature?
8     A.   Yes, it is.
9     Q.   Does this appear to be your report
10 regarding Mr. Carrillo?
11     A.   Yes, it does.
12     Q.   And in this first paragraph here there is
13 a sentence.  It says "I have reviewed the employee's
14 records and job description provided by your office
15 and will address your questions at the end of this
16 report."
17         Do you see that?
18     A.   I do.
19     Q.   Does that refresh your recollection at all
20 about seeing Mr. Carrillo's job description?
21     A.   I must have seen it.  I just don't have
22 independent recollection of seeing that at this
23 point.  It's been a long time ago.
24     Q.   And then you have this "Review of Records"
25 section that kind of overviews what information you

1 saw in Mr. Carrillo's medical records; is that fair?
2     A.   Yes.
3     Q.   And then there's a section in bold on
4 page 3 of 4 that says "Determining Health-related
5 safety risks - for employees in safety critical
6 positions."
7         Do you see that?
8     A.   I do.
9     Q.   Is that a section that you copied from
10 Dr. Holland's letter?
11    A.   I don't recall copying that from
12 Dr. Holland's letter.  I used -- I used a template
13 that was shared with me from another physician
14 elsewhere as a sample report when I was first
15 introduced into doing these reports and used that
16 template as a form for completing my reports.
17    Q.   And who did the template come from?
18    A.   I don't recall.
19    Q.   And when you say you got it from somebody
20 "elsewhere," was that within Nebraska Medicine?
21    A.   No.  I believe it was from another
22 physician with whom Dr. Holland had worked.  I just
23 don't recall who that physician was.
24    Q.   How did you know to reach out to this
25 physician about a template?

1     A.   I did not reach out to the physician.
2 Dr. Holland provided it to me as an example of the
3 form of the reports that had been submitted by
4 someone else.
5     Q.   And so when you put in this report "For
6 individuals who work in a safety critical position
7 at Union Pacific, such as this employee," you don't
8 have any independent knowledge as to why
9 Mr. Carrillo is considered to be in a safety
10 critical position?
11    A.   I don't.  I was -- the file was submitted
12 under the basis that his job is in a safety critical
13 position, and I reviewed the file and applied the
14 guidelines I was asked to apply.
15    Q.   It says here at the bottom of this first
16 paragraph:  "If based on an individualized
17 evaluation, HMS" -- so I believe that's Health &
18 Medical Services at Union Pacific -- "determines a
19 worker has a moderate to high risk for sudden
20 incapacitation, then HMS will give the person
21 medical work restrictions that will be ongoing and
22 will remain in place as long as unacceptably high
23 risks exists."
24        Do you see that?
25    A.   I do.

1     Q.   Do you recall in your medical reviews for
2 Union Pacific whether you ever indicated that an
3 employee has a low risk for sudden incapacitation?
4     A.   I may have.
5     Q.   Can you give me any examples?
6     A.   I don't recall independently any
7 examples.
8     Q.   When you say "moderate risk of sudden
9 incapacitation," what does that mean to you?
10    A.   That there is a significant likelihood of
11 a recurrence.
12    Q.   Can you tell me with a moderate risk what
13 the risk percentage is?
14    A.   I don't have a specific risk percentage.
15 In general in this case -- in this case I made a
16 judgment based upon the condition.
17    Q.   What do you mean you "made a judgment"?
18    A.   Well, again, my opinion was this
19 individual had an unprovoked seizure.  There's a --
20 what I would consider, a significant risk for
21 recurrence certainly in the first two years,
22 but upwards of the first five years, and that
23 risk, depending on, could be anywhere from 20
24 to 40 percent.
25        The most likely period of recurrence is in

1 the first two years, and in some cases could have
2 been within the first three months, but certainly
3 there's extended risk up until that five-year
4 window.
5     Q.   Where do you derive the 20 to 40 percent
6 risk percentage from?
7     A.   There have been a number of studies, you
8 know, over the years that have looked at individuals
9 with single unprovoked seizures, and -- and that's
10 where, you know, those figures come from.
11    Q.   Can you tell me any of the studies?
12    A.   I don't recall the specifics.  They're
13 studies I've read over time.  I can't cite the
14 authors.
15    Q.   Do you recall reviewing any of those
16 studies at the time that you did the medical review
17 for Mr. Carrillo?
18    A.   I did not.
19    Q.   I don't believe you say anywhere in your
20 report to Dr. Holland about a percentage risk of
21 recurrence?
22    A.   I did not.  I believe it's mentioned
23 in the guideline, and I felt that the reference
24 therein as to the percentage was certainly
25 within the ballpark of what other studies had

11 (Pages 38 - 41)

Page 42

1  indicated.
2      Q.  Do you believe the FMCSA guidelines
3  references a specific percentage or range of
4  percentages?
5      A.  I have the guideline in front of me.  It
6  references estimated to be 36 percent within the
7  first five years following the seizure.
8      Q.  What section of the guideline do you have
9  in front of you?
10     A.  I have "Single Unprovoked Seizure."
11  It's page 148 of the guidelines that I reference.
12     Q.  And why do you have that single page?
13     A.  Well, it's the guidelines that I applied
14  to this case.
15     Q.  Do you recall pulling that page out of the
16  entire FMCSA medical guide?
17     A.  I pulled it specifically out of the guide
18  that I might be asked about it today.
19     Q.  It wasn't in your file somewhere?
20     A.  It was not in my file anywhere.
21     Q.  Does the cause of a -- the cause of a
22  seizure impact the risk of recurrence percentage?
23     A.  Well, in this case there was no
24  identifiable cause, and, hence, unprovoked.  If --
25  generally speaking, if there is an abnormality on an

Page 43

1  imaging study, like a CAT scan or an MRI and/or an
2  EEG, which is the electrical recording of the
3  brain's electrical activity -- if there is an
4  abnormality that is discovered during the course of
5  the evaluation, the likelihood of recurrence would
6  be at the higher end of the range.
7          And, that being said, the identified
8  potential risk recurrence even in an unprovoked
9  seizure may still fall within that range.
10         But to your question:  If there's
11  identifiable cause, as I've referenced, that risk of
12  recurrence may certainly be higher.
13     Q.  This range of risk of recurrence, is that
14  over a lifetime?
15     A.  The range I'm referencing is really within
16  the first five years after the indexed event.  If a
17  person remains seizure free for five years off
18  treatment, that risk following an isolated
19  unprovoked seizure is diminished significantly.
20     Q.  Is it diminished after the first year if
21  the person is seizure free?
22     A.  Not from a statistical standpoint.
23     Q.  What do you mean by that?
24     A.  Well, again, this range of percentages is,
25  you know, a statistical estimate given cohorts of

Page 44

1  patients studied and what their outcomes were.
2          And so it doesn't mean that if you go
3  one year seizure free after an unprovoked isolated
4  seizure that you're still not at risk for a
5  subsequent seizure in the next year.  That would not
6  be true; you're still at risk.
7          Does the risk of subsequent seizures
8  diminish the further you are from the indexed event?
9  At a certain period of time that's true.
10     Q.  Do you agree with the idea that every
11  human being has some risk of suffering a seizure?
12     A.  I would not say that every human being is
13  at risk of suffering a seizure.  I would -- every
14  human being is at risk of potentially succumbing to
15  some incident that could potentially result in a
16  seizure, but I don't believe that every human being
17  individually is at risk just de novo.  Certainly
18  there are some that are at risk for a variety of
19  different reasons.
20     Q.  Can you give me an opinion about what you
21  believe Mr. Carrillo's risk of suffering a seizure
22  is in the next year?
23     A.  In the next year?
24     Q.  Correct.
25     A.  So in the next year from when?

Page 45

1      Q.  From today.
2      A.  So I don't know anything about
3  Mr. Carrillo's clinical history beyond what I
4  reviewed in the file, so I don't know that I could
5  opine on what his risk is in the next year.
6      Q.  What about a year after this event, what's
7  his risk of recurrence of a seizure within the first
8  year?
9      A.  I think -- well, a year following the
10  event I think his risk is pretty high, because I
11  said it could be anywhere from 20 to 40, and I think
12  there are even some estimates that suggest it could
13  be upwards of 50 percent within the first two years.
14  So I would think that he would still be at
15  significant risk within that first year.
16     Q.  What if Mr. Carrillo did not have a
17  seizure within the first year?
18     A.  One might say, well, his -- his risk may
19  be diminishing, but he still has risk looking at,
20  you know, the time frame that I reference as to when
21  risk is highest certainly in the first two years
22  following an indexed event, but that risk does not
23  go away and remains present at a significant level
24  really through the first five years.
25     Q.  Can you give me a percentage risk

12 (Pages 42 - 45)

1 after one year if Mr. Carrillo didn't have a
2 seizure?
3     A.  I can't give you an absolute percentage.
4     Q.  How did you come to five years?
5     A.  In terms of --
6     Q.  Mr. Carrillo's risk.  You've referenced
7 five years kind of multiple times.
8     A.  Well, you know, yeah, the studies have
9 been done, you know, where you look at the relative
10 risk, you know, over various time intervals.
11         And without question a person who is
12 seizure free, off medication for a period of
13 five years has a relatively low risk at that point
14 of having a recurrence.  It's not zero, but it's
15 relatively low.  And so that's sort of the standard
16 in how this is viewed.
17     Q.  Can you give me any examples of any
18 studies that support this five-year time frame?
19     A.  There are -- there are studies out there.
20 I can't reference the specifics or the specific
21 authors.
22     Q.  Is that five-year time frame referenced in
23 this section of the FMCSA guideline that you're
24 looking at?
25     A.  It is.

1     Q.  What does it say?
2     A.  Would you like me to read this?
3     Q.  Sure.
4     A.  All right.  This is where I'll start:
5 "While individuals who experience a single
6 unprovoked seizure do not have a diagnosis of
7 epilepsy, they are clearly at a higher risk of
8 having further seizures.  The overall rate
9 occurrence is estimated to be 36 percent in the
10 first 5 years following the seizure.  After 5 years,
11 the risk for recurrence is down to 2 to 3 percent
12 per year for the total group."
13         "Following an initial unprovoked
14 seizure -- well, that speaks to a driver
15 specifically, but that's -- that's where it's
16 referenced.
17     Q.  And that's 36 percent over this entire
18 span of five years, right?
19     A.  Correct.
20     Q.  Doctor, then I want to look at your
21 answers to the questions that Dr. Holland posed.
22         Do you see that on your screen?
23     A.  I do.
24     Q.  Okay.  Did you have any discussions with
25 Dr. Holland about Mr. Carrillo's medical condition?

1     A.  I did.
2     Q.  Before or after you wrote your report?
3     A.  It would have been after I completed my
4 file review and drafted my report.  I likely had not
5 sent it to Dr. Holland at that point in time.
6     Q.  And what was the discussion about?
7     A.  Well, it was not uncommon for Dr. Holland
8 to just want my opinion.  I provided my opinion, and
9 those opinions are reflected in my report.
10     Q.  Did Dr. Holland communicate his opinion at
11 all to you?
12     A.  I don't recall what Dr. -- if he did or
13 not.  If he did, it would have been his opinion, but
14 that wouldn't have swayed my opinion.
15     Q.  So if there's --
16     A.  If it was -- if it was -- if it was
17 in -- contraire to my opinion.
18     Q.  If there's similarity between your opinion
19 and Dr. Holland's opinion, your contention is that's
20 a coincidence?
21     A.  Well, I don't know that it would
22 necessarily be a coincidence.  It may be
23 coincidental, but I think that there is -- my
24 opinion was formed independent of Dr. Holland's
25 opinion, and the fact that he arrived at a similar

1 opinion would suggest, well, he has a level of
2 understanding and knowledge that allowed him to
3 formulate an opinion that, I guess, coincidentally
4 was -- was similar to mine.
5     Q.  Is Dr. Holland a neurologist, as far as
6 you know?
7     A.  I don't believe Dr. Holland is a
8 neurologist.
9     Q.  Did you see anywhere in Mr. Carrillo's
10 medical file that his treating physicians came to a
11 conclusive diagnosis of isolated unprovoked seizure?
12     A.  Well, no.  I didn't see anything that
13 stipulated it was conclusive.  It certainly was in
14 his impression.
15     Q.  In the differential diagnosis?
16     A.  Correct.
17     Q.  As a possibility?
18     A.  Correct.
19     Q.  Did you find anywhere in Mr. Carrillo's
20 medical records that his treating doctors said the
21 most likely diagnosis was an unprovoked seizure?
22     A.  I don't recall that wording.
23     Q.  Question 3 asks you:  "Do guidance
24 documents from FMCSA, including the Medical Expert
25 Panels and Medical Review Board provide good

13 (Pages 46 - 49)

Page 50

1 evidence-based risk assessments about future risks
2 for sudden incapacitations from these conditions?
3 Are the conclusions of these FMCSA reports
4 consistent with the best evidence from the medical
5 literature on these topics?"
6        And you answered "Yes," right?
7    A. I did.
8    Q. Did you look at the Medical Expert Panels
9 and Medical Review Board documents?
10    A. I did not look at those documents
11 specifically. It was my understanding that their
12 documents and the opinions that flow therefrom are
13 what support the guidelines.
14        And the -- certainly the comments relative
15 to the potential risk of seizure recurrence I
16 assumed to be a reflection of those opinions.
17    Q. So your answer "yes" was simply based upon
18 the fact that the guidelines exist?
19    A. And the reference to the risk which would
20 be consistent with my own knowledge.
21    Q. But you didn't look, actually look at the
22 underlying medical rationale or data that apparently
23 support the guidelines?
24    A. I didn't.
25    Q. In these medical reviews for Union Pacific

Page 51

1 have you ever answered that question "no"?
2    A. I don't recall.
3    Q. Have you ever said that additional tests
4 or evaluations would provide clarity, Question 2?
5    A. I don't recall.
6    Q. Question 4 is: "Using the risk
7 assessments and recommendations of the FMCSA
8 guidance documents, as well as other relevant
9 scientific evidence, does the employee have low or
10 moderate to high risk for sudden incapacitation?"
11        Do you see that?
12    A. I do.
13    Q. Did you rely on any other relevant
14 scientific evidence to answer this question for
15 Mr. Carrillo?
16    A. I didn't. Again, as I said previously,
17 the reported risk of recurrence following an indexed
18 event like this, the risk being what it is in my
19 opinion is a moderate to high risk.
20    Q. I think I asked this before but I'll just
21 make sure.
22        Have you ever authored the opinion for
23 Union Pacific that somebody has a low risk of sudden
24 incapacitation?
25    A. I may have. I just don't recall.

Page 52

1    Q. Question 6: "Is it reasonable to apply
2 risk assessments and recommended work restrictions
3 from the FMCSA guidance documents?" You answer
4 "yes" to that question.
5        Do you see that?
6    A. I do.
7    Q. What was the basis for that opinion?
8    A. My understanding of the question was it
9 was for individuals in safety sensitive positions
10 that work for the Union Pacific Railroad, that the
11 guidance provided in the -- in the guidelines would
12 be applicable, if that's what they choose. I -- it
13 sounds and it seemed reasonable to me that that's
14 what they do.
15        I mean, that's their -- that's their
16 method, and so I answered in that vein: Relative to
17 persons in safety sensitive positions that they
18 choose to use the guidelines, and so I responded in
19 the affirmative.
20    Q. Have you ever offered the opinion "no" to
21 that question?
22    A. I don't recall.
23    Q. There's a question at the end of this, or
24 a phrase at the end of this question that says
25 "where sudden incapacitation would pose a

Page 53

1 significant risk for substantial harm to the worker
2 or others?"
3        Do you see that?
4    A. I do.
5    Q. What's the specific significant risk for
6 substantial harm for Mr. Carrillo's position?
7    A. Well, again, I don't -- I don't recall the
8 exact details of his job description, and I don't
9 recall, you know, what type of machinery he might
10 have been working around, what the yard looked like,
11 you know, what kind of driving he did, who he was
12 with, who he was around, et cetera.
13        But in general terms we often advise
14 patients who have an episode or episodic loss of
15 consciousness to avoid situations in which that type
16 of circumstance can be potentially dangerous to
17 themselves or others.
18        So it's not an uncommon recommendation
19 given to patients not knowing what their
20 circumstances might be at any given time if they
21 were to have a sudden episode of impaired awareness
22 or a loss of consciousness.
23    Q. So you don't know the specific risks
24 of substantial harm that might result if
25 Mr. Carrillo had an incident of sudden

14 (Pages 50 - 53)

Page 54

1 incapacitation?
2    A.  I'm saying I don't -- I don't have
3 specific knowledge of different circumstances
4 therein, but certainly there may be circumstances in
5 which such could occur.  I don't know what the
6 specifics of those relative to him might be, but
7 certainly that could be a possibility depending on
8 what he's doing at any given time.
9    Q.  So why didn't you say that in your answer
10 as opposed to "yes"?
11    A.  I don't have a response to that,
12 Counselor, other than I said "yes."  I -- you know,
13 it seemed reasonable that advising, like I
14 described, was reasonable, and I simply answered
15 "yes."
16    Q.  Have you provided the opinion that
17 applying the FMCSA guidelines is appropriate in any
18 other industry besides the railroad industry?
19    A.  I have not.
20    Q.  Have you ever been asked to give the
21 opinion or apply the FMCSA guidelines in the motor
22 carrier industry?
23    A.  I have not.  Again, only -- this is what
24 the Union Pacific Railroad does, and that's what I
25 did.

