CONFIDENTIAL

**Exhibit SS**

**2-2-2018**

**Dr. Frankel**

**Please add to the File Review for:**

**Joseph Carrillo    EID#: 0457172**

UPCARRILLO000578

CONFIDENTIAL

Diplomate American Board of Neurology

# Mario R. Aguilar M.D., P.C.

1240 S. Telshor Blvd, Suite C, Las Cruces, NM 88011-4731
Phone # (575) 522-1212 / Fax # (575) 522-2898

## NEUROLOGY FOLLOW-UP

PATIENT:  **Joseph Carrillo**
GENDER:  **Male**
DOB:
AGE:  **31y**

PRIMARY CARE PROVIDER:  **Saenz, Mia NP**

DATE OF VISIT:  **01/25/2018**

## CHIEF COMPLAINT
Episode of unresponsiveness.
Paresthesia in the right arm, torso and right leg.
Headache.

## SUBJECTIVE
I reviewed the symptoms outlined on his 08/07/2017 visit.

Patient provided the history:

Episode of unresponsiveness.

Patient stated having experienced an episode of unresponsiveness at the end of June 2017.
He denied previous episodes of unresponsiveness or recurrences.

Description:  See H&P.

Headaches.
Headaches have resolved for the most part.

Hypersensitivity:

It has been resolving.  The only area, which has been affected is in the back of his thigh.

He denied new neurologic symptoms.

## HISTORY OF PRESENT ILLNESS
DATE OF INITIAL CONSULTATION:  08/07/2017

Patient provided the history:

Onset
Patient stated having experienced an episode of unresponsiveness at the end of June 2017.
He denied previous episodes of unresponsiveness or recurrences.

UPCARRILLO000579

CONFIDENTIAL

**Joseph Carrillo**                                   **01/25/2018**
Page 2

Description
He woke up at 4:45 am and was getting ready to go to work when he experienced the episode of unresponsiveness. There was no warning.
He recalled brushing his teeth next he is in the bathroom on the floor being helped by his girlfriend.

He reported being told the his breathing was slow and was snoring.
His arms were initially shaking.
His body became limp afterwards.
There was no bowel or bladder incontinence.
There was tongue biting across his tongue worse in the right side.

The duration of the episode is unknown. His girlfriend heard him snoring and went to check on him.

He woke up not knowing what had happened.

He recalled experiencing skin hypersensitivity to light touch in the right side of the body and numbness in the back of his right thigh.

He had a headache when he woke up.

He felt nauseated but he did not vomit.

He went to see Dr. Saenz that day and underwent blood tests.

There was no specific treatment.

Currently.
Headaches. He never had similar headaches. The headaches have been constant since the episode of unresponsiveness. The headaches have been located in the frontal region, left temple and eyes. He described the pain as throbbing and at times severe. He has taken ibuprofen, which does not help.

Hypersensitivity: Patient has been experiencing discomfort (hypersensitivity of skin to light touch) in the right arm, right abdomen, chest and leg (right side).

Tiredness. He feels tired in the mornings.

He has had lower back pain: The pain has recurred at times. The pain has been localized to the lower back. It does not radiate to the legs.

He also described morning stiffness.

He reported having had difficulty recalling phone numbers and passwords.

He reported anxiety episodes since the episode.

He had anxiety before.

UPCARRILLO000580

CONFIDENTIAL

**Joseph Carrillo**                                        **01/25/2018**
**Page 3**

He did not know if he injured his head at the time of unresponsiveness. There were no head lumps or lacerations.

He reported being a diesel electrician and works on locomotives.
He is not working at this time.

He denied double vision, blindness, speech or swallowing problems.
He denied focal weakness. He denied sphincteric dysfunction.

He has taken Gabapentin for years for paresthesias (numbness and tingling) in his right fingers.

**MEDICAL / SURGICAL & HOSPITALIZATION HISTORY**
Patient denies any new medical problems from previous visit. Patient denies any new surgeries from previous visit. Patient denies any hospitalizations since previous visit.

**REVIEW OF SYSTEMS**

**Cardiovascular System Reviewed**
Patient denies Chest Pain. Patient denies Palpitations. Patient denies Dyspnea on Exertion.

**Constitutional System Reviewed**
Patient denies Weight loss. Patient denies Fever. Patient denies Chills.

**PAST MEDICAL HISTORY**
He has had right elbow surgery twice. He reported having had a fatty liver.

**PAST SURGICAL HISTORY**
He has had right elbow surgery twice.

**MEDICATIONS**
No changes
Active Medications
• gabapentin 600 mg tablet. Take 2 tablets by mouth at bedtime QHS. Do not substitute.

**ALLERGIES**
No changes
• No Known Allergies (Mild): Recorded on 08/07/2017. Reactions: None noted.

**OBJECTIVE**

**Vital Signs**
Added vitals entry: Measurement date: 2018-01-25 08:41  Weight: 167.0 lbs  Height: 5 ft 6.0 in  BMI: 27.0
Heart rate: 60 bpm  Blood pressure: 120 / 70 mmHg  Respiration Rate: 20 breaths per minute

**General**
The patient is well developed. The patient is well nourished. The patient is in no acute distress. The patient's head shows no recent trauma. There is no proptosis in the right eye. There is no proptosis in the left eye.

UPCARRILLO000581

Joseph Carrillo                    01/25/2018
Page 4

The patient's neck is supple without any adenopathies or bruits. The patient's lungs are clear. The patient's heart is regular.

**Mental Status**
Patient is awake. Patient is alert. Patient is cooperative. Patient is attentive. Patient is appropriate. The patient's speech is unremarkable.

**Cranial Nerves**
**Cranial Nerve II - Optic**
The patient's right fields are full. The patient's left fields are full.

**Cranial Nerve III - Oculomotor**
The patient's right pupil is 2 mm in size. The patient's left pupil is 2 mm in size. The patient's right pupil is reactive to light. The patient's left pupil is reactive to light. There is no ptosis in the right eye. There is no ptosis in the left eye. The patient's right eye shows normal adduction. The patient's left eye shows normal adduction. The patient's right eye shows normal upward movement. The patient's left eye shows normal upward movement. The patient's right eye shows normal downward movement. The patient's left eye shows normal downward movement.

**Cranial Nerve IV - Trochlear**
The patient's right eye shows normal intorsion. The patient's left eye shows normal intorsion.

**Cranial Nerve VI - Abducens**
The patient's right eye shows normal abduction. The patient's left eye shows normal abduction.

**Cranial Nerve VII - Facial**
There is no weakness of the right frontalis. There is no weakness of the left frontalis. There is no weakness of the right orbicularis oculi. There is no weakness of the left orbicularis oculi. There is no weakness of the right orbicularis oris. There is no weakness of the left orbicularis oris.

**Cranial Nerve IX - Glossopharyngeal**
The patient's palatal motion is normal.

**Cranial Nerve XII - Hypoglossal**
The patient's tongue movements are normal. The patient's tongue shows no atrophy. The patient's tongue shows no fasciculations.

**Motor**
There is no Weakness in the Right and Left Thumb, Index Finger, Middle Finger, Ring Finger, or Little Finger. There is no Hand Grip Weakness. There is no Wrist Weakness. There is no Elbow Weakness. There is no Shoulder Weakness. There is no weakness in the Right or Left Toe. There is no weakness in the Right or Left Foot. There is no weakness in the Right or Left Knee. There is no weakness in the Right or Left Hip. There is no cogwheeling rigidity in the patient's Wrists, Arms, or Legs.   There is no resting tremor in the patient's Lips or Hands. There is No Postural Tremor in the patient's Hands. There is no Bradykinesia. There are no Dyskinesias of the Head, Arms, Hands, or Legs.

**Cerebellar**

CONFIDENTIAL

Joseph Carrillo                          01/25/2018
Page 5

The patient's right finger-to-nose test is normal. The patient's left finger-to-nose test is normal. The patient's right rapid alternating movements of fingers are normal. The patient's left rapid alternating movements of fingers are normal.

**Station & Gait**
The patient gets out of a chair and onto the examination table well. The patient is able to perform Romberg's maneuver well.

**STUDIES**

**Blood Tests**
07.01.2017-8:18A at Fletcher Flora Lab:
CMP: Glucose 116 H (65-100).
ALT: 138 H (10-40), AST 78 H (9-44).
CBC and TSH: Unremarkable.
Lipid panel: cholesterol 223 H (20-200), triglycerides 208 H (0-150), HDL 33 L (40-60). Ma.

10.24.2017-1231 at MMC:
B12, RPR, ANA, IFE, Anti-Hu antibodies and ESR were unremarkable. Ma.

**Neuro Imaging**
PATIENT: Joseph Carrillo
DOB: 5/23/1986
MRN: 100000552974
PHYSICIAN: Mario Aguilar, MD
EXAM DATE: 8/16/2017
MRI, Brain c/s Contrast Brain :
HISTORY: Headaches. Weakness. Memory loss.
REFERENCE : None available in PACS.
TECHNIQUE: Multi-planar and multi-sequential MR images of the brain were performed. Without and with IV contrast, Magnevist contrast 15 cc. No contrast reaction reported.
FINDINGS:
BRAIN:
Cerebrum: No intracranial hemorrhage, cerebral edema, diffusion restriction, or mass lesion.
Basal Ganglia: Normal caudate nuclei and lentiform nuclei.
Thalami: Normal.
Cerebellum: No abnormality.
Brain stem: No suspicious lesion.
Ventricles and CSF spaces:
Cortical sulci and basilar cisterns are unremarkable.
Ventricles are normal in size.
Expected flow-voids are patent.
Sella and Pituitary gland: Normal.
Orbits: Normal.
CALVARIUM:
No significant extracranial soft tissue swelling.
SINUSES and MASTOID AIR CELLS and etc.:

UPCARRILLO000583

CONFIDENTIAL

Joseph Carrillo                                    01/25/2018
Page 6

Visualized paranasal sinuses are clear.
Mastoid air cells are clear.
Post enhancement:
Images obtained after the contrast injection show no enhancing abnormalities.
IMPRESSION:
1. Normal MRI examination of the brain.
2. No abnormal enhancement.
-----------------------------------------------------------------------
Dictation site: SVIPAC-TCSV102R
-----------------------------------------------------------------------
This document has been reviewed and Signed by: Benjamin Wang on 8/16/2017 11:59 AM

10.13.2017  MRI cervical spine without contrast at TIC showed:
IMPRESSION:
No demyelinating lesions or myelomalacia.  Mild disc bulge at C5-6 with no canal stenosis, cord compression
or nerve root impingement.  Ma.

10.13.2017  MRI thoracic spine without contrast at TIC showed:
IMPRESSION:
Unremarkable non-contrast enhanced MRI of the thoracic spine.  Ma.

**Electrophysiological Studies**
08.22.2017 at MMC:
EEG:  Normal awake EEG as per Dr. Aguilar. Ma.

## CLINICAL IMPRESSION
In essence, this is a 31-year-old male with an episode of unresponsiveness in the latter part of June 2017.

He denied recurrences:
MRI brain and EEG were unremarkable.

Headaches:
Resolved.

Hypersensitivity of the skin in right arm, chest, abdomen and leg, etc.  The cause is undetermined.  He has
been doing well.  He sees Dr. Williams regarding this issue.

I previously discussed work-up and significance.  I discussed the results of his cervical and thoracic spine
MRIs and blood tests.  I discussed ongoing symptomatic treatment, other options, referral to university center,
etc.

He apparently has been diagnosed with fatty liver in the past.

## DIFFERENTIAL DIAGNOSIS
Episode of unresponsiveness:
Single unprovoked seizure.
Single provoked seizure.

UPCARRILLO000584

CONFIDENTIAL

Joseph Carrillo                                    01/25/2018
Page 7

Syncope.
Stroke was not demonstrated.
CNS infection.
Metabolic encephalopathy.
Others.

Headaches:
Intracranial mass lesion was not demonstrated.

Hypersensitivity of the skin in right arm, chest, abdomen and leg, etc.
Intracranial pathology such as stroke or multiple sclerosis lesion were not demonstrated.
Myelopathy, radiculopathy, polyneuropathy, etc.

## RECOMMENDATIONS

1.   Patient will continue care with Ms. Saenz and Dr. Williams.

2.   Please refer Mr. Carrillo back here if needed.


The patient and/or all parties present voiced understanding and agreement.

Thank you very much for allowing me to participate in this patient's care.

Sincerely yours,

Mario R. Aguilar M.D., P.C.

*Electronically Signed on 01/26/2018 10:20:10.
*Electronically Faxed to M. Saenz 647-1565 on 01/26/2018 at 10:24 am*

Confidential

**Exhibit TT**



"Frankel, Harris A"
<harris.frankel@un
mc.edu>

02/19/2018 10:59 AM

To   "jpholland@up.com" <jpholland@up.com>, "Deb A. Gengler"
<DAGENGLE@UP.COM>

cc

bcc

Subject   Medical reviews

This email originated from outside of the company.  Please use discretion if opening
attachments or clicking on links.

Attached are final drafts of the first 4 (I apologize for delay...everything now in place to be
more efficient)

**Redacted**

I will affix evals to letter head for final submission and attach timesheet (10 hrs)

**Redacted**

I have done a preliminary review of Joseph Carrillo and **Redacted**
time mutually beneficial

Thanks

H

**Harris A. Frankel, MD**

**Senior Vice President and Chief Medical Officer**

[IMAGE]

Nebraska Medicine

Kiewit Tower, First Floor

987400 Nebraska Medical Center

Omaha, NE 68198-7400

Phone:  402-552-2290

Cell:     402-681-6837

UPCARRILLO2058

Confidential

Fax:       402-552-2152

e-mail    harris.frankel@unmc.edu

Assistant:  Nikia Davis

          Phone:  402-552-3207

          Fax:        402-552-2152

          e-mail:  nidavis@nebraskamed.com

E-mail Confidentiality Disclaimer

The information in this e-mail may be privileged and confidential, intended only for the use of the addressee(s) above. Any unauthorized use or disclosure of this information is prohibited. If you have received this e-mail by mistake, please delete it and immediately contact the sender.

The information in this e-mail may be privileged and confidential, intended only for the use of the addressee(s) above. Any unauthorized use or disclosure of this information is prohibited. If you have received this e-mail by mistake, please delete it and immediately contact the sender.

- image001.png    Redacted .

_Redacted

UPCARRILLO2059

Confidential



"Davis, Nikia S"
<NiDavis@nebraskam
ed.com>

08/01/2018 11:56 AM

To  "Theresa A. Rodino" <tarodino@up.com>

cc

bcc

Subject   Case File Reviews

 Exhibit UU

This email originated from outside of the company.  Please use discretion if opening attachments or clicking on links.

Hello,

Attached are the reports we spoke of on the phone.

Have a great day!

Nikia S. Davis

**Executive Assistant to:**

**Harris Frankel, MD, Chief Medical Officer**

**Frank Venuto, Chief Human Capital Officer**

**Executive Office**

**Nebraska Medicine**

987400 Nebraska Medical Center | Omaha, NE 68198-7400

402.552.3207  | fax 402.552.2152

nidavis@nebraskamed.com

Nebraska Medicine | Facebook | Twitter | YouTube | Instagram



Nebraska Medicine E-mail Confidentiality Disclaimer
The information in this e-mail may be privileged and confidential, intended only for the use of

UPCARRILLO2515

Confidential

the addressee(s) above. Any unauthorized use or disclosure of this information is prohibited. If you have received this e-mail by mistake, please delete it and immediately contact the sender.

- Joseph Carrillo Report.pdf  **Redacted**

UPCARRILLO2516

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

**Exhibit VV**

UNION PACIFIC RAILROAD – HEALTH & MEDICAL SERVICES
RESTRICTION REVIEW FORM

June 18, 2018

To: Andreas Mader

Daniel K. Glenn, Sr Supv Shop Ops

Regarding Employee: Joseph A. Carrillo
Employee ID: 00457172
Job Title or Craft: Electrician
Department: Mechanical
Service Unit: Sunset TSU
Work Location: EL PASO , TX

**INSTRUCTIONS:** Your employee is released to return to work with restrictions. Please review the outlined restrictions and respond to the questions below.
**Restrictions & Accommodations: These work restrictions are to remain in place until June 2022, and then can be reassessed based on information from a current thorough medical evaluation (Health and Medical Services will advise the employee on what is needed for this evaluation).**
***************

| Start Date | End Date | Description |
|---|---|---|
| 06/18/2018 - 12/31/9999 | | Operation of Comp. Vehicles/On-Track or Mobile Equip./Forklifts -Prohibited |
| 06/18/2018 - 12/31/9999 | | Operation of Cranes, Hoists, or Machinery - Prohibited |
| 06/18/2018 - 12/31/9999 | | Work On or Near Moving Trains, Freight Cars or Locomotives - Prohibited |
| 06/18/2018 - 12/31/9999 | | Work Requiring Critical Decision Making - Prohibited |
| 06/18/2018 - 12/31/9999 | | Work at Unprotected Heights Over 4 Feet Above the Work Surface- Prohibited |

These work restrictions are to remain in place until , and then can be reassessed based on information from a current thorough medical evaluation (Health and Medical Services will advise the employee on what is needed for this evaluation).
1) Do these restrictions interfere with the essential job functions? [X] YES    [ ] NO
2) If yes, can reasonable accommodations be provided to allow the employee to perform the essential job functions?
[ ] YES    [X] NO
3) If yes, how will the reasonable accommodation be provided?

[ ] Accessible Parking    [ ] Assistive Technology    [ ] Equipment
[ ] Job Reassignment    [ ] Lift Assistance    [ ] Modification of Job Duties

www.up.com



UPCARRILLO000614

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

[ ] Modified Work Schedule     [ ] Removal Of Non Essential Function
[ ] Tools                [ ] Removal Of Architectural Barrier
[ ] Other(description required)

_____

_____

4) **If no**, please identify the specific reason(s) for the inability to return the employee to work or provide a reasonable accommodation for the outlined restrictions in relation to the employee's essential job functions?
[ ] Accommodation would require removal of an essential function.
[ ] Accommodation would require lowering performance or production standard.
[ ] Accommodation violates the applicable collective bargaining agreement.
[ ] Other (description required)_____

_____
Supervisor Signature

Supervisor Name
        Supervisor Title            Date

_____
Manager Signature

Manager Name
        Manager Title            Date

_____
Director Signature

Director Name
        Director Title            Date

_____
Superintendent Signature

Page 2 of 3

www.up.com

**BUILDING AMERICA**

UPCARRILLO000615

CONFIDENTIAL

**Union Pacific Railroad**
Health and Medical Services

Superintendent Name
    Superintendent Title       Date

*A COPY OF THIS COMPLETED AND SIGNED DOCUMENT MUST BE FAXED TO HEALTH & MEDICAL SERVICES AT 402-501-0067 so a copy can be placed in the employee's personal medical record. This document may also be uploaded via the portal.*

\*\* Please use the bar coded cover sheet when faxing or uploading. Thank you.

\*\* Please complete Form 16975 (see attached) if a Reasonable Accommodation is made.

Page 3 of 3

www.up.com

BUILDING AMERICA®

UPCARRILLO000616

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE WESTERN DISTRICT OF TEXAS

3                       EL PASO DIVISION

4  - - - - - - - - - - - - - - - - - - - - - - - - - -

5  Joseph Carrillo,          Case No. 3:21-cv-00026-FM

6            Plaintiff,

7        v.

8  Union Pacific Railroad Company,

9            Defendant.

10 - - - - - - - - - - - - - - - - - - - - - - - - - -

11                  REMOTE DEPOSITION OF

12                     ANDREAS MADER

13

14

15 DATE:   November 18, 2021

16 TIME:   9:05 a.m. CST

17 PLACE:  Veritext Virtual Videoconference

18

19

20

21

22

23

24 REPORTED BY:  Jayne M. Seward, RPR

25 Job No:  4889286

**Exhibit WW**

1          * * APPEARANCES * *
2
3
4  On Behalf of the Plaintiff:  (via videoconference):
5       James H. Kaster, Esquire
6       Nichols Kaster, PLLP
7       4700 IDS Center
8       80 South Eighth Street
9       Minneapolis, Minnesota 55402
10      (612) 256-3200
11      kaster@nka.com
12
13  On Behalf of the Defendant:  (via videoconference):
14      Katie M. Rhoten, Esquire
15      Constangy, Brooks, Smith & Prophete, LLP
16      680 Craig Road
17      Suite 400
18      St. Louis, Missouri 63141
19      (314) 338-3740
20      krhoten@constangy.com
21
22
23
24
25

1            I N D E X
2
3  WITNESS:  ANDREAS MADER
4
5  EXAMINATION:
6  By Mr. Kaster:  4 - 53
7
8  EXHIBITS MARKED:
9  EXHIBIT 52:  Restriction Review Form,
10     8-18-2018...................................53
11     UPCARRILLO000614 - 616 - CONFIDENTIAL
12
13  PREVIOUSLY MARKED EXHIBITS REFERRED TO:
14  EXHIBIT 30:  Locomotive Electrical Maintenance
15     Technician/Diesel Electrician Job
16     Description Brief
17     UPCARRILLO000071 - 73 - CONFIDENTIAL
18  EXHIBIT 34:  Letter to Carrillo, 6-20-17
19     UPCARRILLO0000612 - CONFIDENTIAL
20
21
22  REPORTER'S NOTE:  All quotations from exhibits are
23  reflected in the manner in which they were read into
24  the record and do not necessarily indicate an exact
25  quote from the document.