Page 55

1    Q.  And I think you said this, but just to
2 make sure, you've never provided a similar opinion
3 to any other railroad?
4    A.  I have not.
5       MR. KASTER:  Why don't we take a short
6 break and go off the record, Jayne.
7       (Recess taken from 10:22 to 10:35 a.m.)
8 BY MR. KASTER:
9    Q.  Dr. Frankel, we're back on the record
10 after a short break.
11       Do you understand you're still under oath?
12    A.  I too.
13    Q.  Anything you want to change or add about
14 your earlier testimony?
15    A.  I don't think so.
16    Q.  Okay.  I just have one follow-up question,
17 Doctor.
18       Outside of this one incident that we've
19 been talking about today, did you observe anything
20 in Mr. Carrillo's medical records that would prevent
21 him from performing his electronic technician or
22 electrician job title?
23    A.  Well, I didn't -- you know, I did not look
24 at the records with the intent of offering an
25 opinion as to fitness-for-duty, so I'm not sure I

Page 56

1 can opine on that.
2    Q.  Okay.  Anything else in his medical
3 records that you believe warranted any type of work
4 restrictions?
5    A.  Again, I was asked to opine on a specific
6 incident and cause thereof, and I applied the FMCSA
7 guidelines, as I was asked to do, that would be
8 consistent with that condition, and that's what I
9 did.
10    Q.  Okay.  Well, I'm trying to make sure,
11 Doctor, that if you're going to testify in this
12 case, that your opinion is going to be limited to
13 the issue we've talked about.
14    A.  It's limited to this case.
15    Q.  Okay.  But limited to the medical opinion
16 about this one incident and seizure?
17    A.  Correct.  I mean, that's -- I mean, I'm
18 not aware that I was asked to opine on anything
19 else.
20    Q.  Okay.  And you're not intending to opine
21 on anything else?
22    A.  Not in -- no, sir.
23       MR. KASTER:  I have no other questions at
24 this time, Doctor.  I appreciate your time today.
25       THE WITNESS:  Thank you.

Page 57

1       MR. ORTBALS:  I have no questions.
2 Doctor, do you want to waive signature or read and
3 sign?
4       THE WITNESS:  I'll waive.
5       (WHEREUPON, the deposition of DR. HARRIS
6 A. FRANKEL was concluded at 10:37 a.m.)
7             ***
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

15 (Pages 54 - 57)

Page 58

```
 1          REPORTER'S CERTIFICATE
 2
 3
    STATE OF MINNESOTA   )
 4                       )SS.
    COUNTY OF HENNEPIN   )
 5
 6
          I hereby certify that I reported the remote
 7   deposition of DR. HARRIS A. FRANKEL on December 17,
     2021, via Veritext Virtual Videoconference, and that
 8   the witness was by me first duly sworn to tell the
     whole truth;
 9
          That the testimony was transcribed by me and is
10   a true record of the testimony of the witness;
11        That the cost of the original has been charged
     to the party who noticed the deposition, and that
12   all parties who ordered copies have been charged at
     the same rate for such copies;
13
          That I am not a relative or employee or
14   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
15
          That I am not financially interested in the
16   action and have no contract with the parties,
     attorneys, or persons with an interest in the action
17   that affects or has a substantial tendency to affect
     my impartiality;
18
          That the right to read and sign the deposition
19   by the witness was waived.
20
          WITNESS MY HAND AND SEAL this 21st day of
21   December, 2021.
22
23
24   Jayne M. Seward
          Notary Public, Hennepin County, Minnesota
25        My commission expires January 31, 2025
```

16 (Page 58)

Confidential



**John P. Holland/UPC**
01/22/2018 01:47 PM

To   "Frankel, Harris A" <harris.frankel@unmc.edu>
cc   "Deb A. Gengler" <DAGENGLE@UP.COM>
bcc
Subject   Re: Files



**Exhibit QQ**

Harris

Glad you are doing better.

I think Deb will follow-up with Nikka regarding these cases

Thank you again for helping us with these reviews

John

| | |
|---|---|
| From: | "Frankel, Harris A" <harris.frankel@unmc.edu> |
| To: | "Deb A. Gengler" <DAGENGLE@UP.COM> |
| Cc: | "John P. Holland" <JPHOLLAN@up.com> |
| Date: | 01/19/2018 09:32 PM |
| Subject: | Re: Files |

This email originated from outside of the company. Please use discretion if opening attachments or clicking on links.

Hi,
Back on grid after being out with food poisoning.
Thanks for your accommodation.
H

Sent from my iPad

On Jan 17, 2018, at 9:19 AM, Deb A. Gengler <DAGENGLE@UP.COM> wrote:

Non-UNMC email

Dr. Frankel,

I know Dr. Holland has placed a call with you. And I have a call into Nikka. We have reviewed our request and now will need for you to review only **Redacted**    In February  we will ask you to review the file on Joseph Carrillo as we know that he is having more testing so we will provide you with additional records.

Please feel free to call me at 712-490-7748.

Thank you,

UPCARRILLO2009

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                    EL PASO DIVISION

**Exhibit RR**

4    - - - - - - - - - - - - - - - - - - - - - - - - - -

5    Joseph Carrillo,          Case No. 3:21-cv-00026-FM

6            Plaintiff,

7        v.

8    Union Pacific Railroad Company,

9            Defendant.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -

11           REMOTE VIDEOTAPED DEPOSITION OF

12                  DR. JOHN HOLLAND

13

14

15   DATE:   November 17, 2021

16   TIME:   9:09 a.m. PST

17   PLACE:  Veritext Virtual Videoconference

18

19

20

21

22

23

24   REPORTED BY:  Jayne M. Seward, RPR

25   Job No:  4890881

Page 2

```
1            * * APPEARANCES * *
2
3  On Behalf of the Plaintiff:  (via videoconference):
4       James H. Kaster, Esquire
5       Nichols Kaster, PLLP
6       4700 IDS Center
7       80 South Eighth Street
8       Minneapolis, Minnesota 55402
9       (612) 256-3200
10      kaster@nka.com
11
12  On Behalf of the Defendant:  (via videoconference):
13      Robert L. Ortbals, Esquire
14      Constangy, Brooks, Smith & Prophete, LLP
15      680 Craig Road
16      Suite 400
17      St. Louis, Missouri 63141
18      (314) 338-3740
19      rortbals@constangy.com
20
21  Also Present:  Kraig Hildahl, Videographer
22
23
24
25
```

Page 3

```
1            I N D E X
2
3  WITNESS:  DR. JOHN HOLLAND
4
5  EXAMINATION:
6  By Mr. Kaster:  7 - 101
7
8  EXHIBITS MARKED:
9  EXHIBIT 38:  Email chain, top Gengler to
10     Frankel/Holland/Gengler, 1-17-18.............18
11     UPCARRILLO1987 - 1988 - CONFIDENTIAL
12  EXHIBIT 39:  Email chain, top Holland to
13     Frankel/Gengler, 1-22-18....................20
14     UPCARRILLO2009 - 2011 - CONFIDENTIAL
15  EXHIBIT 40:  Cover Fitness for Duty Nurse Western
16     Region - Attachment Referral to
17     Dr. Frankel - Frankel to Holland email,
18     2-19-18 re Medical Reviews..................23
19     UPCARRILLO02057 -2059 - CONFIDENTIAL
20  EXHIBIT 41:  Email chain, top Rodino to
21     Gengler/Holland, 3-5-18 re Dr. Frankel
22     cases.......................................27
23     UPCARRILLO2237 - 2238 - CONFIDENTIAL
24
25
```

Page 4

```
1  EXHIBIT 42:  Email chain, top Holland to
2     Rodino/Gengler 3-7-18 re Dr. Frankel
3     cases we are waiting on.....................29
4     UPCARRILLO2247 - 2248 - CONFIDENTIAL
5  EXHIBIT 43:  Rodino to Gengler/Holland email,
6     4-10-18 re 14 pending record review
7     reports.....................................34
8     UPCARRILLO2288 - 2289 - CONFIDENTIAL
9  EXHIBIT 44:  Holland to Frankel/Rodino/Davis,
10     re Medical File Review for Mr. Joseph
11     Carrillo....................................35
12     UPCARRILLO2388 - CONFIDENTIAL
13  EXHIBIT 45:  Rodino to Davis email,
14     4-25-18 re Confidential File Review
15     Reports.....................................36
16     UPCARRILLO2395 - CONFIDENTIAL
17  EXHIBIT 46:  Holland to Gengler/Charboneau/Ziemer,
18     6-14-18 re FFD determination for Mr. Joseph
19     Carrillo....................................36
20     UPCARRILLO2403 - 2405 - CONFIDENTIAL
21  EXHIBIT 47:  Davis to Rodino email re Case File
22     Reviews, 8-1-18.............................54
23     UPCARRILLO2515 - 2516 - CONFIDENTIAL
24
25
```

Page 5

```
1  EXHIBIT 48:  Frankel to Holland letter -
2     Carrillo Medical File Review letter,
3     5-19-18.....................................55
4     UPCARRILLO2517 - 2520 - CONFIDENTIAL
5  EXHIBIT 49:  Holland to Rodino/Gengler email,
6     8-8-18 re Mr. Joseph Carrillo - 0457172 -
7     Put report of Dr. Frankel in eHS file.......59
8     UPCARRILLO2526 - CONFIDENTIAL
9  EXHIBIT 50:  Employee Medical Records File........60
10     UPCARRILLO103 - 647 - CONFIDENTIAL
11  EXHIBIT 51:  Medical Comments History.............92
12     CARRILLO000074 - 102 - CONFIDENTIAL
13
14
15
16
17
18
19
20
21
```
```
22  REPORTER'S NOTE:  All quotations from exhibits are
23  reflected in the manner in which they were read into
24  the record and do not necessarily indicate an exact
25  quote from the document.
```

2 (Pages 2 - 5)

Page 6

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  We are going on
3 the record at 9:09 a.m. Pacific time on
4 November 17th, 2021.  This is Media Unit No. 1 in
5 the video recorded deposition of Dr. John Holland
6 taken in the matter of Joseph Carrillo versus Union
7 Pacific Railroad Company filed in the US District
8 Court for the Western District of Texas, El Paso
9 Division, Case No. 3:21-cv-00026-FM.
10          This deposition is being held remotely.
11 My name is Kraig Hildahl, and I'm from Veritext
12 Legal Solutions and I'm the videographer.
13 The court reporter today is Jayne Seward, also with
14 Veritext.
15          Will counsel please identify themselves
16 for the record.
17          MR. KASTER:  I'm Jim Kaster for the
18 plaintiff.
19          MR. ORTBALS:  Bob Ortbals for defendant,
20 Union Pacific.
21          MR. KASTER:  Why don't we go ahead and
22 swear the witness, please.
23          DR. JOHN HOLLAND,
24  duly sworn, was examined and testified as follows:
25          THE REPORTER:  Thank you, sir.

Page 7

1          EXAMINATION
2 BY MR. KASTER:
3      Q.   Dr. Holland, I know you have been deposed
4 before.  I have deposed you previously in related
5 matters.
6          I will just ask you:  You've been placed
7 under oath here today.  What does that mean to you?
8      A.   It means I'm to tell the truth.
9      Q.   You were the chief medical officer of
10 Union Pacific Railroad through December of 2019; is
11 that correct?
12      A.   Yes.
13      Q.   My understanding is that you retired in
14 that month, December of 2019, correct?
15      A.   Yes, correct.
16      Q.   You were in charge of the Union Pacific
17 fitness-for-duty program; is that correct?
18      A.   It is partly correct.  I was -- as chief
19 medical officer, I was directing the medical aspects
20 of the program.  There were other administrative and
21 nursing aspects that I didn't administer.
22      Q.   Would it be fair to say that you were the
23 final decision maker with respect to disqualifying
24 employees from work or imposing certain work
25 restrictions?

Page 8

1          MR. ORTBALS:  Objection to form.  You can
2 answer.
3          THE WITNESS:  No.  No, I don't -- I don't
4 think that was exactly my role.  My role in fact
5 was -- I provided the medical guidance to the
6 doctors, including myself, and the associate medical
7 directors in making the fitness-for-duty
8 determinations, and the individual associate medical
9 directors were authorized to make the final decision
10 consistent with that guidance.
11 BY MR. KASTER:
12      Q.   How many employees do you think you
13 imposed work restrictions on whom were then unable
14 to return to work?
15      A.   I don't know the number.
16      Q.   Hundreds?
17      A.   Yes, hundreds.
18      Q.   We're here today to talk about Joseph
19 Carrillo.  Are you aware of that?
20      A.   Yes.
21      Q.   And Mr. Carrillo had what job at Union
22 Pacific?
23      A.   He was a diesel electrician or a
24 locomotive electrician in the locomotive shops.
25      Q.   How long did he work in that job?  Do you

Page 9

1 know?
2      A.   From looking at the files, I believe he
3 was hired in 2012.
4          (Telephone ringing.)
5      Q.   Doctor, I'm going to ask that any
6 documents or instruments that are being used by you
7 to testify here today be disclosed.  Can you --
8      A.   I -- no, I'm not.  I just had my phone
9 next to me.  I turned the ringer off, but I'm not
10 looking at any documents.
11          I'm not sure what you asked.  What I used
12 to prepare or what I have in front of me?
13      Q.   No.  I'm -- I heard something going off,
14 and I want to make sure that you're testifying based
15 upon your recollection and the documents that we
16 review and not on -- on the basis of anything that I
17 cannot see.
18      A.   Yes.  I have no documents or devices in
19 front of me except for this screen for our call.
20      Q.   Do you have Mr. Carrillo's case in mind?
21      A.   Yes.
22      Q.   What happened to Mr. Carrillo?
23      A.   In June -- on June 30th, 2017, Health and
24 Medical Services, the fitness-for-duty nurses, got a
25 notification from his supervisor that he'd been off

3 (Pages 6 - 9)

Page 10

1 work for four days, and he'd notified the
2 supervisor he'd had a loss-of-consciousness event
3 and he was concerned it might be a seizure. And the
4 supervisor notified him that he'd have to have a
5 fitness-for-duty evaluation prior to return to work,
6 and then notified Health and Medical Services, and
7 our nurses contacted him.
8     So that was -- so it was a
9 loss-of-consciousness event that he reported
10 to his manager, and then Health and Medical Services
11 started the fitness-for-duty evaluation.
12     Q. Are you testifying under oath here today
13 that Mr. Carrillo described what happened to him as
14 possibly being a seizure?
15     A. Yes, that's what I believe the -- or our
16 department notes show, based on his conversations
17 with our fitness-for-duty nurse.
18     Q. You are not a neurologist; is that
19 correct?
20     A. That's correct.
21     Q. You never examined Mr. Carrillo yourself,
22 correct?
23     A. Correct.
24     Q. You are an occupational doctor; is that
25 correct?