1          P R O C E E D I N G S
2          ANDREAS MADER,
3  duly sworn, was examined and testified as follows:
4          EXAMINATION
5  BY MR. KASTER:
6    Q.  Mr. Mader, have you been through a
7  deposition before?
8    A.  I have.
9    Q.  Okay.  On how many occasions?
10   A.  Several.
11   Q.  Okay.  When's the last time, by the way?
12   A.  Maybe a year or so ago.
13   Q.  Okay.  What kind of proceedings?
14   A.  What was that one?  That was the FMLA
15  termination.
16   Q.  Okay.  So it was a --
17   A.  Fraudulent --
18       THE REPORTER:  I'm sorry.  I'm sorry.  We
19  kind of talked over each other.  Could you repeat
20  your answer, sir?
21       THE WITNESS:  It was for FMLA.  We
22  terminated for fraudulent use.
23       THE REPORTER:  Thank you.
24  BY MR. KASTER:
25   Q.  You terminated for what?  I'm sorry.

1    A.  Fraudulent FMLA use.
2    Q.  Okay.  So how many -- how many depositions
3  do you think you've been through?
4    A.  Call it half a dozen.
5    Q.  Okay.  Well, you know the drill, it sounds
6  like.  I'll be asking you some questions.  I'll try
7  to ask you simple, direct questions, if I'm capable
8  of doing that.  If I don't do that and I ask you a
9  question that's confusing to you, ask me to repeat
10  it and clarify.  I'm happy to do that.
11   A.  Okay.
12   Q.  If you answer the question, I'm going to
13  assume you understood it.  So just let me know if
14  that's an issue.
15   A.  Absolutely.
16   Q.  The second thing is I'd like you to say
17  "yes" when you mean "yes" and "no" when you mean
18  "no."  Don't rely on "um-hum" or "huh-uh."  If I
19  hear you giving a slang answer that won't be well
20  understood later on, I'm going to ask you to clarify
21  it or repeat it.
22       The third thing, and the most important
23  thing really, is that we can't talk at the same
24  time.  This is especially important in a virtual
25  environment like today.  I may think you're

2 (Pages 2 - 5)

1 completed with your answer and you're not.  So if
2 you're not, if I cut you off, that was inadvertent,
3 and you should let me know that you have more to say
4 on your answer.  I'm happy to give you that
5 opportunity.
6        The same is true on my side; if I'm in the
7 middle of a question and you begin to answer, I will
8 ask you to wait until the question is done before
9 answering.
10        Are all those things understood to you?
11    A.  Yes.
12    Q.  Okay.  You've been placed under oath here
13 today.  What does that mean to you?
14    A.  I'm going to tell you the truth.  I'm
15 going to answer the questions truthfully.
16    Q.  How long have you been employed by Union
17 Pacific?
18    A.  2005, so 16 years.
19    Q.  Okay.  And what is your role there?
20    A.  I'm currently the senior manager of shop
21 operations.
22    Q.  And how long have you been in this
23 particular role?
24    A.  Since last July.
25    Q.  And tell me a little bit about your prior

1 roles that you've had with Union Pacific.
2    A.  As I stated, in 2005 I joined on with
3 Union Pacific.  I started off as a OMT which is a
4 management training program.  I was in
5 transportation in Chicago, so I was a transportation
6 manager at the various yards in Chicago.
7        In 2016 I moved over to the Mechanical
8 Department where I was the director of Mechanical
9 Support.  And in 2018 there was some reorganization
10 and title changes.  I went down to Fort Worth as a
11 shop manager down in Fort Worth and that was 2018.
12 And then in 2020 I came back up into Omaha.
13    Q.  And what documents, if any, did you review
14 in preparation for the deposition today?
15    A.  I reviewed the documents that were -- with
16 Katie yesterday.
17    Q.  Okay.  Do you recall what the documents
18 were that you looked at?
19    A.  I recall that there was a letter that I
20 had previously sent out to Mr. Carrillo and -- what
21 else did I review?  A job description.
22    Q.  Okay.
23    A.  There were a couple of others.  Maybe an
24 email.
25    Q.  What are your present duties in the role

1 that you have?
2    A.  So I oversee the shop operations for our
3 system mechanical facilities.  I have my six direct
4 reports who are out in the field, and we --
5 primarily we ensure that the shops are adequately
6 staffed, trained and compliant with the company
7 policies and regulatory compliance.
8    Q.  How much did you work with Joseph
9 Carrillo?
10    A.  None.
11    Q.  You didn't work with him at all?
12    A.  No.
13    Q.  What was the role that you had with Mr. --
14 at the time of these events Mr. Carrillo was taken
15 out of service, say, 2018, 2019, 2017, in that time
16 frame; what was your job at that time?
17    A.  2016, 2017 through -- through, like I
18 said, it would have been, like, November 2018 when I
19 went down to Fort Worth.  So from 2016 through
20 November of 2018 I would have been the director of
21 Mechanical Support.
22    Q.  So you never worked with Mr. Carrillo at
23 all?
24    A.  No.
25    Q.  Did you have any information about his

1 work habits or --
2    A.  His work habits, no.
3    Q.  You don't know if he was a good worker or
4 not a good worker; you don't know?
5    A.  No, sir.
6    Q.  He was a diesel electrician.
7        Did you ever oversee the work of diesel
8 electricians?
9    A.  Yes and no.  So how I do explain that?  Do
10 I oversee their day-to-day activities?  No.  Do I
11 screen and hire them and know what their
12 responsibilities are?  Yes.
13    Q.  You don't really appreciate or understand
14 the day-to-day job duties of a diesel electrician in
15 the sense of what they're physically doing in given
16 shops I take it?
17        MS. RHOTEN:  I'm going to object to the
18 extent that misstates his testimony.  You can
19 answer, Andy.
20        THE WITNESS:  No.  I understand the --
21 what their -- their functions are.  I don't -- I
22 don't sit there and -- so to clarify, I understand
23 what their job is.  I don't understand, like, the
24 troubleshooting, like, as an electrician what he's
25 looking for when he's looking for voltages or

3 (Pages 6 - 9)

1 something of that nature.
2       Does that help clarify that for you?
3 BY MR. KASTER:
4    Q.   Well, I'm going to dig a little into
5 what -- have you ever watched them work?
6    A.   Yes.
7    Q.   Okay.  Do you know -- first of all, do you
8 know whether or not Mr. Carrillo worked in the shop
9 or in the yard?
10   A.   Well, he would have worked at El Paso so
11 that's more of a servicing facility.  They do have
12 the shop there.  He would have worked in and out of
13 the shop.
14   Q.   Do you know if he worked out of the shop
15 at all?
16   A.   If he worked out of the shop?
17   Q.   Do you know if he ever worked outside of
18 the shop, or all of the work that he did was inside
19 of the shop?
20   A.   Oh, no, I wouldn't know that.  I mean, we
21 service locomotives at various locations in the
22 shop.
23   Q.   Do you know whether he had fall protection
24 for any work that he would do?  There would be fall
25 protection in the shop, right?

1       MS. RHOTEN:  I'm going to make an
2 objection, form.  You can answer, Andy.
3       THE WITNESS:  Yeah, shops have fall
4 protection.
5 BY MR. KASTER:
6    Q.   And so his shop would have had fall
7 protection?
8    A.   Yes.
9    Q.   Do you know how many times during a day he
10 would actually have to climb anything to do work?
11   A.   No.
12   Q.   Did you ever ask him that question?
13   A.   No.  I never spoke to Mr. Carrillo.
14   Q.   You've never talked to him at all?
15   A.   No.
16   Q.   You don't know him from Adam?
17   A.   No.
18   Q.   Did you ever speak to anybody who worked
19 with him on a regular basis?
20   A.   Not that I can recall.
21   Q.   What's your educational background, by the
22 way?
23   A.   I have an MBA and a JD.
24   Q.   You do, huh?
25   A.   I do.

1    Q.   Good for you.  So --
2    A.   I'm using it.
3    Q.   Well, I think maybe, like a lot of my
4 classmates, you are using it.
5       So do you have any training in
6 occupational health by the way?
7    A.   How do you mean?
8    Q.   Well, I don't know.  It's right here on my
9 outline so I'm asking you the question.
10   A.   I'm not an occupational health nurse,
11 so...
12   Q.   Yeah.  Have you received any training at
13 Union Pacific in, you know, how to work with
14 somebody in a situation where there might be some
15 restrictions on their ability to do their job?
16   A.   Not that I can think of anything
17 particular that, you know, we say if this is a
18 restriction and this is an accommodation.  I mean,
19 we review ADA, you know, like, on an annual basis
20 with EEOC training and things of that nature.
21   Q.   Where did you work prior to the time that
22 you came to Union Pacific by the way?
23   A.   I was in the military.
24   Q.   Okay.  And what did you do in the
25 military?

1    A.   Well, I was in the military for 20 years.
2 I did a lot.  I --
3    Q.   You did whatever you were told, right?
4    A.   I -- you know, I was engaged in operations
5 is primarily what I did.
6    Q.   What branch were you in, by the way?
7    A.   In the Navy.
8    Q.   Yeah.  So did you receive any specific
9 training when you were in the Navy?  I know the
10 answer to that is yes, but can you give us kind of a
11 10,000-foot view of that?
12   A.   What training I received in the Navy?
13   Q.   Yeah, as it would relate to issues that
14 might be occupational in nature.  Any?
15   A.   I can't recall.
16   Q.   You worked in El Paso for a time.  Did I
17 get that right?
18   A.   I never worked in El Paso.
19   Q.   Oh, you never worked in El Paso.  Have you
20 been there?
21   A.   I've been to El Paso.
22   Q.   How many times once?
23   A.   Once or twice.
24   Q.   For how many days in total?  Do you know?
25   A.   Maybe two, three days at a time.

1    Q.  For what purpose?  Do you recall?
2    A.  Investigations or training.
3    Q.  What kind of investigations?
4    A.  Disciplinary, industrial workplace
5 investigations.
6    Q.  So tell me what your role was in that
7 respect.
8    A.  Hearing officer.
9    Q.  You were a hearing officer.
10       How long have you served in the capacity
11 as a hearing officer?
12    A.  That's kind of a requirement.  You know,
13 all managers have that capability of being a hearing
14 officer.  I've held them since I've been with Union
15 Pacific in Chicago and here in mechanical.
16    Q.  A disciplinary hearing is a hearing where
17 the employee involved is brought in on some kind of
18 a charge of misconduct, right?
19    A.  Or a rules violation.
20    Q.  Or a rules violation.  And oftentimes
21 those disciplinary hearings can involve discipline
22 up to and including termination, right?
23    A.  Correct.
24    Q.  How many of those disciplinary hearings
25 have you been involved in as a hearing officer?

1    A.  Over 100.
2    Q.  On how many occasions have you ruled in
3 favor of the employee by the way?
4    A.  So I do not -- it's not a ruling in favor
5 of the employee.  It's either I sustain the charges
6 or the charges are not sustained, and that's based
7 upon the evidence.  I wouldn't -- I don't keep track
8 of how many times.  Has there been times?  Yes.  Do
9 I know --
10    Q.  Do you know if it's less than 10, less
11 than 10 times that you've not sustained the charges?
12    A.  I'd be guessing if I gave you an answer.
13    Q.  You don't recall?
14    A.  No.
15    Q.  The employee involved doesn't have the
16 right to an outside third-party independent hearing
17 officer, right?
18    A.  No.  That's by the collective bargaining
19 agreement.
20    Q.  Sure.  I understand.
21       The employee can't subpoena witnesses to
22 the hearing, right?
23    A.  They can present witnesses on their
24 behalf, yes, they can.
25    Q.  Okay.  But they can't -- they don't have

1 the right of subpoena?
2    A.  No.
3    Q.  And if witnesses appear for them, they
4 don't get paid, right; they don't get paid for their
5 time?
6    A.  So it would be at the organization's cost,
7 not at the carrier's cost.
8    Q.  And if an employee appears for Union
9 Pacific, they do get paid, right?
10    A.  It would be -- yeah, it would be on
11 company time, correct.
12    Q.  Witnesses are not actually placed under
13 oath, right?
14    A.  No.
15    Q.  And the hearing itself, the employee
16 doesn't have a right to a lawyer, right?
17    A.  Correct.  That is correct.  They have
18 right to representation, again, by the collective
19 bargaining agreement.
20    Q.  By virtue of a union rep?
21    A.  Correct.
22    Q.  So why is it -- just out of curiosity, it
23 sounds like you've spent a lot of time in hearings
24 as a hearing officer.
25       Would that be a fair statement?

1    A.  Yes.
2    Q.  Why?  I mean, what is it about your role
3 that would cause you to be that hearing officer?  Is
4 it your educational background, is it -- do you have
5 a viewpoint on that?
6    A.  I mean, I can only guess it's when I came
7 to the Mechanical Department, they were looking at
8 having one person hold a majority of the hearings,
9 and coming from Transportation I did hold hearings.
10 So maybe that was an influence upon them on why they
11 selected me for that position.
12    Q.  When you say "coming from Transportation,
13 you did hold hearings," tell me about that.
14    A.  How so?  What do you mean, tell you about
15 them?
16    Q.  Well, what I mean is so you had worked in
17 the Transportation Department is what you -- I think
18 is what you're saying, right?
19    A.  Correct.  Out of Chicago, yes.
20    Q.  And so had you spent a lot of time while
21 you were working in the Transportation Department
22 holding these hearings?
23    A.  I held several, yeah.  I mean, it all
24 depended.  You know, it's -- it's not like we're
25 doing them every day.  You know, it's -- as you said

Page 18

1 earlier, it's about rules infractions or policy
2 violations. So, I mean, yeah, I held my fair share.
3 Again, I wouldn't be able to give you a number but
4 I've held, you know, more than 12 throughout that
5 time.
6    Q. So these hearings, how many hours or days
7 did they last typically?
8       MS. RHOTEN: I object to the line of
9 questioning on the grounds of relevance. I don't
10 really see how this pertains to Mr. Carrillo
11 specifically because there is no hearing at issue
12 for which Andy is testifying. But, Andy, you can
13 answer to best of your ability.
14       THE WITNESS: I mean, it varies. You
15 know, if I've held it in absentia because the
16 employee doesn't show up, it could go an hour, hour
17 and a half. I've had some that have lasted, you
18 know, seven hours.
19 BY MR. KASTER:
20    Q. So you went from the Transportation
21 Department to what department are you in today then?
22    A. Mechanical.
23    Q. Mechanical. And that transition happened
24 when?
25    A. 2016.

Page 19

1    Q. And how would you describe the overarching
2 responsibilities of the Mechanical Department?
3    A. Mechanical Department is we're here to
4 service and repair locomotives.
5    Q. You looked at the job description for a
6 diesel electrician in advance of your deposition.
7       Did I get that right?
8    A. Yes.
9    Q. Have you seen that before?
10    A. Yes.
11    Q. When was the first time you saw it?
12    A. I can't tell you. I don't know when the
13 first time I saw that was.
14    Q. Have you ever supervised -- first of all,
15 you've never worked as a diesel electrician, right?
16    A. Correct.
17    Q. You don't have any training as an
18 electrician?
19    A. So do I have electrical training? Yes.
20 But am I an electrician as a journeyman? No.
21    Q. Have you ever worked as an electrician for
22 Union Pacific Railroad?
23    A. No.
24    Q. You don't have any certifications or
25 education in being an electrician, right?

Page 20

1    A. Correct.
2    Q. So other than possibly fixing a loose wire
3 at home, do you have any specific background in the
4 work of an electrician?
5       MS. RHOTEN: I'm going to object to form.
6 You can answer, Andy.
7       THE WITNESS: Well, again, do I understand
8 what their job responsibilities are? Yes, I do. I
9 understand what an electrician does.
10 BY MR. KASTER:
11    Q. Do you know what the duties of an
12 electrician are?
13       Say, Mr. Carrillo, do you know what duties
14 he had in the field?
15    A. I'm not understanding what you mean by "in
16 the field"?
17    Q. Well, I mean outside of the shop.
18       MS. RHOTEN: Are you asking what his
19 duties would have been at the El Paso facility as a
20 diesel electrician?
21       MR. KASTER: I'm okay with my question as
22 it is.
23       THE WITNESS: I'm not sure how to answer
24 that because I'm not understanding the question.
25 BY MR. KASTER:

Page 21

1    Q. Okay. When he stepped outside of the
2 shop, if he ever did, do you know what, if anything,
3 he did?
4    A. Well, I don't know if he's ever worked
5 outside of the shop, so that's --
6    Q. Okay. So the answer is you have no idea?
7       MS. RHOTEN: Objection.
8       THE WITNESS: No, I wouldn't say --
9 that's not my answer because it depends. I've
10 supervised -- like I say, I understand the
11 responsibilities of a road electrician as well, but
12 I don't know if Mr. Carrillo ever held one of those
13 responsibilities. So what he particularly was
14 dispatched to, I don't know.
15 BY MR. KASTER:
16    Q. Do you know if he ever worked on or near
17 the tracks?
18    A. Yes, he would have had to.
19    Q. Because?
20    A. He works on locomotives and locomotives
21 are on the track.
22    Q. Okay. That would be true even in the
23 shop, right?
24    A. Right, yes.
25    Q. Okay. Do you know what duties, if any, he

6 (Pages 18 - 21)

Page 22

1 had on tracks that might have been outside the shop?
2    A. No, I don't know what his -- what jobs he
3 held outside of the shop.
4    Q. Do you know how close he ever got to the
5 tracks to do his work?
6    A. Inside the shop, outside the shop,
7 anywhere outside?
8    Q. Well, since you don't know about anything
9 he ever did outside the shop, let's stay inside the
10 shop.
11    A. Okay.
12      MS. RHOTEN: I'm going to object to form.
13 You can answer, Andy.
14      THE WITNESS: Yeah, so I mean -- again,
15 the locomotives are on the track, so you're going to
16 be within a foot, two foot of the track when you're
17 working on there. It depends. If you're working on
18 something underneath, you could be in between the
19 tracks, you know, because you've got your service
20 track, you've got the rails above; you're working
21 underneath there.
22      So there's a lot of variables. It's not,
23 you know, just one type of answer. It depends where
24 you're working at. If you're changing a light bulb,
25 you're standing right in front of the locomotive in

Page 23

1 between the rail.
2 BY MR. KASTER:
3    Q. Do you know if he ever had to climb on top
4 of a car to do work?
5    A. A railcar?
6    Q. A train car, a railcar, any car.
7    A. A railcar or a locomotive?
8    Q. A locomotive or a railcar.
9    A. And so --
10    Q. Either one.
11    A. As a -- in the Mechanical Department they
12 would not work on railcars. They would just be
13 working on locomotives.
14    Q. Okay.
15    A. Okay. So how -- how many times would he
16 have had to have gotten on top of a locomotive?
17    Q. I don't know.
18    A. I don't know. It depends on what task he
19 would be assigned.
20    Q. Do you know if he ever had to get on top
21 of a locomotive to do work?
22    A. I don't know.
23    Q. Do you know whether or not he had any
24 duties or responsibilities as it related to moving
25 trains?

Page 24

1    A. Moving trains, no. Moving locomotives,
2 yes.
3    Q. Okay. As it related to moving a
4 locomotive, what, if any, duties did he have?
5    A. All right. So at the El Paso locomotive
6 facility, all the employees there are locomotive
7 mover certified. They are all responsible for being
8 able to move the locomotives in and out of the shop
9 and to spot them.
10    Q. And what actually happens when an employee
11 moves a locomotive?
12      First of all, have you done it?
13    A. Well, I was a -- yes, I have moved
14 locomotives.
15    Q. Okay. What actually happens when you move
16 a locomotive?
17    A. Are you asking the process of moving a
18 locomotive?
19    Q. Sure. Who does what?
20    A. All right. Well, typically there's two
21 people when you're moving a locomotive. You have a
22 ground person and you have an operator. The ground
23 person would be giving hand signals and giving
24 directions to the operator, and the oper- -- you
25 know, throwing any switches or -- you know, for

Page 25

1 their intended route, whatever. And then the
2 operator would be up in the cab, and he would be the
3 one controlling the throttle and the brakes.
4    Q. And when you say throwing a switch, you're
5 talking about a directional switch?
6    A. Correct, lining yourself into various
7 tracks in the yard.
8    Q. And when you're in the cab -- first of
9 all, is there any requirement for who's in what
10 position, who's the flagger or signaller or who's
11 the person in the cab?
12    A. You mean who would be the ground person or
13 the operator?
14    Q. Right.
15    A. No, there's no rhyme or reason. They job
16 brief that and discuss it among themselves.
17    Q. Okay. So they're essentially fungible;
18 they're interchangeable parts? Joe can go up and
19 get in the cab and move the locomotive, and Tom can
20 be the flagger or -- and the next day they can flip
21 around, right?
22    A. True, and we can also have single-man
23 moving operations where it would be one person in
24 the cab just moving the locomotive without a ground
25 person.

7 (Pages 22 - 25)

Page 26

1    Q.   You can only go up to five miles an hour
2 when you move the locomotive; that's the rule,
3 right?
4    A.   So the speed limit is five miles an hour.
5 Can you exceed that?  You can exceed the speed
6 limit, not by rule, right, because if you -- you
7 know, if you engage the throttle, it's just like
8 stepping on your gas pedal.  You put more gas,
9 you're going to go faster.
10       So, yes, the speed limit inside the shop
11 is five miles an hour, but, yes, you can exceed that
12 speed limit.
13    Q.   I take it that might be one of the things
14 that would bring someone into a disciplinary hearing
15 like the hearings that you held, right?
16    A.   Correct.
17    Q.   Exceeding the speed limit?
18    A.   Correct.
19    Q.   That would be a safety violation, right?
20    A.   Yes.
21    Q.   I assume there's a rule that's
22 specifically on point that says don't do that?
23    A.   There are several rules.
24    Q.   There's lots of rules, right?
25    A.   There are a lot.