Page 11

1     A. Yes, occupational medicine.
2     Q. Do you feel qualified to render a
3 diagnosis yourself about Mr. Carrillo's neurological
4 condition?
5     A. The -- you know, I -- being -- being a
6 physician and -- and studying these things and being
7 interested in loss-of-consciousness events at the
8 railroad, I do feel -- feel qualified in making a
9 determination about what's a most probable
10 diagnosis.
11     Q. You're aware of the fact that his own
12 doctor, Dr. Aguilar, rendered a differential
13 diagnosis and was unable to pinpoint precisely what
14 happened. You're aware of that?
15     A. Well, I -- I don't agree with that
16 statement entirely. He did -- in his notes I'm
17 familiar with, he always had a differential
18 diagnosis. He did describe both subjective
19 information that was told to him by the patient,
20 Mr. Carrillo, and the results of his physical exam
21 and lab tests, so he had a lot of information.
22     While he had the differential diagnosis,
23 it is notable that he had placed work re- --
24 or he -- functional restrictions on him from driving
25 and other activities that might cause him harm if he

Page 12

1 had a seizure. So -- so he did consider that a
2 possibility.
3     Q. How long was that restriction in place
4 for? Do you recall?
5     A. He -- he saw him three times. The first
6 two times, which was August -- from August 7th and
7 September 7th, he explicitly stated the restriction.
8     And then in his last note he didn't -- he
9 didn't comment on restrictions. So he didn't
10 necessarily remove them, but he didn't -- he didn't
11 cite them again in that note. He just didn't
12 comment on it.
13     Q. You sent this to a Dr. Frankel at the
14 University of Nebraska, Omaha, medical hospital; is
15 that correct?
16     A. Yes.
17     Q. Why?
18     A. Well, Dr. Charbonneau, who was the
19 associate medical director who reviewed the case,
20 thought it would be a good idea to get a -- to get a
21 what we call medical file review. We want to do
22 this when there's a lot of information, and we want
23 to be sure we're interpreting it correctly in terms
24 of diagnosis.
25     So one of the reasons we sent it to him --

Page 13

1 two reasons really: To get his opinion on what the
2 most likely diagnosis was, based on the information
3 we had gathered from Mr. Carrillo's doctors; and,
4 second of all, to give us his opinion about whether
5 this might convey a low or moderate to high risk of
6 sudden incapacitation and how that would fit with
7 guidance from the Federal Motor Carriers Safety
8 Administration, that's abbreviated FMCSA, in terms
9 of his risk for sudden incapacitation events.
10     Q. Did you consider that to be an independent
11 opinion?
12     A. It was -- it was an opinion of our
13 consultant, so it's clear that Dr. Frankel was
14 giving an opinion to us, but we -- we asked him to
15 give his medical opinion based on what he thought
16 the facts were.
17     So I think it's a -- I think it's his
18 honest opinion. We didn't ask him to shape the
19 opinion one way or the other. I'm not sure how you
20 would use "independent" or how you -- you're
21 defining "independent" to be in this context.
22     Q. "Independent" means that you didn't try to
23 put your thumb on the scale one way or the other,
24 and no one else did either.
25     A. That's correct. We -- I didn't try to put

Page 14

1 my thumb on the scale or influence his decision. I
2 really wanted his best answers to the question, and
3 then that would provide guidance to us in how we
4 were going to make the fitness-for-duty
5 determination. And we --
6      MR. KASTER: Dr. Holland, I think we've
7 lost your video.
8      THE WITNESS: Okay.
9 BY MR. KASTER:
10     Q. What is the relationship, contractual or
11 otherwise, between Union Pacific and the University
12 of Nebraska, Omaha, hospital, as you understood it?
13     A. Well, first of all, I mean, I think the --
14 the correct title for the group now, which is both
15 the hospital and the medical staff, is Nebraska
16 Medicine, and it's the academic medical center for
17 the University of Nebraska.
18     At the time we sent this review to
19 Dr. Frankel, Union Pacific had a consulting contract
20 and agreement with the University of Nebraska
21 Medical Center to provide consultation to us,
22 including these type of case reviews, plus other
23 consulting that we might need on an hourly basis,
24 and we arranged that through this contract.
25     Q. So there was in existence a physical

Page 15

1 contract between Nebraska Medicine and Union
2 Pacific?
3      A. Yes.
4      Q. I take it you have seen that contract?
5      A. I have.
6      Q. Did you negotiate the contract?
7      A. No. The Union Pacific lawyers did.
8      Q. So at the time of this review by
9 Dr. Frankel he was, as an employee of Nebraska
10 Medical, under a contractual obligation to do this
11 review; is that correct?
12     A. Well, the -- not exactly. I mean,
13 there -- there was -- we would request, I don't
14 know, through the -- we work through one of the vice
15 chancellors. We would request through his office
16 that we wanted a review done or somebody that could
17 do reviews for us on neurologic cases, and then he
18 would work with the chairman of the department to
19 find a staff member or several staff members that
20 would agree to do them.
21     So the physicians weren't required to
22 do them if they didn't -- if they didn't want to,
23 but --
24     Q. They weren't required?
25     A. No. I mean, I think the physicians could

Page 16

1 have declined, and said, you know, "This is not" --
2 and say "This is the kind of thing I'm not
3 comfortable doing," but they were asked, you know,
4 through those channels, through their chairman, if
5 we were -- we just made the request to the vice
6 chancellor, and he found us physicians in that
7 specialty with that competency that had agreed they
8 would participate and do reviews.
9      Q. So he could turn down a new file or case
10 at any time?
11     A. I -- I -- well, I don't know. I mean,
12 potentially what would happen usually is -- is if
13 they felt they didn't have time or they -- you
14 know, they had -- there was a particular -- they had
15 some other, you know, work interference that they
16 think -- thought they wouldn't be able to do it.
17 That was the only time that I recall people turning
18 it down.
19     They didn't -- they didn't tend to, like,
20 review the case and say then "This is one I don't
21 feel comfortable with." It was more sometimes in
22 terms of timing they said they couldn't do them.
23     Q. Did it matter to your restrictions that
24 this was an event of seizure, as opposed to an event
25 of syncope, for example?

Page 17

1      A. Well, I -- I think it -- it sometimes
2 matters. I mean, we wanted to get as clear as we
3 can with the diagnosis because many of the guidance
4 documents we look at, like the FMCSA guidance
5 documents, are diagnosis related.
6      And so, yeah, it -- it does matter what
7 the diagnosis is in terms of, you know, how we would
8 proceed with a fitness-for-duty determination.
9      Q. So is it your view that Mr. Carrillo is an
10 epileptic, by the way?
11     A. No.
12     Q. Have you, yourself, the qualifications and
13 credentials and background and experience to say
14 that this was an event of seizure, as opposed to an
15 event of syncope?
16     A. I -- well, I -- I do have qualifications
17 as a physician. You know, I have general training
18 in this area, and it's an area I've studied both
19 independently looking at journal articles and also
20 talking and working with our consultants. So I
21 think I have some expertise in this in that regard.
22     Q. And you say you can do that without even
23 examining or talking to Mr. Carrillo, right? Is
24 that your view?
25     A. Well, I -- I think it -- I think you can

1 do that. I mean, if you have adequate records from
2 physicians and specialists that did examine him and
3 take appropriate diagnostic tests, and that you can
4 form an opinion based on the information that's
5 provided in those records without doing an interview
6 or an exam.
7      MR. KASTER: I'm going to mark what I
8 think will be Exhibit 38. Let me share my screen
9 here. Bob, this is Bates No. -- let's get the Bates
10 number here at the bottom. You see that it is 1987
11 through, I believe, 1988 is Exhibit 38.
12      (Exhibit 38 marked.)
13 BY MR. KASTER:
14   Q. Can you see this document?
15   A. Yes, I can.
16   Q. Do you recognize the email address from
17 Deb Gengler at UP.COM?
18   A. Yes.
19   Q. Who is Deb Gengler?
20   A. Deb Gengler is a occupational health
21 nurse, and she was the -- she was in a parallel
22 position with me in Health and Medical Services, and
23 she was in charge of the fitness-for-duty nurses and
24 also some other programs.
25   Q. Do you recognize this email? It looks

1 like you were copied on the email. Do you see that?
2   A. Yes.
3   Q. This email actually contains also at the
4 bottom -- as you can see, as is the case with many
5 emails, there's more than one on the page.
6   A. Yes.
7   Q. It looks like Dr. Frankel is expressing
8 some disappointment at the number of cases that he
9 is being asked to review.
10      Do you see that?
11   A. Yes, he -- he specifically says: "I knew,
12 John" -- that would be me -- "said there was one
13 'priority' file," and "I didn't expect 6."
14 So he's expressing that wasn't what he was
15 expecting to get.
16   Q. And he says here: "I tried to be
17 transparent from the outset that I have a full-time
18 job in my role as CMO, not to mention doing a day
19 clinic every week."
20      "You will need to let me know the expected
21 timeline for these 6 new files. I am hopeful we can
22 come to some mutual understanding here."
23      Did you talk to Dr. Frankel about his
24 email?
25   A. Yeah, I -- I -- I think I did. I'm not

1 sure. I mean, that was three years ago. I don't
2 know.
3   Q. Did he ever express to you that he didn't
4 want to do this review?
5   A. Not that I recall.
6   Q. Which of the cases was the so-called
7 "priority" file? Do you recall?
8   A. No, I don't.
9   Q. Was Mr. Carrillo the priority file? Do
10 you recall?
11   A. No. I said I -- I don't remember.
12   Q. It's possible he was the priority file?
13   A. Possibly.
14   Q. I'm going to mark this as Exhibit 39.
15      (Exhibit 39 marked.)
16 BY MR. KASTER:
17   Q. It's an email dated January 22nd of 2018,
18 to Dr. Frankel regarding certain files. Do you
19 recall that?
20   A. Well, I can see it here. I don't recall
21 it, but I -- this is my email.
22   Q. You call him "Harris"?
23   A. Yes.
24   Q. I take it he calls you "John"?
25   A. Yes.

1   Q. He says "Glad you are doing better. I
2 think Deb will follow-up with Nikki" -- "Nikka
3 regarding these cases."
4      Did "these cases" include Mr. Carrillo's
5 case?
6   A. You know, I don't know. It -- it didn't
7 list them down below and -- or they were redacted.
8 I don't know that they were listed. So I'm assuming
9 it did or we wouldn't be talking about this email,
10 but I don't know.
11   Q. It says here at the bottom,
12 January 17th, 2018, at 9:19 a.m., and it says
13 "Dr. Frankel, I know Dr. Holland has placed a call
14 with you. And I have a call into Nikka. We have
15 reviewed our request and now will need for you to
16 review only" -- this is redacted then. "In February
17 we will ask you to review the file on Joseph
18 Carrillo, as we know he is having more testing, so
19 we will provide you with the additional records."
20      Was the additional testing ever done, do
21 you know?
22   A. Some of it, yes.
23   Q. Was Mr. Carrillo scheduled at some point
24 to go to the Mayo Clinic? Do you recall?
25   A. Yes, that was the information we got on

Page 22

1 him, yeah, that he was going to go to the Mayo
2 Clinic, and also go to his own -- Dr. Aguilar, his
3 own neurologist, again.
4    Q.  Do you know if he ever did that?
5    A.  Yes.  I know he went to see Dr. Aguilar
6 again on January 25th, 2017, and then we got notice
7 later that he was not going to the Mayo Clinic, or
8 did not go and was not intending to go.
9    Q.  Well, this is after the visit with
10 Dr. Aguilar because this is January of 2018.  You
11 see that, right?
12    A.  Yes.  So I misspoke.  It was
13 January 25th, 2018, that he saw Aguilar again, so
14 that was after this.
15    Q.  He was unable to go to the Mayo Clinic
16 because he didn't have the money.  Do you recall
17 that?
18       MR. ORTBALS:  Objection to form, calls for
19 speculation.  You can answer.
20       THE WITNESS:  I -- I -- all I knew was I
21 saw an email and a note.  I don't recall now if it
22 was from him or -- I mean, in my review of this
23 case -- an email in about April that said he's no
24 longer going to the Mayo Clinic, and I don't recall
25 the details.

Page 23

1 BY MR. KASTER:
2    Q.  Were you going to give attention and
3 weight to those additional records if they were
4 forthcoming?
5    A.  Yes.
6    Q.  So this is an email dated February 19th
7 of 2018, about a month later, and Dr. Frankel is
8 sending to you and Deb Gengler what appears to be
9 drafts of reports.
10       THE REPORTER:  Mr. Kaster, is this an
11 exhibit, a new exhibit?
12       MR. KASTER:  Yes.  Exhibit 40.
13       THE REPORTER:  Yes.  Thank you.
14       MR. KASTER:  Thank you, Jayne.
15       (Exhibit 40 marked.)
16       MR. KASTER:  And for the record,
17 Exhibit 40 contains Bates Nos. 2057, 2058 and 2059.
18 BY MR. KASTER:
19    Q.  Do you recognize this as an email from
20 Dr. Frankel to yourself dated February 19th
21 of 2018; is that correct?
22    A.  Yes.
23    Q.  So my question:  Did Dr. Frankel send you
24 drafts of his reports?
25    A.  I -- well, I don't -- he didn't -- he

Page 24

1 doesn't say here he did a draft at this time, and I
2 didn't see a draft.
3       And when he said "a preliminary review," I
4 mean, I interpret it -- I interpret this as saying
5 he'd reviewed the material.  And at that time we had
6 told him we were going to wait and see if we got
7 potentially more information from the Mayo
8 Clinic.
9       So we asked him -- I know in previous
10 emails we asked him to postpone his, you know, final
11 review, you know, until he got that information,
12 but I did not see -- and I don't know if he prepared
13 any preliminary report, but I've not seen it in our
14 records.
15    Q.  Back to my question:  Did Dr. Frankel, as
16 a matter of practice, send you drafts of reports?
17    A.  Not that I recall.
18    Q.  Is there a reason why you wouldn't recall
19 that?
20    A.  Well, yeah, it was -- it was, like, three
21 years ago.  I -- I haven't -- we work with a lot of
22 physicians doing reviews, but I don't -- I don't
23 remember Dr. Frankel sending me drafts.
24    Q.  Well, the second line in this says
25 "Attached are final drafts of the first 4."  Do you

Page 25

1 see that?
2    A.  Yes.
3    Q.  Then he says in the next line:  "Feel free
4 to comment," dash, dash, dash, "John."
5       So did you see drafts of report and -- of
6 reports and comment on them?
7    A.  Well, when I got drafts of reports, I did
8 often -- typically I would talk to the consultant
9 about it and ask questions, and there would be times
10 where I'd ask him to expand on something, you know,
11 and provide more detail or -- you know, if I thought
12 that would be helpful.
13    Q.  So there are occasions when you sought
14 drafts of reports from this so-called "independent
15 expert," Dr. Frankel?
16       MR. ORTBALS:  Objection to form.  It's
17 argumentative.  You can answer.
18       THE WITNESS:  Well, he said they were
19 final drafts.  I mean, and I think they may have
20 been the final reports too, and -- but he did ask me
21 to review them and comment on those what he called
22 "final drafts."
23       And -- well, and, I guess, then he says "I
24 will affix evaluations to letterhead for final
25 submission."  So I guess -- I guess they weren't the

7 (Pages 22 - 25)

1 final reports because they weren't on letterhead.
2 BY MR. KASTER:
3      Q.   So you did, as a matter of practice, see
4 preliminary drafts of Dr. Frankel's reports?
5      A.   Well, I don't know, as a matter of
6 practice, that I always did.  In this case he sent
7 me four that were drafts and weren't on letterhead
8 and asked me to comment.
9      Q.   These four drafts were all employees of
10 Union Pacific Railroad who were being subjected to a
11 fitness-for-duty evaluation, correct?
12      A.   That's correct.
13      Q.   And, as you sit here, do you know if you
14 saw a preliminary draft of the report of Joseph
15 Carrillo?
16      A.   Not -- well, there's -- I don't think I
17 did.  There's nothing in my notes, you know, either
18 the Medical Comments History or emails, that
19 suggested I saw a preliminary draft of this report.
20      Q.   You have no recollection one way or the
21 other; would that be fair?
22      A.   Well, I have no independent recollect- --
23 recollection other than looking at those documents,
24 again, our Medical Comments History and emails.
25          MR. KASTER:  I believe this will be

1 Exhibit 41.  Would that be correct, Jayne?
2          THE REPORTER:  Correct.
3          MR. KASTER:  And for the record, this is
4 Bates No. 2237 through 2238.
5          (Exhibit 41 marked.)
6 BY MR. KASTER:
7      Q.   And, Dr. Holland, this is an email copied
8 to you to Debra Gengler from Theresa Rodino dated
9 March 5th of 2018.  Do you recognize the email?
10      A.   Yes.
11      Q.   Theresa Rodino is who?
12      A.   She was one of the fitness-for-duty
13 nurses.
14      Q.   It appears that these are all the file
15 review requests for Dr. Frankel, right?
16      A.   Yes.
17      Q.   It looks like he's being asked to do two
18 in November, two in December, one in January, one in
19 February and one in March, right?
20      A.   Yes.
21      Q.   And then there's, at the bottom, a subject
22 file review for Joseph Carrillo.  "Deb, following
23 up - do we have a file review report or
24 determination on this Electrician?"
25          That's related to Joseph Carrillo, right?