Page 27

1    Q.   There's hundreds of rules, right?
2    A.   Um-hum.  True.
3    Q.   All right.  When you're in the cab, if
4 you're moving the locomotive, say you're going two
5 or three miles an hour and you want to stop, how do
6 you stop?
7    A.   You apply your independent brakes, if
8 you're operating independently, you know, as a sole
9 locomotive.  Or your locomotive con- --
10       THE REPORTER:  I'm sorry.  "If your
11 locomotive" something brakes?
12       THE WITNESS:  Consist.  You have two --
13 two brake systems on a locomotive, an independent
14 brake and a -- what we refer to as the locomotive
15 consist, and that's where you have locomotives
16 together.
17       THE REPORTER:  Thank you.
18       THE WITNESS:  And when you're operating as
19 a consist, you -- when you apply your -- the train
20 line brakes, you're going to engage all the brakes
21 on the consist versus an independent brake.
22       THE REPORTER:  Thank you.
23       MS. RHOTEN:  Can you spell "consist" for
24 the court reporter, Andy, just --
25       THE WITNESS:  Yeah.

Page 28

1       MS. RHOTEN:  -- so we have that correct
2 for the transcript?
3       THE WITNESS:  Yeah.  Consist,
4 C-O-N-S-I-S-T.  The consist.
5 BY MR. KASTER:
6    Q.   Did you -- what safety measures are built
7 into the locomotive to prevent it from continuing if
8 there is human error?
9    A.   In the shop, none.
10    Q.   Inside the locomotive itself what safety
11 measures exist?  Are there buttons, switches that
12 prevent the locomotive from continuing in the event
13 there is human error?
14    A.   So if I engage the throttle, it will
15 continue until it hits something.
16    Q.   There is nothing that prevents the
17 locomotive?
18    A.   Not inside the shop area.
19    Q.   Well, say outside of the shop.
20    A.   So if you -- so if you're running on a
21 main line, and this is outside of a electrician for
22 this, but on a railroad main line you have to engage
23 an alerter or something along that nature every so
24 often.  If the alerter is not acknowledged, then the
25 train would go into suppression and it would stop,

Page 29

1 but that's running out of on main line when your
2 systems are tested and, you know, engaged.
3       In the shop you don't have that.  What you
4 have in the shop is nothing.  So if you engage the
5 throttle, it will continue until it hits something.
6    Q.   Okay.  So there's absolutely no stop
7 mechanism like what you described when you're moving
8 a locomotive inside a shop?
9    A.   Correct.
10    Q.   How many people worked with Mr. Carrillo?
11 Do you know?
12    A.   I would have to look back at that time
13 frame.  I know we had some layoffs around there.
14 Right now I think our facility count in El Paso is
15 six.
16    Q.   How many times did Mr. Carrillo have to
17 move a locomotive inside the shop where he was
18 inside the cab?  Do you know?
19    A.   No.
20    Q.   Do you have any idea?
21    A.   No.  I just know that it would be a
22 requirement for him to be able to.
23    Q.   You don't know how many times that
24 actually happened?
25    A.   No, sir.

8 (Pages 26 - 29)

1    Q.  You don't know how many times he might
2  have been the person signaling, as opposed to the
3  person inside the cab?
4    A.  No.
5    Q.  Do you know how many times, if at all, he
6  ever climbed over four feet to do his job?
7    A.  No, I wouldn't know.
8    Q.  And you don't know if he ever had to get
9  on top of a locomotive?
10   A.  No, I don't.
11   Q.  You do know that, if he ever had to get
12 off the ground, he had fall protection?
13   A.  Right.  So the shops, again, do have the
14 fall protection, and if you go above the -- you
15 know, the four foot, you need to have the fall
16 protection.
17   Q.  And, in fact, that's one of those rules,
18 right?
19   A.  It is.
20   Q.  That you have to wear the fall protection
21 if you're over four feet?
22   A.  Correct.
23   Q.  Failure to do that would bring you into
24 one of those disciplinary hearings like you have,
25 right?

1    A.  Yes.
2    Q.  Have you ever had any training on the
3  Americans with Disabilities Act?
4    A.  I mean, we have our annual training
5  discussing, you know, the generalities of it, along
6  with our EEOC training on how it matters.
7    Q.  Would you consider yourself familiar with
8  that act in the sense of understanding the different
9  parts of the act, the different subdivisions of the
10 law?
11   A.  Not an expert.
12   Q.  Other than the annual training that you
13 have as it relates to EEO issues, any particular
14 training on the ADA that you can recall?
15   A.  Not that I can recall.
16   Q.  I'm going to bring up a couple of
17 exhibits, but I think --
18   A.  I'm logged into that Exhibit Share, so --
19   Q.  Okay.  Well, I didn't because -- so I'm
20 going to go share this on my screen.
21   A.  Oh, okay.
22   Q.  Okay.
23   A.  So do I need Exhibit Share then now?
24   Q.  You may or may not.
25   A.  All right.

1    Q.  I don't think so.
2    A.  All right.
3       THE REPORTER:  Are we going to mark this
4  as an exhibit, Mr. Kaster?
5       MR. KASTER:  Yeah.  I think it was
6  previously marked, Jayne, but I don't know what
7  number it is.  It's the job description.
8       Katie, do you happen to know what number
9  it is?
10      MS. RHOTEN:  I can't remember off the top
11 of my head because I know it was a continuation from
12 Mr. Carrillo's deposition.  I'm not sure where we
13 pick up with the numbers.
14      MR. KASTER:  Yeah, I know we're on -- what
15 are we on today, Jayne?
16      THE REPORTER:  52.
17      MR. KASTER:  Let's just call this 52.
18 It's a job description for a diesel electrician.
19      (Exhibit 52 marked.)
20 BY MR. KASTER:
21   Q.  Mr. Mader, you told me that you are
22 familiar with the job description, right?
23   A.  Yes.  And I do have it up here on my
24 screen.
25   Q.  Okay.  I'm looking at the essential job

1  functions.
2       THE REPORTER:  There's a number on it.
3  BY MR. KASTER:
4    Q.  Did you have --
5       MS. RHOTEN:  It looks like this is
6  Exhibit 30.  Sorry, James.
7       MR. KASTER:  Oh, let's just call it 30
8  then, Katie.  Thank you very much.
9       (Exhibit 52 withdrawn.)
10 BY MR. KASTER:
11   Q.  Can you see what I'm looking at,
12 Mr. Mader?
13   A.  I have mine up on the screen.  I'm not
14 sure which part you're looking at right now though.
15   Q.  Okay.  Well, can you see the shared
16 screen?
17   A.  Yeah, where it says "Job Requirements:
18 Read and Understand."
19   Q.  Did you have this job description -- first
20 of all, you were asked to consider whether or not
21 Mr. Carrillo could be accommodated based upon the
22 restrictions that he had been given, right?  Am I
23 right about that?
24   A.  Yes.
25   Q.  And who did you talk to for the purpose of

9 (Pages 30 - 33)

Page 34

1 determining whether or not he could be accommodated
2 with the restrictions that he had?
3      A.   So I look at the restrictions that Health
4 and Medical provided me, which I would have to look
5 at those.  I think that was an exhibit that had my
6 letter that I had sent to Mr. Carrillo, which --
7      Q.   Okay.  Are you saying that you would
8 prefer to look at that first?  I've got it right
9 here.
10          Well, let me ask the question to you
11 differently.  Would it be helpful for you to look at
12 your letter?
13     A.   I would look at them side by side, so...
14     Q.   Okay.
15     A.   All right.  So do you want me to explain
16 my process; is that what you're asking me?
17     Q.   Yeah, please.
18     A.   Okay.  So I would get a notification, and
19 it's the Restriction Review Form, which is something
20 that Health and Medical would send, and it would
21 come to me electronically through what we refer to
22 as eHealthSafe.
23          I would then look over the restrictions
24 that Health and Medical decided -- or were placed on
25 the employee by Health and Medical.  I would then

Page 35

1 look at the job functions of the electrician and
2 compare it against the restrictions that Health and
3 Medical imposed on the employee and compare to see
4 whether or not those -- what -- and what we -- what
5 the restrictions were in looking at the essential
6 job functions.
7          Does that answer that?
8      Q.   Well, this is what I'm getting from your
9 answer.  This is what I think I'm hearing.  I think
10 I'm hearing that you don't remember this; is that
11 right?
12     A.   That I don't remember this?  I mean, I did
13 more than just Mr. Carrillo.
14     Q.   You have no memory of actually doing the
15 restriction review for Mr. Carrillo; am I right
16 about that?
17     A.   I remember being -- having that
18 responsibility.
19     Q.   You don't remember actually doing it?
20     A.   Not that I recall.  I mean, I remem-- as
21 I said, that was part of my job responsibility when
22 I was the director of Mechanical Support where I
23 would review.  Mr. Carrillo wasn't the only one I
24 had reviewed.
25          So I can't say that, yes, I remember

Page 36

1 sitting down and reviewing Mr. Carrillo's
2 restrictions.  It was a process when I looked at the
3 restrictions versus the essential job functions.
4      Q.   I understand you recall the process.  What
5 I want to be clear about is you don't recall
6 actually doing this review for Mr. Carrillo.
7          Am I right about that?
8      A.   Yes.
9      Q.   All right.  Well, we'll take a look at a
10 couple of other documents.
11          Well, let me ask you this:  Do you
12 remember if you spoke to anyone as a part of the
13 restriction review process for Mr. Carrillo?
14     A.   I believe I did.
15     Q.   Do you remember who?
16     A.   I think it was -- it might have been Voc
17 Rehab.
18     Q.   Do you remember who?
19     A.   That would have been somebody in Voc
20 Rehab.  I don't know who was in that position back
21 then.
22     Q.   Do you have any notes of a conversation
23 with anyone in Voc Rehab?
24     A.   No, I don't have any notes.
25     Q.   Did you speak to anybody in the El Paso

Page 37

1 shop?
2      A.   Not that I recall.
3      Q.   Did you speak to anybody who actually
4 worked with Mr. Carrillo?
5      A.   Not that I recall.
6      Q.   And you didn't speak to Mr. Carrillo?
7      A.   No.
8      Q.   How much time do you think you spent on
9 this restriction review process for Mr. Carrillo?
10     A.   Maybe 45 minutes.
11     Q.   Maybe?
12     A.   Maybe.
13     Q.   And you have no recollection of what you
14 actually did in terms of the review process?
15     A.   So that would go to my process that, as I
16 stated early, is that I would review the
17 restrictions imposed and balance them up against the
18 essential job functions.
19          So, I mean, it was standard whether it be
20 Mr. Carrillo or Joe Smith.  I mean, it was still the
21 process that I followed.  But to answer do I
22 specifically remember doing it for Mr. Carrillo?
23 No.
24     Q.   All right.  Well, I'm going to leave the
25 job description and look at a different document

10 (Pages 34 - 37)

here. Okay. So let's do this. All right. I don't believe this is marked? Am I correct, Katie, this?

MS. RHOTEN: I do not believe so. Unless it was used in one of the -- unless it was used in Dr. Holland's deposition yesterday, I don't believe it's been marked.

MR. KASTER: No. It wasn't used yesterday. So let's call this -- this will be 52 then.

(Exhibit 52 marked.)

BY MR. KASTER:

Q. And, Mr. Mader, I take it this is a document you looked at yesterday?

A. Yes. Yeah.

Q. And this is what you filled out during that 45 minutes?

A. Yeah, this would have been the document that I received through eHealthSafe.

THE REPORTER: Are there Bates stamps on this, Jim?

MR. KASTER: Oh, yeah. Sorry. Let's get that so that's clear. It's Bates stamps 614, 615 and 616.

THE REPORTER: Thank you.

BY MR. KASTER:

Q. All right. So how did you know that Mr. Carrillo was an electrician?

A. It says it right there.

Q. Okay. You didn't have any conversations with anybody about what he actually did as an electrician? You relied on, I take it, the job description?

A. Yeah. I mean, yeah, the electricians across the system perform very similar tasks.

Q. Let's look at the restrictions themselves. Operation -- the first one is he's prohibited from "Operating Company Vehicles/On Track or Mobile Equipment/Forklifts."

I take it that would include the locomotive, right?

A. Yes, company vehicles, locomotives. If he were in a different facility, a car mover, which is a -- like a prime mover. It's something you would take on, but it's an on-track equipment. It could be a high-rail in engineering, but that's not applicable here. So, yeah. Yeah.

Q. You don't know, as we've discussed, how many times he actually operated a locomotive inside the shop, right?

A. No.

Q. Did he operate any other on-track equipment besides the locomotive?

A. On-track equipment, no. The only on-track equipment would be a locomotive.

Q. The next one is: Operation of cranes, hoists or machinery is prohibited.

Do you know whether or not he operated cranes, hoists or machinery?

A. It depends on the task. But do I know specifically? No. If he operated one or how many times he's operated in the past? No. But, again, it's task-based. If they had to change out a generator, then he would have to use one.

Q. Do you know whether or not someone else could operate the crane, hoist or other machinery?

A. So I guess it would depend, right, on what the task was and how many people, because when we're looking at El Paso. I said there's six employees that worked there, I guess it would be possible.

Q. The next one says "Work On or Near Moving Trains, Freight Cars or Locomotives."

A. Okay.

Q. Do you know if he worked on or near moving trains?

A. He could. I don't know specifically if he

did, but when you're in a train yard, there's trains because that's the nature of our industry. So if he was working out in the yard, you'd have moving trains.

Q. I take it that diesel electricians would actually work on a train or a locomotive inside the shop when the locomotive was stopped, right?

A. Right. So if a locomotive is being worked on, it would be in the shop.

Q. And it would be stopped?

A. On that particular track, yes.

Q. I mean, I take it that, if somebody was working on a locomotive, on the electrical part of a locomotive as it was rolling down the tracks, that might be one of those rule violations, right?

A. Possibly, possibly not. Like, if you were troubleshooting something, right? So, I mean, I couldn't say definitively.

Q. It's safe to say, though, that an electrician, a diesel electrician is typically working on a stopped train in the shop, right?

A. Yes. Yeah. So -- yeah. So the train -- so let me just clear up some -- some definitions, if you would.

A train is a complete cars and locomotive,

1  okay, because we're using them interchangeably here.
2  A train is a complete set.  It's loco- -- a
3  locomotive with cars attached.  A locomotive being a
4  singular or multiple locomotive in a consist.
5      Q.  Okay.  You said we're using them
6  interchangeably.  You really meant I was using them
7  interchangeably, right?
8      A.  Yes, yes.  I just wanted to clarify so
9  we're on the same page --
10      Q.  Okay.  I got it.
11      A.  -- when you're using "train" and
12  "locomotive."
13      Q.  I hear you.  I hear you.  Okay.  All
14  right.
15      So in the shop, if you are working on a
16  locomotive, yes, that -- that particular locomotive
17  would be stopped.
18      Q.  The next restriction here is "Work
19  Requiring Critical Decision Making."
20      A.  Okay.
21      Q.  Do you know what jobs don't require
22  critical decision making?
23      A.  There's a lot of jobs that don't require
24  critical decision making.
25      Q.  Can you think of one?

1      A.  A janitor.
2      Q.  Well, you know, I have many friends who
3  are janitors who might argue with you about that.
4      A.  So when used in reference to an
5  electrician for Union Pacific, what we look at with
6  the critical decision making aspect of that is
7  testing and setting up things like Positive Train
8  Control, coded cab signals, working with the TIR,
9  the Track Image Recorder, the inward- and outward-
10  facing cameras.  Those are all those safety
11  appliances.
12      Like you were referring to earlier, like,
13  what stops a train, you know, in the shop, nothing.
14  On the track, Positive Train Control, coded cab
15  signals, those would stop a train on the main track.
16  And that --
17      Q.  Is there any definition -- go ahead.  I
18  didn't mean to cut you off.  I thought you were
19  done.
20      A.  No, I was -- I'm done.
21      Q.  Okay.  Is there any definition anywhere of
22  critical decision making?
23      A.  Not that I'm aware of.
24      Q.  Are there any jobs at Union Pacific that
25  don't require critical decision making?

1      A.  So anything that doesn't impact safety.
2  So a timekeeper or an admin who is processing
3  timecards where there's no impact of safety to
4  themselves or others, I would consider that, you
5  know, a noncritical decision making position.
6      Q.  Any management position that -- any
7  management position at Union Pacific would be a job
8  requiring critical decision making, right?
9      A.  I would say so, yes.
10      Q.  And it's probably fair to say that anybody
11  working in maintenance on or around the tracks would
12  require critical decision making, right?
13      A.  Yes.
14      Q.  So other than an admin who might be
15  keeping track of time, can you think of another
16  person, another job that didn't require critical
17  decision making?
18      A.  Not off the top of my head I can't think
19  of anything.
20      Q.  How many different jobs are there at Union
21  Pacific?
22      A.  I don't know.  A lot.
23      Q.  Hundreds.  Hundreds, right?
24      A.  A lot.  I don't have a number.
25      Q.  There's 40,000 employees at Union Pacific,

1  right?
2      A.  There's, like, 32,000 now.
3      Q.  Wow.  There used to be 40,000.  What
4  happened?
5      A.  That would have been that reorg I talked
6  about in 2018.
7      Q.  I see.  Is it fair to say this
8  restriction, this prohibition would screen
9  Mr. Carrillo out of the vast majority of
10  those 32,000 jobs?
11      MS. RHOTEN:  I object to form.  You can
12  answer, Andy.
13      THE WITNESS:  Yeah.  Honestly I couldn't
14  say that.
15  BY MR. KASTER:
16      Q.  Did you, yourself, consider whether or not
17  there were other jobs that Mr. Carrillo could do?
18      A.  Me personally?  No.
19      Q.  Do you know whether or not Mr. Carrillo
20  was actually seeking to be reemployed or employed at
21  Union Pacific on an ongoing basis at the time of the
22  consideration of these restrictions?
23      A.  Can you say that again, please?
24      Q.  Do you know if he was looking for another
25  position at Union Pacific at the time of your

12 (Pages 42 - 45)

Page 46

1  consideration of these restrictions?
2       MS. RHOTEN:  I'm going to object again.
3  It calls for speculation.  You can answer, Andy.
4       THE WITNESS:  Not that I'm aware of.  And
5  do you mind if I elaborate a second on this?
6  BY MR. KASTER:
7    Q.  Go ahead.
8    A.  All right.  So with these restrictions,
9  when you ask about other jobs, right, so, as you
10 know, we're a unionized environment.  When I look at
11 these restrictions, I look at it as the electrician,
12 right, because that was his current craft.
13       After I get done with the review, like in
14 this case, where we could not accommodate, then I
15 would send this over to Voc Rehab, and Voc Rehab
16 would work and look for the other opportunities in
17 Union Pacific.
18    Q.  So it's not your job?
19    A.  No, I wouldn't say that.  That -- that --
20 that sounds kind of snarky, if you don't mind.  But
21 what I'm saying is I am looking at it as the -- as
22 the requirements of an electrician in a Union
23 Pacific shop in El Paso.  That's because that is
24 what he was hired on for, that is his -- his -- his
25 agreement, his craft.  That is his current job that

Page 47

1  he was, you know, employed as.
2       So, once I review that, then, like I said,
3  Voc Rehab would look for those other opportunities.
4  So that's like it wouldn't be my responsibility.
5  Not not my job, but that's why we have that group to
6  research and work with those particular restrictions
7  and other job opportunities.
8    Q.  Do you know what, if anything, they did?
9    A.  No, I don't.
10    Q.  The last restriction here -- let's go back
11 to this critical decision making.
12    A.  Okay.
13    Q.  And I just want to be clear about this.
14 Is there a definition somewhere of critical decision
15 making at the Union Pacific Railroad, if you know?
16    A.  Yeah, you already asked that.  No, I don't
17 know.
18    Q.  Dr. Holland testified yesterday that this
19 restriction is ambiguous.
20       Do you think it's ambiguous?
21       MS. RHOTEN:  I'm going to object to form.
22 You can answer, Andy.
23       THE WITNESS:  Yes, because it -- it's
24 ambiguous, but you have to look at it in the context
25 of what we're referring to.

Page 48

1       So a critical decision making for an
2  electrician would be different than a critical
3  decision making for a dispatcher, right?  I mean,
4  they're both safety sensitive.
5       So, yes, I can agree where he would say
6  it's -- it's ambiguous, but if there is that safety
7  aspect to it, that's what I would consider with the
8  critical decision making, the safety aspect of it.
9  BY MR. KASTER:
10    Q.  The last restriction here is "Work at
11 Unprotected Heights over 4 Feet Above the Work
12 Surface."
13    A.  Okay.
14    Q.  Do you know whether or not Mr. Carrillo
15 ever had to work at unprotected heights over
16 four feet?
17    A.  No.
18    Q.  You don't know what, if anything,
19 Mr. Carrillo suggested about whether he could work
20 with these restrictions or not?
21    A.  I'm sorry.  Say that again, sir.
22    Q.  Do you know what, if anything,
23 Mr. Carrillo said in response to these restrictions?
24    A.  I never spoke to Mr. Carrillo.
25    Q.  And you don't know about his conversations

Page 49

1  with anybody within the fitness-for-duty process or
2  within Voc Rehab, right?
3    A.  No, sir.
4    Q.  You don't know what, if any,
5  accommodations were considered beyond the 45 minutes
6  that you spent on this, right?
7    A.  Say that again.
8    Q.  You don't know what, if anything, happened
9  with respect to the restrictions or considerations
10 of whether or not Mr. Carrillo could do this job or
11 other jobs at Union Pacific beyond that 45-minute
12 window of time?
13       MS. RHOTEN:  I'm going to object to form.
14 You can answer, Andy.
15       THE WITNESS:  Yeah, what do you mean by
16 "other jobs"?
17 BY MR. KASTER:
18    Q.  Do you know whether or not there was
19 consideration for other job opportunities for
20 Mr. Carrillo?
21    A.  No.  That would have been Voc Rehab.
22    Q.  That's what I'm trying to establish is:
23 Beyond this 45-minute window, you had no contact
24 with anything related to Mr. Carrillo, right?
25    A.  Yes, sir.  That's correct.