1      A.   Yes.
2      Q.   This says Fitness-For-Duty Western at UPC
3 from.  Who's that from?
4      A.   Well, it's from Bridgette Ziegler (sic).
5 You can see her name is at the bottom of that block
6 of --
7      Q.   Um-hum.  And who is that?
8      A.   She's the fitness-for-duty nurse that
9 was -- had this Western Region.
10      Q.   So there's a request about what the status
11 is of Joseph Carrillo's file review, right?
12      A.   Yes.
13      Q.   And this is March 5th of 2018?
14      A.   Yes.
15      Q.   Now, does Dr. Frankel have all the
16 information he needs at this point to do a
17 fitness-for-duty determination on this electrician
18 as of that date?  Do you know?
19      A.   I -- you know, based on some of the
20 subsequent emails that I looked at and reviewed in
21 this case, I think it wasn't until April that we
22 told him to go ahead and finish the review, and we
23 were still looking for any follow-up information
24 from Mayo Clinic.  So I think he -- he was waiting
25 for us to provide him more information, which is

1 what we'd instructed him, I believe, at this time.
2      Q.   Do you know whether or not Ms. Ziemer was
3 confused about that?
4      A.   Well, I don't think -- she wasn't actually
5 handling the case.  The way it was being done at
6 this time is when we had cases going for file
7 review, Theresa Rodino would manage the cases.  So I
8 don't think Bridgette Ziegler (sic) was -- she was
9 really informational.  I don't think she knew where
10 we were with -- without asking.
11      Q.   Is it Ziegler or Ziemer?
12      A.   Ziemer.  I -- you know, I -- I can't
13 remember.  I guess -- I guess this is correct.  It's
14 Ziemer.
15      Q.   This is an email dated March 7th of 2018.
16          THE REPORTER:  Exhibit 42?
17          MR. KASTER:  This is 42.  Thank you,
18 Jayne.  And for the record this is Bates No. 2247
19 and 2248.
20          (Exhibit 42 marked.)
21 BY MR. KASTER:
22      Q.   So you send this email to Theresa Rodino,
23 copied to Deb Gengler, and you say "I had a call
24 with Dr. Frankel yesterday and reviewed his reports
25 on the first 4 cases."  Then you say "He will be

Page 30

1 sending the final reports shortly."
2     So it looks like you're reviewing drafts
3 of his reports before they're submitted as final
4 reports, right?
5     A.  Well, I was discussing it with him.  I
6 mean, I don't -- I don't know that I actually had
7 drafts.  I was discussing the cases with him to get
8 his opinions and find out what his opinions were,
9 but I don't know if I had drafts.  It doesn't say.
10     Q.  Well, actually I think it does say.  It
11 says "I had a call with Dr. Frankel yesterday and
12 reviewed his reports on the first 4 cases.  He will
13 be sending the final reports shortly."  Do you see
14 that?
15     A.  Yes.
16     Q.  Doesn't that mean to you that you were
17 reviewing reports in draft before they're final?
18     A.  Not necessarily.  I don't -- I may have
19 been that I was just asking him to give me his
20 opinions, and that he would be -- find out where he
21 was with the cases.  So I don't -- I don't think it
22 implies I had draft reports or I don't know that
23 it -- I don't know that I did.
24     Q.  Do you know that you didn't?
25     A.  I -- well, I don't know.  Like I said,

Page 31

1 this was three years ago.  I mean, I think -- I
2 think that -- I don't know.
3     Q.  Well, you know, we have gotten, I think,
4 what is a pretty robust discovery, I don't know if
5 it's full discovery, so far.  I haven't seen any
6 draft reports.
7     Did you destroy draft reports in these
8 cases?
9     MR. ORTBALS:  Objection to form.  It's
10 argumentative.  You can answer.
11     THE WITNESS:  No.  And, in fact, if he
12 sent me something to the Union Pacific email, I
13 can't destroy it.  I mean, it's -- it would be
14 impossible for me to destroy it.
15 BY MR. KASTER:
16     Q.  So do you have an explanation for why
17 there are no reports --
18     A.  I --
19     Q.  -- that are in a --
20     A.  Well, I think I -- go ahead.
21     Q.  Go ahead.
22     A.  All right.
23     Q.  That are in a more draft form?
24     A.  Yes.
25     Q.  Please.

Page 32

1     A.  Well, as I said, I think it's likely that
2 what I did is -- if we don't have draft reports, is
3 I asked him what his impression was, and I said "his
4 report," but I might have just said I reviewed the
5 cases with him might have been more proper, and that
6 he'll be sending the final report shortly.
7     So I -- I interpret this to mean I got
8 his -- asked him for his final opinions on the case,
9 and he gave them to me and then we'd get the
10 reports.
11     And sometimes the -- we would do this
12 with -- with the con- --consultants sort of to
13 speed along the fitness-for-duty determination.  If
14 they -- if they were really -- if they'd already
15 made the determination and they -- and they -- we
16 discussed it by phone and they gave that to me, then
17 I could go ahead and complete the fitness-for-duty
18 determination, and we could add the final report to
19 the case later.
20     And that's actually what happened back in
21 June of this year, 2018, when I did a phone call
22 with Dr. Frankel.  He gave me his opinions over the
23 phone.  I wrote them in a fitness-for-duty
24 determination, and then we got his final report,
25 which was consistent with my fitness-for-duty

Page 33

1 determination.  We got his final report later.
2     Q.  Do you have a photographic memory?
3     A.  No.
4     Q.  Do you take notes?
5     A.  Yes.
6     Q.  Did you take notes on this conversation?
7     A.  The -- on this conversation on these
8 cases?  I probably did.
9     Q.  In these cases.
10     A.  Yeah, on the -- on the -- for this email I
11 probably did take notes.
12     Q.  On the conversation that you had where you
13 say Dr. Frankel communicated his viewpoints on
14 Joseph Carrillo, did you take notes?
15     A.  It would have been -- yeah, I probably
16 would have because I wanted to record it accurately.
17     Q.  Have you seen those notes?
18     A.  Well, these handwritten notes, once I've
19 got it written in the -- in my email, which I did,
20 in my memo, then I don't keep the notes after I've
21 got it written down.
22     Q.  So you threw out the contemporaneous notes
23 of the conversation about Joseph Carrillo with
24 Dr. Frankel?
25     A.  Yes, that would be my practice.  I mean,

9 (Pages 30 - 33)

Page 34

1 once I'd written it in a -- in a written document.
2          MR. KASTER:  This will be Exhibit?
3          THE REPORTER:  43.
4          MR. KASTER:  43.  Thank you.
5          (Exhibit 43 marked.)
6 BY MR. KASTER:
7     Q.  So it appears that there are record
8 reviews scheduled for Dr. Frankel, a Lowes, an Ivan.
9 Who are Ivan and Lowes?
10    A.  Well, they're other consultants we have.
11    Q.  At Nebraska Medical?
12    A.  Dr. Lowes is at Nebraska Medical.  He's a
13 cardiologist.  Dr. Ivan is an independent
14 consultant, and he's an ophthalmologist.
15    Q.  These are all file reviews related to
16 fitness-for-duty evaluations?
17    A.  Yes.
18    Q.  It says "Waiting on Dr. Frankel for the
19 following delivered December of 2017, Joseph
20 Carrillo."
21         Was that when Dr. Frankel received the
22 medical records for Joseph Carrillo?
23    A.  You know, it doesn't say when we sent the
24 records on here.  I'm thinking the -- I -- I -- I
25 know we sent them to him in mid-January.  Probably

Page 35

1 around the 17th or 18th.  And I -- oh, it says -- it
2 does say January, 2018, which is probably when he
3 got the first group of records.
4          THE REPORTER:  Excuse me, Mr. Kaster.  Did
5 you give the Bates numbers for that last exhibit?
6 I'm not --
7          MR. KASTER:  Absolutely.  Thank you,
8 Jayne.  It's Bates No. 2288 and 2289.  It's a
9 two-page document.
10         THE REPORTER:  Thank you so much.
11         MR. KASTER:  This will be Exhibit 44.  Is
12 that correct, Jayne?
13         THE REPORTER:  Correct.  Yes.
14         MR. KASTER:  And this is an email
15 dated 4/17/2018.  It's Bates No. 2388.
16         (Exhibit 44 marked.)
17 BY MR. KASTER:
18    Q.  Dr. Frankel is informed that there won't
19 be any records of medical care from the Mayo Clinic.
20 Do you see that?
21    A.  Yes.
22    Q.  So is the record of, or records, that
23 Dr. Frankel have -- has related to Mr. Carrillo, are
24 those at this point in Dr. Frankel's possession, if
25 you know?

Page 36

1     A.  I believe they are.
2          MR. KASTER:  And this will be Exhibit 45.
3 Is that correct, Jayne?
4          THE REPORTER:  Correct.
5          MR. KASTER:  And for the record, this is
6 Bates No. 2395.
7          (Exhibit 45 marked.)
8 BY MR. KASTER:
9     Q.  This is an email requesting Dr. Frankel if
10 he has an update on Joseph Carrillo?
11    A.  Yes.
12    Q.  Do you recognize this as such?
13    A.  Yes.
14    Q.  Did you direct that they -- that Theresa
15 Rodino or someone else find out the status of the
16 cases that you had sent to Dr. Frankel for review at
17 or about this time in April of 2018?
18    A.  I don't recall.  I don't recall if I
19 requested it or if she initiated it, because this is
20 her area of responsibility is these cases.
21         (Exhibit 46 marked.)
22 BY MR. KASTER:
23    Q.  And it looks like Exhibit 46 is your memo
24 regarding Mr. Carrillo.  It's a fitness-for-duty
25 evaluation or determination dated 6/14 of 2018.

Page 37

1          Is this when you made your final decision
2 with respect to Mr. Carrillo's fitness-for-duty?
3     A.  Yes.
4     Q.  Can you place in time when it is that you
5 had this phone call with Dr. Frankel?
6     A.  I think it says -- I think it says later
7 in this memo that I talked to him -- probably my --
8 my general practice would be to write the memo right
9 after I talked to him so it was probably the same
10 day, but it probably says farther down.
11    Q.  I'll keep going.  This is Bates No. 2403.
12    A.  Okay.  So -- so it -- to finish this
13 question under the header "Findings of Medical
14 Review with Dr. Frankel," it says "I recently
15 discussed this with Dr. Frankel" on the phone.
16 So I -- I don't know the -- typically I either write
17 it the same day or -- or the next day, but I don't
18 let it go very long.  So it would probably have been
19 in the last day or so after this -- before this was
20 written.
21    Q.  You can't be precise about when it is you
22 had this phone call, right?
23    A.  No.  Not from this memo, no.
24    Q.  Did Dr. Frankel say in the phone call that
25 he was medically certain that it was a seizure, as

10 (Pages 34 - 37)

Page 38

1  opposed to an event of syncope?
2    A.  Well, as I recall, I know his report -- I
3  read it recently, and my specific question to him
4  is:  What is the likely diagnosis?  And so he said
5  "single unprovoked seizure," so that's what he
6  thought the likely diagnosis was.
7    Q.  But my question is a little different.
8  Was Dr. Frankel certain that it was a -- an event of
9  seizure, a single unprovoked seizure, as opposed to
10  an event of syncope?
11    A.  I think he was.  You know, when you use
12  the word "likely," you know, in this context in
13  clinical medicine, "likely" means most probable.
14  You know, more than any other probable diagnosis.
15  And I think -- so I think he had a reasonable
16  degree, another way to put it, of medical certainty
17  that that was the diagnosis.
18    Q.  What was his percentage degree of
19  certainty?  Do you know?
20    A.  I don't know.  You know, I mean, you can
21  ask him.  I think that typically if you don't have
22  evidence for any diagnosis, you could say that the
23  diagnosis is unclear or he could have said, in this
24  case, loss of consciousness of uncertain origin.
25    I mean, you'd have to ask him, but I think

Page 39

1  medical certainty means to many physicians it's the
2  most probable; more probable than the others, and
3  there's some evidence for it.
4    Q.  Are seizures sometimes caused by a lesion
5  on the brain?
6    A.  Yes.
7    Q.  Is that a -- a probable cause?
8    A.  The -- I mean, it could be on occasion if
9  you had -- depending on the case and what the
10  history was, what the objective findings were.
11    Q.  I mean, there's no evidence of a lesion on
12  Mr. Carrillo's brain, correct?
13    A.  That's right.  He'd had his MRI scan,
14  which was done after the loss-of-consciousness
15  event.  It didn't show a lesion on the brain.
16    Q.  He also had a normal EEG test, right?
17    A.  Yes.
18    Q.  All of his tests that were conducted,
19  including the MRI and the EEG, were normal, correct?
20    A.  The -- well, the diagnostic tests that he
21  had, neurological tests were more the -- well, let
22  me just put it this way:  He had a lot of lab tests
23  done, and there were some minor abnormalities in
24  some of those.  Like in the liver function test.  I
25  don't think those, and don't think Dr. Frankel,

Page 40

1  either, thought those were relevant to these
2  questions of loss of consciousness.
3    And so the abnormalities that -- on some
4  of his lab tests I don't think would -- would have
5  been relevant to loss-of-consciousness issues.
6    And -- and then the other abnormality he
7  had on physical exams, he had some sensory defects
8  in the right upper extremities, but he'd had those
9  before after his elbow operations and carpal tunnel.
10    So, you know, it -- it isn't fair to say
11  everything was normal, but on those two tests you're
12  talking about, the MRI and the EEG, they are normal.
13    And Dr. Frankel didn't note any -- any lab
14  test abnormalities that he thought were relevant to
15  determining loss of consciousness.
16    Q.  He had, in fact, some elbow difficulty
17  from an injury from wrestling in high school, right?
18    A.  Yes.
19    Q.  And that has nothing to do with his loss
20  of consciousness, right?
21    A.  I -- I don't believe it would.  Yes,
22  that's correct.
23    Q.  How about this Gabapentin, does that have
24  anything to do with this case?
25    A.  Well, he -- he -- the notes, the records

Page 41

1  suggest he was taking it, or at least he was
2  prescribed to be taking it at this time, and it
3  was -- and it's an issue of interest because
4  Gabapentin is used for pain issues, which is what
5  Mr. Carrillo reported he was taking it for, but
6  it's also an antiepilepsy drug.  So it was something
7  that -- it was an issue we had to clarify why he was
8  taking the Gabapentin.
9    Q.  Did you clarify it?
10    A.  Yes, and the clarification came in in a
11  note from the fitness-for-duty nurse and
12  Mr. Carrillo where he said he was taking it for his
13  right arm pain or -- or sensory problems.
14    Q.  It is, in fact, prescribed, often
15  prescribed for pain, right?
16    A.  Yes.
17    Q.  There's no indication in this case that
18  Mr. Carrillo ever had an event of seizure or was in
19  any way ever diagnosed as an epileptic, correct?
20    A.  Well, there's little --
21    Q.  Just let me --
22    A.  -- evidence that --
23    Q.  Let me back up because that's a multiple
24  question.
25    Do you have any record evidence that

11 (Pages 38 - 41)

1 Mr. Carrillo had an event of loss of consciousness
2 prior to the event at issue here?
3     A.   No, I haven't seen anything in the records
4 related to that.  So there's no evidence that I've
5 seen of that, of a prior loss-of-consciousness
6 episode before the one in June of 2017.
7     Q.   Does he have, to your knowledge, any
8 history of epilepsy prior to the event in this case?
9     A.   No.
10     Q.   Do you have any reason to believe that he
11 was taking Gabapentin for epilepsy?
12     A.   No.
13     Q.   Is Dr. Frankel an expert in the FMCSA, do
14 you know?
15     A.   I know he's familiar with it because when
16 we asked him to start doing the reviews, we gave him
17 copies of some of the relevant documents.
18     Q.   Do you know if he followed the FMCSA in
19 placing any work restrictions on Mr. Carrillo?
20     A.   Yes.
21     Q.   How do you know that?
22     A.   Because I'm familiar with the FMCSA
23 medical expert handbook and their guidance on a
24 seizure of -- a single unprovoked seizure of unknown
25 cause.