13 (Pages 46 - 49)

Page 50

1    Q.  And we've covered this, but you've never
2  talked to Mr. Carrillo or anybody who worked with
3  him, right?
4    A.  I've talked with them.  Did I talk to them
5  about Mr. Carrillo?  No, not that I recall.  So have
6  I talked with the people in the shop over in
7  El Paso?  Yes.  Did I ever specifically talk about
8  Mr. Carrillo?  Not that I recall.
9    Q.  I'm going to bring up this last document
10  just so we're clear.  I think this is the letter
11  that you sent.
12    A.  Okay.
13    THE REPORTER:  A new exhibit, Mr. Kaster?
14    MR. KASTER:  Yes, and I'll be right there.
15    THE REPORTER:  And that will be 53.
16    (Exhibit 53 marked.)
17  BY MR. KASTER:
18    Q.  Do you see a letter of June 20th, 2018, to
19  Mr. Carrillo?
20    A.  Yes.
21    MR. KASTER:  And so we're clear about
22  this, this was previously marked as Exhibit 34.  So
23  sorry, Jayne, I didn't see that sticker at the
24  bottom there.
25    THE REPORTER:  I'll just say we didn't

Page 51

1  mark it.  And we'll use 34 you said?
2    MR. KASTER:  Yes.
3    (Exhibit 53 withdrawn.)
4  BY MR. KASTER:
5    Q.  Is says "This is to advise you" -- and
6  we've -- so there's a repeat at the beginning of the
7  letter of the restrictions that we just looked at,
8  right?
9    A.  Yes, sir.
10    Q.  And then it says in bold caps, or in bold
11  letters rather, bold typeface, "This Is To Advise
12  You That These Permanent Restrictions Cannot Be
13  Accommodated By Your Supervisor," right?
14    A.  Yes.
15    Q.  A supervisor that you never talked to as a
16  part of this process, right?
17    A.  Well, no.  I mean, being a manager for
18  Union Pacific and having responsibility to look at
19  and review the permanent restrictions, that's me.
20    Q.  Oh, so you're the supervisor?
21    A.  Yeah.  I mean, I'm using that as a general
22  term.  I'm not saying specifically that Roddy in
23  El Paso said that he couldn't accommodate that.  Me
24  being a manager for Union Pacific and having
25  responsibility for reviewing things.

Page 52

1    Q.  Okay.  Because you never talked to Roddy
2  in El Paso about Mr. Carrillo, right?
3    A.  No, not that I recall.
4    Q.  So when you're saying "This is to advise
5  you that these permanent restrictions cannot be
6  accommodated by your supervisor," "your supervisor"
7  is you?
8    A.  Yes.
9    Q.  Do you often refer to yourself in the
10  third person, by the way?
11    A.  No.  I mean, it's a form letter.
12    Q.  So back to my question:  Do you often
13  refer to yourself in the third person?
14    MS. RHOTEN:  I'm going to --
15    THE WITNESS:  No.
16    MS. RHOTEN:  -- object.  You can answer,
17  Andy.
18    THE WITNESS:  No.
19  BY MR. KASTER:
20    Q.  This is Exhibit 34, and what you're
21  saying, what I think I hear you saying, Mr. Mader,
22  is that this is a form letter.
23    A.  Yes.
24    Q.  So you didn't write these words; somebody
25  else wrote the words?

Page 53

1    A.  Well, yes.  I mean, I drafted this based
2  off of the form letter that we had used at the time.
3    Q.  Okay.  But the form letter that you used
4  at the time would probably be all filled out except
5  for possibly these specific restrictions and
6  Mr. Carrillo's name, right?
7    A.  Yes.
8    MR. KASTER:  I think that's all the
9  questions I have for you today, Mr. Mader.  Thank
10  you.
11    THE WITNESS:  Thank you.
12    MS. RHOTEN:  Nothing from us.  Jayne,
13  we're going to read and sign.  And then we'll do PDF
14  condensed and full size of the transcript with
15  exhibits, please.
16    MR. KASTER:  Okay.  Thank very much.
17    THE WITNESS:  Thank you all.  Have a
18  wonderful day.
19    MS. RHOTEN:  Thanks, Andy.  Thanks, Jayne.
20    (WHEREUPON, the deposition of ANDREAS
21  MADER was concluded at 10:12 a.m.)
22    ***
23
24
25

14 (Pages 50 - 53)

Page 54

REPORTER'S CERTIFICATE

STATE OF MINNESOTA   )
                     )SS.
COUNTY OF HENNEPIN   )

I hereby certify that I reported the remote deposition of ANDREAS MADER on November 18, 2021, via Veritext Virtual Videoconference, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was not waived.

WITNESS MY HAND AND SEAL this 24th day of November, 2021.

Jayne M. Seward
Notary Public, Hennepin County, Minnesota
My commission expires January 31, 2025

Page 55

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

November 29, 2021

To: Mr. Ortbals

Case Name: Carrillo, Joseph v. Union Pacific Railroad Company

Veritext Reference Number: 4889286

Witness: Andreas Mader      Deposition Date: 11/18/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 56

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4889286
CASE NAME: Carrillo, Joseph v. Union Pacific Railroad Company
DATE OF DEPOSITION: 11/18/2021
WITNESS' NAME: Andreas Mader

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____
Date          Andreas Mader

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this _____ day of _____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 57

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4889286
CASE NAME: Carrillo, Joseph v. Union Pacific Railroad Company
DATE OF DEPOSITION: 11/18/2021
WITNESS' NAME: Andreas Mader

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____
Date          Andreas Mader

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this _____ day of _____, 20____.

_____
Notary Public

_____
Commission Expiration Date

15 (Pages 54 - 57)

Page 58

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 4889286
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date            Andreas Mader
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
         Notary Public
24
    _____
25       Commission Expiration Date

CONFIDENTIAL

 **BUILDING AMERICA**®

**Exhibit XX**

<u>US CERTIFIED MAIL</u>
<u>RETURN RECEIPT ELECTRONIC</u>

June 20, 2018

Joseph Carrillo
0457172

3013 Zacatecas Ct
Las Cruces, NM 88012

Dear Mr. Carrillo:

Health & Medical Services has advised the Mechanical Department, based on medical documentation available to Union Pacific Railroad, that you have been released to return to work with the following permanent restrictions:

- Operation of Comp. Vehicles/On-Track or Mobile Equip./Forklifts -Prohibited
- Operation of Cranes, Hoists, or Machinery - Prohibited
- Work On or Near Moving Trains, Freight Cars or Locomotives - Prohibited
- Work Requiring Critical Decision Making - Prohibited
- Work at Unprotected Heights Over 4 Feet Above the Work Surface - Prohibited

**This is to advise you that these permanent restrictions cannot be accommodated by your supervisor.**

Depending on the circumstances, the following options are available to you:
- You may exercise your seniority in accordance with your respective agreement;
- Your case can be reviewed by Health & Medical Services, and a referral made to Disability Prevention Management for potential vocational opportunities; or
- You may choose to seek Railroad Retirement benefits.

If updated medical information is received, Heath & Medical Services will be able to review the information and issue another fitness-for-duty decision. Please contact Health & Medical Services at (877) 275-8747 to initiate a Fitness for Duty review. If you will be applying for Railroad Retirement benefits, I suggest you take a copy of this letter with you.

If you have any other questions regarding the medical review process, please contact Health & Medical Services at (877) 275-8747, Option 4.

Andreas Mader

CC:
- Dan Glenn, E-mailed
- Roddy Rodriguez, Emailed
- Bridgette Ziemer, Emailed
- Pauline Weatherford, E-mailed
- EHEALTHSAFE, E-mailed

**UNION PACIFIC RAILROAD**
1400 Douglas Street, STOP 1050
Omaha, Nebraska 68179

RTW_Perm Rest_Cannot Accom

UPCARRILLO000612

CONFIDENTIAL



Exhibit YY



COLLEGE OF MEDICINE
Department of Neurological Sciences

T. Scott Diesing , M.D.
988440 Nebraska Medical Center
Omaha, NE 68198-8440
402-559-9953

12/1/2021

Mr. Robert Ortbals, Jr
Constangy, Brooks, Smith, & Prophete LLP
680 Craig Road
Suite 400
St. Louis, MO 63141

Re: Mr. Joseph Carrillo

Dear Mr. Ortbals,

I have reviewed the provided documents related to Mr. Carrillo and the Union Pacific Railroad Company. The reviewed records include: Plaintiff's Complaint; Protective Order entered by the Court; Electronic Technician Job Description Brief (dated 05/2009) (UPCARRILLO000071-73); Union Pacific Medical Comments History re: Joseph Carrillo (UPCARRILLO000074- 102); Union Pacific Medical File re: Joseph Carrillo (UPCARRILLO000103-647); Carrillo's Medical Records from Mountain View LCPS (UPCARRILLO001373-1385); Carrillo's Medical Records from New Mexico Cardiac Care (UPCARRILLO001386- 1465); Carrillo's Medical Records from Sun View Imaging (UPCARRILLO001466-1471); Carrillo's Medical Records from Valencia Health and Wellness (UPCARRILLO001472- 001526); and Expert report prepared by Dr. Michael Devereaux, M.D., F.A.C.P.

As you are aware, I have no physician-patient, personal, or professional relationship with Mr. Carrillo.  I have not personally examined nor taken a medical history from Mr. Carrillo.



UPCARRILLO002562

CONFIDENTIAL

**Summary of the reviewed records**

Mr. Carrillo suffered a loss of consciousness on or around June 27, 2017. At the time he was a 31-year-old diesel electrician employed by Union Pacific Railroad. He had reportedly been feeling ill with some "flu-like symptoms" for the previous 4 days. He had also stopped taking his medication including gabapentin 800mg BID for the same period. On a particular morning in late June 2017, he awoke for work. Mr. Carrillo reported to multiple providers that he had taken a shower and brushed his teeth. The next thing he recalls is waking on the floor. He was not incontinent of bowel or bladder. He reported that he was "very confused", had a headache and nausea soon after waking. He also reported an injury to his tongue. He has no recollection of the actual event itself.

His wife was not present at the onset of the event per documentation by the primary care provider (PCP) Mia Saenz APRN who was the first provider to speak with him days after the event. Nor was she present at the onset per the documentation of the neurologist, Dr. Aguilar. The history obtained by the treating neurologist Dr. Aguilar and the PCP states that his spouse heard him snoring and went into the room to check on him. She found him lying on the floor. When she found him, he was breathing slowly and snoring. There was shaking of his arms, shoulders and trunk followed by limpness. She as well reported a lateral tongue injury. She reported the loss or consciousness lasting at least 5 minutes. The reports state that she was not present at the onset. Therefore, the total duration of the event is not known, nor what happened prior to her finding Mr. Carrillo. Notably, Mr. Carrillo, Mia Saenz NP, and Dr. Aguilar all note a right lateral predominant tongue bite. At no point is there evidence in any of the examining providers notes of external trauma, closed head injury, or craniofacial injury.

Mr. Carrillo described a number of other symptoms subsequent to the event in question. He complained of a novel headache following the event which persisted for at least several months. To Dr. Aguilar he consistently reported hypersensitive skin on the right side along with numbness of the back of his right thigh. He also reported memory difficulties. He may have also continued to have some nausea and diarrhea.

Mr. Carrillo was evaluated by a neurologist, Dr. Aguilar and cardiologist, Dr. Motta. The evaluation included but was not limited to a negative or normal EEG, MRI brain with and without contrast, electrocardiogram, trans thoracic echocardiogram, carotid artery ultrasound, cardiac stress test, and Holter monitor. The cardiologist Dr. Motta lists "syncope, unspecified syncope type" as a presumptive diagnosis but there is no documented follow up. The treating neurologist, Dr. Aguilar continuously lists the impression as "an episode of unresponsiveness" and a list of possible etiologies beginning with a seizure. Dr. Aguilar lists this as the first possible differential diagnosis in both of the first two notes, and goes on to recommend typical seizure precautions including restrictions from driving, ladders, etc. Drs. Holland and Frankel have reviewed the case and associated documents, and both have found the etiology to be most consistent with a seizure and recommended appropriate precautions. Dr. Devereaux reviewed the records as well but did not examine the patient. He did question Mr. Carrillo 4 years after the event and admits that the diagnosis is that of an episode of transient loss of consciousness of unknown etiology. He goes on to state that even if it were a seizure, 20% of patients would not present with a second seizure in the subsequent 2 years. Thus Dr. Devereaux does not exclude the diagnosis of seizure.

2

UPCARRILLO002563

CONFIDENTIAL

As part of my review, I have been asked to answer the following questions:

1. Explain the nature of Joseph Carrillo's condition and diagnosis. Was it medically reasonable for Union Pacific to conclude that Carrillo most likely lost consciousness due to a single unprovoked seizure?

   Mr. Carrillo's diagnosis is that of a transient loss of consciousness. It is clear and agreed upon by all the evaluating providers that he unpredictably and acutely was suddenly incapacitated, unresponsive, and unconscious. The definitive etiology of his event cannot be conclusively determined at this time. However, two neurologists, both Dr. Frankel and I feel reasonably confident that the event was most likely an unprovoked epileptic seizure. The treating neurologist Dr. Aguilar treated Mr. Carrillo as though he may have had a seizure by recommending standard seizure precautions such as refrain from driving. Dr. Devereaux does not share that confidence, but states that it could have been a seizure. Based on the preponderance of evidence and medical opinions was medically reasonable for Union Pacific to conclude that Mr. Carrillo most likely lost consciousness due to single unprovoked seizure.

2. What neurological complications or issues are associated with Mr. Carrillo's condition? Why?

   The neurological complications or issues associated with both an epileptic seizure or syncope include a sudden incapacitation to the effect of losing responsiveness and control of one's own body. This has implications when the patient is sometimes involved in safety sensitive or vulnerable activities. There is a known risk of recurrent seizures following a single unprovoked seizure. The rate of second seizure after an unprovoked seizure has been shown to be 29% at 3 years (Hauser et al, Neurology, 1990) and 33% at 5 years (Hauser et al, NEJM, 1998). The risk of a second unprovoked seizure following a first seizure and following a negative comprehensive neurologic evaluation cannot be reduced without the passage of time. At the time of initial evaluation, there is little way to predict exactly which patient will go on to have a second seizure.

3. Does the guidance from the FMCSA regarding fitness-for-duty for commercial motor vehicle drivers (including guidance from the FMCSA Medical Expert Panels, Medical Review Board, and Medical Examiner Handbook) provide a reasonable evidence-based assessment of risks for sudden incapacitation relating to specific health conditions such as, for example, seizures?

   Yes, Page 137 of the FMCSA Medical Examiner Handbook in the section titled Risk from Seizures and Epilepsy explains that the safety of the driver and the public are the major reasons for restricting a person from commercial driving. Page 148 of the Handbook under

3

UPCARRILLO002564

CONFIDENTIAL

the section Single Unprovoked Seizure, paragraph 2 states "The overall rate occurrence is estimated to be 36% within the first 5years following the seizure.  After 5 years, the risk for recurrence is down to 2% to 3% per year for the total group."  These assessments are similar to the evidence-based literature cited elsewhere in this report.

4.  Are the conclusions and recommendations of the FMCSA guidance consistent with the best evidence from the scientific literature on these topics?

Yes, (See response #2)

5.  For conditions/diagnoses like Mr. Carrillo suffered, what does the FMCSA guidance provide with regard to restricting such person from operating a motor vehicle?

Yes.  Page 148 of the FMCSA Handbook addresses this specific condition under the section Single Unprovoked Seizure.  Paragraph 3 states "Following an initial unprovoked seizure, the driver should be seizure free and off anticonvulsant medication for at least 5 years to distinguish between a medical history of a single unprovoked seizure and epilepsy."

As previously stated, the definitive etiology is not confirmed.  The other etiology suggested by Dr. Devereaux has been syncope.  Page 103 of the FMCSA Handbook under the section Syncope, states that "Syncope is a symptom, not a medical condition..." The Handbook provides multiple areas of guidance for restrictions based specific causes of syncope. However, none directly apply to Mr. Carrillo's case since syncope due to a specific cause was never diagnosed.  In the absence of more specific recommendations or when multiple conditions may apply, the FMCSA Handbook advises on page 148 "Note: that "If more than one waiting period applies ... examine the driver for certification after the completion of the longest waiting period."

6.  In applying the FMCSA medical guidance, how long would Mr. Carrillo be at risk for sudden incapacitation? What is considered sudden incapacitation and how much greater is Mr. Carrillo's risk for sudden incapacitation than the average population?

The rate of second seizure after an unprovoked seizure has been shown to be 29% at 3 years (Hauser et al, Neurology, 1990) and 33% at 5 years (Hauser et al, NEJM, 1998). Sudden incapacitation is an abrupt loss or impairment of consciousness, control, or performance (Hastings et al, Occupational Medicine, 2002:17(2):197-209).  Sudden incapacitation may be due to loss of motor control, vision, coordination, or consciousness as

4

UPCARRILLO002565

CONFIDENTIAL

a result of a seizure.  The risk of unprovoked epileptic seizures in the general population ranges from 0.04% to 0.06% per year (Hauser et al, Epilepsia, 2008:49(S1):8-12).

7.  Is it reasonable for Union Pacific to apply the FMCSA medical guidance in determining if an individual can safely perform a safety-sensitive position at Union Pacific that involved moving locomotives, such as the position held by Mr. Carrillo even though the position didn't involve operating a commercial motor vehicle?

   Yes, The FMCSA was established in 1999 by the United States government and is part of the U.S. Department of Transportation.  The FMCSA created guidance for determining medical fitness and safety for commercial drivers in the trucking industry.  It is reasonable to apply this guidance to persons working in safety-critical positions in the railroad industry.

8.  Did Union Pacific correctly apply the FMCSA medical guidance for the type of condition/diagnosis from which Mr. Carrillo suffered?

   Yes.  Mr. Carrillo suffered an unpredicted and sudden incapacitation that was more likely than not due to a single unprovoked epileptic seizure. Page 148 of the FMCSA Handbook addresses this specific condition under the section Single Unprovoked Seizure.  Paragraph 3 states "Following an initial unprovoked seizure, the driver should be seizure free and off anticonvulsant medication for at least 5 years to distinguish between a medical history of a single unprovoked seizure and epilepsy."

9.  Was it medically reasonable for Union Pacific to rely on the medical file review conducted by Dr. Harris Frankel?

   Yes. Dr. Frankel is a board-certified neurologist.  I reviewed his report of 5/19/18 and found it to be accurate.

10. Do you have an opinion to a reasonable degree of medical certainty based on your education and experience as to whether Union Pacific was reasonable in placing the restrictions on Mr. Carrillo that it did for a period of 5 years? What is that opinion?

   Yes, I believe it was very reasonable for Union Pacific to place the restrictions on Mr. Carrillo for a period of 5 years.   Mr. Carrillo suffered an unpredicted loss of consciousness one morning in late June 20217. He was found unresponsive with some shaking of the torso and

5

UPCARRILLO002566

CONFIDENTIAL

bilateral upper extremities. He suffered an injury to the right lateral tongue as a result of the event. Mr. Carrillo did not make a full and rapid return to normal after the event. A subsequent comprehensive neurologic and cardiologic evaluation did not result in a certain diagnosis. These salient facts are not in dispute and have been corroborated in combination by all providers that have evaluated Mr. Carrillo or the records, including Dr. Devereaux. The agreed upon uncertainties include the onset and duration of the event, what the shaking was, and most essentially the definitive cause of his loss of consciousness.

Dr. Devereaux's opinions as listed in his report of 10/21/21 are that Mr. Carrillo more likely had a syncopal event rather than a seizure. Three other physicians have reviewed the same records, and all independently concluded that a seizure is the most likely diagnosis. Dr. Devereaux opines that the available evidence "more strongly supports" the possibility of a syncopal event and refers to a telephone interview of the Carrillos 4 years after the event, and long after legal action has been initiated. I agree with Dr. Devereaux's comments on the reduced reliability of obtained history as time passes and would apply Dr. Devereaux's comments accordingly to the 4-year gap between his phone conversation and the event in question. Furthermore, this implies that the more accurate histories were obtained by the PCP Mia Saenz APRN, cardiologist Dr. Motta, and neurologist Dr. Aguilar when compared to his own.

One of the points Dr. Deveraux uses in suggesting that a seizure was not the etiology of the event was that "80% of second seizures occur within two years of the initial unprovoked seizure." No references are cited. However, the documented rate of second seizure after an unprovoked seizure has been shown to be 29% at 3 years (Hauser et al, Neurology, 1990) and 33% at 5 years (Hauser et al, NEJM, 1998). This means that Mr. Carrillo had between a 29-33% chance of having a subsequent seizure during the time he was under restrictions. Even if we use Dr. Devereaux's estimated percentage, Mr. Carrillo would be predicted to have a 20% chance of having a subsequent seizure during the period of restriction. All of these percentages would have placed Mr. Carrillo at an unacceptably high risk of sudden incapacitation.