1     Q.   Do you know Larry Mann?
2     A.   I've met him.
3     Q.   Do you know if he was deposed in another
4 matter, the Ingram matter?
5     A.   I do know that.
6     Q.   Is it your testimony that Union Pacific
7 adopted the FMCSA because of the failure of the RSAC
8 committee to come up with a set of rules and
9 regulations pertaining to workplace safety for
10 railroad workers?
11     A.   Well, I -- I -- it is -- I believe you're
12 talking about the F -- the Federal Railroad
13 Administration's RSAC committee -- RSAC is Rail
14 Safety Advisory Committee -- had formed a medical
15 standards working group and were charged by the RSAC
16 committee with coming up with some proposed medical
17 standards for safety critical railroad workers that
18 then could be used under the FRA as a basis for
19 regulation.
20         And so the -- in answer to your question,
21 I'm aware that that working group -- the -- a
22 doctors' task force within that working group, which
23 I -- which I participated, did come up with a draft
24 set of medical guidelines, but then they weren't
25 moved forward, and FRA did not institute any medical

1 standard regulations that were comprehensive.
2         And Union Pacific did -- after that
3 happened, we took an approach that we would use the
4 FMCSA medical guidelines for commercial drivers to
5 the extent they were applicable -- or we -- we would
6 use those, as well as other information, other
7 medical information and guidance in making
8 fitness-for-duty determinations.
9         So I think this answers your question.
10 So, yes, all this was -- happened after the RSAC
11 medical standards committee didn't result in any
12 FRA medical standards.
13     Q.   What was your position on -- on the
14 committee?  You worked on the committee, right?
15     A.   Yes.  When I -- after I became -- the
16 committee actually started, I think, in 2006, and it
17 went actively until 2011.  And in 2010, 2011, when I
18 was chief medical officer, I -- I would go to the
19 meetings, and I'd participate in the -- both the
20 working group meetings and in the physician task
21 force meetings.
22     Q.   Did you support the adoption of these
23 standards for railroads, the medical standards that
24 were being worked on by this committee?
25     A.   Yes.

1     Q.   So your -- did you have a vote, by the
2 way?
3     A.   Not individually.  The way the task force
4 worked is if it ever came -- basically I don't
5 recall a vote while I was there.  People were in
6 agreement.  But there was one vote for the American
7 Association of Railroads which -- although we had
8 more than one railroad physician at the meetings, if
9 it would -- ever came to a vote, we'd have one vote.
10 One vote for the physician who was representing the
11 unions and one vote for the FRA who had their chief
12 medical officer presiding over the meeting.
13         So, yeah, I don't recall having a vote.  I
14 think it -- there was agreement that -- among the
15 group that we'd move these forward.
16     Q.   So did the railroads vote in favor?
17     A.   Well, let me -- let me just back up.  I
18 was talking about I don't recall a vote in the
19 physicians' task force, and -- and although there
20 were, you know, debates and discussions, we came up
21 with a consensus agreement that was acceptable.
22 That was sent by the chief medical officers for the
23 FRA, Dr. Arseneau, to the larger working group in
24 early September.  And then either --
25     Q.   Of what year?

12 (Pages 42 - 45)

1   A.  2011, early September 2011.  And then
2 there was a final meeting of the working group in
3 late December, 2011, where they were discussed.  My
4 recollection is the -- there wasn't a vote at that
5 meeting by the working group either, whether to move
6 them forward or not, and there was going to be
7 further discussions about it, and that was the last
8 meeting.
9   Q.  Was there ever another meeting?
10   A.  Not an in-person meeting of the whole
11 group, no, of the whole working group.  That was the
12 last one of the working group.
13   Q.  Was there a final vote of the medical
14 group?
15   A.  I -- I -- as a -- well, I don't think
16 there was a final vote on whether to adopt the
17 medical standards proposed by the physicians' group.
18     I think there was a -- and I don't know if
19 there was a vote, but I think the action was to go
20 ahead and have a smaller working group that looked
21 at the -- and I'm not sure if this is precise, but
22 so the cost benefit of this proposed new regulation,
23 which is required by the Office of Management and
24 Budget, OMB, and to proceed with that part.
25     So I think -- I -- I -- I don't recall any

1 vote, even by the large working group, about whether
2 to accept these medical standards or not.
3   Q.  So when did Union Pacific decide to
4 default to the FMCSA or some portions of the FMCSA
5 to make its fitness-for-duty determinations?
6   A.  I -- I think it was -- well, it was
7 sometime after that.  You know, when -- when it
8 became -- it seemed that either these FRA medical
9 standards weren't going to be promulgated or it
10 would be a long time before they were, so it was
11 sometime after that.  I don't know, you know,
12 what -- but within the next year, sometime in that
13 time period.
14   Q.  So Union Pacific decided to start
15 applying some sections of the FMCSA sometime
16 in 2012 or 2013?
17   A.  The -- I don't recall.  I mean, I -- I
18 mean, I think we were doing that in 2012, 2013, but
19 I don't know -- I don't know that there was a
20 specific starting time that I can recall.
21   Q.  It's fair to say that Union Pacific
22 doesn't adopt the FMCSA as a whole, correct?
23   A.  The -- you know, it -- that's correct, we
24 haven't -- we haven't made a statement that we're
25 adopting it as a whole, but what we've done, and

1 mainly on individual cases, is -- is, among the
2 physicians, we've consistently applied it.  And then
3 there's some areas where we have used other evidence
4 and recommendations for our consultants often in
5 areas where the FMCSA doesn't provide a lot of
6 detail.
7     And in some cases, like in our dealing
8 with diabetes with insulin, we have had -- been
9 using guidelines that -- you know, that were less
10 restrictive than FMCSA because we thought that was
11 appropriate.
12   Q.  Is there any official policy statement or
13 proclamation from Union Pacific that they were going
14 to adopt the FMCSA or some portions of it?
15   A.  I -- well, I don't know that there's a
16 policy statement per se.  There -- there are various
17 fitness-for-duty determination memos that have --
18 that I and the associate medical directors have
19 written where we say we're following that guidance.
20     And, you know, so we -- we have written it
21 in related individual cases, and -- and there are
22 some memos which -- which I had written mainly to
23 the Law Department or EEOC Department to say this is
24 what we are doing, and I did that really to provide
25 a -- such a document.  And -- and those -- I mean, I

1 know you're familiar with because they've been
2 produced in other cases that you and I both have
3 been involved in.
4   Q.  The FMCSA as a matter of law doesn't apply
5 to Union Pacific Railroad, right?
6   A.  Well, not exactly.  You know, we do have a
7 number of employees that have commercial driver's
8 licenses which are regulated by the FMCSA, and it
9 does directly apply to those individuals.  And for
10 workers that aren't seeking a commercial motor
11 vehicle driving license it doesn't directly apply to
12 them legally.
13   Q.  The FMCSA has qualified and certified
14 examiners, right?
15   A.  Yes.
16   Q.  You're not such a person, right?
17   A.  No, no.
18   Q.  You've never been certified or qualified
19 to do an FMCSA examination, correct?
20   A.  Well, no, that's not correct.
21   Q.  Well, there's an actual process for -- for
22 becoming certified.  You're aware of that, right?
23   A.  Yes.
24   Q.  You've never become certified, right?
25   A.  That's correct.

1    Q.   Let me ask you about these work
2  restrictions.  I'm going to focus in on No. 5.
3      These were the work restrictions you placed on
4  Mr. Carrillo, right?
5    A.   Yes.
6    Q.   It says not to operate company vehicles;
7  not to work on or near moving trains; not to operate
8  cranes, hoists, or machinery; not to work at
9  unprotected heights.
10       Then the number 5:  "Not to perform work
11  where decisions or actions can affect the safety of
12  others."  Then it puts in parens "(not to work as a
13  Train Dispatcher or similarly" -- "similar safety
14  sensitive positions.)"
15       Does the language in parens define the
16  first section of that sentence?
17    A.   Well, I -- I don't think -- I think
18  "define" is -- is too -- is maybe the wrong word
19  here.
20       It's meant to be partly an example and
21  explain it.  So it's meant to help explain what we
22  mean, and the train dispatcher's specifically one of
23  the jobs we're concerned about with No. 5.
24    Q.   You consider an electrician to be a
25  similar safety sensitive position to a train

1  dispatcher?
2    A.   No.  I mean, their tasks are -- are
3  different, and the safety concerns are somewhat
4  different.
5    Q.   Do you remember a restriction being placed
6  on Mr. Carrillo that is different than these
7  restrictions?
8    A.   I -- well, no.  I mean, I think these are
9  the only restrictions that have been placed on him.
10  I think before this final determination, the
11  fitness-for-duty -- fitness-for-duty determination
12  was just not fit for duty pending completion of the
13  evaluation.
14    Q.   So these are the final restrictions,
15  correct?
16    A.   Yes.
17    Q.   And these are the only restrictions,
18  correct?
19    A.   The -- well, these are the final
20  restrictions that I gave.  I know they're
21  interpreted by our fitness-for-duty nurses, and I
22  think correctly, is when people get these
23  restrictions, they're also given restriction from
24  applying for a commercial driver's license or a
25  crane operating license for Union Pacific.

1    Q.   Did Mr. Carrillo need a commercial
2  driver's license to be an electrician?
3    A.   Well, as far as I know, he didn't, but
4  with this -- with the electricians, you know, the --
5  the individual shops sometimes have additional
6  requirements based on geography and location.  And I
7  don't know that he needed that, but it -- it could
8  be -- there could be some situations where a diesel
9  electrician might need that to go out and help with
10  a repair where they -- they couldn't bring it into
11  the shop, but I don't think -- but I don't know of
12  any reason to think he needed that.
13    Q.   In any case, setting aside the commercial
14  driver's license for the sake of this question,
15  these are the only restrictions that you placed on
16  Mr. Carrillo, right?
17    A.   These are the only ones I placed on him.
18  As I said, you know, just to clarify what I also
19  said, is when it comes out in the computer, it says
20  not to -- applying for a crane operator's license,
21  which is a special certification.  Now, they're sort
22  of covered by this where I said not to operate
23  cranes if it could result in injuries to himself or
24  others.  And I think -- but these are the only ones
25  I wrote and placed on him, yes.

1    Q.   Did somebody else place different
2  restrictions on him, as far as you know?
3    A.   I don't know.  But just to clarify
4  again, I do know that -- that the nurses go
5  ahead and re- -- and also our computer program goes
6  ahead and -- and does place those additional
7  restrictions that they can't apply for a commercial
8  driver's license during operation based on these
9  restrictions.
10       So it's just a different -- you know,
11  technically there's the -- those things would also
12  show up to the manager, but I think they're covered
13  by the ones I wrote.  So it's just another
14  explanation.  And I don't know of any other
15  restrictions that were placed on him.
16       THE WITNESS:  Would this be a time we
17  could break for maybe five minutes?
18       MR. KASTER:  Absolutely, certainly.
19       THE WITNESS:  Okay.
20       MR. KASTER:  Let's -- let's take -- let's
21  take 10 minutes.
22       THE WITNESS:  Okay.
23       THE VIDEOGRAPHER:  We are going off the
24  record at 10:27 a.m.
25       (Recess taken from 10:27 to 10:41 Pacific

14 (Pages 50 - 53)

Page 54

1 time.)
2        THE VIDEOGRAPHER:  This is Media No. 2 in
3 the deposition of Dr. John Holland.  Today is
4 November 17th of 2021.  We're going back on the
5 record at 10:41 a.m.
6 BY MR. KASTER:
7    Q.   Dr. Holland, I'm going to take you to
8 another exhibit.
9        THE REPORTER:  That would be Exhibit 47.
10       MR. KASTER:  Thank you.
11       (Exhibit 47 marked.)
12 BY MR. KASTER:
13   Q.   It says from Niki -- I can't say this.
14 Nikia Davis.  Who is that?  Do you know?
15   A.   She was Dr. Frankel's assistant.
16   Q.   It says "Attached are the reports we spoke
17 of."  It looks like this -- these reports were
18 communicated on or about August 1st, right?
19   A.   Yes.
20   Q.   Does that include -- and it's not clear
21 from this record if that includes Mr. Carrillo.  Do
22 you know if it does?
23   A.   Well, it's one of the attachments down
24 below.  It says --
25   Q.   Yeah.  So, for the record, we'll look at

Page 55

1 Bates No. 2515 and 2516.  2515 doesn't refer to
2 Mr. Carrillo specifically, but the second page
3 refers to a report PDF attached for Mr. Joseph
4 Carrillo, right?
5    A.   Yes.
6    Q.   And from your review of these files in
7 preparation for your deposition here today, do you
8 believe you received Dr. Frankel's written report on
9 or after August 1st of 2018?
10   A.   Yes.  I mean, I -- I know the report has a
11 date on it too, but I -- from this I believe that is
12 true.
13   Q.   All right.  So I want to be clear about
14 this:  You received Dr. Frankel's report on Joseph
15 Carrillo on or after August 1st of 2018, correct?
16   A.   Well, you know, I don't have an
17 independent recollection.  Looking at this email,
18 that -- that appears correct.
19   Q.   So I'm going to ask you about the next
20 exhibit.
21       THE REPORTER:  48?
22       MR. KASTER:  Exhibit 48.
23       (Exhibit 48 marked.)
24 BY MR. KASTER:
25   Q.   And this is actually the report on Joseph

Page 56

1 Carrillo that was attached to the email previous,
2 correct?
3    A.   Well, I assume it is, yes.
4    Q.   And just for the record, we're talking
5 about Bates No. -- and I'm sorry to make everyone
6 dizzy here -- 2517 through 2520, and this is
7 actually the signed writing of Dr. Frankel related
8 to Dr. -- related to Joseph Carrillo, correct?
9    A.   Yes.
10   Q.   And I noticed this:  It's actually dated
11 May 19th of 2018.  Do you see that?
12   A.   Yes.
13   Q.   Do you have any explanation for why you
14 didn't receive it in this form until on or after
15 August 1st of 2018?
16   A.   I don't know.  I mean, my -- my assumption
17 is that -- I don't know.  Actually I don't have an
18 assumption.  I don't know.
19   Q.   Well, let me ask you this question:  Is it
20 possible that this report was in draft in or about
21 May of 2018, and that you went back and forth with
22 Dr. Frankel until you were satisfied with the final
23 draft which you received on or after August 1st
24 of 2018?
25       MR. ORTBALS:  Objection to form, but you