It is my opinion based on the available evidence that it is more likely than not (and quite probable) that Mr. Carrillo suffered an unprovoked epileptic seizure. This is supported by the lateral tongue injury, prolonged recovery, and concurrent shaking movements. This is also the conclusion of Drs. Frankel and Holland. The treating neurologist Dr. Aguilar also treated Mr. Carrillo as if he had a single unprovoked seizure. While convulsive syncope or syncope with resultant concussion can not be definitively excluded, there is no objective evidence to support those possibilities, and they are much less likely. It is nearly impossible for anyone at this point to determine if Mr. Carrillo's event of late June 2021 was an unprovoked seizure or syncope. Regardless, in clinical medicine and especially neurology we very often face uncertainty about a diagnosis. The standard practice when faced with two possible diagnoses is to err on the side of caution and respect both diagnostic possibilities but apply restrictions or preventative measures based on the diagnosis that is most serious or likely to cause subsequent harm. In Mr. Carrillo's case that diagnosis is

6

UPCARRILLO002567

CONFIDENTIAL

clearly that of an epileptic seizure.  As such, it was very appropriate for Union Pacific
Railroad to apply the 5-year restrictions associated with an epileptic seizure.

T. Scott Diesing, M.D., FHM
Neurohospitalist
Medical Director of Inpatient Neurology Services
Division Chief of General Neurology
Associate Professor
Department of Neurological Sciences
University of Nebraska Medical Center
988440 Nebraska Medical Center
Omaha, NE 68198-8440

7

APP0534                                    UPCARRILLO002568

CONFIDENTIAL

**CURRICULUM VITAE**

**Exhibit ZZ**

**T. Scott Diesing, M.D.**
**Department of Neurological Sciences**
**University of Nebraska Medical Center**
**988440 Nebraska Medical Center**
**Omaha, NE 68198-8440**
**Office (402) 552-6605**
**Cell (402) 541-4585**
**tdiesing@unmc.edu**

**EDUCATION:**

**B.A., Biology**

| | |
|---|---|
| August 1993 – May 1995 | Northwest Missouri State University<br>Maryville, MO |
| August 1995 – May 1998 | University of Nebraska at Omaha<br>Omaha, NE |

**M.D.**

| | |
|---|---|
| August 1998 – May 2002 | University of Nebraska Medical Center<br>Omaha, NE |

**POST-DEGREE TRAINING:**

**Internship**

| | |
|---|---|
| June 2002 – June 2003 | Internal Medicine, Mayo Clinic<br>Rochester, MN |

**Residency**

| | |
|---|---|
| June 2003 – June 2006 | Neurology, Mayo Clinic<br>Rochester, MN |

**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| July 2020 – Present | Academic Associate Professor<br>Department of Neurological Sciences<br>University of Nebraska Medical Center<br>Omaha, NE |
| July 2018 - Present | Division Chief – General Neurology & Neurohospitalist Medicine,<br>Department of Neurological Sciences<br>University of Nebraska Medical Center<br>Omaha, NE |
| October 2018 – Present | Faculty Senate<br>University of Nebraska Medical Center<br>Omaha, NE |
| 2017 – Present | Chair – Quality Safety and Performance<br>Department of Neurological Sciences |

1

UPCARRILLO002569

CONFIDENTIAL

|  | University of Nebraska Medical Center<br>Omaha, NE |
|---|---|
| June 2016 –<br>October 2018 | Faculty Senate Alternate<br>University of Nebraska Medical Center<br>Omaha, NE |
| November 2014 -<br>Present | Academic Assistant Professor,<br>Department of Neurological Sciences<br>University of Nebraska Medical Center<br>Omaha, NE |
| November 2014 –<br>Present | Director of Hospital Neurology<br>Department of Neurological Sciences<br>University of Nebraska Medical Center<br>Omaha, NE |
| July 2006 –<br>November 2014 | Adjunct Clinical Professor/Clinician<br>Department of Neurological Sciences<br>University of Nebraska Medical Center<br>Omaha, NE |

**CERTIFICATIONS AND LICENSES:**

| 2008 – Present | Neurology, American Board of Psychiatry and Neurology |
|---|---|
| 2008 – 2018 | EMG, American Board of Electrodiagnostic Medicine |
| 2006 – 2020 | Physician Nebraska, 23574 (Active, unrestricted) |
| 2016 – 2019 | Physician Iowa, MD-43214 (Active, unrestricted) |

**OTHER APPOINTMENTS:**

| July 2020 –<br>Present | Director & Mentor, Clinical Neurology Rotation<br>Physician Assistant Program<br>College of Saint Mary<br>Omaha, NE |
|---|---|
| March 2020 –<br>Present | Special Appointment, COVID-19 Crisis Czar<br>Department of Neurological Sciences<br>University of Nebraska Medical Center<br>Omaha, NE |
| November 2019 -<br>May 2020 | Chair, Physician Investigations, Medical Staff<br>Nebraska Medicine<br>Omaha, NE |
| October 2018 –<br>Present | Service Line Chief, Neurosciences<br>Medical Executive Committee<br>Nebraska Medicine<br>Omaha, NE |
| October 2017 –<br>Present | Chair – Unit Based Medical Directors<br>Nebraska Medicine |

2

UPCARRILLO002570

CONFIDENTIAL

Omaha, NE

| | |
|---|---|
| July 2015 - Present | Mentor, Quality & Performance Improvement<br>University of Nebraska Medical Center Neurology Residency Program |
| July 2015 - Present | Telestroke Program<br>Department of Neurological Sciences<br>University of Nebraska Medical Center |
| November 2014 – Present | Medical Director – Neuroscience Unit<br>Nebraska Medicine<br>Omaha, NE |
| 2013 – 2014 | PHO Board Member<br>Methodist / Physicians Clinic<br>Omaha, NE |
| 2012 – Present | Advisory Board Member<br>Live On Nebraska (formerly Nebraska Organ Recovery System) |
| April 2012- October 2014 | Managing partner<br>Neurology, LLP<br>Omaha, NE |
| 2010 - 2014 | Medical Director - EMG<br>Clinical Neurophysiology Lab<br>Nebraska Medical Center<br>Omaha, NE |
| March 2010 – October 2014 | Medical Director – Stroke Program<br>Nebraska Methodist Hospital<br>Omaha, NE |
| 2009 - Present | Board member<br>Nebraska Medical Education Foundation |
| 2006 - 2014 | Physician<br>Neurology, LLP<br>Omaha, NE |

**CONSULTING POSITIONS:**

| | |
|---|---|
| December 2017 – Present | Reviewer<br>Journal of Neurological Sciences |

**HONORS AND AWARDS:**

| | |
|---|---|
| 2020 | Resident Advocacy & Mentorship Award - University of Nebraska Medical Center Neurology Residency Program |

APP0537

UPCARRILLO002571

CONFIDENTIAL

| | |
|---|---|
| 2020 | Impact in Education Award, Inspirational Mentor of Educators: Nomination – University of Nebraska Medical Center |
| 2020 | Physician Leadership Program, Health Management Academy Washington, D.C. |
| 2019 | Impact in Education Award, Inspirational Mentor of Educators: Nomination – University of Nebraska Medical Center |
| 2019 | Most Effective Rounding Award - University of Nebraska Medical Center Neurology Residency Program |
| 2018-2019 | Teacher of the Year - University of Nebraska Medical Center Neurology Residency Program |
| 2018 | Impact in Education Award, Inter-professional Education Scholar: Nomination - University of Nebraska Medical Center |
| 2018 | Physician of the Quarter - Q1, Nebraska Medicine Neuroscience Unit Omaha, NE |
| 2017 | Quality & Safety Educators Academy – Society of Hospital Medicine Tempe, AZ |
| 2017 | Physician Leadership Academy Nebraska Medicine |
| 2016 | Most Effective Rounding Award - UNMC and Creighton University Joint Neurology Residency Program Omaha, NE |
| 2015-2016 | Teacher of the Year - UNMC and Creighton University Joint Neurology Residency Program Omaha, NE |
| 2015 | Physician of the Quarter - Q2, Nebraska Medicine Neuroscience Unit Omaha, NE |
| 2014-2015 | Teacher of the Year – UNMC and Creighton University Joint Neurology Residency Program Omaha, |
| 2013 | Meaning of Care Award - Nebraska Methodist Health Omaha, NE |
| 2012 | Emerging Leader Award - Private Practice Associates |
| 2005 | Resident Scholarship - American Academy of Neurology |
| 2001-2002 | Scholarship - Nebraska Medical Foundation |
| 2000-2001 | Full Tuition Scholarship – University of Nebraska Medical Center |
| 1999 | Summer Research Scholarship – University of Nebraska Medical Center |
| 1997-1998 | State Scholarship - University of Nebraska Honor Society - Omicron Delta Kappa Honor Society - Golden Key |

## MEMBERSHIPS AND OFFICES IN PROFESSIONAL SOCIETIES:

| | |
|---|---|
| Present | Member – Nebraska Neurologic Society |
| Present | Member - Omaha Medical Society |
| Present | Member - Neurohospitalist Society |
| Present | Member - American Medical Association |
| Present | Member - Nebraska Medical Association |
| Present | Member - Society of Hospital Medicine |
| Present | Member - American Academy of Neurology |
| Present | Member - Mayo Clinic Alumni Association |
| 2014 - 2018 | Member - Neurocritical Care Society |

UPCARRILLO002572

pardon

CONFIDENTIAL

| 2008 - 2018 | Member - American Association of Neuromuscular & Electrodiagnostic Medicine |
| 1998 - 1999 | Student Elected Representative - Student Ethics Committee, University of Nebraska Medical Center |

**COMMITTEE ASSIGNMENTS:**

| November 2019 - Present | Physician Investigations, Medical Executive Committee<br>Nebraska Medicine |
| July 2019 – Present | Core Event Review Team Committee<br>Nebraska Medicine |
| January 2019 – 2020 | Vizient Hospital Design Committee<br>Nebraska Medicine |
| October 2018 – Present | Chief, Neurosciences Service Line<br>Medical Executive Committee<br>Nebraska Medicine |
| July 2018 – Present | Clinical Operations Committee (formerly Senior Leadership Committee)<br>Department of Neurological Sciences<br>University of Nebraska Medical Center |
| July 2018 - Present | Capacity & Throughput Committee<br>Nebraska Medicine |
| October 2017 – Present | Chair – Unit Based Medical Directors Leadership Committee<br>Nebraska Medicine |
| July 2017 – Present | Chair – Quality Safety and Performance<br>Department of Neurological Sciences<br>University of Nebraska Medical Center |
| July 2016 - Present | Utilization Management Committee<br>Nebraska Medicine |
| July 2016 - Present | Pharmacy & Therapeutics Committee<br>Nebraska Medicine |
| July 2016 - Present | Core Curriculum Committee<br>University of Nebraska Medical Center Neurology Residency Program |
| July 2016 - Present | Mortality Committee<br>Nebraska Medicine |
| July 2016 - Present | Quality & Safety Committee<br>Nebraska Medicine |
| July 2015 - Present | Clinical Learning Environment Review Committee<br>University of Nebraska Medical Center Neurology Residency Program |

UPCARRILLO002573

CONFIDENTIAL

| July 2015 - Present | Comprehensive Stroke Center Steering Committee<br>Nebraska Medicine |
|---|---|
| July 2015 - Present | Patient & Provider Experience Committee<br>Nebraska Medicine |
| July 2015 - 2019 | One Chart Patient Steering Committee<br>Nebraska Medicine |
| July 2015 - Present | EPIC One Chart Physicians Advisory Committee<br>Nebraska Medicine |

**INVITED EXTRAMURAL PRESENTATIONS:**
1. Diesing TS. Neurologic Aspects of COVID-19. 2020 May. Learning As We Go Webinar
2. Diesing TS. COVID-19 Related Changes in Acute Stroke Management. 2020 May. Nebraska Telestroke Network
3. Diesing TS. Delirium. 2020 July. College of St. Mary Physician Assistant Program
4. Diesing TS. Neuroinfectious Diseases. 2020 July. College of St. Mary Physician Assistant Program
5. Diesing TS. Neurology in the Hospital. 2017 Apr. Omaha Public Schools
6. Diesing TS. What is a Neurohospitalist? 2016 Nov. Creighton University Medical School
7. Diesing TS. Practical Stroke and Seizure Update. Department of Nursing; 2014 Sept. Nebraska Methodist Hospital
8. Diesing TS. Progressive Supranuclear Palsy. Hillcrest Annual Rehab Health Services; 2013 Apr
9. Diesing TS. Visual Deficits and Stroke. 10th Annual Nebraska Stroke Symposium; 2011
10. Diesing TS. Neuroanatomy. Annual Rehab Conference; 2010. Nebraska Methodist Hospital, Omaha, NE
11. Diesing TS. Critical Care Nursing. Educational Conference; 2010. Nebraska Methodist Hospital, Omaha, NE
12. Diesing TS. Parkinson's disease. Nebraska Academy of Family Physicians Fall Conference. 2010
13. Diesing TS. Prion Disease. Critical Care Conference; 2008 Nov. Nebraska Methodist Hospital, Omaha, NE
14. Diesing TS. Multiple Sclerosis. Critical Care Conference; 2007 Jun. Nebraska Methodist Hospital, Omaha, NE
15. Diesing TS. Annual Nursing Education Conference. 2007. Alegent Health System, Omaha, NE
16. Diesing TS. Amyotrophic Lateral Sclerosis. Critical Care Conference; 2006 Aug. Nebraska Methodist Hospital, Omaha, NE

**COMMUNITY SERVICE/OUTREACH:**

| 2017 – Present | High School Alliance Project, Mentoring high school students in health careers<br>Omaha Public Schools |
|---|---|
| 2017 | Concussion Awareness & Education<br>Omaha Catholic Schools |
| 1998 - 2000 | Spanish Translator – SHARING Clinic (a student operated health clinic for the medically underserved)<br>Omaha, NE |

**TEACHING ACTIVITIES:**

UPCARRILLO002574

CONFIDENTIAL

| 2020 –<br>Present | Clinical Neurology for Psychiatrists, Board Review<br>Psychiatry Residency Program<br>University of Nebraska Medical Center |
| --- | --- |
| 2018 –<br>Present | Medical Student Neurology Core Lecture Series<br>College of Medicine<br>University of Nebraska Medical Center |
| 2018 –<br>Present | Emergency Medicine Neurology Lecture Series<br>Emergency Medicine Residency<br>University of Nebraska Medical Center |
| April 2018 | Neuroscience Symposium: Stroke Prevention<br>Nebraska Medicine |
| 2017 –<br>Present | Founder, Curriculum Creator, Director, & Lecturer<br>Quality Improvement & Patient Safety Curriculum<br>Neurology Residency<br>University of Nebraska Medical Center |
| 2017 –<br>Present | Continuing Education Lectures<br>Department of Nursing<br>Nebraska Medicine |
| 2015 –<br>Present | Neurology Emergency Lecture Series<br>Neurology Residency<br>University of Nebraska Medical Center |
| 2015 –<br>Present | Annual Neurosciences Grand Rounds<br>Department of Neurological Sciences<br>University of Nebraska Medical Center |
| 2015 –<br>Present | Neurology Core Didactic Lecture Series<br>Neurology Residency<br>University of Nebraska Medical Center |

**PUBLICATIONS:**

**Articles published in scholarly journals**

1. Diesing TS, Swindells S, Gelbard H, Gendelman HE. HIV-1-associated dementia: a basic science and clinical perspective. AIDS Reader. 12: 358-68. 2002
2. Diesing TS, Wijdicks EF. Ping-pong gaze in coma may not indicate persistent hemispheric damage. Neurology. 63: 1537-8. 2004
3. Diesing TS, Wijdicks EF. Arc de cercle and dysautonomia from anoxic injury. Mov. Disord. 21: 868-9. 2006
4. Warchol JM; Cooper JS; Diesing TS. Hyperbaric oxygen-associated seizure leading to stroke. Diving Hyperb Med. 2017 Dec; Vol. 47 (4): p. 260-262
5. Villafuerte Trisolini BJ, Taha M, Yousif Matloub MS, Diesing TS. A case of monocytic pleocytosis in West Nile Virus encephalitis and review of the literature. Ann Indian Acad Neurol. 2020 Sep-

UPCARRILLO002575

CONFIDENTIAL

Oct;23(5): 687-688.

## Chapters in books

1.  Gendelman HE, Diesing S, Gelbard H, Swindels S. The Neuropathogensis of HIV-1 Infections. In: Wormser G, ed.AIDS and Other Manifestations of HIV Infection. 4th ed. Academic Press, 2004.

2.  Diesing TS, Rizzo M. Medical Assessment of the Aging Mind and Brain. In: Rizzo M, ed The Wiley Handbook on the Aging Mind and Brain. 1st ed. John Wiley & Sons Ltd, 2018.

## Abstracts and preliminary communications

1.  Stenzel L, Diesing TS, Kaluza J. Standardization and facilitation of clinical documentation for acute stroke improves adherence to stroke core measures. University of Nebraska Department of Neurological Sciences Research Conference. 5/2016: Omaha, NE.

2.  Galla K, Diesing TS, et al. Factors affecting post-discharge outcomes in hospital patients with non-surgical neurological diseases. Platform poster presentation 69th Annual American Academy of Neurology Conference. 4/2017: Boston, MA.

3.  Balasetti V, Galla K, et al. Post hospitalization follow-up clinic visits in neurologic diseases. Poster presentation 69th Annual American Academy of Neurology Conference. 4/2017: Boston, MA.

4.  Ahmed F, Balasetti v, et al. Factors in Unplanned Readmission or ED visit within 30 days of discharge from an inpatient neurology service. Platform poster presentation 69th Annual American Academy of Neurology Conference. 4/2017: Boston, MA.

5.  Baang H, Sajja K, Arcot L, Diesing TS, Murman D. The influence of delirium on the prognosis of acute stroke. University of Nebraska Department of Neurological Sciences Research Conference. 5,2017: Omaha, NE.

6.  Baang H, Diesing TS, Gonzalez M. Diffuse ischemic brain injury with moderate grade carotid stenosis. University of Nebraska Department of Neurological Sciences Research Conference. 5,2017: Omaha, NE.

7.  Baang H, Diesing TS. Catastrophic reversible cerebral vasoconstriction syndrome with bilateral intraocular hemorrhage. 70th Annual American Academy of Neurology Conference. 4/2018: Los Angeles, CA.

8.  Baang H, Diesing TS, Murman D. Delirium Assessment for acute ischemic stroke patients at UNMC. University of Nebraska Medical Center Graduate Education Research Meeting. 10/2018: Omaha, NE

9.  Baang H, Diesing TS, Murman D. Delirium Assessment for acute ischemic stroke patients at UNMC. 71st Annual American Academy of Neurology Conference. 4/2019: Philadelphia, PA.

10. Smith E, Diesing TS. Strategies to decrease post hospital discharge negative outcomes for patients with neurological diseases. 71st Annual American Academy of Neurology Conference. 4/2019: Philadelphia, PA.

11. Purbaugh M, Diesing TS. Neuroinvasive West Nile virus: A case series in Nebraska. 71st Annual American Academy of Neurology Conference. 4/2019: Philadelphia, PA.

UPCARRILLO002576

1          UNITED STATES DISTRICT COURT          **Exhibit AAA**

2          WESTERN DISTRICT OF TEXAS

3               EL PASO DIVISION

4                    *   *   *

5    JOSEPH CARRILLO,

6          Plaintiff,

7       vs.             CASE NO. 3:21-cv-00026-FM

8    UNION PACIFIC RAILROAD CO.,

9          Defendant.

10                   *   *   *

11        Deposition of MICHAEL DEVEREAUX, M.D.,

12   Witness herein, called by the Defendant for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me, Mindy R. Huffman, a

15   Notary Public in and for the State of Ohio, with

16   the Witness appearing in Cleveland, Ohio, on

17   Tuesday, February 22, 2022, at 1:01 p.m.

18                   *   *   *

19

20

21

22

23

24

25

                                        Page 1

1      EXAMINATION CONDUCTED      PAGE
2  BY MR. ORTBALS:......................    4
3
4      EXHIBITS MARKED AND PRESENTED
5  (Thereupon, Exhibit 72, curriculum
6  vitae, was marked for purposes of
7  identification.)......................    5
8  (Thereupon, Exhibit 73, testimony
9  history, was marked for purposes of
10 identification.)......................    8
11 (Thereupon, Exhibit 74, report, was
12 marked for purposes of
13 identification.)......................   11
14 (Thereupon, Exhibit 8 from a prior
15 deposition, Saenz report, was
16 presented for purposes of
17 identification.)......................   13
18 (Thereupon, Exhibit 13 from a prior
19 deposition, Aguilar record, was
20 presented for purposes of
21 identification.)......................   65
22
23
24
25
         MIKE MOBLEY REPORTING  937-222-2259
                                                        Page 2

1 APPEARANCES:
  On behalf of the Plaintiff:
2
    Nichols Kaster, P.L.L.P.
3
  By: Lucas J. Kaster
4    Attorney at Law
     4700 IDS Center
5    Minneapolis, Minnesota  55402
     612-256-3231
6    lkaster@nka.com
7 On behalf of the Defendant:
8    Constangy, Brooks, Smith & Prophete,
     L.L.P.
9
  By: Robert L. Ortbals, Jr.
10   Attorney at Law
     680 Craig Road, Suite 400
11   St. Louis, Missouri  63141
     314-338-3740
12   rortbals@constangy.com
13 ALSO PRESENT:
14   Joseph VanDetta, videographer
15            * * *
16
17
18
19
20
21
22
23
24
25
                                                        Page 3

1        THE VIDEOGRAPHER:  We are now on the
2  record.  The date is Tuesday, February 22nd, 2022.
3  The time is 1:01 p.m.  The caption of the case is
4  Joseph Carrillo vs. Union Pacific Railroad
5  Company.  The name of the witness is Dr. Michael
6  Devereaux.
7        At this time, the attorneys present
8  will identify themselves for the record.
9        MR. ORTBALS:  Bob Ortbals for
10 Defendant, Union Pacific.
11       MR. KASTER:  Lucas Kaster on behalf
12 of the plaintiff.
13       THE VIDEOGRAPHER:  Thank you.
14       Will the court reporter please swear
15 in the witness?
16       MICHAEL DEVEREAUX, M.D.
17 of lawful age, Witness herein, having been first
18 duly cautioned and sworn, as hereinafter
19 certified, was examined and said as follows:
20           CROSS-EXAMINATION
21 BY MR. ORTBALS:
22     Q.  Can you state your name for the
23 record, please?
24     A.  Michael Devereaux.
25     Q.  And you're a medical doctor; is
                                                        Page 4

1  that correct?
2      A.  Correct.
3      Q.  And, Dr. Devereaux, I deposed you
4  yesterday in another matter, and I know you've
5  been deposed numerous times in the past, so I'm
6  not going to go through all the deposition
7  rules and guidelines here up front.
8          Just as I did yesterday, I'll remind
9  you, if at any point you don't hear a question
10 clearly, since we're doing this remotely, over
11 Zoom, if there's an issue with the video or audio
12 feed or anything like that or you need me to
13 re-ask a question or you don't quite understand a
14 question I'm asking you, just absolutely let me
15 know and I'll rephrase or re-ask the question as
16 needed.
17         I don't think we're going to go as
18 long as we did yesterday, but if at any point in
19 time you need to take a break, just let us know
20 and we'll be happy to take a break.  Okay?
21     A.  Yes, sir.  Thank you.
22     Q.  All right.
23         (Thereupon, Exhibit 72, curriculum
24 vitae, was marked for purposes of
25 identification.)
                                                        Page 5

                                    2 (Pages 2 - 5)

1  BY MR. ORTBALS:
2      Q.   And I've just shared what has been
3  marked as Exhibit 72.  Doctor, this is an
4  updated version of your CV that you sent about
5  a month ago; is that correct?
6      A.   Yes, sir.  Excuse me.  Yes, sir.
7      Q.   And there's nothing that needs to
8  be added to this CV to make it current; is that
9  right?
10     A.   No, sir.
11     Q.   And turning to the second page of
12 Exhibit 72, it looks like you've been board
13 certified since the mid 1970s by the American
14 Board of Psychiatry and Neurology and the
15 American Board of Clinical Neurophysiology; is
16 that right?
17     A.   Yes, sir.
18     Q.   And both of those certifications
19 are still current?
20     A.   Yes, sir.
21     Q.   And then going to page 3 of the
22 exhibit, it looks like you have served as the
23 professor of neurology at Case Western Reserve
24 University since 1996; is that right?
25     A.   Yes, sir.