Page 57

1 can answer.
2        THE WITNESS:  Well, I -- I don't think
3 that's what happened.  I mean, I think if I -- you
4 know, I think, as I -- we discussed, I had
5 discussion with him on the phone in June right
6 before I wrote my memo dated June 14th, and he said
7 he would send the final report, but I -- I don't
8 have any indication, and I don't believe, from the
9 way I wrote it, I ever saw a draft.
10       And I don't have any independent
11 recollection, and I don't think there's any- --
12 anything in the Medical Comments History that
13 suggests I talked to him more than that one time.
14       And my practice in talking with the
15 consultants was to go over the report so I
16 understood it, and I ask them to explain things, and
17 sometimes they would add to their report more
18 explanation.  I never asked for changes, other than,
19 you know, to make sure it was clear in terms of the
20 explanation.
21 BY MR. KASTER:
22   Q.   Do you have any explanation for why this
23 is dated in May?
24   A.   I -- I mean, sometimes things get misdated
25 just by a clerical mistake or there is a draft

Page 58

1  that's started or maybe they copied part of the, you
2  know, address block from another letter and don't
3  correct it.  There could be a number of
4  explanations, but I don't know.
5      Q.  Well, that's one explanation.  Is -- was
6  there a draft started on or about May 19th of 2018?
7  Is that a possibility?
8      MR. ORTBALS:  Objection to form.  You can
9  answer.
10      THE WITNESS:  It's a possibility, but I
11  don't know.  I don't know if that's the case.
12  BY MR. KASTER:
13      Q.  In any case, it looks like you send this
14  on to Theresa Rodino on or about August 8th of 2018,
15  correct?
16      A.  Yes.
17      Q.  And just so we're clear about this, this
18  is Bates No. 2526.
19      MR. KASTER:  And, Jayne, I'm not sure that
20  I gave you the Bates numbers on the report of
21  Dr. Frankel.  Did I do that?
22      THE REPORTER:  Would that be Exhibit 48?
23      MR. KASTER:  That would be the previous
24  exhibit, yes.
25      THE REPORTER:  And so this document that

Page 59

1  we were just looking at should be marked 49?  I'm
2  sorry.
3      MR. KASTER:  Correct.
4      THE REPORTER:  Correct?  Okay.
5      (Exhibit 49 marked.)
6      MR. KASTER:  So we're clear I'm going to
7  pull up 48 again --
8      THE REPORTER:  Okay.
9      MR. KASTER:  -- to make sure the record is
10  clear about this.  So the May 19th, 2018, document
11  is Bates numbered 2517 through 2520.
12      THE REPORTER:  I want to go back to
13  that -- where I marked that, Mr. Kaster, to make
14  sure that those are the Bates I've got there.
15      MR. KASTER:  Sure.  Absolutely.
16      THE REPORTER:  48, Bates No. 2517 through
17  2520.  We're right on.  So 49 is 2526.
18      MR. KASTER:  All right.
19      THE REPORTER:  Okay.
20      MR. KASTER:  Thank you.
21      THE REPORTER:  Thank you.
22  BY MR. KASTER:
23      Q.  Doctor, I'm now going to go to a medical
24  records file.  I will ask you about selected pages
25  of this file.  It's quite a voluminous file.  I

Page 60

1  don't want to deprive you of the opportunity of
2  looking at any part of it if you choose to in
3  answer -- answering my questions.  I have questions
4  about certain pages of this document.
5      A.  All right.
6      THE REPORTER:  And this will be
7  Exhibit 50?
8      MR. KASTER:  This will be 50.
9      THE REPORTER:  Okay.  Thank you.
10      (Exhibit 50 marked.)
11  BY MR. KASTER:
12      Q.  By my understanding of these documents,
13  this is the medical record history that was provided
14  to Union Pacific for Mr. Carrillo.
15      Do you recognize it as such?  I will page
16  through this document, if you need me to.
17      A.  Okay.  Let -- let me -- let me just
18  clarify, because you put up a page of this big PDF
19  file that's 545 pages, and then this particular
20  document is part, I believe, of the preplacement
21  medical exam.  So when you're talking about -- are
22  you just talking about this preplacement medical
23  exam document?
24      Q.  I'm actually talking about the entire
25  document, which I understood to be -- and I'm paging

Page 61

1  through it now.  For the record, it starts at Bates
2  No. 103 and it goes to Bates No. 647.
3      Let me ask you this question:  Without
4  asking you if you've seen every single page of this
5  document, do you recall receiving a medical record
6  or history for Mr. Carrillo as a part of your
7  fitness-for-duty determination?
8      A.  Well, to -- to clarify, I mean, I think
9  the document, the big document we're looking at,
10  even though it's not labeled, is my -- what we
11  typically would call at Union Pacific the Employee
12  Medical file, and it's all the documents that are
13  put in the electronic medical record for
14  Mr. Carrillo from the time he started work with
15  Union Pacific through our last contact with him.
16  Not -- and so I am familiar with this.  I reviewed
17  this in -- this large PDF file in preparation for my
18  testimony today.
19      Q.  Did you review this medical record history
20  at the time that you made the fitness-for-duty
21  determination for Mr. Carrillo?
22      A.  Well, I would have had the relevant
23  records related to the loss of consciousness -- the
24  loss-of-consciousness episode and other medical
25  records he provided after that to Union Pacific.  I

16 (Pages 58 - 61)

1 would have had all of them available to me to look
2 at, you know, through our computer system.
3         My typical process would be for the
4 fitness-for-duty nurses to print out all of those
5 and put them in a paper file for me to look at when
6 I was doing this fitness-for-duty review and
7 determination.
8         And so that would be the typical process,
9 but I don't have any document that said I did that.
10 But I -- all of them would have been available, and
11 it would have been my usual practice to look at all
12 of the relevant documents related to this episode
13 and fitness-for-duty determination.
14    Q.   All right.  I'm going to take you through
15 some of the pages.  So one thing I'm not clear
16 about, and I want the record to be as clear as your
17 memory is on this subject.
18         Did you read the medical file in its
19 entirety before placing the restrictions on
20 Mr. Carrillo?  Do you recall?
21    A.   You know, I -- I likely did.  I mean I
22 think, when I wrote my memo in June, 2014, I put a
23 lot of detail in about the history, you know, in
24 addition to what my statement is about my phone call
25 with Dr. Frankel.  So in -- so it would have been my

1 practice to review those records.
2    Q.   So that would be your general practice.
3 You don't have any memory of doing it here, I take
4 it?
5    A.   No, I don't have any other -- I don't
6 remember the -- independent memory of doing that,
7 no.
8    Q.   All right.  I'm going to try to make this
9 as efficient as possible.  So if we go to page --
10 and so we're clear, these are medical history
11 documents.
12         These medical documents appear to be
13 related to Mr. Carrillo's previous surgeries.  He
14 had surgery on his elbow -- as I look at the
15 records, it appears to have been twice, right?
16    A.   The -- he had two surgeries on the right
17 upper extremity.  One was on the elbow.  I -- I saw
18 somewhere reports that he also had a carpal tunnel
19 procedure, which would have been on the wrist,
20 but -- but they were both on the upper extremity.
21    Q.   All right.  So did you look at these
22 history records?
23    A.   Yes.  Well, I mean, I looked at them in
24 preparation for this deposition.  I don't know if I
25 looked at them at the time of the fitness-for-duty

1 determination.
2    Q.   All right.  Because there's a family
3 history here that was -- that's discussed in this
4 record, which is on Bates number, page No. 200, and
5 I want to know if you take this as true:  "Patient
6 reports athralgias" -- "athralgias/joint pain but
7 reports no muscle aches, no muscle weakness, no back
8 pain and swelling in the extremities.  He reports
9 numbness but reports no loss of consciousness, no
10 weakness, no seizures, no dizziness and no
11 headaches."
12         Do you take that as true?
13    A.   Yeah, I don't -- I don't have any reason
14 to believe it's not true.  I mean, and...
15    Q.   So if we go to Bates No. 201, it has a
16 description here of his neurological condition.
17 "Gait and Station:  Normal gait and station.
18 Cranial nerves:  Grossly intact."
19         Do you see that?
20    A.   Yes.
21    Q.   Do you take that as true?
22    A.   Well, I -- I mean, I -- I don't have
23 any -- I don't have any reason to doubt it, so I
24 will accept it, yes.
25    Q.   So if we go to Bates page 227, I think we

1 see that Mr. Carrillo was cleared for work in a
2 prior fitness-for-duty evaluation in or about
3 December of 2015, correct?
4    A.   Yes.  Can -- can -- can I add something?
5 As you were scrolling through here, I think I -- I
6 made an error in one of my prior statements where I
7 said he had an elbow operation and a carpal tunnel
8 operation.  It actually was a cubital tunnel,
9 C-U-B-I-T-A-L, tunnel, which is also at the elbow.
10 So you were correct when you said they were both
11 elbow operations.
12    Q.   In any case, Mr. Carrillo is medically
13 cleared with no restrictions in December of 2015?
14    A.   Yes.
15    Q.   Union Pacific would have had the right to
16 look at any medical records as a part of that
17 medical clearance, right?
18    A.   Well, yes, we can ask for any medical
19 records in a fitness-for-duty determination.
20    Q.   And I'm going to ask you if you take this
21 as true.  I'm going to go to Bates No. 306.  It will
22 take me a minute to get here.
23         This is a record related to his cubital
24 tunnel surgery in late June of 2016.  Do you see
25 that?

Page 66

1    A.  Yes.
2    Q.  It appears that there was a neurological
3  review at that time.  It says "Alert & oriented
4  X 4."
5       Do you see that?
6    A.  Yes.
7    Q.  What does that mean, "Alert & oriented
8  X 4"?
9    A.  Well, it has to do with mental status.  So
10  the alertness means that you're -- you're not
11  drowsy.  You're not asleep.  You're responsive to
12  questions, and you -- it's just sort of a general
13  description of your responsiveness to the
14  environment.
15       Oriented means you're -- you ask questions
16  about what day is it, what time is it, who are you,
17  where are we at, that type of thing, so you're
18  oriented to yourself and to the environment.
19    Q.  That's a standard neurologic exam?  Would
20  that be true?
21    A.  Yeah, I mean, it's -- it's mainly a mental
22  status exam.  It's sort of brief.  It's not a full
23  neurological exam.
24    Q.  I'm going to take you to Bates page
25  No. 223.

Page 67

1       By the way, can people faint from being
2  dehydrated?
3    A.  It -- yeah, they're -- it -- it depends
4  how dehydrated you are and other effects, but that
5  is -- sometimes seems to be a contributor to what's
6  called orthostatic syncope.  So that can happen,
7  but not -- but not everyone that's dehydrated is
8  going to faint, but it can contribute to it in some
9  situations.
10    Q.  It has a description from the patient of
11  his chief complaint here.  It says "Patient is here
12  for physical exam and states last Tuesday he
13  fainted."  Do you see that?
14    A.  Yes.
15    Q.  Did you see this record at the time that
16  you were reviewing his medical records?
17    A.  Well, I did -- I do -- reviewed this for
18  this testimony or for my deposition.  Like I said,
19  it would have been my practice to review these
20  records at the time I'm making my fitness-for-duty
21  determination because Union Pacific had this.  I
22  believe -- well, it's in the Union Pacific medical
23  files so we have it.
24    Q.  I'm going to take you now to Bates
25  No. 327.  This is a -- the neurological examination

Page 68

1  based on a physical exam of Mr. Carrillo, right?
2    A.  Yes.
3    Q.  It says "Neurological:  No dizziness and
4  no vertigo.  Fainting one episode and upon standing
5  up.  No motor disturbances and no sensory
6  disturbances."
7       What does that mean:  "No motor
8  disturbances and no sensory disturbances"?
9    A.  So motor is movement of your limbs with
10  your muscles.  Moving your limbs, your fingers, your
11  hand, muscles in your face, and you can test that on
12  a physical exam.
13       The -- the -- and -- and "no sensory
14  disturbances" has to do with sensation.  So pain,
15  cold, hot, vibration, position sensation.
16       I -- I think this is actually -- this is
17  actually not the physical exam.  I think this is the
18  review of symptoms, and then the physical exam is
19  down below.  So this is asking the patient questions
20  about whether you have dizziness or vertigo.
21    Q.  Asking the patient questions about what
22  happened, right?
23    A.  And what their symptoms are, yes.
24    Q.  Is it your view that Mr. Carrillo is
25  disabled?

Page 69

1    A.  The -- I'm -- I -- I don't know that --
2  you know, I don't tend to think of disability
3  as a -- as a medical issue.  You know, more
4  physical impairment as -- I -- would be a medical
5  issue.
6       I think he has a medical condition that
7  poses a risk for sudden incapacitation that requires
8  work restrictions.  I don't know if that meets the
9  definition of disability.
10    Q.  When you say that he has a "risk of sudden
11  incapacitation," do you regard that as a risk
12  related to his ability to work in a job at Union
13  Pacific Railroad?
14    A.  Yes.
15    Q.  So I'm looking at page Bates No. 2 -- 334.
16  You filled out this form.  It says "TO BE COMPLETED
17  BY THE ATTENDING PHYSICIAN."
18       You weren't --
19    A.  This is --
20    Q.  You weren't the attending physician, were
21  you?
22    A.  No.  Can I see the top of the form?
23    Q.  You can see anything you want.  Sure.
24  Just tell me.
25    A.  So I think it's a two-page form to the

18 (Pages 66 - 69)

Page 70

1 Railroad Retirement --

2   Q.   Okay.

3   A.   -- if I remember.  Okay.  So this is a --

4 because there were forms that go to the Railroad

5 Retirement Board, and this is -- okay.  So this is a

6 letter to the employee at the top, and then the

7 second part, "TO BE COMPLETED BY THE ATTENDING

8 PHYSICIAN," if you can go to that.  Can I -- can I

9 see the whole --

10   Q.   What would you like me to do, Doctor?  Go

11 up or down?

12   A.   Raise it up about a half a page so I can

13 see it from the place where it says "COMPLETED BY

14 THE ATTENDING PHYSICIAN."

15   Q.   Right there?  Is that what you --

16   A.   The other direction.

17   Q.   The other direction.

18   A.   Direction, yes.

19   Q.   Certainly.

20   A.   Yeah, I guess that's going down.

21   Q.   Yeah.

22   A.   "TO BE COM"- -- yeah, so keep raising it

23 up a little bit more.

24        Okay.  So I -- I don't remember your

25 specific question now about this.

Page 71

1   Q.   It says "TO BE COMPLETED BY THE ATTENDING

2 PHYSICIAN."

3        You weren't the attending physician as the

4 stamp below indicates, right?

5   A.   That's correct.

6   Q.   Okay.  Then it says "RHE."  What does that

7 stand for, RHE?

8   A.   Well, that is our acronym, Reportable

9 Health Event.

10   Q.   And LOC stands for what?

11   A.   Loss of consciousness.  And if I could --

12   Q.   Then you say --

13   A.   -- further explain -- if I can explain

14 this for you.

15   Q.   I just wanted to know what that meant.

16   A.   Okay.

17   Q.   "Is the employee permanently disabled from

18 his or her regular occupation?"  You put "no,"

19 right?

20   A.   Yes.  And to be -- to clarify, these are

21 filled out by the fitness-for-duty nurses, and then

22 I authorize it and put my stamp with a name on

23 there.  But this is -- these -- these obviously are

24 done so they can get their temporary benefits from

25 the Railroad Retirement Board during the

Page 72

1 fitness-for-duty determination.

2   Q.   So why is the word "no" written on there?

3   A.   Well, they ask is he permanently disabled.

4 No.  I mean, he -- we had -- during the

5 fitness-for-duty process, and this was signed, you

6 know, pretty early in July 2017, we were still

7 completing the fitness-for-duty evaluation.  We

8 didn't know what the determination would be about

9 whether he'd be able to return to work or have -- or

10 if -- if there would be a time period where he

11 wouldn't be able to work or if it would be

12 permanent.  So that wasn't known then.  And --

13 and --

14   Q.   You also -- go ahead.  I'm sorry.  I'm

15 sorry.

16   A.   And -- and --

17   Q.   I'm sorry.

18   A.   And -- and --

19   Q.   I didn't mean to -- go ahead.

20   A.   And actually he wasn't permanently

21 disabled.  We -- we put a five- -- five-year limit

22 on him from doing safety critical work or, more

23 precisely, we put work restrictions on him for

24 five years for activities that would pose a safety

25 risk if he had sudden incapacitation.  So it wasn't

Page 73

1 permanent.