Page 6

1      Q.   And you're still in that position
2  today?
3      A.   Yes.
4      Q.   And do you maintain a clinical
5  practice outside of your academic role?
6      A.   I'm not sure how to answer that
7  because my clinical work is part of my academic
8  role.  I'm salaried through University Hospital
9  as part of the Case Western Reserve University
10 system, so I'm not in private practice.
11     Q.   Why don't you just briefly
12 describe your responsibilities as professor of
13 neurology.
14     A.   Well, they cover various issues
15 based on my activities.  I teach on the
16 inpatient clinical neurology service.  I run
17 the residents continuity clinic.  I teach and
18 read EEGs with the epilepsy fellows as part of
19 their fellowship training.  I see patients now
20 mostly through the residents clinic and when
21 I'm on the inpatient services.  And, of course,
22 as anybody who is in an academic setting, a
23 large amount of my time is also spent teaching
24 in various venues, including lectures at the
25 medical school, teaching medical students, the

Page 7

1  inpatient and outpatient services, running an
2  EEG epilepsy course.  I teach a course on -- we
3  have an eight-week course we offer here.  Is
4  that good enough?
5      Q.   Absolutely.  Thank you, Doctor.
6  All right.  Doctor, I've just -- I'm going to
7  do it this way.  I'm going to pull this exhibit
8  up separately.
9          (Thereupon, Exhibit 73, testimony
10 history, was marked for purposes of
11 identification.)
12 BY MR. ORTBALS:
13     Q.   All right.  Doctor, I've just
14 shared on the screen what has been marked as
15 Exhibit 73, and this is the testimony history
16 you produced with your expert report; is that
17 correct?
18     A.   Yes, sir.
19     Q.   And it looks like, in April of
20 2018, you gave testimony in a case John Baker,
21 Quinton Harris, Thomas Taylor vs. Union
22 Pacific; is that right?
23     A.   Yes, sir.
24     Q.   And you were retained by Nichols
25 Kaster to participate in that case; is that

Page 8

1  correct?
2      A.   Yes, sir.
3      Q.   And that's the same firm
4  representing Mr. Carrillo in this case; is that
5  right?
6      A.   Yes, sir.
7      Q.   And the opposing party in the
8  Baker case was Union Pacific; is that right?
9      A.   Yes, sir.
10     Q.   And then on March the 2nd, 2020,
11 you gave testimony in a case Mark Hayhurst vs.
12 Union Pacific; is that right?
13     A.   Yes, sir.
14     Q.   And Mr. Hayhurst was represented
15 by Nichols Kaster, who retained you to give an
16 opinion in that case?
17     A.   Correct.
18     Q.   And then yesterday you testified
19 in the case John Ingram vs. Union Pacific; is
20 that right?
21     A.   Correct.
22     Q.   And Nichols Kaster represented
23 Mr. Ingram, right?
24     A.   Correct.
25     Q.   And they are the ones who retained

Page 9

3 (Pages 6 - 9)

1  you to provide an opinion in that case?
2      A.  Correct.
3      Q.  I think yesterday you mentioned
4  there was a case starting with a B against
5  Union Pacific that you thought you might be
6  giving testimony in.  Have you figured out what
7  the name of that case is?
8      A.  Is that listed here under 9/10?  I
9  didn't look it up, but -- it is a case through
10 the same Kaster law firm that involves Union
11 Pacific, but I did not look it up.  As I
12 understand it, we're working towards
13 establishing a deposition time for that case
14 sometime in the next month or two.
15     Q.  Are there any other cases where
16 you've been retained by Nichols Kaster to
17 provide an opinion on behalf of one of its
18 clients?
19     A.  I don't believe so.
20         THE WITNESS:  Mr. Kaster, are you
21 aware of anything else?  I don't believe so.
22 BY MR. ORTBALS:
23     Q.  Are there any other cases in which
24 you've been retained as an expert in which
25 Union Pacific was an opposing party?

1      A.  Are there any other cases, you're
2  saying -- asking other than Union Pacific, as
3  in a person?
4      Q.  No.  I'll ask it -- are there any
5  other cases where you've served as an expert
6  witness involving Union Pacific that we haven't
7  already talked about?
8      A.  I don't believe so.
9         (Thereupon, Exhibit 74, report,
10 was marked for purposes of identification.)
11 BY MR. ORTBALS:
12     Q.  All right.  Doctor, I've just
13 shared on my screen what's been marked as
14 Deposition Exhibit 74.
15         MR. ORTBALS:  And, Lucas, so you
16 know, I'm also simultaneously introducing these
17 through Exhibit Share so -- it's easier for me to
18 share the screen this way than through Exhibit
19 Share, so --
20         MR. KASTER:  Thanks.
21         MR. ORTBALS:  Absolutely.
22 BY MR. ORTBALS:
23     Q.  And this is a copy, Doctor, of
24 your October 21st, 2021, report that you
25 prepared for this case; is that correct?

1      A.  Yes, sir.
2      Q.  And if we look kind of toward the
3  bottom -- well, I guess technically it's the
4  middle, but the bottom of what's on the screen
5  of the first page of the exhibit, you're being
6  paid for your time to provide an opinion in
7  this case; is that right?
8      A.  Yes, sir.  As I've said before, my
9  thanks to you for the residents of University
10 Hospital since all that money is going into an
11 endowment fund for resident education.  So they
12 send their thanks to you, sir.
13     Q.  Our pleasure.
14     A.  Yeah, I'm sure.
15     Q.  In preparing your report, you did
16 not examine Mr. Carrillo; is that correct?
17     A.  That is correct.  I did speak to
18 him, as you know, but I did not examine him.
19     Q.  And then at the top of your
20 report, kind of the first paragraph of your
21 report lays out various documents that you
22 reviewed in preparing your report; is that
23 correct?
24     A.  Yes, sir.
25     Q.  And are there any additional

1  documents that you reviewed in preparing your
2  report that aren't referenced?
3      A.  I don't believe so, no, just, you
4  know, the 647 pages, one aliquot and the
5  29 pages of another are my source outside of my
6  conversations with the patient and his
7  significant other.
8      Q.  And your opinions in Exhibit 74,
9  are any of them based on any information other
10 than the documents listed or other references
11 contained in your report?
12     A.  No, except, as I say, to the --
13 the added conversations with -- with
14 Mr. Carrillo and his significant other, which I
15 consider to be fundamentally important.
16         (Thereupon, Exhibit 8 from a prior
17 deposition, Saenz report, was presented for
18 purposes of identification.)
19 BY MR. ORTBALS:
20     Q.  Okay.  Doctor, I've just shared
21 what's been marked -- previously marked as
22 Exhibit 8.  Are you able to see that on your
23 screen?
24     A.  Yes, I do.
25     Q.  Okay.  And Exhibit 8 is a

1 June 30th, 2017, medical note from provider Mia
2 Saenz; is that correct?
3    A. Yes.
4    Q. And this is one of the medical
5 records you reviewed in preparing your report;
6 is that correct?
7    A. Yes.
8    Q. And this was the medical
9 examination conducted by Mr. Carrillo's primary
10 care provider within days of his loss of
11 consciousness; is that right?
12    A. Yes, a clinical nurse
13 practitioner.
14    Q. And you're aware, Doctor, in some
15 jurisdictions nurse practitioners are able to
16 serve as a patient's primary care?
17    A. Yes. I consider that a mistake,
18 by the way.
19    Q. And toward the mid bottom of the
20 first page of Exhibit 8, Bates numbered 000325,
21 you see there's a history of present illness
22 section?
23    A. Yes, sir.
24    Q. And in that section, Dr. Saenz --
25 I realize is not a medical doctor, but she's

Page 14

1 actually a Ph.D. -- records notes that
2 Mr. Carrillo reported that he was taking a
3 shower, and while getting ready for work,
4 fainted and just remembers waking up on the
5 floor; is that correct?
6    A. Yes.
7    Q. And then she notes --
8    A. That is not correct, but it is
9 correct as far as what is written there.
10    Q. It's what Dr. Saenz reported
11 within days of Mr. Carrillo's loss of
12 consciousness; is that right?
13    A. Well, not Dr. Saenz. Nurse
14 Practitioner Saenz. Yes.
15    Q. Okay. She's a Ph.D., Doctor?
16    A. I don't care. She's listed as a
17 clinical nurse practitioner or advanced nurse
18 practitioner, not a Ph.D. in all the stuff I
19 reviewed.
20    Q. All right. And then Dr. Saenz
21 notes that Mr. Carrillo's wife then came into
22 the room and found him lying on the floor; is
23 that correct?
24    A. That's what she wrote.
25    Q. And she noted that Mr. Carrillo

Page 15

1 denied having any symptoms before fainting; is
2 that right?
3    A. That's what she wrote. And, Ken,
4 it depends on what you mean by symptoms because
5 he had been sick for four days before, as
6 others have noted.
7    Q. Well, this is two days after his
8 loss of consciousness; is that right?
9    A. Yes.
10    Q. Okay. And there's no report of
11 dizziness made; is that right?
12    A. No report of -- say that again.
13    Q. There's no report of dizziness?
14    A. No.
15    Q. There's no report of nausea?
16    A. No.
17    Q. There are no flu-like symptoms
18 reported?
19    A. No. That was all missed.
20    Q. There's no diarrhea reported?
21    A. No. That was also missed.
22    Q. Well, you're assuming that based
23 on what Mr. Carrillo has told you four years
24 later, Doctor?
25       MR. KASTER: I'm objecting to --

Page 16

1       THE WITNESS: No, no, no.
2       MR. KASTER: Hold on. Hold on,
3 Doctor. Hold on, Doctor. I'm objecting to form
4 and foundation. It mischaracterizes the evidence.
5 Go ahead.
6       THE WITNESS: The physicians who --
7 and the railroad people all note that he had been
8 sick for four days before and two days after.
9 That's in reports of the physicians that you
10 consulted for expert advice. Unfortunately that
11 was not listed, but others have noted it as well,
12 not just me. That comes in information in the
13 medical records, not just in the conversation that
14 I had with both Mr. Carrillo and now his wife,
15 Mrs. Carrillo.
16 BY MR. ORTBALS:
17    Q. There's no feelings of dehydration
18 reported; is that correct?
19    A. There's --
20       MR. KASTER: Same -- hold on. Same
21 objections. You can answer, Doctor.
22       THE WITNESS: No, there's -- none of
23 that is listed, which others have listed.
24 BY MR. ORTBALS:
25    Q. Then if we go to the second page

Page 17

5 (Pages 14 - 17)

1  of the document, UPCARRILLO326, there's a
2  review of systems section.  Do you see that,
3  Doctor?
4      A.  Right.
5      Q.  And in the systemic section,
6  Dr. Saenz records that Mr. Carrillo was not
7  feeling poorly, no fever, no chills and no
8  recurrent weight change; is that right?
9      A.  Yes.  It was also missed, as it
10  has not been missed by other physicians
11  involved, including Dr. Aguilar, who saw him as
12  a neurologist.
13      Q.  There's no report of flu-like
14  symptoms there; is that right?
15      A.  Correct.
16      Q.  And then in the gastrointestinal
17  system review, it's noted that Mr. Carrillo had
18  normal appetite, no dysphasia -- which is
19  difficulty swallowing -- no heartburn, no
20  nausea, no vomiting, no abdominal pain and no
21  diarrhea; is that right?
22      A.  This is boilerplate.  She pushed a
23  button, and all this came out.
24      Q.  Have you talked to Dr. Saenz to
25  determine what she did to examine Mr. Carrillo?

Page 18

1      A.  No.
2      Q.  So you don't know what her
3  methodology was at all.
4      A.  Yes, I do.  I've seen it over and
5  over and over and over again.  It's one of the
6  problems with the computerized system.  All
7  this is preprint.  You just push a button.  And
8  you, as lawyers, know that that's how it works.
9  I know how it works as well.  That's what's
10  here.
11      As I've already stated, other
12  physicians involved in this case have noted his
13  symptoms before or after, including Dr. Aguilar,
14  who saw him as a neurologist, who he was referred
15  to by this practitioner.
16      Q.  Doctor, you have no personal
17  knowledge of what Dr. Saenz did in preparing
18  this medical report; is that right?
19      A.  No, of course not.
20      Q.  And Dr. Aguilar's records related
21  to Mr. Carrillo's flu-like symptoms are the
22  first time that any type of flu-like symptoms
23  are mentioned in the medical records; is that
24  right?
25      MR. KASTER:  Objection to form and

Page 19

1  foundation.  You can answer if you can, Doctor.
2      THE WITNESS:  I'm sorry.  My computer
3  just shut down, and I just came back online.
4  Would you just repeat the question for me?
5  BY MR. ORTBALS:
6      Q.  Sure.
7      A.  I heard the objection, but --
8      Q.  Dr. Aguilar's records indicating
9  that Mr. Carrillo was suffering from flu-like
10  symptoms are the first records -- medical
11  records in this case that have such a report in
12  them; is that right?
13      A.  Right.
14      Q.  If we go to page 3, Bates number
15  UPCARRILLO327, on to page 4, 328, there's a
16  physical findings section prepared by
17  Dr. Saenz, and you would agree with me that
18  there's nothing in those physical findings
19  demonstrating Mr. Carrillo was suffering from
20  the flu or flu-like symptoms?
21      A.  Well, there wouldn't be any at
22  this point.
23      Q.  What makes you say that?
24      A.  Well, the vast majority of
25  patients, even in the midst of a flu, if you

Page 20

1  see anything, there will be fever.  And this is
2  two days after his event, as noted, and his
3  symptoms, as he has stated and as others have
4  stated, resolved after two days.
5      Q.  All right.  Doctor, I've brought
6  back up Exhibit 74, your report, and toward the
7  bottom of the first page, you write:  It should
8  be noted that Dr. Aguilar saw Mr. Carrillo five
9  to six weeks after the event.  Do you see that?
10      A.  Yes, I do.
11      Q.  Why did you note that?
12      A.  Because it was in the record, and
13  I noted the date because that was the date he
14  saw the patient.
15      Q.  Right, but you could have just
16  noted the date of the record.  Why did you
17  specifically call out in your report that this
18  date is five to six weeks after Mr. Carrillo's
19  loss of consciousness?
20      A.  There's nothing that I can recall
21  in making the report other than to note that it
22  was five to six weeks removed from the event in
23  question, but there's nothing -- I can't offer
24  you anything more than that response.
25      I mean, you're obviously placing a

Page 21

6 (Pages 18 - 21)

1 lot of importance to the initial evaluation two
2 days later and this evaluation six weeks later.
3     Q.  Well, let me ask you this, Doctor:
4 In your experience as a physician, does the
5 passage of time reduce the reliability of a
6 patient's memory in reporting their symptoms?
7     A.  Well, yes, but then there are
8 other issues here, aren't there?  And that is
9 that Mr. Carrillo, as has been noted by all
10 except the initial evaluation, had some
11 post-event symptoms, including changes in
12 memory.  And how much that played a role, I
13 can't tell you for sure, but it's not at all --
14 it's hard for me to know exactly the tack
15 you're taking.  Are you suggesting that when he
16 got to Dr. Aguilar, he made all this
17 symptomatology up, or is it just that the way
18 neurologists work versus the way primary care
19 physicians work who see 20 to 30 patients a day
20 and take much more scant constant histories.
21 Neurologists spend usually an hour with a
22 patient -- a new patient evaluation.  We
23 obviously pick up more information.
24     Q.  I didn't take any tack.  I just
25 asked if you, as a physician, feel that memory

Page 22

1 is less reliable the longer in time that has
2 passed?
3     A.  Well, he seems to remember more
4 when he got to see Dr. Aguilar than he did when
5 he saw the physician initially -- the nurse
6 practitioner initially.
7     Q.  And then turning to the second
8 page of Exhibit 4, you note that Dr. Aguilar
9 offered a differential diagnosis for the loss
10 of consciousness episode that included a single
11 unprovoked seizure and syncope; is that right?
12     A.  And also a number of other
13 conditions or several other conditions, I
14 should say.
15     Q.  Sure.  And I'll ask you about
16 those in just a minute, but you would agree --
17 you don't disagree that unprovoked seizure and
18 syncope were potential diagnoses for
19 Mr. Carrillo; is that right?
20     A.  Yes, given the mistake that was
21 made, and the mistake that was made which runs
22 through this entire report and this entire
23 issue is they didn't take a history -- they
24 didn't take an adequate history.
25         It's fundamental in neurology that

Page 23

1 when you have an observed spell, you talk to the
2 observer, and no one talked to the observer,
3 because the patient can't fully know what happened
4 to him, in particular if, as I suspect, he had a
5 concussion secondary to the fall, secondary to his
6 sudden loss of consciousness.  That's the
7 situation that we are faced with, and that's why I
8 essentially wrote two reports here, the first that
9 you're reading from, which was prepared on October
10 the 13th, and the second report and one in the
11 form of addendums which was completed after I
12 spoke to Mrs. Carrillo -- now Mrs. Carrillo and
13 the patient, Mr. Carrillo.  No one talked to
14 either one, most important to her, and that's --
15 so we can go on and go and on because we're all
16 churning the same information, and that is based
17 on what the patient could tell, even though he was
18 the one that was unconscious.  That's not fancy
19 professorial neurology.  That's fundamental
20 resident neurology.  You talk to the observer, and
21 no one did that.  And as a result, they didn't get
22 a complete history.
23     Q.  Well, Doctor, first of all, your
24 report is dated October 21st; is that correct?
25     A.  Yes.