2   Q.   On or about this same time you fill out a

3 Supplemental Doctor's Statement that put the

4 diagnosis as loss of consciousness according to

5 Bates No. 344, right?

6   A.   Yeah.  So that was completed three months

7 later, October 25, 2017, yes.

8   Q.   Did you have the records at that time

9 related to his event of loss of consciousness?

10   A.   The -- so at this time -- I -- I don't

11 know which records we had and which we didn't have.

12 At this time Dr. Charbonneau was managing the case,

13 and I know that from looking at the Medical Comments

14 History.

15        And some of the records it took a long

16 time to get.  For instance, the records from the

17 neurologist I think we didn't get until late in the

18 fall.  So I don't know if we had them at that time.

19 I don't know that we had a complete set of records

20 at this time.

21   Q.   So if we take a look at Bates No. 354, we

22 see the assessment here for Mr. Carrillo of

23 "Syncope, unspecified syncope type."  Do you see

24 that?

25   A.   Yes.

19 (Pages 70 - 73)

Page 74

1    Q.   And then the next thing says "Sinus
2  bradycadia- -- "cardia."  What is that?
3    A.   So that means the person's -- it has to do
4  with a heart rhythm.  The person's heart rhythm is
5  an irregular rhythm, but it's just beating slowly.
6  And typically it means if the heart rate is recorded
7  to be less than 60 beats a minute.
8    Q.   One of the things it says here is there's
9  "No sensory or motor focal neurodeficits."  Do you
10  see that?
11    A.   I see that, yes.
12    Q.   Is it true that when a person has a
13  seizure, it's often accompanied by partial or
14  permanent paralysis of some part of the body?
15    A.   The -- no, I don't think that's true.
16  I don't think that's often.  It -- it's possible if
17  you had -- for instance, if it was related to a
18  stroke or a severe head injury, but I -- it's
19  not a -- not a usual residual effect of a seizure.
20    Q.   Taking you to Bates No. 368, this is a
21  reference to Dr. Aguilar's exam of Mr. Carrillo
22  dated August of 2017.  Do you see that?
23    A.   The -- so -- yeah, I think this is
24  actually the radiology report from the MRI brain
25  scan on August 16th, and I think it just has

Page 75

1  Dr. Aguilar as the referring physician.
2    Q.   Thank you.  In any case, there's no
3  abnormality or suspicious legion -- lesion in the
4  brain, right?
5    A.   That's correct.
6    Q.   His MRI was normal, as we discussed,
7  right?
8    A.   That's correct.
9    Q.   And if we look at Bates No. 379, it looks
10  like you asked for the full neurological evaluation
11  of Mr. Carrillo, right?
12    A.   Yes.  Could I see the -- the date on this
13  at the top of the page?
14    Q.   Certainly.  This is December 1st of 2017.
15    A.   Okay.  Thank you.  I can answer your
16  question, yes, this is -- this is a letter that the
17  fitness-for-duty nurses send out during the
18  fitness-for-duty evaluation asking for specific
19  medical records we haven't received -- received yet.
20  So one of the things that was asked for here was the
21  full neurology evaluation.
22    Q.   If we go to this record, it looks like his
23  motor functions and sensory func- -- functions are
24  all normal, right?
25    A.   Yes.  Let -- can I just see the -- I think

Page 76

1  this is Dr. Aguilar's report, but can I just see the
2  first page for --
3    Q.   Of course, of course.  You can ask me to
4  move up or down any time.
5    A.   Thank you.  So, I mean --
6    Q.   This -- let me --
7    A.   I don't know where it is.
8    Q.   Let me go back and get the first page
9  of this as you requested, and so I think this
10  is Dr. Aguilar's report.  We're looking at
11  Bates Nos. 354, 355.
12    A.   You know, I think this is the
13  cardiology -- cardiologist's report.
14    Q.   Okay.
15    A.   Maybe I'm wrong.
16    Q.   Okay.  Well, let's take a look at the
17  first page then.  I believe this is the first page
18  of this document.
19    A.   So -- so this is the cardiologist's
20  report.
21    Q.   Okay.  And, again, it has the "Reason for
22  Appointment, syncope and collapse."
23         What does syncope mean, by the way?
24    A.   So syncope -- it -- it describes both an
25  event and -- and the cause of it.  Syncope is where

Page 77

1  someone collapses.  They -- they lose consciousness,
2  and they collapse and fall to the floor, you know,
3  or -- and it is caused by a drop in the profusion of
4  blood in the brain.  In other words, a drop in the
5  blood pressure in the brain which causes the brain
6  not to have enough oxygen and the person loses
7  consciousness.  So if the person's standing,
8  they'll -- like I said, they'll fall, collapse to
9  the floor.
10         So that's what syncope is.  It doesn't --
11  there's various causes of it, but that's sort of an
12  explanation of what you both see and the underlying
13  physiology.
14    Q.   So is syncope essentially a term for a
15  loss of consciousness?
16    A.   No, not exactly.  Loss of consciousness
17  is really a descriptive term.  The person
18  lost responsiveness, consciousness.  And -- and
19  syncope is -- is a description of the events
20  after the blood pressure in the brain drops below a
21  level -- drops too low, and the person loses
22  consciousness and -- and muscle tone.  And if
23  they're standing, they fall.
24         So it -- it's an explanation for loss of
25  consciousness, but it's a more specific diagnosis.

20 (Pages 74 - 77)

1    Q.  If we take a look at Bates No. 393, I
2  think we're seeing the last page of the report of
3  Mario Aguilar, Dr. Mario Aguilar, but I'll bring you
4  back because this is page 6.  So let's look at
5  page 1 so you can be certain what we're looking at.
6        This is the neurological follow-up.  It
7  actually says "Mia Saenz" on the -- if I'm saying
8  that correct.
9    A.  Yes, but I -- I think, again, it refers
10  to -- she's the primary care physician that's going
11  to get a copy of the report, but I think this is
12  Dr. Aguilar's report.  That's my --
13    Q.  Okay.
14    A.  -- recollection.
15    Q.  That was my understanding of this document
16  as well.  Thank you.
17        If we look at the differential diagnosis,
18  based upon his physical exam of -- based upon
19  whatever examination he did of Joseph Carrillo, he
20  has a differential diagnosis here, which is, as I
21  read this, an offer of different explanations
22  without selecting one, right?
23    A.  Yes, that's what he did.
24    Q.  The only thing he eliminates as a
25  possibility here is a stroke.

1    A.  Well, he says -- I mean, it actually
2  doesn't eliminate stroke because sometimes you can't
3  see them on an MRI scan, particularly if it's
4  done -- well, he hadn't done the MRI scan yet, but
5  he -- he says it's not demonstrated.  I -- I think
6  I'm interpreting that to mean he didn't find any
7  objective findings of a stroke on physical exam, and
8  so he thinks it's less likely, but I -- and I think
9  it's less likely too.
10    Q.  So the neurologist, the treating
11  neurologist, after whatever examination he did of
12  Mr. Carrillo, wasn't sure what happened, right?
13    MR. ORTBALS:  Objection to form.
14    THE WITNESS:  He -- well, I think it --
15  he -- he doesn't choose between the -- the different
16  possibilities in the differential diagnosis, and,
17  you know, so I -- I don't know, and he didn't have
18  any more explanation of -- of which he thought was
19  most likely.
20  BY MR. KASTER:
21    Q.  I'm going to take a look at another
22  document in this medical history file.  This
23  includes -- let's go to 307.  In my pagination
24  it's 307.
25        Can you tell me what this is?

1    A.  I think there's a prior page, but I -- I
2  can't without looking at the prior page.  There must
3  be a page before this too because I -- I would
4  imagine --
5    Q.  Is this your -- I'm sorry.  Is this your
6  handwriting?
7    A.  No.
8    Q.  Whose handwriting is it?  Do you know?
9    A.  Okay.  This is a form -- it was a form for
10  Aetna, which is what I believe was his disability
11  insurance policy.  And so typically this would be
12  filled out by either our clerical assistant or --
13  and/or the fitness-for-duty nurses, and they would
14  put my stamp on it.  So I did not fill out these
15  insurance verification forms.
16    Q.  Okay.  Whoever filled it out described
17  what happened to Mr. Carrillo as syncope, right?
18    A.  Yes.
19    Q.  What does the second term mean, RBBB?
20    A.  Right Bundle Blanch -- Branch Block, and
21  that has to do with conduction of electricity within
22  the heart.  There are -- and it's the nerve fibers
23  going down to the right side of the heart, and
24  they're -- the -- the heartbeat conductions are
25  slowed, so that's what -- and it could potentially

1  be relevant in terms of heart disease.  I don't know
2  if it's relevant in this case.
3    Q.  I'm now looking at -- we're now looking at
4  a letter that you sent on January 10th of 2018 to
5  Harris Frankel, Dr. Frankel, the outside
6  neurologist, right?
7    A.  Yes.
8    Q.  In this letter of January 10th of 2018,
9  you say this episode -- "The episode sounded like a
10  seizure."  Do you see that?
11    A.  I -- I -- no.  I'm looking for where that
12  is.
13    Q.  All right.  "Summary of medical issues of
14  concern."  Do you see that second paragraph,
15  "Mr. Carrillo had a precipitous loss of
16  consciousness event at home in late June, 2017"?
17    A.  Okay.
18    Q.  And then it says, in middle of that
19  paragraph:  "The episode sounded like a seizure."
20    A.  Yes.
21    Q.  Then you say "He is reported to have no
22  medical conditions, but he was apparently taking
23  Gabapentin twice per day."  Then you say "There was
24  no clear explanation of why he takes this
25  medication."

21 (Pages 78 - 81)

Page 82

1    A.  Yes.  I -- I -- and I want to clarify
2  something.  So this -- when we do a referral to the
3  neurologist, there is a template letter where some
4  of it, like the first paragraph here is template,
5  and the questions we're going to ask are the same.
6         And then there's a summary that we fill
7  out issues of medical concern individualized to the
8  person.  And so this one was filled -- completed by
9  Dr. Charbonneau, our associate medical director, who
10  was handling the case.  And that is the typical
11  process is the -- the associate medical directors
12  fill out these details.  And we're -- we're not
13  trying to -- we're also sending them the medical
14  records which -- where these came from, but we want
15  to give them a little bit of an impression of what
16  we want.
17         So -- so he filled it out and then --
18    Q.  And you signed it?
19    A.  I -- no.  This is a nurse -- the nurse
20  that sent it signed it.  So he filled it out, and --
21  and they were authorized to go ahead and send these,
22  you know, under my signature to get the
23  fitness-for-duty or the review process started.
24    Q.  So are you --
25    A.  But then -- but then -- excuse me.

Page 83

1    Q.  No, no, no.  Go --
2    A.  I didn't mean to interrupt.
3    Q.  -- ahead.  I don't mean to --
4    A.  Part of the reason we do this is -- is
5  it's under my authority, and the reports are going
6  to come back to me and then I'll make the
7  fitness-for-duty determination.  So it's just our
8  process to -- of how we do the final reviews.
9    Q.  I mean, I'm confused about something else
10  here.
11         Remember when you told me that you weren't
12  trying to put your finger on the scale about what
13  happened to Mr. Carrillo?
14    A.  Yes.
15    Q.  Then it says "but he was apparently taking
16  Gabapentin 600 milligrams twice per day.  There is
17  no clear explanation of why he takes this
18  medication."
19         That's just not true, is it?
20    A.  Well, I -- I -- I think it was true based
21  on the records.  I mean, the records don't really --
22  the -- the records I think that were available at
23  that time didn't seem to clarify it, and that was
24  Dr. Charbonneau's impression at least.  And I think
25  the -- we -- it actually got clarified by our nurse

Page 84

1  talking to him and explaining why he was taking
2  it.
3         But I -- I do think the records
4  that we had contemporaneous to this event,
5  loss-of-consciousness event, don't really
6  describe why he was taking it.  They just say
7  it's a prescription he's taking.
8    Q.  Then it has on this page, page 2 of 4, it
9  says "Mr. Carrillo's neurologist is considering
10  several diagnoses which include an 'Episode of
11  nonresponsiveness,' a single unprovoked seizure or a
12  single provoked seizure."
13         That isn't the entirety of the
14  differential diagnosis, is it?
15    A.  No.
16    Q.  Do you have any explanation for why the
17  other items listed as possibilities in the
18  differential diagnosis of the treating neurologist
19  were not included here?
20    A.  No, I don't, but, of course, at this time
21  some of the records being sent were -- Dr. Aguilar's
22  direct records would have been sent too, but I don't
23  have an explanation why the other conditions aren't
24  listed.
25    Q.  So this is his actual contemporaneous

Page 85

1  record where he repo-- -- reported a fainting
2  episode, right?  For the record, this is Bates
3  No. 423.
4    A.  Yes, this is June 30th, 2017, and this is
5  the first medical provider that saw him after the
6  loss-of-consciousness episode, and it was his
7  primary care provider, I believe.
8    Q.  So this is his contemporaneous report of
9  what happened, right?
10    A.  Yes.
11    Q.  And this is Bates No. 506.  And, again, we
12  have a listing here of imaging record indications,
13  Syncope, unspecified type," right?
14    A.  Yes.
15    Q.  And it looks like, after seeing records
16  through January of 2018, a report -- through March
17  of 2018, that is -- a report is filled out under
18  your direction of diagnosis, syncope, RBBB and sinus
19  bradycardia, right?
20    A.  So, yeah, I don't know that I -- actually
21  it says "first treatment" and "most recent
22  treatment."  So this is in January.  I -- I don't
23  know exactly when this was sent, but that's what's
24  written here, yes.
25    Q.  And now we see another copy in the record

22 (Pages 82 - 85)

Page 86

1  of your fitness-for-duty determination of 6-14-2018,
2  right?
3      A.  Yes.
4      Q.  Do you recall ever seeing a restriction
5  that prevented Mr. Carrillo from working in any job
6  that required critical thinking?
7      A.  So I -- I don't recall a restriction that
8  was just critical thinking that didn't involve
9  safety critical activities or decisions.
10     Q.  All right.  Well, I'm showing you what I
11 understand to be the final fitness-for-duty
12 determination as a result of your fitness-for-duty
13 evaluation of Mr. Carrillo, and we're looking at
14 Bates No. 617.
15     Do you see this document?
16     A.  Yes.
17     Q.  Do you recognize this document?
18     A.  And so this is a document -- yes, this is
19 a document that is printed out by our system for
20 our what we call eHealthSafe which is our electronic
21 system for medical records and communications.  And
22 the nurses put restrictions in the system, and then
23 it prints out a document which might be sent to a
24 manager or the -- I don't know where this one was
25 sent.

Page 87

1      Q.  This is the document that is sent to the
2  managers to determine if they can accommodate the
3  restriction, right?
4      A.  I don't know.  I don't know who this was
5  sent to.
6      Q.  Well, don't you recognize this as the
7  standard document listing the restrictions placed on
8  an employee as a result of a fitness-for-duty
9  determination?
10     MR. ORTBALS:  Objection to form.
11     THE WITNESS:  This -- this is that type of
12 document.  I mean, I -- it says "From:  Bridgette
13 Ziemer."  I don't know if this went to the managers.
14 It may have.
15 BY MR. KASTER:
16     Q.  What do you mean "it may have"?
17 This is what is typically sent to the managers,
18 right?
19     MR. ORTBALS:  Objection to form.  You can
20 answer.
21     THE WITNESS:  It is a type --
22 BY MR. KASTER:
23     Q.  Yes.
24     A.  It is a type of document that's
25 typically sent to the managers, yes.  I don't know

Page 88

1  what this -- where this particular document was
2  sent.
3      Q.  Do you know what this means, "Critical
4  Decision Making"?
5      A.  Well, that isn't what I wrote in the
6  restriction, and so I think that --
7      Q.  That's not my question.  Do you know what
8  it means?
9      A.  I think it means -- it is -- I don't know.
10 I think it's ambiguous.  Work requiring critical
11 decision making the way I had written it was work
12 requiring decision making that affects the safety of
13 others, so...
14     Q.  Do you know of a job that doesn't require
15 critical decision making?
16     A.  The -- I don't know.  I don't use that
17 term.  You know, I think there are probably some
18 jobs that don't require critical decision making.
19     Q.  Can you think of one?
20     A.  So I -- I -- I think if you have some
21 jobs, for instance, if they're simple clerical
22 tasks, I wouldn't call that critical decision
23 making.  It's really doing -- you know, following a
24 task.  And so I think there could be jobs like that,
25 yes.