Page 24

1     Q.  It's not dated October 13th.
2     A.  I just -- I dictated the first
3 part October 13th.  Then when I talked to
4 Mr. Kaster and asked if I could speak to the
5 patient -- really to the observer, I did that
6 on October 21st.  And so rather than --
7 basically you could look at this as two
8 reports, the information that everybody else
9 had after the primary evaluations and then the
10 information that I added, because I did what a
11 good resident would do, and that is I talked to
12 the observer of the spell and I put it all
13 together in one report.
14     Q.  Well, Doctor, when you speak about
15 the observer of the spell, you're talking about
16 Mrs. Carrillo; is that right?
17     A.  Yes.
18     Q.  You're not talking about the
19 patient, Mr. Carrillo.
20     A.  No.  He doesn't know anything.  He
21 hit the deck.  He just lost consciousness
22 running to the bathroom, and like most
23 individuals who had an unobserved spell, he
24 can't tell you very much.
25     Q.  Four years later, he can't tell

Page 25

7 (Pages 22 - 25)

1  you very much.
2      A.  Say that again.
3      Q.  Four years later, he can't tell
4  you very much.
5      A.  He can tell you more than the
6  observers to that point, the physicians who
7  never talked to him.  I'm sorry that it was a
8  four-year delay.  It's because no one talked to
9  him sooner.
10      Q.  So wait.  It's your position that
11  none of the physicians who treated Mr. Carrillo
12  and created medical records of their
13  examinations of him talked to him during their
14  examination.
15      A.  No.
16      Q.  Is that what your testimony is?
17      A.  Let me rephrase it to make it
18  clear.  The mistake that was made was not
19  talking to now Mrs. Carrillo, who observed the
20  spell as outlined in my addendum based on a
21  conversation I had with her.  That was the
22  error.
23         As I tell you, when you come to a
24  spell like this where there is an observer who
25  doesn't show up, what is the most important

Page 26

1  technology you can apply to the situation?  That's
2  a cell phone because everybody has a phone now.
3  And the thing that you do and the thing I teach my
4  residents to do is if someone comes in having had
5  an episode of altered awareness and there was an
6  observer, you call the observer.  That's resident
7  medicine.  You talk to the observer.  Anything you
8  want to read about episodes and taking a history
9  like this is if there's an observer, you talk to
10  the observer.
11      Q.  Except, Doctor, what Mr. Carrillo
12  reported to Dr. Saenz is that he passed out
13  after taking a shower.
14      A.  He didn't.
15      Q.  But he -- but, Doctor, that's
16  your -- that's your opinion based on --
17      A.  That's not my opinion.  It's not
18  my opinion.  It's the opinion of an observer
19  who watched him go down.  He was confused
20  afterward.  He has a memory impairment.  He
21  probably had a concussion.  Individuals who
22  have an episode like this often have retrograde
23  amnesia for the episode, and the observer
24  becomes fundamental.  That was the mistake that
25  was made.  No one had talked to the observer

Page 27

1  before I did.
2      Q.  So, Doctor, it's your testimony
3  that Mr. Carrillo couldn't have possibly
4  remembered whether he had taken a shower when
5  he reported that --
6      A.  Yes, yes.  There are several
7  observers -- we know that -- that give
8  different stories, one that he was on the way
9  to the bathroom and the other one, that he was
10  in the shower.  The man was confused
11  afterwards.
12      Q.  And so when Dr. Aguilar notes that
13  Mr. Carrillo told him that he recalled brushing
14  his teeth in the bathroom, your position is
15  that Mr. Carrillo could have had no idea what
16  he was talking about?
17      A.  He may have -- he may have
18  actually had not only retrograde amnesia.  He
19  may have been had post-event amnesia,
20  particularly if he had a concussion.
21         The fact of the matter remains.  When
22  you challenge me about that, what you really have
23  to do is challenge the observer.  And the way I
24  took a history is -- I think Mr. Carrillo will
25  support -- I made it very clear I didn't want any

Page 28

1  information other than what the patient could
2  remember, and I didn't ask any leading questions.
3  I just asked her, tell me what you saw, and I
4  recorded what she saw.
5         And I don't think anybody is making
6  that up.  They don't even know to make that up.
7  So there is -- and we can sit here until tomorrow
8  morning talking about this, but the issue is what
9  she saw and no one interviewed her.
10         In fact, the primary care physician
11  or, in this case, nurse practitioner should have
12  done that two days later, and then we wouldn't be
13  having this meeting.
14      Q.  Doctor, you interviewed
15  Mrs. Carrillo on October 21st, 2021; is that
16  right?
17      A.  Yes, sir.
18      Q.  You would agree with me that was
19  over four years after Mr. Carrillo's loss of
20  consciousness?
21      A.  Unfortunately so, because no one
22  else did it.
23      Q.  And you spoke with her over the
24  telephone?
25      A.  That is correct.

Page 29

8 (Pages 26 - 29)

1    Q.   How long of a telephone call was
2 that?
3    A.   I would suspect -- again,
4 Mr. Kaster can correct me if he -- feel free to
5 do so -- but probably about 20 minutes, maybe a
6 bit more because I talked to three people that
7 morning in a row, Mr. Kaster and then now
8 Mrs. Carrillo and then Mr. Carrillo, and I
9 totaled that up as an hour.
10    Q.   Did you talk with each of these
11 three individuals separately or all at the same
12 time?
13    A.   Separately.
14    Q.   So if I understand the sequence,
15 you spoke with Mr. Kaster by phone for --
16    A.   I needed a phone number, and being
17 that this is a legal situation, I thought it
18 appropriate to clear that with Mr. -- his
19 attorney, which I did.  And he gave me the
20 phone number, and I called and spoke --
21    THE WITNESS:  What I can't remember,
22 Mr. Kaster, is if you listened into the
23 conversation.  I can't remember that.
24 BY MR. ORTBALS:
25    Q.   Did you take any notes of the

1    A.   Yeah.  Actually in those -- in
2 this case since, as I remember correctly, the
3 due date for the report was the 21st, I
4 actually typed my own notes, keyboarded my own
5 notes.  I didn't -- I didn't dictate a report
6 and then --
7    Q.   Is what's in the addendum on
8 page 5 onto page 6 then just your typed-up
9 notes?
10    A.   Uh-huh.  And by the way, there is
11 a manifestation of my typing.  There is a typo
12 in the last paragraph where I write this helps
13 me classify the type of movements that -- it's
14 moments, M O M E N T S.  It should read
15 movements.  It's several sentences from the end
16 of the report.
17    Q.   Now, Doctor, in your regular
18 practice as a neurologist, how often do you
19 gather patient histories of a loss of
20 consciousness event four years after the fact?
21    A.   If the case comes to me four years
22 after the fact, then I would call the observer.
23    Q.   How many loss of consciousness
24 cases have you dealt with four years after the
25 fact professionally?

1 conversation?
2    A.   Well, as I discussed with you
3 yesterday in another case, I wrote down notes
4 as I talked and then immediately created the
5 addendum.
6    Q.   And so you spoke with
7 Mrs. Carrillo after her husband had a lawsuit
8 pending against Union Pacific; is that right?
9    A.   Well, that's right, but that's of
10 no -- that's of no importance to me whatsoever.
11 What I'm doing is carrying out what you do in
12 this case as an expert witness, and that is
13 make a history, create any -- what is my
14 opinion and send it to the attorney with really
15 no concern of whether the attorney likes it or
16 not.  But it was just automatic.  Someone had
17 to talk to the observer.
18    Q.   And then after you spoke with
19 Mrs. Carrillo, you separately called
20 Mr. Carrillo; is that correct?
21    A.   That is correct.  They were not
22 together.  He was at work, I suppose, as I
23 think she was.
24    Q.   And did you, similarly, take notes
25 and then transcribe them?

1    A.   You know, I can't answer that in
2 all the years I've practiced.  It certainly
3 comes up.  Most of the time, you're not seeing
4 a patient four years after an event for that
5 event.  You're seeing a patient for other
6 events, and you may end up calling to find out
7 about a prior history of events if any of them
8 have been observed.
9    Q.   All right.  You would agree with
10 me that gathering a patient's prior history is
11 different than the information that you would
12 ask them to determine their current medical
13 condition and history; is that right?
14    A.   I'm not sure I understand that.
15 Say that again.
16    Q.   Well, let me ask it this way:  You
17 mentioned that if somebody does have a past
18 loss of consciousness and they are coming to
19 you years later, it's usually about some type
20 of current medical issue; is that correct?
21    A.   Yes.  I mean, most patients don't
22 come to me for a new patient evaluation for an
23 episode that happened four years before.  I
24 can't say that's never happened, but it's
25 certainly not routine.

1     Q.   And in terms of gathering the
2  information for their current medical
3  condition, their symptoms, their physical exam,
4  whatever neurological exam you might perform,
5  that's different than the information that you
6  obtain for purposes of determining whether they
7  had a past history of loss of consciousness?
8          MR. KASTER:  I'm going to object to
9  form.  You can answer if you can.
10          THE WITNESS:  I'm not sure I can.  If
11  a person comes in to me with a current episode of
12  altered awareness or something of a spell, then I
13  would do the same thing.  I would gather a history
14  about prior spells.  I've certainly seen
15  situations where I've had a person come in with a
16  spell that's been observed where past spells have
17  been observed, and so I will call to find out what
18  the past spells were.  I will call the observer if
19  they don't come with the patient as part of
20  completing the history.  I'm not sure that answers
21  your question, but that's --
22  BY MR. ORTBALS:
23     Q.   Will you gather and review their
24  past medical records related to the issue?
25     A.   Would I gather records?

Page 34

1     Q.   Right.
2     A.   Sure, if they are available.  The
3  thing you have to understand, Mr. Ortbals, as I
4  teach and as is certainly the case,
5  neurologists are trained to do histories and
6  physicals.  That's what we do.  Probably more
7  than any other subspecialty in medicine,
8  history is -- and the literature demonstrates
9  that most diagnoses we make are made by the end
10  of the history.  And therefore, anything you
11  can do to obtain history is critical and
12  important, and that -- it depends on the
13  circumstances, but it may mean exploring
14  records from 20 years ago.  It may mean -- if
15  they are available.  It may mean contacting
16  other institutions for records.  All that
17  becomes critical.
18     Q.   Okay.  So, Doctor, this whole line
19  of questioning started because I asked you
20  about the differential diagnoses, including
21  single unprovoked seizure, and I want to make
22  sure that I understand your now testimony is
23  that, based on your discussion four years later
24  with Mrs. Carrillo as the observer, you're
25  conclusively opining that Mr. Carrillo did not

Page 35

1  suffer from a single unprovoked seizure; is
2  that correct?
3     A.   Correct.
4     Q.   There's no chance he had a
5  seizure?
6     A.   Well, I hate those kinds of
7  statements.  We deal in realities, not in
8  absolutes.  What I'm telling you is based on
9  the information available from the complete
10  history, everything points to -- away from a
11  seizure and towards a syncopal event, and the
12  critical observer history is what is leading me
13  to that.
14          If you read the first part of my
15  report before the addendum, it's not that much
16  different from all the other physicians who saw
17  this patient rechurning the same information.  I
18  was a little more interested in syncope, along
19  with the cardiologist, as a diagnosis than maybe
20  some of the others, but I was dealing with the
21  same information.  What changed my opinion was
22  gathering more history.  That's why there's two
23  parts to my report.
24     Q.   So, Doctor, is it your testimony
25  then that the opinions expressed in your

Page 36

1  report, the report you produced in this case as
2  your expert opinion, are no longer valid based
3  on a 20-minute telephone conversation four
4  years later with the plaintiff's wife?
5          MR. KASTER:  Objection.  Form.
6  Misstates his testimony.  You can answer if you
7  can.
8          THE WITNESS:  Correct, because it's a
9  20-minute conversation no one else had.
10  BY MR. ORTBALS:
11     Q.   Okay.  Doctor, you also mentioned
12  the other -- some of these several other
13  potential differential diagnoses that
14  Dr. Aguilar noted -- TIA, stroke, infection,
15  metabolic encephalopathy -- and you noted that
16  all of which you thought were highly unlikely;
17  is that right?
18     A.   Yes, and I agree with him.
19     Q.   But what was your basis for
20  believing those were highly unlikely diagnoses?
21     A.   Well, there was no evidence to
22  support any of them.  TIAs, by their very
23  definitions, are vascular events that usually
24  last minutes without any persistent
25  symptomatology.  There's no evidence of a

Page 37

10 (Pages 34 - 37)

1 stroke.  He had MRIs that didn't reveal any
2 evidence of a stroke.  There's no evidence that
3 he had an infection.  He was not treated for an
4 infection, meningitis, whatever.  Metabolic
5 encephalopathy, he did have a few laboratory
6 studies that were reported as being mildly
7 abnormal, but nothing that would suggest a
8 metabolic encephalopathy.  For sure it was not
9 diagnosed by anybody else.  I think those are
10 highly unlikely.  Certainly metabolic
11 encephalopathy wouldn't produce the event that
12 he had unless there were other symptoms and
13 other -- i.e., if he had nausea, vomiting, what
14 have you, along with a metabolic
15 encephalopathy, he might have fainted
16 associated with that, but there's really no
17 evidence to any of those conditions.
18        As my colleagues in Texas would say,
19 this old boy upped and had a spell.
20     Q.   And then if we go to page 3 of
21 your report, you note that Mr. Carrillo had
22 blood tests following his loss of
23 consciousness.
24     A.   Uh-huh.
25     Q.   Some of which revealed

Page 38

1 abnormalities, but none of which had any
2 bearing on the loss of consciousness; is that
3 right?
4     A.   Now, that's an interesting
5 question.  The -- you're looking at a slightly
6 elevated liver enzyme.  What the problem is,
7 these were done a long time later.  If he had
8 some significant viral illness, there may have
9 been, you know, other symptoms along with his
10 episode of lost consciousness, but -- how do
11 you answer this -- none of this really pertains
12 to the nature of the spell.  I think the nature
13 of the spell is really outlined by
14 Mrs. Carrillo.  There could be other -- you
15 know, he was sick.
16     Q.   Let me make sure that I understand
17 your opinion on his syncope now.  Are you -- is
18 it your testimony that after speaking with
19 Mrs. Carrillo, you're no longer suggesting that
20 Mr. Carrillo's flu-like symptoms caused his
21 syncope?
22     A.   Oh, I think they probably did.
23     Q.   Okay.
24     A.   I think I made that -- I indicated
25 that -- I beg your pardon.  I think I indicated

Page 39

1 that in my report, that I think this man, he
2 was sick, nausea, diarrhea, probably
3 hypovolemic.  He jumps out of bed suddenly in
4 the morning.  Probably everybody involved in
5 this conversation has had an episode where you
6 jump out of bed early in the morning and you
7 get lightheaded, but usually transiently.  You
8 wait a minute, and you're fine.  Then this man
9 runs to the bathroom and, boom, he goes down.
10 That's a pretty classic story.
11     Q.   Okay.  So then what aspect of his
12 illness contributed to the loss of
13 consciousness?
14     A.   Probably volume depletion.  That's
15 a history for an event that's generated by
16 orthostatic hypotension.
17     Q.   And when you say orthostatic
18 hypotension, that's the rapid drop of blood
19 pressure to the brain?
20     A.   Yes, and reduced nutrient supply
21 to the brain by a drop in blood pressure.  The
22 brain cannot tolerate drops in blood pressure,
23 and that's a -- you're going down very quickly
24 when blood pressure drops.
25     Q.   And so it was -- in your opinion,

Page 40

1 that was the result of him jumping out of bed
2 quickly?
3     A.   That contributed to it, yes.
4     Q.   Okay.  And then I'm still not
5 understanding then, how did his flu-like
6 symptoms also contribute?
7     A.   He gets sick.  He has diarrhea,
8 probably not eating and drinking adequately.
9 He's volume depleted.  He's laying supine for a
10 period of hours -- and that's why this is such
11 a typical spell -- and then he jumps up out
12 of -- bounds out of bed in the morning, and his
13 blood pressure doesn't have a chance to adapt.
14        Had he gotten up more slowly and
15 dangled his legs, he would have probably not
16 blacked out, and we wouldn't be having this
17 conversation.
18     Q.   Okay.  When you say --
19     A.   This is a very common -- this is a
20 very common story about -- I mean, the older we
21 get, the more common it is, and particularly in
22 males, who do make it to the bathroom and then
23 urinate and then develop a syncope, so this is
24 a very common story.
25     Q.   Mr. Carrillo was in his early 30s,

Page 41

11 (Pages 38 - 41)

1 right?
2       A.   Right, but -- syncope and fainting
3 is very common, particularly in slender young
4 women, but it happens in males as well,
5 particularly in a situation like this.  And
6 this was an atypical occurrence because it's
7 unique.  It's the only time it has ever
8 happened to him because he happened to be sick
9 at the time, and that was a generator.  Then
10 the, quote, mistake that he made was jumping
11 out of bed in the morning.  That's not an
12 uncommon story.
13      Q.   Now, Doctor, when you say
14 Mr. Carrillo was volume depleted, what do you
15 mean by that?
16      A.   Well, he hadn't been eating and
17 drinking.  He had low volume.  In a situation
18 like that, if you potentiate orthostatic
19 hypertension by jumping out of bed, you have
20 less volume and you go down.
21      Q.   How can you measure the level of
22 volume?
23      A.   Well, you -- in a situation like
24 this, I mean, you could do urine gravities.
25 You could do other things to look at volume,

1 but that wasn't done.  And probably by two days
2 later, if he started drinking fluids, he would
3 be -- probably have corrected that.  I mean,
4 you, yourself, know, when people come in sick,
5 the first thing you do in a situation like this
6 is put an IV in and give them fluids because
7 they are volume depleted.  That's not uncommon.
8        Fainting from being volume depleted
9 is more uncommon, but at the same time, not
10 infrequent.
11      Q.   What level of volume depletion or
12 dehydration would --
13      A.   You don't measure --
14      Q.   -- need to be at to --
15      A.   You'd have to look at -- it
16 depends on a variety of factors.  What you want
17 to do in him, if he came into the emergency
18 room that morning, would be to do standing --
19 supine and standing blood pressures to see how
20 much his blood pressure dropped because there
21 are criteria for defining what orthostatic
22 hypotension is, usually a drop of
23 20 milliliters of mercury of systolic pressure.
24 Frequently the heart rate doesn't respond by
25 going up, and down you go.

1       Q.   So it sounds like there are
2 objective measurements for determining whether
3 somebody's volume is low; is that correct?
4       A.   Objective measurements.  There
5 would be some, yeah, criteria that you could --
6 the history, again, would be very important.
7 In a situation like this, you probably wouldn't
8 bother with any of that.  In this case, you
9 take a history, if you can get one, in the ED,
10 probably give him some fluids, check him out
11 again, send him home, tell him not to jump up
12 out of bed, and you would be done with it.
13 That's probably -- that's how he would have
14 been worked up in most EDs or Urgent Care
15 centers if he came in that -- that morning.
16      Q.   I appreciate that answer, Doctor,
17 but that wasn't really my question.  My
18 question was, are there objective ways to
19 measure whether somebody is volume depleted; is
20 that right?
21      A.   There would be -- at the time of
22 the event, you would look at different -- urine
23 concentration.  Urine-specific gravity, you
24 could look at.  You could look at the
25 hematocrit level and so forth to see if it was

1 high, that would suggest volume depletion.
2       Q.   Is it similarly true that there
3 are objective measurements to determine whether
4 somebody is dehydrated at a level that might
5 put them at a risk for loss of consciousness?
6       A.   Yeah, there would be some things
7 that you could do that would be done in an ED.
8       Q.   And none of those objective
9 measurements exist in this case?
10      A.   No, exactly, because he didn't go
11 in that morning.
12      Q.   And you would agree, in your
13 report -- your expert report that you wrote,
14 his blood work -- what was shown in his blood
15 work, in your opinion, had no bearing on the
16 episode of altered awareness?
17      A.   Not that I can tell you, no.
18      Q.   And then at the -- just above the
19 comment section on -- still on the third page
20 of your report, you wrote:  Therefore, the
21 current diagnosis remains unchanged from the
22 initial diagnosis of an episode of transient
23 loss of consciousness of unknown etiology; is
24 that right?
25      A.   That is correct.  That's part one

1 of my report.
2     Q.   And you are -- it's your testimony
3 that you have now abandoned that opinion; is
4 that correct?
5     A.   Yes.
6     Q.   You abandoned the opinion that you
7 issued as your expert opinion in this case?
8     A.   That's right, based on the history
9 that everybody else was playing with and came
10 up with the same opinions, picking out seizure
11 more than syncope, except for the cardiologist,
12 because as I said earlier, we were churning the
13 same information.  You can deal with that
14 information -- 100 neurologists could deal with
15 that information, and you couldn't say anything
16 more than this, based on that information.  You
17 had to talk to the observer.
18     Q.   And, Doctor, etiology, that's just
19 a fancy word for cause; is that right?
20     A.   Yes.
21     Q.   And so then your next sentence,
22 the first sentence in the comments section:  To
23 begin with, as stated above, the etiology of
24 Mr. Carrillo's event remains unknown.  That's
25 no longer true, in your opinion; is that

Page 46

1 correct?
2     A.   Yes, and I think I make that
3 pretty clear.
4     Q.   Even though that's what you wrote
5 as your expert opinion in this case?
6     A.   Yes.  And it is correct based on
7 the information prior to that comment, just
8 like most of the others who have evaluated him,
9 whether it was Dr. Holland or Dr. Frankel or
10 Dr. Aguilar, based on the information, they
11 came up with a spell of uncertain etiology, but
12 they leaned more towards epilepsy, but it's the
13 same information that I had.  Again, the other
14 physicians that I've mentioned say roughly the
15 same thing.  You've got to take a history.
16     Q.   So you didn't review the other
17 physician's opinions as medically unreasonable
18 based on the information --
19     A.   Based on the information
20 available.  I don't know -- and you'll have to
21 inform me whether they had a right or were
22 allowed to speak to the observer since they
23 were being called in by you.  Dr. Holland
24 should have, and Dr. Aguilar should have, in
25 particular.