Page 89

1      Q.  A clerical job wouldn't require --
2      A.  And possibly some physical jobs too where
3  they -- where they don't require -- you know, where
4  they're basically you do what you're told to do, and
5  you don't have to make decisions.  So, yes, I think
6  there could be jobs like that.
7      Q.  Is an electrician, a diesel electrician, a
8  job that requires critical decision making?
9      A.  I would say yes.
10     Q.  You agree the term is ambiguous?
11     A.  Yes.  I think it misstates the work
12 restriction.
13     Q.  So this is a mistake?
14     A.  I think -- I think it's ambiguous and --
15 and -- if you just read this part.  I don't
16 know -- if -- if the managers aren't sure what we
17 mean, they would typically, and what they're
18 supposed to do is call us, call Health and Medical
19 Services and get some clarification.  And so I don't
20 know if that happened in this case.
21     I mean, there's some other things about
22 this document that are problematic, and this is a
23 problem with the computer system is it doesn't show
24 that they're just five years.  We have other
25 documents that we produce in Health and Medical that

23 (Pages 86 - 89)

Page 90

1  make it clear it's a five-year restriction.
2       But I think it's -- I think the response
3  for a manager, if they got this, would be if that
4  was -- if that was the restriction that was going to
5  cause him not to be able to work, I think they would
6  call, and they should call, and ask for an
7  explanation because it's not -- it doesn't speak for
8  itself.
9       Q.  My question is more simple than that.  Is
10 this a mistake?
11      A.  The -- you know, I -- in terms of the
12 computer programming, you know, I -- I -- I wish
13 they would have done it differently.  So I would say
14 this is not the way I would like to see it because I
15 don't think it's clear enough in communicating it.
16      I don't know -- if the managers were
17 relying on something that is that ambiguous, like I
18 said, they're -- the process is they're supposed to
19 call and ask for clarification.
20      So I -- it's not -- I'm not going to say
21 it's a mistake.  I'd say I wish it had been written
22 differently, but I think -- I think there's a
23 process where the managers could get clarification
24 if this is the deciding factor in terms of the
25 regulations -- or the restrictions.

Page 91

1       Q.  This actually goes to the managers who
2  then decide whether or not they can accommodate the
3  employee, right?
4       A.  Yes.
5       Q.  Do you think that this kind of a
6  restriction, as written, could lead to confusion?
7       MR. ORTBALS:  Objection to form.
8       THE WITNESS:  I think it -- I think I said
9  that.  I think it's ambiguous, and it's not clear
10 what it means.  So it could lead to confusion
11 (sic), and, of course, the process then would be for
12 the managers to call Health and Medical Services and
13 get clarification.
14 BY MR. KASTER:
15      Q.  Is there a writing that says that?
16      A.  There -- there is, I believe, training for
17 the managers in how to deal with this process of
18 getting workers fitness-for-duty work restrictions
19 and determining if they can be accommodated.  And so
20 there is, my understanding, training for the
21 managers on how to follow this process.
22      Q.  Is there a writing about that?
23      A.  I -- there may be.  I don't know.
24      Q.  Have you ever seen it?
25      A.  Well, the -- the one thing that is -- that

Page 92

1  is in writing is the, you know, medical rules that
2  describe at a general level of how the process of
3  fitness-for-duty evaluations, and then
4  interpretation by the managers is supposed --
5  supposed to proceed.  There may be other
6  instructions in writing or in PowerPoint training
7  about this but I don't know.
8       Q.  I'm going to share one last document, and
9  I have just one question about the document.
10      THE REPORTER:  I believe we're at 51.
11      MR. KASTER:  I think that's correct.
12 Thank you.  Thank you, Jayne.
13      (Exhibit 51 marked.)
14 BY MR. KASTER:
15      Q.  And so the record is clear, this is the
16 Medical Comments History, and it's Bates numbered 74
17 through 102.
18      This is the document that contains sort of
19 a blow-by-blow description of the fitness-for-duty
20 evaluations that were done on Mr. Carrillo, right?
21      A.  Yes.  And, I mean, technically this is
22 from the time he started at the company until our
23 last contact with him when he left the company.
24      But this is just -- this is the
25 communications between the fitness-for-duty nurses,

Page 93

1  mainly the associate medical directors and myself
2  and the vocational rehabilitation managers and
3  not -- so that's what it is.
4       Q.  Every contact with Mr. Carrillo pertaining
5  to any attempt to place him back in this job despite
6  whatever restrictions you placed on him should be
7  listed here, right?
8       A.  So this doesn't really include contacts
9  with Mr. Carrillo except it -- the nurse would be
10 the prior contact.  And if she contacted him, she
11 would either paste part of his email here or maybe
12 summarize it or say he called.  So, you know, there
13 would also be emails between Mr. Carrillo and the
14 fitness-for-duty nurse that aren't contained in here
15 unless the nurse happened to paste them in.
16      Q.  All right.  Well, I'm going to take you to
17 a couple of entries here.
18      So nobody ever talked to you about this
19 critical decision making restriction, right?
20      A.  Not that I recall, but I don't --
21      Q.  So we're -- go ahead.  Go ahead.
22      A.  I -- I -- I don't recall -- I mean, we had
23 discussions about how we would like to have -- well,
24 I don't know.  I mean, let me get to answer your
25 question.  I don't recall talking about that

24 (Pages 90 - 93)

Page 94

1 specific issue at the time or -- or when I was
2 working at Union Pacific. I may have, but I don't
3 recall it.
4    Q. In the middle of this Activity Comment
5 from August of 2018, August 16th of 2018, the same
6 month when you received Dr. Frankel's report, there
7 is this contact with Mr. Carrillo. There's a
8 phone call from the employee, do you see that,
9 August 16th of 2018?
10   A. Yes.
11   Q. It says "He was upset that he had not
12 talked to anyone."
13      You never talked to him, for example,
14 right?
15   A. I -- you know, in looking through the
16 records I don't think that I did. I mean, I was
17 always available to talk to him if he wanted to, and
18 that's what the fitness-for-duty nurses typically
19 tell them. But this -- this is a note from
20 Kimberlee Foye, our vocational rehabilitation
21 manager. And so I know Mr. Carrillo had been
22 talking with the fitness-for-duty nurses because
23 they often commented on that.
24      I'm interpreting his thing where he says
25 he's upset he'd not talked to anyone that he's

Page 95

1 not -- by meaning he'd not talked to anybody from
2 the vocational rehabilitation group yet, and that's
3 why Kimberlee said "I'm sorry, it was my fault, I
4 didn't respond." So I think that's --
5    Q. Well -- go ahead.
6    A. I think they -- I think that's -- I
7 think I'm -- I'm assuming this is
8 specifically about talking to vocational
9 rehabilitation because it's clear he'd been
10 talking to the fitness-for-duty nurses, and they --
11 they will typically say "If you want to talk to the
12 doctor, we'll set up an appointment or a conference
13 call."
14   Q. Okay. He's -- he says "I disagree with
15 the restrictions." Do you see that in the middle of
16 the paragraph?
17   A. Yes.
18   Q. And he's told by Kimberlee Foye "We have
19 to work with the restrictions."
20   A. Yes.
21   Q. Then she says "You're welcome to explore
22 reconsideration with fitness-for-duty."
23      Is that a formal thing, by the way?
24   A. No, it's not formal, but if -- if --
25 typically after we made the fitness-for-duty

Page 96

1 decision, if the employee, for instance, provides us
2 more information from another doctor, we'll
3 reconsider it.
4    So it's not -- it's not a formal process,
5 but we try to -- or we do that if we get more
6 information, additional information from their
7 physicians.
8    Q. Then it says "He has passed the OMTB."
9 What is OMTB?
10   A. I -- in this context it appears to be some
11 kind of vocational rehabilitation. Probably
12 aptitude tests, but I don't know.
13   Q. "And is interested in manager positions."
14      And then it says "We discussed his
15 restriction regarding critical decision making and
16 his applications." It says "He would like to see
17 the restriction removed."
18      Did anyone talk to you about that
19 restriction; why it was there, what did it mean,
20 could it be removed?
21   A. So I don't recall. I mean, there's
22 nothing in the Medical Comments History. I mean,
23 Kimberlee Foye is well familiar with what that
24 restriction means. That it's -- it's really
25 critical decision making related to safety, and what

Page 97

1 would -- and, you know, the only thing we really
2 specify is the train dispatcher in there, although
3 there could be other positions.
4    What Kimberlee would typically do, if
5 she's working with someone with a job placement, and
6 she is -- she or he, the employee, is concerned
7 about whether the work restriction would prohibit it
8 or it would interfere with the job duties, Kimberlee
9 would typically contact me, as well as the manager,
10 and -- and we might do clarification about a
11 specific job, but I don't know that -- I don't have
12 any record that we talked about it in this case.
13   Q. All right. So just so we're clear on the
14 process, these restrictions are placed by the
15 fitness-for-duty people in the Medical Department,
16 including you under your supervision when you were
17 chief medical officer, correct?
18   A. Yes.
19   Q. And then they are documented in the
20 writing -- the writings that we've looked at,
21 right --
22   A. Yes.
23   Q. -- your memo --
24   A. Yeah.
25   Q. -- and then the form that is filled out

25 (Pages 94 - 97)

1 for Mr. Carrillo that goes to the managers, right?

2    A.  Yes.

3    Q.  And the form that was filled out that goes

4 to the managers said no critical decision making,

5 right?

6    A.  Yes.

7    Q.  Was there any explanation to any managers

8 what does that mean?

9    A.  So I don't have any record in here that I

10 talked to any managers, and -- and I -- you know, in

11 terms of whether Kimberlee Foye or one of the

12 fitness-for-duty nurses did or Deb Gengler did, I

13 don't know.

14        The typical process, as I said, if -- if

15 they -- if there is a restriction that isn't clear

16 to the managers, and it -- and it is a restriction

17 that they think might be the deciding factor in

18 whether they can do essential job functions, then

19 the process is for them to get clarification from

20 us.

21        You know, in this case for Mr. Carrillo,

22 there were other issues that were pretty clear in

23 the job descriptions that would be something that

24 would interfere with essential job functions.  You

25 know, for instance, climbing at unprotected heights

1 because they sometimes have to climb on locomotives,

2 working with high voltage electricity which --

3 working around moving equipment in the shop and --

4 and also possibly operating overhead cranes and --

5 forklifts and all those things that were pretty

6 clearly stated in the work restrictions.

7        And I -- I don't know, but I -- I think it

8 seems likely that the managers found there were

9 enough things that were going to interfere with

10 essential job functions and couldn't be accommodated

11 that that may have been the basis for the decision,

12 and they didn't need to clarify the thing about

13 critical decision making.

14        But if they had -- if that had been an

15 important deciding factor, the process would have

16 been for them to call us and get clarification.

17    Q.  You're totally guessing about what

18 restriction disqualified him from particular jobs,

19 including his electrician job, right?

20        MR. ORTBALS:  Objection to form.

21        THE WITNESS:  No, I'm -- I'm not

22 totally guessing.  I don't know specifically what

23 it was, but I know -- I've been in these -- like,

24 I've been in these shops.  I know a fair amount

25 about what, like, diesel electricians do and -- and

1 from past experience, and -- and I know that

2 many of those are essential job functions that

3 can't be accommodated, and I don't know what it was

4 in this case.

5 BY MR. KASTER:

6    Q.  How about being screened out of different

7 jobs as a part of this process?  Do you know whether

8 the critical decision making disqualification

9 screened him out of other positions that he could

10 have transferred or moved to?

11    A.  I don't know, but in that case, if it was

12 working with Kimberlee Foye, I've worked with her

13 enough to know if there's some concern

14 about a specific restriction and the restriction

15 is perhaps ambiguous, that she would contact

16 me and the fitness-for-duty nurses, and we

17 would work on getting clarification both about

18 what the restriction meant and what -- what the

19 potential duties and safety concerns of the new job

20 are.

21    Q.  If someone had called you about this

22 particular restriction, the critical decision making

23 restriction, would you have said "Oh, that's a

24 mistake, that's not relevant"?

25    A.  I -- I don't know if I would have said

1 it's a mistake.  I would say that -- that it needs

2 to be clarified about what we mean.

3    Q.  You would have said "That's ambiguous"?

4    A.  I would say -- I probably would have said

5 it's ambiguous, yes.

6        MR. KASTER:  That's all the questions I

7 have for you, Doctor.  Thank you.

8        MR. ORTBALS:  No questions.  We'll read

9 and sign.

10        THE VIDEOGRAPHER:  We're going off the

11 record at 12:09 p.m.

12        (WHEREUPON, the videotaped deposition of

13 DR. JOHN HOLLAND was concluded at 12:09 p.m. Pacific

14 time.)

15            ***

16

17

18

19

20

21

22

23

24

25

26 (Pages 98 - 101)

Page 102

```
 1         REPORTER'S CERTIFICATE
 2
 3
   STATE OF MINNESOTA   )
 4                      )SS.
   COUNTY OF HENNEPIN   )
 5
 6
        I hereby certify that I reported the remote
 7  videotaped deposition of DR. JOHN HOLLAND on
    November 17, 2021, via Veritext Virtual
 8  Videoconference, and that the witness was by me
    first duly sworn to tell the whole truth;
 9
        That the testimony was transcribed by me and is
10  a true record of the testimony of the witness;
11      That the cost of the original has been charged
    to the party who noticed the deposition, and that
12  all parties who ordered copies have been charged at
    the same rate for such copies;
13
        That I am not a relative or employee or
14  attorney or counsel of any of the parties, or a
    relative or employee of such attorney or counsel;
15
        That I am not financially interested in the
16  action and have no contract with the parties,
    attorneys, or persons with an interest in the action
17  that affects or has a substantial tendency to affect
    my impartiality;
18
        That the right to read and sign the deposition
19  by the witness was not waived reserved.
20
        WITNESS MY HAND AND SEAL this 24th day of
21  November, 2021.
22
23
24
    Jayne M. Seward
    Notary Public, Hennepin County, Minnesota
25  My commission expires January 31, 2025
```

Page 104

```
 1         DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4890881
 3  CASE NAME: Carrillo, Joseph v. Union Pacific Railroad Company
    DATE OF DEPOSITION: 11/17/2021
 4  WITNESS' NAME: Dr. John Holland
 5  In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
        I have made no changes to the testimony
 7  as transcribed by the court reporter.
 8  _____
 9  Date            Dr. John Holland
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
        _____
18      Notary Public
19      _____
20      Commission Expiration Date
21
22
23
24
25
```

Page 103

```
 1         Veritext Legal Solutions
              1100 Superior Ave
 2               Suite 1820
            Cleveland, Ohio 44114
 3          Phone: 216-523-1313
 4
 5  November 29, 2021
    To: Mr. Ortbals
 6
    Case Name: Carrillo, Joseph v. Union Pacific Railroad Company
 7
    Veritext Reference Number: 4890881
 8
    Witness:  Dr. John Holland      Deposition Date:  11/17/2021
 9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 105

```
 1         DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4890881
 3  CASE NAME: Carrillo, Joseph v. Union Pacific Railroad Company
    DATE OF DEPOSITION: 11/17/2021
 4  WITNESS' NAME: Dr. John Holland
 5  In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9      I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date            Dr. John Holland
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23      _____
        Notary Public
24
        _____
25      Commission Expiration Date
```

27 (Pages 102 - 105)

Page 106

1           ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 4890881
3   PAGE/LINE(S) /        CHANGE        /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____    _____
20  Date          Dr. John Holland
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date