Page 47

1     Q.   Right.  But whether they could
2 have, it sounds like your opinion is based on
3 the medically -- the information contained in
4 the medical records, their opinions were not
5 medically unreasonable?
6         MR. KASTER:  I'm going to object to
7 form and foundation, and it mischaracterizes the
8 answer.  You can answer.
9         THE WITNESS:  It's not unreasonable
10 based on the information available.  Although I
11 think the -- as I made clear, I think the --
12 leaning towards an epileptic seizure is difficult
13 and has -- and is problematic, but not
14 unreasonable.
15 BY MR. ORTBALS:
16     Q.   And then this statement at the
17 very bottom of the third page:  From my
18 perspective, a definitive diagnosis cannot be
19 given based on the records I have reviewed.
20     A.   That is correct and that still is
21 correct, even though it's in the first part,
22 and that's because of what I said at the end,
23 the records I have reviewed.
24     Q.   And based on the records you
25 reviewed -- and I understand this is no longer

Page 48

1 your opinion based on your conversation with
2 Mrs. Carrillo.
3     A.   Right.
4     Q.   But based on the records you
5 reviewed, even you could not rule out
6 unprovoked seizure as a diagnosis; is that
7 right?
8     A.   Yes.  As I made clear in my
9 report, I leaned away from it, but I could not
10 rule it out, correct.
11     Q.   Then at the top of page 4 of your
12 report, you wrote:  If the episode was a
13 seizure, the fact that it has not recurred for
14 over four years following the late June 2017
15 episode does rule against it since
16 approximately 80 percent of second seizures
17 occur within two years of an initial unprovoked
18 seizure; is that right?
19     A.   Yeah, sure.
20     Q.   And you didn't cite any medical
21 literature for this 80 percent number; is that
22 right?
23     A.   No.  It's a -- it's a commonly
24 used statement coming from papers by Alan
25 Hauser and others, Anne Berg, but it is -- it's

Page 49

13 (Pages 46 - 49)

1 a guide post.  It's not an absolute.
2      Q.   Okay.  Now, do 100 percent of
3 patients who suffer an unprovoked seizure go on
4 to suffer a second seizure?
5      A.   Say that again for me, would you
6 please?
7      Q.   Sure.  Do 100 percent of patients
8 who suffer an unprovoked seizure go on to
9 suffer a second seizure?
10      A.   What percent?
11      Q.   100 percent.  Do all patients who
12 suffer a first seizure --
13      A.   No.  Lots of people have a single
14 seizure and do not develop epilepsy.  Another
15 statistic is about 7 percent of Americans,
16 sometime in their life, have a seizure without
17 a diagnosis of epilepsy being established.
18 It's not a rare occurrence.
19      Q.   Okay.  So this 80 percent number
20 is actually a subset of those individuals who
21 do go on to suffer a second seizure; is that
22 right?
23      A.   Yeah.  The rule -- I mean, numbers
24 are thrown around.  It's estimated that -- by
25 people like Hauser and Berg that maybe

Page 50

1 opinion has changed based on a conversation
2 four years later, but I'm still going to ask
3 you questions about the opinion you gave in
4 your expert report.
5      A.   Well, as I say --
6          MR. KASTER:  Hold on.  Hold on,
7 Doctor.  Hold on, Doctor.  I'm going to object.
8 That's not what his expert report says.  If you
9 keep misstating his expert report, I'm going to
10 tell you what it says, Bob.
11          MR. ORTBALS:  I mean, Lucas, you're
12 welcome to read it to me aloud.  I can read as
13 well.  I appreciate it.  I think I'm being
14 perfectly fair with the doctor.
15          THE WITNESS:  Please don't punish me
16 for talking to Mrs. Carrillo four years later.  I
17 didn't have the opportunity to talk to her sooner,
18 but about seven or eight physicians did and didn't
19 talk to her, and that's why we're having -- you
20 know, we're churning this information over and
21 over again.
22          This fellow fainted, and it cost him
23 his job.  He fainted because he was sick, and it
24 cost him his job.
25 BY MR. ORTBALS:

Page 52

1 50 percent of people who have a single seizure
2 go on to have repeat seizures.  These numbers
3 are all soft.  Again, in this case, it becomes
4 an academic discussion because I don't think
5 that's what Mr. Carrillo had.
6      Q.   Well, regardless of whether it's
7 academic or not, I mean, you would agree,
8 ultimately, Doctor, the fact that you haven't
9 had a second seizure does not mean that you
10 didn't have a first seizure?
11      A.   Oh, I see what you're saying.
12 That's an interesting way of placing the
13 statement, but the answer is true, you can have
14 a single seizure and not have repeat seizures.
15          In that case, why was he fired?
16      Q.   Well, Doctor, I'm asking you this
17 way because you seem to be relying on the fact
18 that he didn't have a second seizure as somehow
19 evidence that he didn't have a first.
20      A.   Well, that's, again, in the first
21 part of this report.  And we can sit here and
22 we can churn this information, as I say, until
23 tomorrow morning, but we're talking about, in
24 my opinion, something he did not have
25      Q.   Right.  I understand that your

Page 51

1      Q.   Now, Doctor, based on this
2 80 percent number that you set forth -- and we
3 can agree that the levels of risk for suffering
4 a second seizure are going to be the highest in
5 the first two years following an unprovoked
6 seizure; is that right?
7      A.   Yes.
8      Q.   It's also true, Doctor, that the
9 medical literature shows that there's still
10 elevated risks of a second seizure three to
11 four years after an unprovoked seizure?
12      A.   Correct.
13      Q.   And is it also true, Doctor, that
14 at the time of initial evaluation, there's
15 little way to predict exactly which patient
16 will go on to have a second seizure?
17      A.   Assuming they had a first seizure,
18 yes.  There are other predictors.  Let me take
19 that back.  If an EEG was abnormal and showed
20 epileptogenic activity, focal structural
21 lesions on an MRI, that increases the ante of
22 developing epilepsy after a first or single
23 seizure.
24      Q.   And in that circumstance, I
25 think -- I'm trying to recall from the ILAE

Page 53

14 (Pages 50 - 53)

1 definition of epilepsy we discussed yesterday.
2 That sounds like those could be circumstances
3 where the first unprovoked seizure coupled with
4 the highly elevated risk of a second seizure
5 could lead to an epilepsy diagnosis just based
6 on that information?
7     A.   Well, yeah, particularly the EEG,
8 and we didn't get into that.  We talked about
9 this before, but if you have a single seizure
10 and you have epileptogenic activity on an EEG
11 in a -- that really increases the risk of going
12 on to develop further seizures.  It's not
13 absolute, but it increases the risk
14 significantly, in particular.
15     Q.   But absent some type of
16 measurement like that, it's going to be
17 difficult to predict who might go on to have a
18 second seizure following their first?
19     A.   If you had a seizure, yes.
20     Q.   And it's true, Doctor, that in
21 2017 and 2018, Union Pacific did not have the
22 four-year look-back period that you mention
23 here in the highlighted portion of your report?
24     A.   Correct, for a seizure.
25     Q.   Now, Doctor, you mentioned

1 convulsive syncope in your report.  What is
2 convulsive syncope?
3     A.   It's a very common phenomenon for
4 individuals to have movements in association
5 with a syncopal episode, and these can be very
6 modest and just some myoclonic-like jerks in
7 various extremities, and it can be a little
8 more profound and can actually involve some
9 rigidity and clonic activity in the
10 extremities, but usually it can be separated
11 from epilepsy if observed.
12     Q.   If observed by whom?
13     A.   Well, by the -- certainly by the
14 doctor, but -- most of the time, that doesn't
15 happen -- but by the observer.  As I indicated
16 in my report, you know, lots of words that
17 you hear all the time when asked to have an
18 observer -- shaking.  What is shaking?  Well,
19 what does shaking mean?  Shaking is, by no
20 means, in and of itself a definition of having
21 had an epileptic seizure.  Lots of things shake
22 that aren't a seizure.
23     Q.   And so then, Doctor, is it your --
24 now your opinion that Mr. Carrillo's loss of
25 consciousness was convulsive syncope?

1     A.   Well, I -- it was a syncope.  I
2 don't know -- at least the description of the
3 movements that I could take over the phone from
4 Mrs. Carrillo had -- there was motor activity.
5 Whether it rises to calling it convulsive
6 syncope is uncertain.  If he just had some
7 scattered myoclonic jerks, you might not use
8 that terminology.
9     Q.   And what's --
10     A.   There's no specific defining of
11 convulsive syncope.  If you look it up, they
12 will talk about motor activity associated with
13 a syncopal event.
14     Q.   And so then what -- based on
15 Mrs. Carrillo's description of the -- of
16 Mr. Carrillo's movements or jerking during his
17 loss of consciousness, I mean, how would -- how
18 do you define them then?
19     A.   Well, I think by what she told me
20 and what she subsequently learned, having
21 observed it in other -- in medical settings,
22 what she described to me was myoclonus, just
23 some kind of multifocal myoclonic-type
24 activity.
25     Q.   And so then are those movements

1 anything that you're relying on in determining
2 that Mr. Carrillo had syncope?
3     A.   Mr. Ortbals, could you say that
4 again?
5     Q.   Yeah.  I'm just -- so the
6 movements she described, are you relying on
7 those in making your opinion that Mr. Carrillo
8 suffered from syncope?
9     A.   Yeah.  Not solely on that, as I
10 described, what she could recall.  Certainly
11 what she described was more consistent with --
12 in my estimation, with syncope than seizure and
13 supported the remainder of the observations
14 that she made.
15     Q.   How do you differentiate the
16 diagnosis of convulsive syncope from an
17 unprovoked seizure?
18     A.   Well, as best you -- as sometimes
19 literature or textbooks will tell you, it can
20 be done to a certain degree, with difficulty,
21 but it's, again, taking a history, and over a
22 series of phenomena, as you can see, when I
23 asked her, that she could answer -- some things
24 she couldn't -- it's collecting information of
25 motor activity, skin color, duration of the

1 event, whether eyes were open or closed. All
2 of these can help distinguish, although there's
3 not one specific feature that you can call upon
4 that makes for an absolute.
5          MR. KASTER: Hey, Bob, I'm not sure
6 how much you have left, but could we take a break
7 at some point?
8          MR. ORTBALS: Yeah. Let's go ahead
9 and take that -- take a break. That's fine. Do
10 you want to take ten minutes? Is that fine?
11          MR. KASTER: Sure.
12          MR. ORTBALS: Certainly.
13          THE VIDEOGRAPHER: Off the record at
14 2:20.
15          (Pause in proceedings.)
16          THE VIDEOGRAPHER: On the record,
17 2:30.
18 BY MR. ORTBALS:
19     Q.  All right. Doctor, we're back on
20 the record after a short break. I'll remind
21 you that you are still under oath.
22          The next paragraph of your report, on
23 page 4 of your report, references a diagnosis that
24 had not been entertained that you thought was
25 possible, and that is that Mr. Carrillo suffered

<div align="right">Page 58</div>

1 them up. I doubt there's any reason that he would
2 do that, so they are due to something.
3     Q.  Well, how do you -- how do you go
4 about diagnosing a concussion, Doctor?
5     A.  How do I know about diagnosing --
6     Q.  What do you do to diagnose a
7 concussion?
8     A.  Take a history.
9     Q.  Now, what, in somebody's history,
10 would lead you to diagnose somebody as being
11 concussed?
12     A.  Well, having a head injury is
13 important, and then it can be a variety of
14 situations, which, of course, is all over the
15 news today with -- in recent years with the NFL
16 and the whole role of concussion. So it comes
17 down to a history, was there a loss of
18 consciousness, post-event symptoms which
19 include headache, can include memory
20 disturbances, can include anxiety and other
21 mood changes and the like.
22     Q.  And you agree there was no
23 evidence in Mr. Carrillo's medical records of
24 any external head trauma; is that right?
25     A.  The only trauma that you would

<div align="right">Page 60</div>

1 from a concussion; is that right?
2     A.  That's -- let me make it very
3 clear. That is a speculation based on the
4 information in the medical record. So
5 that's -- just to let -- just to clarify that.
6     Q.  So your opinion that Mr. Carrillo
7 could have had a concussion is based on your
8 own speculation?
9     A.  Yeah, in terms of how to explain
10 the symptoms that followed the event that began
11 with the event. No one has really commented on
12 it, the other physicians going over the record,
13 and it is a curiosity. It doesn't support
14 whether he had a seizure or a syncope in and of
15 itself, so you have to look for another cause.
16     Q.  And it sounds like you don't have
17 enough information to diagnose him as having
18 had a concussion.
19     A.  Well, again, that's -- there is --
20 with concussions, there may be no specific way
21 to determine that an individual had a
22 concussion beyond the history and how to deal
23 with a postconcussion syndrome.
24          So those symptoms, we all know, are
25 due to something. I'm assuming he didn't make

<div align="right">Page 59</div>

1 look to would be (inaudible) --
2     Q.  He didn't have any head
3 contusions?
4     A.  Correct.
5     Q.  No lumps on his head?
6     A.  Correct.
7     Q.  No lacerations to his head?
8     A.  Correct. And with the blunt
9 closed head injury, you don't have to. Again,
10 read the literature out of the NFL on this
11 whole issue of concussion.
12     Q.  Right, but you don't know that he
13 had a blunt closed head injury.
14     A.  No, other than the fact that the
15 situation certainly could support that
16 possibility, number one; and number two, we
17 don't have another explanation for those
18 symptoms. They have just, more or less, been
19 ignored in all of the discussions.
20     Q.  Then you say: Any suggested
21 etiology, be it seizure versus syncope,
22 requires speculation, exclamation point; is
23 that right?
24     A.  Yeah. That's been my contention
25 all along.

<div align="right">Page 61</div>

<div align="right">16 (Pages 58 - 61)</div>

1     Q.   Is that still the case, or is it
2 your position --
3     A.   No, because again, as I said, the
4 first part of this report is based on the
5 information that we have all had available, and
6 certainly I agree that speculation is required
7 because the history was not complete, so
8 that's -- I've been in situations like this
9 before many, many times with unobserved
10 episodes of syncope where somebody just
11 collapses, and you struggle to try to come up
12 with a diagnosis.
13     Q.   And then the last paragraph of the
14 first part of your report for the addendum,
15 still on page 4 of your report, you express
16 your concern about why it is that Mr. Carrillo
17 has not been able to return back to work; is
18 that correct?
19     A.   Yes.
20     Q.   And you state:  It seems
21 reasonable, based upon the job description and
22 a common understanding of an electrician's
23 duties, that Mr. Carrillo could return to work
24 shortly after the event; is that right?
25     A.   Yes.

1     Q.   What's your understanding of
2 Mr. Carrillo's job duties on which you're
3 basing that statement?
4     A.   Just general information that was
5 available in all the reports that we see, I
6 have -- and also from what he told me in my
7 telephone conversation with him.  I have no,
8 you know, precise information beyond that.
9     Q.   What do you recall about what he
10 told you about his job duties?
11     A.   Well, let's see.  I didn't
12 actually -- from the looks of this, I didn't
13 really comment much on that because -- other
14 than to say that I just spent a few moments
15 about, you know, the risks in terms of his work
16 as an electrician, and he didn't see any, but I
17 didn't -- I didn't really comment on that.
18     Q.   And I know I asked you some of
19 these questions yesterday.  I apologize that I
20 need to re-ask them just because we're in a
21 different case.  Have you ever worked in the
22 railroad industry?
23     A.   No.
24     Q.   Have you ever worked in a rail
25 yard or locomotive shop?

1     A.   No.
2     Q.   Have you ever seen Mr. Carrillo's
3 diesel electrician job performed?
4     A.   Have I ever seen his what
5 performed?
6     Q.   Diesel electrician job.
7     A.   Oh, no, no.
8     Q.   Do you know what Union Pacific's
9 job requirements for the position are?
10     A.   No.
11     Q.   Did you have any understanding
12 that Mr. Carrillo moved locomotives within the
13 yard and shop in which he worked?
14     A.   I did see something to that effect
15 in the information -- in the Union Pacific
16 portion of the records that I have, but I don't
17 know the details on that.
18     Q.   Do you hold yourself out as an
19 expert in occupational medicine?
20     A.   No.
21     Q.   Have you authored any articles on
22 occupational medicine?
23     A.   No.
24     Q.   Have you conducted any
25 peer-reviewed studies on occupational medicine?

1     A.   No.
2     Q.   Do you belong to any occupational
3 medicine professional organizations?
4     A.   No.
5     Q.   Do you have any certifications in
6 occupational medicine?
7     A.   No, but I do know one thing.  A
8 fainting spell for being -- when you're sick
9 doesn't rule out his doing any of the jobs that
10 Union Pacific would outline for him, or at
11 least it shouldn't.
12         (Thereupon, Exhibit 13 from a
13 prior deposition, Aguilar record, was presented
14 for purposes of identification.)
15 BY MR. ORTBALS:
16     Q.   Doctor, I've shared what's
17 previously been marked as Exhibit 13.  Are you
18 able to see that on your screen?
19     A.   Yes, sir.
20     Q.   Doctor, are you able to see
21 Exhibit 13 on your screen?
22     A.   I do.
23     Q.   Okay.  And this is an August 7th,
24 2017, medical note from Dr. Aguilar's visit
25 with Mr. Carrillo; is that correct?

1    A.   Yes.
2    Q.   And this is one of the medical
3 records you reviewed in preparing your report?
4    A.   Correct.
5    Q.   If we go to the sixth page of
6 Exhibit 13, Bates numbered UPCARRILLO36 at the
7 bottom, do you agree with me that Dr. Aguilar
8 section, do you agree with me that Dr. Aguilar
9 told Mr. Carrillo not to drive and to avoid any
10 other activities in which Mr. Carrillo could
11 sustain any injuries or cause injuries to
12 others if a seizure were to recur?  Is that
13 right?
14    A.   Given the information he had, that
15 was most appropriate.
16    Q.   And these are pretty typical
17 seizure precautions; is that right?
18    A.   Yeah.  I'm sure he programmed that
19 in and pushed a button, and that came up.  Our
20 residents do the same thing.
21    Q.   You don't know that that's what he
22 did though?
23    A.   No, but I -- I can't prove it, but
24 I know that's what he did.  I mean, that's what
25 we all do.  You don't want to type the same

Page 66

1 MR. ORTBALS:  Electronic for us.
2 THE NOTARY:  Two weeks?
3 MR. ORTBALS:  That's perfect.
4 THE NOTARY:  Copy?
5 MR. KASTER:  Whatever our standard
6 order is through Veritext.
7    (Thereupon, the deposition
8 concluded at 2:45 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

1 thing out each time, so you have statements
2 like that that you just bring up.  And that's
3 fine.  I have no problem with that.
4    Q.   It sounds like you don't believe
5 it was inappropriate to issue seizure
6 precautions based on the information
7 Dr. Aguilar had at the time?
8    A.   That's correct.
9 MR. ORTBALS:  I don't have any
10 further questions.
11 MR. KASTER:  I don't have any
12 questions at this time.
13 THE VIDEOGRAPHER:  Off the record at
14 2:43.
15 MR. KASTER:  Doctor, I'll give you
16 the same notice as yesterday.  You have the right
17 to read it.  Are you waiving that?
18 THE WITNESS:  I am, particularly
19 since it's audiovisual and not some poor court
20 reporter trying to keep up with me, so I
21 completely agree.
22 MR. KASTER:  Okay.
23    (Thereupon, an off-the-record
24 discussion was had.)
25 THE NOTARY:  Transcripts?

Page 67

1 STATE OF OHIO          )
2 COUNTY OF MONTGOMERY ) SS: CERTIFICATE
3    I, Mindy R. Huffman, a Notary
4 Public within and for the State of Ohio, duly
5 commissioned and qualified,
6    DO HEREBY CERTIFY that the
7 above-named MICHAEL DEVEREAUX, M.D., was by me
8 first duly sworn to testify the truth, the whole
9 truth and nothing but the truth.
10    Said testimony was reduced to writing
11 by me stenographically in the presence of the
12 witness and thereafter reduced to typewriting.
13    I FURTHER CERTIFY that I am not a
14 relative or Attorney of either party, in any
15 manner interested in the event of this action, nor
16 am I, or the court reporting firm with which I am
17 affiliated, under a contract as defined in Civil
18 Rule 28(D).
19
20
21
22
23
24
25

Page 69

18 (Pages 66 - 69)

1        IN WITNESS WHEREOF, I have hereunto set

2   my hand and seal of office at Dayton, Ohio, on

3   this 8th day of with March, 2022.

4

5   _____

    MINDY K. HUFFMAN

6   NOTARY PUBLIC, STATE OF OHIO

    My commission expires 3-21-2024

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 70

                                    19 (Page 70)

002892    **CONFIDENTIAL**


BUILDING AMERICA®

**HEALTH & MEDICAL SERVICES**
Laura G. Gillis, MD, MPH, FACOEM
Chief Medical Officer
Phone: (402) 544-4679
Fax:  (402) 233-3456

April 7, 2022

Mr. Joseph Carrillo
DOB:  05/23/1986
Employee ID:  0457172
Position:  Electrician

**Exhibit BBB**

Re:  Return to Work Fitness for Duty Evaluation

Dear Mr. Carrillo,

The Union Pacific Health and Medical Services (HMS) Department has many functions including assessing employee fitness for duty based on medical information.  This information may be obtained from an employee's health care provider, a UP ordered medical examination or other health professional evaluations.  We also take into consideration our knowledge of your work tasks and work environment.  Our mission is to ensure that employees are safe to return to work, especially if they are in safety sensitive positions.

In June 2017, you experienced a loss of consciousness that was most likely a single unprovoked seizure of unknown cause.  For this reason, you were given restrictions for a period of 5 years.  This period will end in June 2022, and we would like to advise you on what information should be submitted for a return-to-work review.  Based upon a review of your file, please submit the following for reconsideration:

1.  Loss of consciousness/seizure history:  Due to your previous history, please submit a full and comprehensive evaluation performed by a neurologist within the last 90 days to include a detailed interval history outlining any and all subsequent events involving seizures or loss of consciousness, current detailed physical examination, any functional restrictions that are recommended, treatment plan including medications, and prognosis.  Please include copies of any clinically pertinent diagnostic studies that were performed.

2.  If any other medical or mental health conditions have developed since 2018 that may potentially impact your ability to perform safety sensitive work, then please submit the last three (3) office visit notes from the treating providers for those conditions along with copies of any clinically pertinent diagnostic testing results.

Please feel free to have your providers contact me at any time with questions pertaining to this matter at (402) 544-4679.

I encourage you to work closely with your providers on this matter.  I look forward to speaking with you in the near future.

Sincerely,

Laura Gillis, MD, MPH, FACOEM
Chief Medical Officer

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services